# No. 25-1113

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

---

**MOHSEN MAHDAWI,**

*Petitioner-Appellee,*

v.

**DONALD J. TRUMP, in his official capacity as President of the United States, PATRICIA HYDE, in her official capacity as Acting Boston Field Office Director, Immigration and Customs Enforcement, Enforcement and Removal Operations, J DOE, in official capacity as Vermont Sub-Office Director of Immigration and Customs Enforcement, Enforcement and Removal Operations, TODD LYONS, in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement, KRISTI NOEM, in her official capacity as Secretary of The United States Department of Homeland Security, MARCO A. RUBIO, in his official capacity as Secretary of State, PAMELA BONDI, in her official capacity as U.S. Attorney General,**

*Respondents-Appellants.*

---

**On Appeal from the United States District Court for the District of Vermont District Court Case No. 2:25-cv-389**

---

JOINT APPENDIX – VOLUME II of IV (254 – 365)

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

MICHAEL P. DRESCHER
Acting United States Attorney
District of Vermont

ALANNA T. DUONG
Senior Litigation Counsel

DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice

*Attorneys for Respondents-Appellants*

# TABLE OF CONTENTS

Declaration of Mohsen Mahdawi……………………………………..254

Declaration of David A. Isaacson……………………………………..268

Record of Deportable/Inadmissible Alien………………………………272

Government's Pre-Hearing Submission……………………………....276

April 23, 2025 Status Conference and Motion for Release Transcript.297

Court Order Extending Temporary Restraining Order……………….325

Opposition to Motion for Release under *Mapp v. Reno*………………329

Secretary of State Marco Rubio Memorandum for the Secretary of Homeland Security…………………………………………………...340

Windsor Police Department Report…………………………………342

U.S. Customs and Border Protection Secondary Inspection Report….348

Reply to Respondents' Opposition to Petitioner's Motion for Release Under *Mapp v. Reno*……………………………………………….353

# DECLARATION OF MOHSEN MAHDAWI

I, Mohsen Mahdawi, declare under penalty of perjury as follows pursuant to 28 U.S.C. § 1746:

1.    I am a Lawful Permanent Resident of the United States, and have been for ten years. My Permanent Resident Card ("green card") confirms that I have been a resident since January of 2015.

2.    My permanent address is in White River Junction, Vermont. I am also currently a student at Columbia University, and in connection with my studies, I also live in New York, New York.

3.    I have reviewed the habeas petition that was filed on my behalf on April 14, 2025. I confirm that it is accurate. I will not restate, in this declaration, all of what was already said in my petition.

4.    I was born and raised in Al-Fara'a refugee camp in the West Bank. There, I witnessed the deaths of friends, relatives, and community members due to Israeli military violence. At age 15, I was shot in my left leg by an Israeli soldier.

5.    I immigrated to the United States to be reunited with my then-partner. In this country, I experienced freedom for the first time–freedom of speech, freedom of movement, and freedom of safety. I hoped to use my time in the United States as an opportunity to learn and grow as a person.

6.    On or about February 15, 2024, I applied for naturalization to become a U.S. Citizen.

7.    I first attended Lehigh University in Pennsylvania beginning in 2018, where I studied computer science. In 2021, I transferred to Columbia University in New York, where I began a bachelor's degree in philosophy. While my program was expected to be completed in May 2024, the onset of the war in Gaza impacted my ability to do this. I expect to graduate now in May 2025, as long as I am able to complete the rest of my classes.

8.    Before I was detained, I expected to graduate officially on May 19, 2025, and then walk in commencement on May 21, 2025.

9.    I have also been admitted to a Master's degree program at Columbia's School of International and Public Affairs ("SIPA"), to begin in the fall of 2025. **Exhibit 1**.

10.    The Master's program will be in International Affairs, with a concentration in International Security & Diplomacy. My focus will be on peacemaking. I also hope to participate in the Kent Global Leadership Program on Conflict Resolution.

11.     Because my upbringing was very traumatic due to the violence and repression that I experienced in the West Bank, shortly after I came to the United States, I found comfort and healing in spiritual communities. I joined the First Universalist Society in Hartland, Vermont, where I learned about inclusion, tolerance, and love as a practice. I also began to study Buddhism. This spiritual practice helped me progress in my journey in finding peace for myself and for others. For two years, I served as the President of the Columbia Buddhist Association.

12.     My spirituality, which is rooted in Buddhism, and my experiences growing up in a refugee camp under occupation have impressed in me many deeply-held beliefs including empathy, compassion, and a commitment to end all suffering. I believe that every person deserves their basic human rights, including Palestinians. I believe that every human being is precious, regardless of their race, religion, ethnicity, or national origin. I believe there is more that unites humans than separates us, and since coming to the United States, I have worked tirelessly to bring people together. As part of these efforts, I have also always felt compelled to advocate for the human rights of Palestinians through nonviolent and peaceful means.

13.     For the past two years, my family in the West Bank has been targeted, detained and harassed as a collective punishment for my advocacy. I thought I was safe in the United States to speak my mind, and I did not believe that the same would happen to me here.

14.     At Columbia, I dedicated myself to understanding how to achieve a lasting peace for Palestinians and Israelis, particularly through the study of conflict resolution. I took courses on negotiation and conflict resolution from professors such as Seth Freeman and Jean Krasno. Following the course on Peace Making and Negotiations with Professor Krasno, Professor Krasno and I and a fellow student, Aharon Dardik, who is Israeli, organized a 4-day seminar retreat to produce a Peace Initiative for Israel-Palestine.

15.     Following Israel's military campaign in Gaza which began in fall of 2023, I was outspoken in opposition to the war—consistent with my belief in non-violence and the value of human life. I spoke at a few protests, where I talked about the importance of respecting international law, human rights, and the need for a permanent ceasefire and a peaceful resolution.

16.     I believe, and I have always stated, that Palestinian safety and Jewish safety are intertwined. To work towards the collective liberation of both people, I worked with a wide range of groups, including Israeli and Jewish groups. I worked with the Columbia chapter of an organization called Jews for Ceasefire. I also worked with other organizations seeking a peaceful resolution to end the violence in Palestine and Israel, such as Combatants for Peace, A Land for All, Standing Together, and the New Israel Fund.

17.     During this time, I fostered friendships with people from all backgrounds, including many Israeli and Jewish students. I believe diplomacy and open-hearted dialogue are the best ways to resolve conflict and disagreement. So I made a point of reaching out to people whose views differed from mine to try and find common ground.

18.     After March of 2024, I stepped away from Columbia University Apartheid Divest, the coalition that I co-founded, to pursue alternative strategies to build peace, which involved building individual relationships with people of all backgrounds.

19.     Despite my work being rooted in empathy and compassion, I faced some online harassment from outside groups who do not see Palestinians as human beings.

20.     Following the election of President Donald J. Trump, these groups launched a deportation campaign against me and declared that they had reported me to the Trump administration so that I may be deported for my speech in support of Palestinian rights.

21.     I saw that Mahmoud Khalil, another Palestinian lawful permanent resident, was also being targeted by these groups for his speech. When he was arrested and detained by the government on the basis of his speech, I felt like I could no longer speak freely on the issues that mattered to me, and I realized that my physical safety was in jeopardy. After Mahmoud's arrest, I didn't go outside much, or say much publicly.

22.     On March 27, 2025, I received a notification from the USCIS portal that my naturalization interview had been scheduled for April 14, 2025, in Colchester, Vermont.

23.     This interview was the last stage of my naturalization process, and having lived and learned in this country for over ten years, I was excited to become a United States citizen.

24.     Although I suspected that the Trump administration would use the interview as an opportunity to target and detain me for my speech, it was never a question of *if* I would attend. I have always complied with the conditions of my status. I immediately made arrangements to attend the interview in person.

25.     At around 10:50AM on April 14, 2025, I arrived in Colchester, Vermont for my naturalization interview. My interview was scheduled for 11AM.

26.     When I entered the interview room, I recognized the official who would be interviewing me as the same official who interviewed me for my green card.

27.     I raised my right hand and pledged to answer all of the questions asked of me truthfully. The entire interview was recorded on video, which had not happened during my other immigration interviews.

28.     Since I was born in a refugee camp in the West Bank, my place of birth was listed on my application as "Palestine." It is also listed on my green card as "Palestine before 1948." But during the interview, the USCIS official insisted that I had been born in Jordan. My place of birth is now incorrectly listed as Jordan within the immigration system, which is neither true nor accurate.

29.     I answered all the questions that were asked of me, and I passed the citizenship test. At the end of the interview, I signed a document affirming that I was willing to take the Oath of Allegiance to the United States.

30.     After signing the document, the USCIS official said that he needed to "check" on some information and would be right back.

31.     Once the USCIS official left the room, three masked agents wearing Homeland Security Investigation ("HSI") jackets and their supervisor entered the room and surrounded me.

32.     They showed me their badges and said I was under arrest. They did not show me a warrant or any documents.

33.     The agents separated me from my attorney and brought me into the hallway, where two more masked agents were waiting for me. They shackled me and escorted me to a black van.

34.     They drove me approximately 10 to 15 minutes away, to another USCIS office in Burlington, Vermont. It was not a detention center, but an office building.

35.     Around 12:30PM, I was processed in this office building, and shortly before 2:00PM the agents transported me to the airport. They never processed me in a detention center in Vermont before they began moving me to the airport.

36.     Shortly before the transportation process, I started having severe stomach pains. I informed the agents that I needed medical attention, but they told me that it could be handled at the airport.

37.     Once I arrived at the airport, I was handed off from the two agents who had been transporting me so far to another pair of agents who were to handle me at the airport. One of these agents had a gun visible in a holster. I felt like cargo.

38.     These agents walked beside me through the airport. After repeatedly asking where I was being taken, the agents finally told me that I was being sent to Louisiana.

39.     Ultimately, the flight left before we were able to board it. All the agents appeared visibly upset that we had missed the flight.

40.     I was then taken to the ICE field office in St. Albans, Vermont, where my attorney was already waiting for me.

41.     After seeing my attorney, I was re-shackled, with my hands chained to each other and chained to my waist, and my feet shackled.

42.     It was in this manner that I was transported to the Northwest State Correctional Facility in Swanton, Vermont, where I am currently being held.

43.     At the first processing office before going to the airport, a Notice to Appear ("NTA") was shoved by agents into my jacket, attached ᵥ�q" ᵥjᵤ" Fᵍeₙᵣctᵥᵥqp" as **Gzjᵢkdᵥ'40** The NTA charges that I am removable under "Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious foreign policy consequences for the United States." **Gzjᵢkdᵥ'4** at 1. The NTA orders me to appear before an immigration judge in the South Louisiana Correctional Center on May 1, 2025 at 8:30 am.

44.     I am fearful of the possibility of being sent back to the West Bank, where I worry that I will be targeted and tortured for my speech in the same way that my family has been.

45.     Vermont is my home. Columbia University is my intellectual home and path to peace. The United States was the first place where I ever felt freedom and safety in my life. This country is the only home I have known for the past ten years. It is where I have found a community, where I have healed from the trauma of my past, where I have fallen in love, where I have discovered Buddhism, and where I hope to continue living, as a citizen. In the past, the United States was a place that I felt safe enough to speak on the issues that mattered to me.

46.     Sitting inside a cell for nothing more than my words for one week has made me realize that free speech comes with a heavy cost and is apparently no longer free.

47.     In order to graduate from Columbia on time in May 2025, and be able to start my Master's program in International Affairs in the fall of 2025 and continue with my studies so that I can learn more about international diplomacy and peacemaking, there is work that I still need to submit.

48.      If I am detained and am not able to finish my work for Columbia, I will not be able to finish my bachelor's degree on time.  If I am not able to finish my bachelor's degree, I will not be able to start my Master's degree in the fall of 2025.

49.     I aspire to be a peacemaker on a larger scale and a continued advocate for the dignity of all people after I graduate with a Master's degree, and my continued detention will not allow me to do that.

50.     I ask that I be released from prison while my case continues. I will attend all hearings and vigorously contest the charge against me. I am not a flight risk or a danger to the community.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 20, 2025.

Mohsen Mahdawi

# EXHIBIT 1



**2:21**    apply.sipa.columbia.edu

Dear Mohsen Mahdawi,

It is with great excitement that I offer you admission to the Master of
International Affairs program at the School of International and Public
Affairs (SIPA) at Columbia University for the Fall 2025 term. Your
admission corresponds to the International Security and Diplomacy
concentration. On behalf of the entire SIPA community, I extend our
congratulations and wish you every success in the pursuit of your graduate
degree here. This year's applicant pool is of extraordinarily high quality
and you can be justifiably proud of your membership in this talented class.
Your offer of admission is for full-time study only.

As a member of the SIPA community, you will join a global network of
extraordinarily diverse and accomplished students committed to making a
difference in the world. Our curriculum is designed to prepare our students
to gain the skills and experiences necessary to achieve their career
aspirations. We are confident that you will contribute to our community and
enrich the educational experience of your fellow classmates.

According to our records you have not yet completed your bachelor's
degree. As soon as you complete your bachelor's degree, you must
provide us with official proof of the degree. *If you do not provide proof of
your completed degree prior to enrollment you will not be eligible to enroll*.

To reserve your seat in the Class of 2027, please respond to this offer of
admission using our Enrollment Response Form and submit the
nonrefundable tuition deposit of $2,000 no later than **May 01, 2025**. Your
deposit will be credited toward your tuition when you enroll.

We encourage you to visit our new student Welcome Portal to help you
prepare for your journey at SIPA. Use your Welcome Portal to keep track
of the following:

- Next steps to becoming a SIPA student
- Requirements you must fulfill, including deadlines
- The timeline between now and the first day of classes
- All the SIPA offices that will support your student experience

**Admitted Student Event**
You are invited to Admitted Students Day on **Tuesday, April 1, 2025** to join
fellow admitted students to learn more about SIPA, network with faculty
and current students, and hear from guest speakers.

**Orientation**
Looking further ahead, SIPA's **mandatory Orientation is scheduled from
August 25 to 29, 2025**. That's when you will meet the remarkable
students and faculty who will become your lifelong network. Please
arrange to attend the orientation as your participation is required. **Classes
begin on September 2, 2025**.

Please note, documents submitted for your application will require
verification. Details can be found on the Welcome Portal.

We look forward to welcoming you as a new student at SIPA. If you decide
to join us in Fall 2025, you will join our community of over 20,000 alumni in
over 150 countries, all of whom are working to make the world a better
place.

Sincerely,

# EXHIBIT 2

DEPARTMENT OF HOMELAND SECURITY
**NOTICE TO APPEAR**

DOB: 09/12/1990

Event No: XBN2504000001

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID: 398423893

File No: 207 408 761

In the Matter of:

Respondent: MOHSEN KHADER MAHDAWI AKA: MEHDAWI, Mohsen                                    currently residing at:

80 AZALEA CIR 17 WHITE RIVER JCT,VERMONT,05001                                    (603) 667-8822

(Number, street, city, state and ZIP code)                                    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of Stateless and a citizen of Stateless;

3. You were admitted to the United States, on or about July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6);

4. Your status was adjusted to that of a lawful permanent resident on October 24, 2014, based on marriage to a U.S. Citizen spouse, under section 245(a) of the INA;

5. The Secretary of State has determined that your presence and activities in the See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:        ☐ 8CFR 208.30        ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

3843 E STAGG AVE BASILE LA 70515. SOUTH LOUISIANA CORR CENTER
(Complete Address of Immigration Court, including Room Number, if any)

on    May 1, 2025    at    8:30 AM    to show why you should not be removed from the United States based on the
(Date)                    (Time)

charge(s) set forth above.                    CHRISTOPHER HERTZOG - Supervisory Special Agent
(Signature and Title of Issuing Officer)

Date:    April 14, 2025                    South Burlington, Vermont
(City and State)

DHS Form I-862 (6/22)                    **JA 263**                    Page 1 of 4

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____     _____
                                                                    *(Signature of Respondent)*

_____                                     Date: _____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on **04|14|2025**, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person   ☐ by certified mail, returned receipt # _____ requested   ☐ by regular mail
☐ Attached is a credible fear worksheet.
☒ Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ___English___ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

*Refused to sign w/out attorney present*                     - E Nellijan, Special Agent
*(Signature of Respondent if Personally Served)*             *(Signature and Title of officer)*

DHS Form I-862 (6/22)                        **JA 264**                        Page 2 of 4

## Privacy Act Statement

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**U.S. Department of Homeland Security**                                    Continuation Page for Form ___I-862___

| Alien's Name | File Number | Date |
|---|---|---|
| **MAHDAWI, MOHSEN KHADER** | 207 408 761 <br> Event No: XBN2504000001 | 04/14/2025 |

```
THE SERVICE ALLEGES THAT YOU:
-----------------------------
United States would have serious adverse foreign policy consequences and would compromise a
compelling U.S. foreign policy interest.
```

| Signature | Title |
|---|---|
| CHRISTOPHER HERTZOG | Supervisory Special Agent |

Form I-831 Continuation Page (Rev. 08/01/07)

**JA 266**

# EXHIBIT 3

## DECLARATION OF DAVID A. ISAACSON

I, David A. Isaacson, declare under penalty of perjury as follows:

1. I am an attorney admitted in the State of New York, among other jurisdictions.

2. I am one of the attorneys of record representing Mohsen Mahdawi in his immigration court proceedings.

3. The immigration court is a component of the Executive Office for Immigration Review ("EOIR"). EOIR maintains an online system, the "EOIR Case Portal", in which attorneys of record can review the status of their clients' cases.

4. Annexed hereto as Exhibit 1 is a true and correct copy of a PDF printout from the EOIR Case Portal as of April 20, 2025, regarding Mohsen Madawi's case.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 20, 2025.

_David Isaacson_

David A. Isaacson

# EXHIBIT 1



**A-Number:** 207-408-761, MAHDAWI, MOHSEN KHADER

Select a case to view details and file documents

Removal | Charging Doc. Date:
04/14/2025 | Case Pending

## Court Information

| Case Type: | Removal |
| Charging Doc. Date: | 04/14/2025 |
| Noncitizen Name: | MAHDAWI, MOHSEN KHADER |
| Hearing Location: | 3843 E. STAGG AVE BASILE, LA 70515 |
| Immigration on Court: | 1900 E. WHATLEY RD. POBOX 750 OAKDALE, LA 71463 |
| Next Case Hearing: | 05/01/2025   08:30 AM - 09:00 AM MASTER HEARING Ashworth, Sherron |
| IJ Decision Date: | -- NA -- |
| | IJ Decision: | This case is pending. |
| Hearing Medium: | Internet-Based |

## Court Actions

## eROP Documents

**Document Filters**

◉ View All    ○ Filter at the Court    ○ Filter at the BIA

| Actions | Document Type | Filed Date ▾ | Filed At | Filed By | Document Status |
|---|---|---|---|---|---|
| | I-862 Notice to Appear | 04/16/2025 | Court | DHS | Accepted |
| | EOIR-28, Notice of Entry of Appearance as an Attorney or Representative before the Immigration Court | 04/16/2025 | Court | Respondent Rep | Accepted |
| | EOIR-28, Notice of Entry of Appearance as an Attorney or Representative before the Immigration Court | 04/16/2025 | Court | Respondent Rep | Accepted |

**Total Count:  3**

## JA 270

1/2

# EXHIBIT 4

U.S. Department of Homeland Security    Subject ID : 398423893    **Record of Deportable/Inadmissible Alien**

| Family Name (CAPS) MAHDAWI, MOHSEN KHADER | First | Middle | Sex M | Hair BRO | Eyes BRO | Cmplxn LGT |
|---|---|---|---|---|---|---|

| Country of Citizenship STATELESS | Passport Number and Country of Issue | File Number XBN2504000001 207 408 761 | Height 74 | Weight 180 | Occupation |

U.S. Address
80 AZALEA CIR 17 WHITE RIVER JCT, VERMONT, 05001    Scars and Marks

| Date, Place, Time, and Manner of Last Entry 07/01/2014, LAX | Passenger Boarded at See Narrative | F.B.I. Number 710359AH3 | ☐ Single ☒ Divorced ☐ Married ☐ Widower ☐ Separated |

| Number, Street, City, Province (State) and Country of Permanent Residence MAYSOUN BLD. MAIN STREET SURDA, ISRAEL | Method of Location/Apprehension L 16C |

| Date of Birth 09/12/1990  Age: 34 | Date of Action 04/14/2025 | Location Code XBN/XBO | At/Near See I-831 | Date/Hour 04/14/2025 12:02 |

| City, Province (State) and Country of Birth Nablus, STATELESS | AR ☒ | Form : (Type and No.) Lifted ☐ Not Lifted ☐ | By ERIN NELLIGAN |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry See Narrative | Status When Found SERVICES |

| Date Visa Issued | Social Security Number 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 | Length of Time Illegally in U.S. Not Applicable |

| Immigration Record POSITIVE - See Narrative | Criminal Record See Narrative |

| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children None |

| Father's Name, Nationality, and Address, if Known KHADER MEHDAWI, KHADER MOHSEN ALHAJ   NATIONALITY: STATELESS | Mother's Present and Maiden Names, Nationality, and Address, if Known ABU NADA, ABEER MAHMOUD AHMAD NATIONALITY: STATELESS |

| Monies Due/Property in U.S. Not in Immediate Possession None Claimed | Fingerprinted? ☐ Yes ☒ No | Systems Checks See Narrative | Charge Code Word(s) See Narrative |

| Name and Address of (Last)(Current) U.S. Employer | Type of Employment | Salary Hr | Employed from/to |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

Left Index fingerprint                    Right Index fingerprint



OTHER ALIASES KNOWN BY:
----------------------------------------
MEHDAWI, Mohsen


Current Administrative Charges
-------------------------------

...(CONTINUED ON I-831)

ERIN NELLIGAN
Special Agent

| Alien has been advised of communication privileges | (Date/Initials) | (Signature and Title of Immigration Officer) |

| Distribution: | Received: (Subject and Documents) (Report of Interview) Officer: ERIN NELLIGAN on: April 14, 2025  (time) Disposition: Warrant of Arrest/Notice to Appear Examining Officer: HERTZOG, CHRISTOPHER |

Form I-213 (Rev. 08/01/07)

U.S. Department of Homeland Security                    Continuation Page for Form __I-213__

| Alien's Name | File Number | Date |
|---|---|---|
| MAHDAWI, MOHSEN KHADER | 207 408 761<br>Event No: XBN2504000001 | 04/14/2025 |

04/13/2025 - 237a4Ci - FOREIGN POLICY


Previous Criminal History
----------------------------------------
On 01/12/2019, the subject was arrested for the crime of "Dangerous Drugs" which resulted in a dropped charge.


BOARDED AT
---------------------
, ISRAEL


Records Checked
----------------
EARM Pos
TECS Pos
IAFIS Pos
NCIC Pos
CIS Pos
ADIS Pos
CCD Pos
CLAIM Pos


At/Near
------------------------------------
Colchester, Vermont


Record of Deportable/Excludable Alien:
ENCOUNTER/ PREDICTION FOR ARREST:
On April 14, 2025, Immigration Customs Enforcement (ICE), Homeland Security Investigations (HSI), Burlington, Vermont, encountered Mohsen Khader MAHDAWI, A207 408 761, a stateless citizen and national, with a date of birth of September 12, 1990, herein after referred as Subject, in Colchester, Vermont.

On March 14, 2025, the Secretary of State determined that MAHDAWI, a U.S. Lawful Permanent Resident (LPR), was a deportable alien under INA section 237(a)(4)(C). The determination was based on an assessment stating that the activities and presence of MAHDAWI in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest. Specifically, the determinations are based on information provided by DHS/ICE/HSI that MAHDAWI, through his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction.

ARREST:
On April 14, 2025, Mohsen Khader MAHDAWI, A207 408 761, date of birth September 12, 1990, was encountered in Colchester, Vermont by Special Agents from HSI Burlington and Deby Line, and Diplomatic Security Service (DSS). HSI witnessed MAHDAWI exit 463 Mountain View Dr Suite 200, Colchester, VT 05446 walk out to his vehicle in the parking lot. Subject was then met by HSI Burlington and Derby Line, and DSS agents

| Signature | Title |
|---|---|
| ERIN NELLIGAN | Special Agent |

2 __ of __ 4 __ Pages

Form I-831 Continuation Page (Rev. 08/01/07)          **JA 273**

U.S. Department of Homeland Security                    Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| MAHDAWI, MOHSEN KHADER | 207 408 761<br>Event No: XBN2504000001 | 04/14/2025 |

Agents identified themselves as police/ICE and notified Subject he was under arrest. Agent Hertzog placed handcuffs on subject. Subject was taken into custody and transported to HSI Burlington for processing.

Subject issued an NTA and detained in ICE custody pending a hearing before an immigration judge under Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (INA), as amended, in that you are an alien who the Secretary of State has reasonable ground to believe your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States, to wit: the Secretary of State personally determined that your presence or activities in the United States compromise a compelling United States foreign policy interest under INA ý 237(a)(4)(C)(ii).

DERIVATION ANALYSIS:
Subject does not have any claim to derivative United States Citizenship.

SOURCE OF INFORMATION:
Subject's mother (Abu Nada, Abeer Mahmoud Ahmad) is a stateless citizen. Subject's father Khader Mehdawi, Khader Mohsen Alhaj is a stateless citizen.
A review of his application for naturalization (N-400) indicates his parents have never visited the United States and have no claims to U.S. Citizenship and are not Lawful Permanent residents of the U.S.

ENTRY DATA:
Subject entered the US on July 1, 2014, at Los Angeles International Airport, Los Angles, California, as a conditional resident (CR6).

IMMIGRATION HISTORY:
On June 19, 2014, Subject petitioned for a nonimmigrant visa with Department of State (DOS), as a visitor for business and pleasure (B1/B2). This visa was granted on June 20, 2014, and expired on June 18, 2017 (Foil No: J5273088). This visa was revoked by DOS on September 16, 2015.

On September 26, 2014, U.S. Citizenship and Immigration Services (USCIS) received a Petition for Alien Relative (I-130) filed on the Subject's behalf by his wife, Meagan Dechen. On the same date, USCIS received the Subject's concurrently filed Application to Register Permanent Residence or Adjust Status (I-485).

On January 7, 2015, USCIS approved the Subject's I-130 petition and I-485 application. The Subject's status was adjusted to conditional permanent resident (CR6).

On June 3, 2016, the Honorable Jack Anderson, of the Vermont Superior Court, Windsor Unit approved the subject's divorce from Dechen (Docket No: 363-11-15).

On September 26, 2016, Subject filed an application to replace permanent resident card (I-90). This was withdrawn by the Subject on May 3, 2017.

On October 24, 2016, Subject filed a Petition to Remove Conditions on Residence. (I-751).

On June 27, 2018, USCIS approved the I-751 petition thus removing the conditions on the Subject's permanent residence and changing his code of admission to an IR6.

On February 16, 2024, Subject applied for naturalization (N-400). This remains pending with USCIS.

| Signature | Title |
|---|---|
| ERIN NELLIGAN | Special Agent |

_____3_____ of _____4_____ Pages

U.S. Department of Homeland Security                    Continuation Page for Form  I-213

| Alien's Name | File Number | Date |
|---|---|---|
| MAHDAWI, MOHSEN KHADER | 207 408 761<br>Event No: XBN2504000001 | 04/14/2025 |

CRIMINAL HISTORY:
Subject was arrested by Vermont State Police on January 12, 2019, for possession of LSD,
mushrooms (opiate), and methamphetamine. Subject completed diversion court and the charge
was thereby dismissed with prejudice, pursuant to V.R.Cr.P 48(a) This charge has been
expunged as of June 1, 2020 in the Orleans, Vermont Superior Court, Criminal Division
(Docket No: 132-3-19).

WANTS / WARRANTS:
Subject has no Wants and no Warrants.

CREDIBLE / REASONABLE FEAR:
Subject has a credible fear of return to his country.

MILITARY SERVICE:
Subject states that he has never served in the military.

CHILD-CARE / CUSTODY ISSUE:
None. Subject states he has no childcare or custody issues.

GANG / TERRORIST AFFILIATION:
Subject claims no membership of an any gangs or criminal organizations.

MEDICAL HISTORY:
Subject claims the following health concerns:
Subject states he has Attention-Deficit/Hyperactivity Disorder (ADHD). Subject takes 5mg of
Adderall on an almost daily basis.
Subject states he has severe acid reflux. Subject takes Penrazol takes it daily

Subject was provided a sandwich, water and seltzer water.

DISPOSITION:
On April 14, 2025, a Notice to Appear was issued and Subject was served with forms I-200
warrant for arrest, I-862 notice to appear, I-286 custody determination, I-826 notice of
rights, EOIR-33 change of address, and a list of free legal services. Subject detained in
ICE custody pending a hearing before an Immigration Judge.

Other Identifying Numbers
-----------------------------------
ALIEN-207408761
Driver's License (State and Country)-92976220 (VERMONT UNITED STATES)
  COMMENT: VT DL
ENTRY STATUS
------------
Conditional Resident

| Signature | Title |
|---|---|
| ERIN NELLIGAN | Special Agent |

_____4___ of ___4___ Pages

Form I-831 Continuation Page (Rev. 08/01/07)              JA 275

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| MOHSEN MAHDAWI, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 25-cv-389 |
| DONALD J. TRUMP; *et al.,* | ) | |
| Respondents. | ) | |

## <u>PRE-HEARING SUBMISSION</u>

On April 16, the Court noticed a status conference in this matter for April 23. ECF No. 15. On April 18, the Court ordered that counsel be prepared to address "preliminary issues of jurisdiction and detention or release" at the April 23 hearing. ECF No. 16. This morning, the Court noticed that tomorrow's hearing would also take up Petitioner's Motion for Release that was filed last night. ECF Nos. 19 & 21. This submission is intended to facilitate the Court's consideration of the jurisdictional and other issues raised by these docket entries. Respondents intend to supplement the arguments and information contained herein at the April 23 hearing and, if permitted, in supplemental filings as contemplated by the April 18 Order.

## FACTUAL AND PROCEDURAL BACKGROUND

Last Monday, April 14, 2025, Petitioner Mohsen Mahdawi was taken into custody by the Department of Homeland Security and served with a Notice to Appear ("NTA") in removal proceedings under the Immigration and Nationality Act ("INA"). The NTA alleges that Petitioner is removable because "[t]he Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would compromise compelling U.S. foreign policy interest." The NTA further alleges that Petitioner is subject to removal pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), "in that the Secretary of State has reasonable

ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

While he was in custody in Vermont, Petitioner filed a Petition for Writ of Habeas Corpus in this Court. ECF No. 1 ("Petition"). At the outset, the Petition explained, among other things, that "[t]his case concern's the government's retaliatory and targeted detention and attempted removal of Mr. Mahdawi for his constitutionally protected speech." *Id.*, ¶ 1. The Petition further alleges that Petitioner is subject to removal and detention in retaliation for his criticism of Israel's military campaign in Gaza, and for his role as an activist and organizer in student protests on Columbia University's campus until March 2024. *Id.*, ¶¶ 2, 21-31. The Petition further alleges that Petitioner's detention and potential removal are in furtherance of a policy "to retaliate and punish noncitizens for their speech and expressive conduct related to Palestine and Israel." *Id.*, ¶¶ 4, 32-57.

The Petition alleges that the government's "targeting and detention of" Petitioner violates the First and Fifth Amendments, the Administrative Procedures Act, and the non-delegation doctrine. *Id.*, ¶¶ 58-85. The Petition also asks the Court to release Petitioner under *Mapp v. Reno,* 241 F.3d 221 (2d Cir. 2001), pending the resolution of this litigation. ECF No. 1, ¶¶ 86-90.

The Petition asks this Court for various forms of relief, including: vacating the administration's "unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights;" and a declaration that Petitioner's arrest and detention violate the First and Fifth Amendments, as well as the Administrative Procedure Act and the non-delegation doctrine. The Petition also seeks Petitioner's "immediate release" "pending these proceedings." ECF No. 1, at 18.

Shortly after the Petition's filing, the Court issued an Order directing that Petitioner be neither removed from the Country, nor the District of Vermont. ECF No. 6.

## THE COURT SHOULD DISMISS THIS ACTION

### A.  This Court Lacks Jurisdiction Under the INA

The Court lacks subject-matter jurisdiction over Petitioner's claims.[1]  The jurisdiction-stripping provisions of 8 U.S.C. § 1252 deprive this Court of jurisdiction over Petitioner's claims, which are all, at bottom, challenges to his removal proceedings. Specifically, Petitioner's claims are barred by 8 U.S.C. § 1252(g), which deprives this Court of jurisdiction to review claims arising from the decision or action to "commence proceedings." Additionally, 8 U.S.C. §§ 1252(a)(5) and (b)(9), deprive this Court of jurisdiction to review actions taken or proceedings brought to remove aliens from the United States, and channel such challenges to the courts of appeals.

### 1.  8 U.S.C. § 1252(g) Bars Judicial Review of ICE's Decision to Commence Removal Proceedings Against Petitioner.

By its plain terms, 8 U.S.C. § 1252(g) eliminates district court jurisdiction over challenges to commencing removal proceedings.  Petitioner seeks to challenge the government's decisions to charge him with removability and detain him, which arise "from the decision [and] action" to "commence proceedings."  8 U.S.C. § 1252(g); *see also* ECF No. 1, at ¶ 1 ("This case concern's the government's retaliatory and targeted detention and attempted removal of Mr. Mahdawi for his constitutionally protected speech."). Petitioner's claims echo the ones raised in *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ("*AADC*"), where the Supreme Court unequivocally held that § 1252(g) barred review. Therefore, *AADC* specifically forecloses

---

[1] The jurisdiction of the federal courts is presumptively limited.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Sheldon v. Sill*, 49 U.S. 441, 448 (1850) ("Congress, having the power to establish the courts, must define their respective jurisdictions."). They "possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree."  *Kokkonen*, 511 U.S. at 377 (internal citations omitted); *see also Sheldon*, 49 U.S. at 449 ("Courts created by statute can have no jurisdiction but such as the statute confers.").  As relevant here, Congress divested district courts of jurisdiction to review challenges relating to removal proceedings and instead vested only the courts of appeals with jurisdiction over such claims.

review of Petitioner's claims here. Moreover, as the Second Circuit observed in *Ragbir v. Homan,* 923 F.3d 53, 64 (2d Cir. 2019), Petitioner cannot circumvent § 1252(g)'s jurisdiction-stripping effect by alleging that the challenged decisions were "made based on unlawful considerations." Thus, regardless of the styling of his claims, this Court does not have jurisdiction over Petitioner's challenges.

Section 1252(g), as amended by the REAL ID Act, specifically deprives courts of jurisdiction, including habeas corpus jurisdiction, to review "any cause or claim by or on behalf of an alien arising from the decision or action by [the Secretary of Homeland Security] to [1] *commence proceedings*, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter."[2] *Id.* (emphasis added). Section 1252(g) eliminates jurisdiction "[e]xcept as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title."[3] Though this section "does not sweep broadly," *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 296 (3d Cir. 2020), its "narrow sweep is firm," *E.F.L. v. Prim*, 986 F.3d 959, 964-65 (7th Cir. 2021). Except as provided in § 1252, courts "cannot entertain challenges to the enumerated executive branch decisions or actions." *Id.*

Section 1252(g) is "directed against a particular evil: attempts to impose judicial constraints upon [certain categories of] prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9.

---

[2] The Attorney General once exercised all of that authority, but much of that authority has been transferred to the Secretary of Homeland Security. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005). Many of the INA's references to the Attorney General are now understood to refer to the Secretary. *Id.*

[3] Congress initially passed § 1252(g) in the IIRIRA, Pub. L. 104-208, 110 Stat. 3009. In 2005, Congress amended § 1252(g) by adding "(statutory or nonstatutory), including section 2241 of title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title" after "notwithstanding any other provision of law." REAL ID Act of 2005, Pub. L. 109-13, § 106(a), 119 Stat. 231, 311.

Indeed, Section 1252(g) was designed to protect the Executive's discretion and avoid the "deconstruction, fragmentation, and hence prolongation of removal proceedings." *Id.* at 487; *see, e.g.*, *Rauda v. Jennings*, 55 F.4th 773, 777-78 (9th Cir. 2022) ("Limiting federal jurisdiction in this way is understandable because Congress wanted to streamline immigration proceedings by limiting judicial review to final orders, litigated in the context of petitions for review."). Indeed, Section 1252(g)'s language protects the government's authority to make "discretionary determinations" over whether and when to commence removal proceedings against an alien, "providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." *AADC*, 525 U.S. at 485.

The Supreme Court has held that a prior version of § 1252(g) barred claims similar to those brought here. *See AADC*, 525 U.S. at 487-92. In *AADC*, noncitizens alleged that the "INS was selectively enforcing the immigration laws against them in violation of their First and Fifth Amendment rights." *Id.* at 473-74. And the government admitted "that the alleged First Amendment activity was the basis for selecting the individuals for adverse action." *Id.* at 488 n.10. The noncitizens argued to the Supreme Court that a lack of immediate review would have a "chilling effect" on their First Amendment rights. *Id.* at 488. Nonetheless, the Supreme Court held that the "challenge to the Attorney General's decision to 'commence proceedings' against them falls squarely within § 1252(g)." *Id.* at 487; *see also Cooper Butt ex rel Q.T.R. v. Barr*, 954 F.3d 901, 908–09 (6th Cir. 2020) (holding that the district court did not have jurisdiction to review a claim that the plaintiffs' father "was removed 'based upon ethnic, religious and racial bias' in violation of the Equal Protection Clause of the Fifth Amendment").

Even under the current version of Section 1252(g), district courts lack subject-matter jurisdiction to statutory and constitutional claims because the provision bars review of "*any* cause

or claim" that arises from the commencement of removal proceedings.  *See, e.g.*, *Tazu*, 975 F.3d at 296-98 (holding that any constitutional claims must be brought in a petition for review, not a separate district court action); *Elgharib v. Napolitano*, 600 F.3d 597, 602–04 (6th Cir. 2010) (noting that "a natural reading of 'any other provision of law (statutory or nonstatutory)' includes the U.S. Constitution" and finding additional support for the court's interpretation from the remainder of the statute).  Indeed, the Second Circuit explained, "[w]hile the statute creates an exception for 'constitutional claim or questions of law,' jurisdiction to review such claims is vested exclusively in the courts of appeals and can be exercised only after the alien has exhausted administrative remedies." *Ajlani v. Chertoff*, 545 F.3d 229, 235 (2d Cir. 2008) (internal citations omitted); *see also id.* ("Accordingly, the district court lacked jurisdiction to review Ajlani's constitutional challenges to his removal proceedings, and it would be premature for this court to do so now."); 8 U.S.C. § 1252(a)(2)(D).

In Friday's ruling in *Ozturk v. Trump,* No. 2:25-cv-374 (ECF No. 104), Judge Sessions distinguished *AADC*, stating that *"AADC* was exclusively about removal, not detention." Slip. Op. at 41 n.5. The Court further reasoned that because Petitioner's "detention did not flow naturally as a consequence of her removal proceedings," the question of detention did not "arise from" the initiation of the removal action. *Id.* at 38. Here, the Petition makes clear at the outset, that "[t]his case concerns the government's retaliatory and targeted detention *and attempted removal* of Mr. Mahdawi for his constitutionally protected speech." (Emphasis added.) The plain language of § 1252(g) bars review of "any cause or claim by or on behalf of any alien arising from the decision *or action* by the Attorney General *to commence proceedings,* adjudicate cases, or execute removal orders against any alien under this chapter." (Emphasis added.) Accordingly, just as *AADC* applied § 1252(g) to bar jurisdiction to review removal orders, the statute similarly strips this court of

jurisdiction in this context. As the Second Circuit explained in *Ragbir,* the jurisdictional bar of §
1525(g) cannot be avoided by the "mere styling of [] claims." 923 F.3d at 64.

Accordingly, Petitioner's allegation that his arrest and the commencement of removal
proceedings against him are in retaliation for his exercise of the First Amendment rights does not
remove his claims from Section 1252(g)'s reach.  *See, e.g.*, *AADC*, 525 U.S. at 487-92 (holding
that Section 1252(g) deprived district court of jurisdiction over claim that certain aliens were
targeted for deportation in violation of the First Amendment.); *Ragbir,* 923 F.3d at 73 (finding
habeas jurisdiction appropriate only because the opportunity to present the constitutional claim in
a petition for review to the appropriate circuit court of appeals was no longer available); *Zundel v.
Gonzales*, 230 F. App'x 468, 475 (6th Cir. 2007) (explaining that First Amendment challenge
related to immigration enforcement action "is properly characterized as a challenge to a
discretionary decision to 'commence proceedings' . . . [and] is insulated from judicial review");
*Humphries v. Various Fed. U.S. INS Emps.*, 164 F.3d 936, 945 (5th Cir. 1999) (ruling that
§ 1252(g) prohibited review of an alien's First Amendment claim based on decision to put him
into exclusion proceedings); *Vargas v. United States Dep't of Homeland Sec.*, 2017 WL 962420,
at *3 (W.D. La. Mar. 10, 2017) (claim that ICE "violated her First Amendment right to free speech
by arresting her and initiating her removal after she made statements to the media . . . is barred by
8 U.S.C. § 1252(g)."); *Kumar v. Holder*, 2013 WL 6092707, at *6 (E.D.N.Y. Nov. 18, 2013)
(claim of initiation of proceedings in retaliatory manner "falls squarely within Section 1252(g) . .
. [and] [t]he pending immigration proceedings are the appropriate forum for addressing petitioner's
retaliation claim in the first instance.").  As such, judicial review of Petitioner's claims that the
commencement of removal proceedings against him is unconstitutional is barred by Section
1252(g).

Petitioner's claims are really a challenge to *whether* and *when* to commence proceedings, which is also barred by section 1252(g).  *See, e.g.*, *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g) . . . to include not only a decision in an individual case *whether* to commence, but also *when* to commence, a proceeding."); *Sissoko v. Rocha*, 509 F.3d 947, 950-51 (9th Cir. 2007) (holding that § 1252(g) barred review of a Fourth Amendment false arrest claim that "directly challenge[d] [the] decision to commence expedited removal proceedings."); *Obado v. Superior Ct. of New Jersey Middlesex Cnty.*, 2022 WL 283133, at *3 (D.N.J. Jan. 31, 2022) ("Because [p]etitioner challenges the decision to commence and adjudicate removal proceedings against him, the [c]ourt lacks jurisdiction to direct [respondents] to terminate [p]etitioner's NTA and/or halt his removal proceedings.").

The scope of § 1252(g) also bars district courts from hearing challenges to the *method* by which the Secretary of Homeland Security chooses to commence removal proceedings.  *See, e.g.*, *Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal" and also to review "ICE's decision to take him into custody and to detain him during removal proceedings"); *Saadulloev v. Garland*, 2024 WL 1076106, at *3 (W.D. Pa. Mar. 12, 2024) ("The Government's decision to arrest [petitioner], clearly is a decision to 'commence proceedings' that squarely falls within the jurisdictional bar of § 1252(g).").  The act of arresting an alien to serve a charging document and initiate removal proceedings is an "action . . . to commence proceedings" that this Court lacks jurisdiction to review.  *See, e.g.*, *id.*; *Tazu*, 975 F.3d at 298-99 ("Tazu also challenges the Government's re-detaining him for prompt removal. . . .  While this claim does not challenge the Attorney General's *decision* to execute his removal order, it does attack the *action* taken to execute that order.  So under § 1252(g) and (b)(9), the District Court lacked jurisdiction to review it.").

### 2. 8 U.S.C. §§ 1252(a)(5) and (b)(9) Channel All of Petitioner's Challenges to the Courts of Appeals

Under the INA, removal proceedings generally provide the exclusive means for determining whether an alien is both removable from the United States and eligible for any relief or protection from removal. *See* 8 U.S.C. § 1229a. In 8 U.S.C. § 1252, Congress channeled into the statutorily prescribed removal process all legal and factual questions—including constitutional issues—that may arise from the removal of an alien, with judicial review of those decisions vested exclusively in the courts of appeals. *See AADC*, 525 at 483. District courts play no role in that process. Consequently, this Court lacks jurisdiction over Petitioner's claims, which are all, at bottom, challenges to removal proceedings. Petitioner must first raise all his challenges through the administrative removal proceedings, and then, if necessary, in the appropriate court of appeals.

To start, 8 U.S.C. § 1252(b)(9) eliminates this Court's jurisdiction over Petitioner's claims by channeling all challenges to immigration proceedings (and removal orders) to the courts of appeals:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from any action taken or proceeding brought to remove an alien* from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction . . . by any . . . provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9) (emphasis added). Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of *all* [claims arising from deportation proceedings]" to a court of appeals in the first instance. *AADC*, 525 U.S. at 483. As the Second Circuit explained, § 1252(b)(9) requires claims like Petitioner's to be consolidated in one proceeding before the Court of Appeals:

> Congress enacted [8 U.S.C. § 1252(b)(9)] for the important purpose of consolidating all claims that may be brought in removal proceedings into one final

> petition for review of a final order in the court of appeals. . . . Before [8 U.S.C. § 1252(b)(9)], only actions attacking the deportation order itself were brought in a petition for review while other challenges could be brought pursuant to a federal court's federal question subject matter jurisdiction under 28 U.S.C. § 1331. Now, by establishing "exclusive appellate court" jurisdiction over claims "arising from any action taken or proceeding brought to remove an alien," all challenges are channeled into one petition.

*Calcano-Martinez v. INS*, 232 F.3d 328, 340 (2d Cir. 2000). By law, "the sole and exclusive means for judicial review of an order of removal" is a "petition for review filed with an appropriate court of appeals," that is, "the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. §§ 1252(a)(5), (b)(2).

Moreover, Section 1252(a)(5) reiterates that a petition for review is the exclusive means for judicial review of immigration proceedings:

> Notwithstanding any other provision of law (statutory or nonstatutory), . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e) [concerning aliens not admitted to the United States].

8 U.S.C. § 1252(a)(5). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the [petition-for-review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016); *see id.* at 1035 ("§§ 1252(a)(5) and [(b)(9)] channel review of all claims, including policies-and-practices challenges . . . whenever they 'arise from' removal proceedings"); *accord Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009) (only when the action is "unrelated to any removal action or proceeding" is it within the district court's jurisdiction); *cf. Xiao Ji Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 151 n.3 (2d Cir. 2006) (a "primary effect" of the REAL ID Act is to "limit all aliens to one bite of the apple" (internal quotation marks omitted)).

Critically, "[§] 1252(b)(9) is a judicial channeling provision, not a claim-barring one." *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007). Indeed, 8 U.S.C. § 1252(a)(2)(D) provides that

"[n]othing . . . in any other provision of this chapter . . . shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." *See also Ajlani*, 545 F.3d at 235 ("jurisdiction to review such claims is vested exclusively in the courts of appeals"). The petition-for-review process before the court of appeals thus ensures that aliens have a proper forum for claims arising from their immigration proceedings and "receive their 'day in court.'" *J.E.F.M.*, 837 F.3d at 1031-32; *see also Rosario v. Holder*, 627 F.3d 58, 61 (2d Cir. 2010) ("The REAL ID Act of 2005 amended the [INA] to obviate . . . Suspension Clause concerns" by permitting judicial review of "nondiscretionary" BIA determinations and "all constitutional claims or questions of law.").

In evaluating the reach of subsections (a)(5) and (b)(9), the Second Circuit has explained that "whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking." *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011). Those provisions divest district courts of jurisdiction to review both direct and indirect challenges to removal orders, which includes any challenge that is inextricably intertwined with the final order of removal that precedes issuance of any removal order, *see id.*, as well as decisions to detain for purposes of removal or for proceedings, *see Jennings v. Rodriguez*, 538 U.S. 281, 294-95 (§ 1252(b)(9) includes challenges to "decision to detain [alien] in the first place or to seek removal," which precedes any issuance of an NTA). Here, Petitioner's claims challenge the government's ability to arrest and detain him in the first place and to place him in removal proceedings, which all arise from the government's efforts to remove him. *See, e.g.*, *id.*, 538 U.S. at 294-95 (§ 1252(b)(9) includes challenges to "decision to detain [alien] in the first place or to seek removal," which precedes any issuance of an NTA); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (finding that 8 U.S.C. § 1226(e) did not bar review in that case because the petitioner did not challenge "his initial detention"); *Saadulloev*, 2024 WL 1076106, at *3 (recognizing that there is no judicial

review of the threshold detention decision).  As such, the Court lacks jurisdiction over this action.

*See, e.g.*, *Ali v. Barr*, 464 F. Supp. 3d 549, 557-58 (S.D.N.Y. 2020) (Buchwald, J.) (lack of

jurisdiction over issues arising from removal proceedings); *Nikolic v. Decker*, 2019 WL 5887500,

at *3 (S.D.N.Y. Nov. 12, 2019) (same); *P.L. v. ICE*, 2019 WL 2568648, at *2 (S.D.N.Y. June 21,

2019) (collecting cases) ("Where immigrants in removal proceedings directly or indirectly

challenge removal orders or proceedings, the Second Circuit and district courts within the circuit

have held district courts do not have jurisdiction."); *Selvarajah v. U.S. Dep't of Homeland Security*,

2010 WL 4861347, at *4 (S.D.N.Y. Nov. 30, 2010) ("challenges to actions that are part of [an

ongoing] removal proceeding have been treated in the same manner as challenges to removal

orders, for jurisdictional purposes"); *see also Taal v. Trump*, 2025 WL 926207, at *2 (N.D.N.Y.

Mar. 27, 2025) ("Plaintiffs have not established that the Court has subject matter jurisdiction over

Taal's claim for a temporary restraining order enjoining his removal proceedings."); *Sophia v.

Decker*, 2020 WL 764279, at *2 (S.D.N.Y. Feb. 14, 2020) (applying § 1252(b)(9) to strip district

court of jurisdiction over challenge to whether the petitioner was legally in removal proceedings);

*cf. Qiao v. Lynch*, 672 F. App'x 134, 135 (2d Cir. 2017) ("Like the district court, we conclude that

the IJ's challenged order reopening removal proceedings against Qiao is inextricably linked to the

removal proceedings, as well as any removal order that may ultimately result from reopening those

proceedings.").

The Third Circuit's decision in *Massieu v. Reno*, 91 F.3d 416 (3d Cir. 1996) (Alito, J.), is

instructive.  There, in a case concerning the same charge of removability (under the predecessor

statute, 8 U.S.C. § 1251(a)(4)(C)(i)), the Third Circuit reversed a district court's order declaring

the statute unconstitutional and enjoining deportation proceedings, because the petitioner was

required to first exhaust administrative remedies through the immigration court and then file a

petition for review. *Massieu*, 91 F.3d at 417.  The court specifically noted that for "an alien

attempting to prevent an exclusion or deportation proceeding from taking place in the first instance," he must avail himself of the administrative procedures. *Id.* at 421. This case was decided prior to IIRIRA and the REAL ID Act, but as discussed above, those laws withdrew district court jurisdiction and made the courts of appeals the exclusive forum to hear such challenges. Thus, this Court should reach the same result as *Massieu*: Petitioner's claims should be dismissed for lack of jurisdiction; he must present his challenges in the administrative removal process, and then, if necessary, to the appropriate court of appeals.

### 3. Petitioner's Detention is Constitutionally Valid.

It is well settled that the public interest in the enforcement of the United States' immigration laws is significant. *See, e.g., United States v. Martinez-Fuerte,* 428 U.S. 543, 556-58 (1976); *Nken,* 556 U.S. at 435. There is "always a public interest in prompt execution of removal orders." *Nken,* 556 U.S. at 436. That principle extends to the prompt resolution of determining removability because "[t]he continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Id.* (quoting *AADC,* 525 U.S., at 490). Granting the relief that Petitioner seeks would impair the government's ability to carry out its official duties, which is contrary to the public interest.

By seeking an order preventing ICE from detaining him, Petitioner frustrates the public interest in enforcing the immigration laws and in determining his removability. Petitioner's detention by ICE has a valid statutory basis, *see* 8 U.S.C. § 1226(a) (authorizing ICE to arrest and detain an alien "pending a decision on whether the alien is to be removed from the United States"), and "detention during [removal] proceedings is a constitutionally valid aspect of the process," *Demore v. Kim,* 538 U.S. 510, 511 (2003) (citing *Wong Wing v. United States,* 163 U.S. 228, 235 (1896)); *accord Velasco Lopez,* 978 F.3d at 848 (same).

Relatedly, whether Petitioner poses a danger to the community or a flight risk is not the correct analysis; Congress has removed federal court jurisdiction over challenges to discretionary detention decisions. *See* 8 U.S.C. § 1226(e); *see also Jennings,* 583 U.S. at 295; *Demore,* 538 U.S. at 516; *cf. Arevalo-Guasco v. Dubois,* 788 F. App'x 25, 27 (2d Cir. 2019); *but see* footnote 4, below. In short, it is not the district court's judgment regarding risk of flight and danger to the community that governs whether ICE may permissibly detain an alien pending removal proceedings.

### 4. Petitioner's Other Claims Should Also Be Rejected.

Petitioner cannot invoke the APA because he has an adequate remedy at law: the petition for review process.  The APA permits judicial review of agency action only when, *inter alia*, statutes do not "preclude judicial review," 5 U.S.C. § 701(a)(1), and "there is no other adequate remedy in a court." 5 U.S.C. § 704.  Here, Congress barred district court review of Petitioner's claims in § 1252.  Accordingly, no claim may lie under the APA. *See, e.g.*, *Delgado*, 643 F.3d at 55 (no APA claim because § 1252 barred judicial review).  Moreover, Congress channeled into the statutorily prescribed administrative removal procedure review of all legal, constitutional, and factual questions that may arise from the removal of an alien, with judicial review of those decisions vested exclusively in the courts of appeals.  As a petition for review provides an adequate remedy at law for Petitioner's claims, as set out in 8 U.S.C. § 1252(b)(9), an APA may not be asserted in this Court for that reason as well. *See Aguilar*, 510 F.3d at 11 ("[§] 1252(b)(9) is a judicial channeling provision, not a claim-barring one").

Furthermore, Petitioner's challenge to and request for the Court to vacate the Secretary of State's foreign policy determination invokes an unreviewable political question.  The political question doctrine is an "exception" to the "general" rule that "the Judiciary has a responsibility to decide cases properly before it." *Zivtofsky v. Clinton*, 566 U.S. 189, 194-95 (2012).  A

nonjusticiable political question occurs when "there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department[] or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). "In such a case," the political question doctrine deprives a court of "the authority to decide the dispute before it." *Zivtofsky*, 566 U.S. at 195.

The political question doctrine requires "a case-by-case inquiry." *Whiteman v. Dorotheum GmbH*, 431 F.3d 57, 70 (2d Cir. 2005). A claim is nonjusticiable if it satisfies any one of "six independent tests" the Supreme Court enumerated in *Baker v. Carr*:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Whiteman*, 431 F.3d at 70 (quoting *Baker v. Carr*, 369 U.S. at 217); *see Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) ("To find a political question, we need only conclude that one factor is present, not all.").

Here, Petitioner's challenge to the Secretary's foreign policy determination is non-justiciable. Necessarily, Petitioner's requested injunction sits at the intersection of two issues textually committed to the political branches of the government: (1) foreign affairs, *see State of California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) ("the issue of protection of the States from invasion implicates foreign policy concerns which have been constitutionally committed to the political branches"); *see also El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political

branches in matters of foreign policy or national security constitutionally committed to their discretion."); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.").  As observed by the Supreme Court, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.  Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952).

There is simply no manageable standard on what constitutes "potentially serious adverse foreign policy consequences."  8 U.S.C. § 1227(a)(4)(C)(i).  Nor is there a manageable standard on what constitutes a "compelling foreign policy interest."  8 U.S.C. § 1227(a)(4)(C)(ii).  Petitioner is asking this Court to "displac[e] the Executive in its foreign policy making role" and to reverse a political decision that has already been made.  *Gross v. German Foundation Indus. Initiative*, 456 F.3d 363, 389-90 (3d Cir. 2006).  But second-guessing foreign policy decisions is exactly what the political doctrine was meant to insulate from judicial review.  *Id.* at 390.

## THE COURT SHOULD NOT RELEASE PETITIONER ON BAIL

### A.  The Court Lacks Authority to Order Petitioner's Release.

As explained above, the Court lacks habeas jurisdiction to consider the Petition. It is therefore also without power to order his release. Furthermore, under well-settled precedent, the detention of an alien during removal proceedings is "a constitutionally valid aspect of the deportation process." *Demore v. Kim,* 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores,* 507 U.S. 292, 306 (1993)).

To be sure, where a district court does exercise habeas jurisdiction, it may have the inherent power to release the petitioner pending determination of the merits. *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). The Second Circuit has cautioned, however, that any such power "is a limited one, to be exercised in special cases only." *Id.* Furthermore, "the standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Id.* (brackets omitted) (quoting *Grune v. Coughlin,* 913 F.2d 41, 43-44 (2d Cir. 1990)).

Accordingly, the viability of *Mapp* relief in this context is in doubt. *But see Ozturk v. Trump,* No. 2:25-cv-374, ECF No. 104, at 43-44 ("release is authorized by *Mapp* provided the Court finds the habeas petition raises 'substantial claims' and that 'extraordinary circumstances' exist 'that make the grant of bail necessary to make the habeas remedy effective."); *id.* at 63-65.

*Mapp* was decided in 2001, before the REAL ID Act, and involved an alien challenging his deportation proceedings, but not the validity of his detention, through a district court habeas petition. Prior to passage of the REAL ID Act of 2005, aliens could seek review of their removal orders through the filing of a habeas petition in federal district court. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 311–14 (2001). The REAL ID Act removed habeas as a permissible avenue for challenging a removal order, stripped district courts of jurisdiction to review removal orders, and vested the courts of appeals with exclusive jurisdiction to review challenges to final removal orders. *See* 8 U.S.C. § 1252(a)(5). The Second Circuit recognized that it cannot override a statute to grant relief. *Mapp,* 241 F.3d at 227–29. Because a statute applies here, Mapp cannot create authority that is otherwise limited by statute.

Further, in *Mapp*, the Court qualified its holding that there is inherent authority to admit habeas petitioners to bail, as subject to limits imposed by Congress. *Mapp,* 241 F.3d at 223 (noting

"that this authority may well be subject to appropriate limits imposed by Congress"). "[I]n cases involving challenges to [ICE] detention, Congress's plenary power over immigration matters renders this authority readily subject to congressional limitation." *Id.* at 231. No such limitation was at issue in Mapp, but here 8 U.S.C. § 1226(e) is an "express statutory constraint[]" that limits the Court's authority in this context. *Mapp,* 241 F.3d at 231. Section 1226(e) restricts this Court's authority in two ways. First, Section 1226(e) provides a "clear direction from Congress," *Mapp,* 241 F.3d at 227, that "[n]o court may set aside any action or decision by [ICE] under [§ 1226] regarding the detention or release of any alien," 8 U.S.C. § 1226(e). Thus, this Court lacks authority to grant interim release to a habeas petitioner who is subject to detention under § 1226(a). Second, ICE's discretionary decision to detain the petitioner cannot readily be set aside through a *Mapp* motion. As the Second Circuit explained, where Congress provided for discretionary detention, federal courts may be further constrained from granting release on bail where the agency has exercised such discretion. *See Mapp,* 241 F.3d at 229 n.12 ("[W]hile it may be the case that had the INS exercised its discretion under § 1231(a)(6) and decided not to release Mapp on bail, we would be required to defer to its decision, where there has been no such consideration of a detainee's fitness for release, deference to the INS . . . is not warranted."); *see also Cinquemani v. Ashcroft,* 2001 WL 939664, at *6–8 & n.6 (E.D.N.Y. Aug. 16, 2001).

But, as noted above, the "discretionary judgment . . . regarding the detention or release of any [alien] or the grant, revocation, or denial of bond or parole" is not reviewable by the courts. 8 U.S.C. § 1226(e).[4] As determined by the Supreme Court, that statute precludes an alien from

---

[4] On Friday, in *Ozturk v. Trump,* No. 2:25-cv-374, Judge Sessions concluded that habeas review in that case was not barred by § 1226(e). *See slip. op.* at 29-33. The Court distinguished the Supreme Court's decision in *Jennings v. Rodriquez,* 583 U.S. 281 (2018), by construing that decision's limitation on habeas review over immigration detention to only to apply to aliens subject to detention under § 1226(c), and not § 1226(a). But *Jennings*'s holding appears to

"challeng[ing] a 'discretionary judgment' by the Attorney General or a 'decision' that the Attorney General has made regarding his detention or release." *Jennings,* 583 U.S. at 295 (quoting *Demore,* 538 U.S. at 516); *see also Hechavarria v. Whitaker,* 358 F.Supp.3d 227, 235 (W.D.N.Y. 2019) ("This provision 'precludes an alien from "challenging a discretionary judgment by the Attorney General or a decision that the Attorney General has made regarding his detention or release."'") (quoting *Jennings*); *Negusie v. Holder,* 555 U.S. 511, 517 (2009) (acknowledging that "[j]udicial deference" "is of special importance" where Congress has provided the Attorney General with discretion in making immigration decisions); *Sukwanputra v. Gonzales,* 434 F.3d 627, 632-33 (3d Cir. 2006) ("[t]he power to expel [noncitizens], being essentially a power of the political branches of government . . . may be exercised entirely through executive officers, with such opportunity for judicial review of their action as congress may see fit to authorize or permit").

Similarly, 8 U.S.C. § 1252(a)(2)(B)(ii) bars judicial review of discretionary decisions including bond determinations under § 1226(a):

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision . . . regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

§ 1252(a)(2)(B)(ii). Courts are precluded under § 1252(a)(2)(B)(ii) from reviewing any "decision or action" that is committed to the agency's discretion by statute. *See Kucana v. Holder,* 558 U.S. 233, 241-52 (2009). The "key to [section] 1252(a)(2)(B)(ii) lies in its requirement that the

---

extend to discretionary detention under § 1226(a). *See* 583 U.S. at 306. Further, in *Ozturk* this Court emphasized that § 1226(e) was not sufficiently clear to strip the Court of habeas jurisdiction. Even if § 1226(e) does not affect habeas jurisdiction, it appears to be a limit on the authority to release a petitioner on bail.

discretion giving rise to the jurisdictional bar must be specified by statute, and that whether such a specification has been made is determined by examining the statute as a whole." *Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196, 200 (3d Cir. 2006) (internal quotations omitted).

### B.   Petitioner Cannot Meet *Mapp's* Difficult Standard for Release.

If the Court is to consider Petitioner's release pending the determination of this proceeding, under *Mapp*, he must "demonstrate that the habeas petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226. Petitioner cannot make this showing.

First, his detention is consistent with statutory authority. He is a non-citizen. The Secretary of State has determined that he is subject to removal. Removal proceedings have been commenced. And he has been detained during the pendency of those proceedings. And all of his challenges are subject to Article III judicial review.

Second, he cannot show extraordinary circumstances that make the grant of bail necessary to make the habeas remedy effective. *Id.* at 230. While recognizing the seriousness of being detained, release must be for a reason other than the Petitioner's convenience. *See Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) ("We see no reason, and Elkimya has proffered none other than convenience, why his continued detention by the INS would affect this Court's ultimate consideration of the legal issues presented in his petition for review.") Petitioner does not appear offer a health-related reason that rises to the level of extraordinary, tantamount to the worst of the COVID-19 crises. In *Graham v. Decker*, 454 F. Supp. 3d 347, 358 (S.D.N.Y. 2020), for example, the Court recognized that the COVID-19 pandemic was extraordinary and affected the Petitioner personally. But release was denied because he failed to demonstrate "that he personally faces a heightened risk of complications or that the conditions and procedures in place at the OCCF

are constitutionally deficient. The Court therefore denies his application for bail brought pursuant to Mapp."

The Petition offers two paragraphs specific to his request for release. First, it asserts that Petitioner "will be unable to speak freely" while he is in custody. ECF No. 1, ¶89. Second, it asserts that so "long as [Petitioner] is in detention, he will be punished for his disfavored speech, ratifying another constitutional violation that the government sought to achieve with his detention." ECF No. 1, ¶ 90. As noted above, while judicial review was still available under § 1252(b)(9), the presence of constitutional claims did not provide habeas jurisdiction.

## CONCLUSION

For the above reasons, this Court lacks jurisdiction over the Petition and must therefore deny the request to issue a writ of habeas corpus.

Respectfully submitted,

Dated: April 22, 2025                    By:    */s/ Michael P. Drescher*
                                                Michael P. Drescher
                                                Assistant United States Attorney
                                                District of Vermont

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MOHSEN MAHDAWI,                          )        CIVIL ACTION NO.
          Petitioner,                    )        2:25-cv-389
                                         )
          v.                             )
                                         )
DONALD J. TRUMP, et al.                  )
          Respondents.                   )


STATUS CONFERENCE and MOTION FOR RELEASE
Wednesday, April 23, 2025
Burlington, Vermont


BEFORE:

     THE HONORABLE GEOFFREY W. CRAWFORD,
     District Judge


APPEARANCES:

CYRUS D. MEHTA, ESQ., and DAVID A. ISAACSON, ESQ., Cyrus D.
     Mehta & Partners PLLC, One Battery Park Plaza, 9th Floor,
     New York, NY 10004, Counsel for the Petitioner

LUNA DROUBI, ESQ., and MATTHEW D. MELEWSKI, ESQ., Beldock
     Levine & Hoffman LLP, 99 Park Avenue, PH/26th Floor, New
     York, NY 10016, Counsel for the Petitioner

ANDREW B. DELANEY, ESQ., Martin Delaney & Ricci Law Group, 100
     North Main Street, P. O. Box 607, Barre, VT 05641-0607,
     Counsel for the Petitioner

MICHAEL P. DRESCHER, Acting United States Attorney, U.S.
     Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
     570, Burlington, VT 05402-0570, Counsel for the
     Respondents


Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

**JA 297**

1  Wednesday, April 23, 2025

2       (The following was held in open court at 9:04 AM.)

3            COURTROOM DEPUTY:  Your Honor, the matter before the

4  Court is civil case number 25-CV-389, Mohsen Mahdawi v. Donald

5  Trump, *et al.*  Present on behalf of the petitioner are

6  attorneys Andrew Delaney, Cyrus Mehta, David Isaacson, Luna

7  Droubi, and Matthew Melewski.  Present on behalf of the

8  respondents is Assistant -- or Acting United States Attorney

9  Michael Drescher.

10      We are here for a status conference and hearing on motion

11 for release under *Mapp v. Reno.*

12           THE COURT:  All right.  Good morning.  It's nice to

13 see so many people here.  I appreciate the audience coming in

14 particular.  This is an open society and open courtroom, and I

15 want to extend my welcome.  And for those -- a lot of you look

16 to be kind of more towards my age, but for those who aren't,

17 this may interest you in the law, and we would welcome your

18 engagement in legal studies.

19      Mr. Delaney, why don't you introduce your team and then

20 I'll say a few words of welcome.

21           MR. DELANEY:  Thank you, Your Honor.

22      First I'd like to introduce our client, Mr. Mohsen

23 Mahdawi.

24      Luna Droubi.

25           MS. DROUBI:  Good morning, Your Honor.

**JA 298**

```
 1              THE COURT:  Good morning.

 2              MR. DELANEY:  Cyrus Mehta.

 3              MR. MEHTA:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MR. DELANEY:  Matthew Melewski.

 6              MR. MELEWSKI:  Good morning, Your Honor.

 7              THE COURT:  Good morning.

 8              MR. DELANEY:  And David Isaacson.

 9              MR. ISAACSON:  Good morning, Your Honor.

10              THE COURT:  All right.  And who's going to take the

11 laboring oar on these issues?

12              MR. DELANEY:  I believe Ms. Droubi will take the lead

13 on these issues.

14              THE COURT:  Okay.  Good enough.  Thank you.

15              MR. DELANEY:  Thank you.

16              THE COURT:  And, Mr. Drescher, I'm very glad to see

17 you again as well.

18              MR. DRESCHER:  Thank you.

19              THE COURT:  Ms. Droubi, are you in the Battery Park --

20 One Battery Park Plaza building?

21              MS. DROUBI:  I'm not, Your Honor, no.

22              MR. MEHTA:  Your Honor, my office is in the One

23 Battery Park.

24              THE COURT:  I was there in the early '80s as a young

25 associate at one of the firms, so I know the building well.  I
```

**JA 299**

1  just wanted to --

2          MR. MEHTA:  It's a nice building, Your Honor.

3          THE COURT:  Good.  Thank you.

4      And, Ms. Droubi, have you had a chance to chat at all with

5  Mr. Drescher, kind of off-line?

6          MS. DROUBI:  Not this morning, Your Honor, but on some

7  parts of this agenda we have --

8          THE COURT:  Good.

9          MS. DROUBI:  -- discussed things.

10         THE COURT:  I would just ask perhaps after we're done

11 today if the two of you just meet and talk a little bit, you'll

12 find him a very candid and professional colleague, and if you

13 were to ask him people he knows attending law school, things

14 like that, you'll find it helpful, I think, just to talk a

15 little bit together.  Okay?

16         MS. DROUBI:  Thank you, Your Honor.

17         THE COURT:  But I would be grateful if you guys could

18 do that after we're done.

19     I've passed out a short agenda.  I'm glad to add to it.  I

20 just wanted to kind of set the table so we would have some idea

21 of what to do.  I don't think we'll get much more done today

22 than to identify the issues and make plans.  The case is

23 brand-new to me and to you too, and I wanted to make sure that

24 we kind of had a plan going forward.

25     A question or two for Mr. Mahdawi.  Are you treated well

**JA 300**

 1  by the staff at Northwest?

 2          THE PETITIONER:  Good morning, Your Honor.

 3          THE COURT:  Good morning.

 4          THE PETITIONER:  I was not briefed on the

 5  introductions, so my apologies for not saying good morning.

 6          THE COURT:  Not a bit.

 7          THE PETITIONER:  Yes.  People have been very kind to

 8  me.

 9          THE COURT:  Good.

10          THE PETITIONER:  So I'm grateful for the kindness of

11  this state and the agents here.

12          THE COURT:  Good.  Okay.  If anything comes up, I know

13  Mr. Hale, the superintendent.  You could let your lawyer know.

14  She will let Mr. Drescher know.  The three of us could talk.

15  I'm sure there won't be a problem, but if there is, if you will

16  raise it, we can talk.  I'm sure we can get Mr. Hale on the

17  phone and solve whatever problem there is.  Okay?

18          THE PETITIONER:  I'm very grateful.  Thank you.

19          THE COURT:  Good.  Thank you.

20      I think those were the initial concerns that I had.  The

21  first question I had was housekeeping.  In a sense, we have

22  Judge Sessions' temporary restraining order ordered on an

23  *ex parte* basis on the day of Mr. Mahdawi's arrest, but

24  temporary restraining orders have a short life unless extended.

25  It's an important order from my perspective because it

**JA 301**

1  preserves the Court's jurisdiction until we can resolve the

2  issues in this case one way or the other, so I would invite

3  Mr. Drescher, saving your concerns about the Court's

4  jurisdiction and without conceding anything there, any

5  objection to extending the restraining order to allow time?

6  Because I don't want Mr. Mahdawi to be whisked out of state and

7  then face the additional hurdle of whether he is still subject

8  to jurisdiction here.

9          MR. DRESCHER:  I appreciate Your Honor's concerns, and

10 I appreciate asking for our position.

11     Your Honor, I am not authorized to consent to the

12 extension of the TRO.  It's my understanding that Rule 65

13 requires the Court to find good cause and to make -- and to

14 state findings on the record to justify the extension of the

15 TRO, and we would ask the Court -- we think the Court needs to

16 do that in this circumstance, and we would not consent.

17         THE COURT:  Fair enough.

18     Ms. Droubi, how do you see this initial issue?

19         MS. DROUBI:  Your Honor, I think without question

20 Mr. Mahdawi would suffer irreparable harm if he were to leave

21 this jurisdiction.  It's unfortunate to hear that the

22 Government is not willing to consent to an extension of the

23 temporary restraining order.

24     To the extent the Court needs additional information, we'd

25 be happy to provide it.  So we seek at least an extension

**JA 302**

1 through initial briefing on -- whether it's a preliminary

2 injunction or -- or not so that we can preserve Mr. Mahdawi's

3 presence in this jurisdiction.

4      THE COURT:  All right.  I kind of saw the merits

5 either through the jurisdictional question or kind of on the

6 substance of the petition coming to a head in this court at the

7 preliminary injunction stage, right?  That would certainly

8 trigger an opportunity for the losing side to appeal and you'd

9 be off to another court.  Do you see that the same way?

10      MS. DROUBI:  I do, Your Honor, yes.

11      THE COURT:  All right.  So I will extend the -- and

12 I'll get something out in writing later today, but I'll extend

13 the temporary restraining order that issued on April 14th,

14 2025, for a period of up to 90 days or until issuance of a

15 preliminary injunction following briefing and a hearing,

16 whichever comes first.  I don't want to keep hauling you back

17 here on short notice because the order is about to expire.

18     From my perspective, the principal reason for extending

19 the order is to preserve the Court's jurisdiction over this

20 case, the jurisdiction in the sense of jurisdiction over the

21 habeas claims due to the presence of the petitioner in Vermont.

22 As we've seen in the other cases, if he's moved out of state,

23 it creates an entire second tier of issues.  He is a Vermont

24 resident, he was arrested in Vermont, he's present in Vermont,

25 and I'll order that that not change and that he not be removed

1  from Vermont until the parties and the Court have had a full

2  opportunity to engage with the issues and the Court's had a

3  chance to rule at least at the level of a preliminary

4  injunction.

5       So I'll put something out in writing.  I suppose with

6  respect to the equities concerning the petitioner's

7  perspective, I think his contact with his attorneys in the

8  Northeast and his continued presence in the state of his home

9  and the need to resolve this matter safely and quickly all

10 favor an extension of the order, and I respect the Government's

11 position that they can't consent, but I did not hear strong

12 reasons why they would be prejudiced by proceeding in this

13 court as opposed to a court elsewhere in the United States.

14      So for all those reasons, I'll extend the restraining

15 order until we can get to the bottom of the case.

16      Why don't we turn to the meat of the case, which I think

17 is primarily the Government's objections, which I thought were

18 very carefully laid out in the memo filed yesterday, which I've

19 had a chance to read, focusing on the jurisdiction-stripping

20 issues.

21      I had planned, Mr. Drescher, to try and torment you with a

22 series of hypotheticals at sort of increasing severity, but

23 then as I thought about it, it's not really necessary because

24 the hypothetical really -- this case kind of captures the

25 constitutional issues, and there's no need to kind of create

**JA 304**

1 other narratives and fact patterns.  It's a long-winded way of

2 saying I'm inclined to treat your memorandum as a motion to

3 dismiss under Rule 12, which would mean that I accept as true

4 the allegations in the petition and consider the

5 jurisdiction-stripping questions with those facts in mind.

6      Is that the fairest way to proceed from your perspective?

7           MR. DRESCHER:  I think so, Your Honor.

8           THE COURT:  Appreciate it.  That's what I'll do.

9      Does that work for you, Ms. Droubi?

10          MS. DROUBI:  Yes, Your Honor.  I would only ask

11 that -- and I know this is jumping ahead, so I apologize.

12          THE COURT:  That's okay.

13          MS. DROUBI:  -- that any briefing schedule that we

14 prepare with respect to the jurisdiction issue and the motion

15 to dismiss be -- not be limiting the scheduling of the hearing

16 on the request for release, which we're seeking immediately.

17          THE COURT:  Yeah.

18          MS. DROUBI:  That's all.  Thank you, Your Honor.

19          THE COURT:  I'm -- I hear you.  So I'll convert it to

20 a motion to dismiss.  Certainly you're free if you wish to

21 file, you know, the statement of undisputed facts, and I don't

22 see it as necessary.  We can -- I can work with the very

23 thorough memorandum that you supplied.  I don't think we need

24 to kind of dress it up in the way that we would a Rule 12

25 motion.  If I'm overlooking something that you think needs to

1  be before the Court, of course you can add to it, but I'm

2  content with addressing these issues on the basis of your memo,

3  the petition, and a response and a reply coming in from the

4  lawyers.

5      Do you see that the same way?

6          MR. DRESCHER:  It's been a minute since I've had my

7  civil AUSA hat on, Your Honor, but --

8          THE COURT:  Right.

9          MR. DRESCHER:  -- it's my recollection that that's the

10 appropriate way to proceed, that statements of undisputed fact

11 are really questions that come up with a summary judgment

12 context.

13         THE COURT:  You're right.  Of course.

14         MR. DRESCHER:  Our argument for dismissal is a legal

15 one.

16         THE COURT:  Right.

17         MR. DRESCHER:  It's grounded in the provisions of the

18 INA --

19         THE COURT:  Yeah, yeah, yeah.

20         MR. DRESCHER:  -- and how they apply here.

21         THE COURT:  Yeah.  No.  Thank you.  That's -- you're

22 absolutely right.  All right.  So that's what we'll do.

23     When would you like to file a responsive memo?

24         MS. DROUBI:  We'd ask for 14 days, Your Honor.

25         THE COURT:  Okay.  And seven days to reply?

**JA 306**

1          MR. DRESCHER:  That's fine.

2          THE COURT:  Good.  I had thought to talk a little bit

3 about the merits.  Really the question that I had, which I'm

4 not sure how to bring into focus but I could use some help from

5 you, is as I read these papers, I have nothing but respect for

6 the immigration court and the immigration judges and the tasks

7 that they're handed.

8     Usually when people say they have respect, it's because

9 there is a "but" coming.  There isn't really a "but" here.

10 It's just that I'm concerned about whether they have any

11 authority to hear the First Amendment constitutional claim

12 brought here, and when we speak about kind of shifting these

13 issues into the immigration lane and then to presumably the

14 Fifth Circuit, I don't see where the immigration judge has

15 authority to rule on the issues raised in the petition or how

16 the Court of Appeals would have a record and a ruling to get

17 their teeth into.

18     Do you see the authority of the immigration court going

19 that far, or -- let me turn the floor over to you,

20 Mr. Drescher.

21          MR. DRESCHER:  Is it okay with Your Honor if I address

22 Your Honor from here rather than the podium?

23          THE COURT:  Of course.  It's totally fine.

24          MR. DRESCHER:  So with the caveat that I don't pretend

25 to be an expert or overly familiar in the operations of the

1  immigration court, it is my understanding that, generally

2  speaking, the immigration judges do not have authority to

3  review a constitutional question.  Similarly with regard to the

4  BIA.  However, the person who is before the immigration court

5  has the opportunity to create a record, make any and all

6  arguments to preserve a record for eventual presentation to the

7  Court of Appeals, you know, in a petition for review in the

8  event the person is not satisfied with the rulings of the

9  immigration judge or the BIA.

10      I understand that this question -- the answers to your --

11  if I understand, Your Honor's questions were presented to the

12  United States District Court in New Jersey in the case of

13  Mr. Khalil.  I can provide to the Court, with copies to

14  counsel, of course, copies of the submissions that -- I believe

15  they were letter submissions to the Court in that case

16  addressing the scope of the authority of the immigration judge.

17  And it's -- based on review of that submission is what I -- is

18  the basis for my answer to Your Honor's questions today.

19      THE COURT:  Yeah.  No.  That's very helpful.  It

20  leaves the circuit court in a bit of a pickle, though, in the

21  sense that they may well have a body of declarations that

22  weren't the subject of any kind of fact-finding or trial-level

23  decision-making and then they would be, what, kind of the first

24  court up to decide whether the petitioner had -- I guess the

25  respondent, right, in the immigration context, had made his

1 case?  That's an awkward position for an appeals court.

2        MR. DRESCHER:  I appreciate Your Honor's point, but I

3 believe that's the import of Section 1252(g).  I'd point Your

4 Honor also to Justice Ginsburg's concurring decision in the

5 *AADC* case --

6        THE COURT:  Right.

7        MR. DRESCHER:  -- in which she specifically concludes

8 that the petition for review at the end of the immigration

9 proceedings is an appropriate forum to take up a constitutional

10 challenge, not unlike the one here, of alleging discriminatory

11 enforcement, selective enforcement, on unconstitutional

12 grounds, that the appropriate forum for that is in the

13 appropriate Court of Appeals.

14        And that's also consistent with the majority's decision --

15 or the decision for the court in that case as well in which the

16 court recognized and in fact there was an admission by the

17 government in that case that the decisions to engage in

18 immigration enforcement were based upon the exercise of

19 constitutionally protected activity, and notwithstanding the

20 admission in that case, the Supreme Court ruled that Section

21 1252(g) requires that there be no jurisdiction in the district

22 courts to consider that question.

23        So a little bit of a long-winded answer to I think what

24 Your Honor's question was, is really just the Court of Appeals

25 good enough, and I think the Supreme Court has spoken to that

**JA 309**

1  principally in the *AADC* case.

2          THE COURT:  All right.  That's a fair answer.  It's

3  not long-winded at all.  I've been trying to figure it out, and

4  it's helpful.  Thank you.

5      How about from your side?

6          MS. DROUBI:  I'll turn to my colleague, Mr. Mehta.

7          THE COURT:  Sure.

8          MR. MEHTA:  Your Honor, the immigration judge does not

9  have any constitutional authority to hear a constitutional

10 claim such as this.

11         THE COURT:  Right.

12         MR. MEHTA:  There was an egregious First Amendment

13 violation here, and the immigration judge or the Board of

14 Immigration Appeals don't have that authority.

15         THE COURT:  Right.

16         MR. MEHTA:  By the time it reaches the Court of

17 Appeals -- we have done many immigration cases.  It may take a

18 year or two before it reaches the Court of Appeals.  My client

19 will be detained.  There has been an egregious First Amendment

20 violation here, and this court clearly has habeas jurisdiction

21 to release him based on the motion we have filed with your

22 court, Your Honor.

23     To add further color to this argument, I would ask my

24 client, David Isaacson, to provide a little more of the basis

25 as to why they're here today in your court.

**JA 310**

1          THE COURT:  All right.  Mr. Isaacson, you have the

2     floor.

3          MR. ISAACSON:  Yes.  Your Honor, do you care if I

4     stand up or sit down, or does it matter?

5          THE COURT:  Just what really matters is that you get

6     that microphone.

7          MR. ISAACSON:  Sorry, Your Honor.

8          THE COURT:  Sitting is fine.

9          MR. ISAACSON:  Given the altitude of the microphone,

10    sitting will probably work better.

11       If I could just respond regarding 1252(g) in particular,

12    *Reno v. AADC* is not a case about detention.  If you read *Reno*

13    *v. AADC*, you won't see essentially any mention that there's a

14    stray reference to habeas, as it was back then, potentially as

15    a form of review of the order of removal, but that case was not

16    about whether the person should be detained during the

17    potentially year or two that my colleague, Mr. Mehta, was

18    talking about, and I think *AADC*, the Supreme Court made very

19    clear that there are only these three discrete actions that the

20    jurisdictional bar applies to:  you know, to commence the

21    proceedings, to adjudicate the proceedings, to execute the

22    order.  It's not, as Justin Scalia's majority opinion said, an

23    all-purpose zipper clause, and it doesn't cover, among other

24    things, therefore, the decision whether to detain during the

25    proceedings, and that decision is not something that the Court

**JA 311**

1 of Appeals can meaningfully review, which is also why it

2 doesn't fall under the 1252(b)(9) zipper clause, which is a

3 zipper clause, which is broader, as *AADC* explained.  It doesn't

4 apply to some transitional cases, so 1252(g) still has an

5 important role, but 1252(b)(9) is the broader zipper clause.

6      And as Judge Bibas in the Third Circuit explained in

7 *E.O.H.C.*, it doesn't apply to things that the Court of Appeals

8 can't meaningfully review.  He referred in that case to the "If

9 not now, when?" principle.  Right?  Your Honor is in a position

10 to review whether Mr. Mahdawi should be detained during the

11 course of the proceedings.  The Court of Appeals hearing a

12 petition for review at the end of the proceedings is not in a

13 position to review whether Mr. Mahdawi ought to have been

14 detained during the proceedings.  It can't travel backwards in

15 time.

16      THE COURT:  I understand.  And we will get in a few

17 minutes to the issue of detention.

18      MR. ISAACSON:  Okay.

19      THE COURT:  I was looking for some guidance - and I

20 know I can get it from you because I don't go to immigration

21 court; you do - about the scope of the issues that those judges

22 are authorized to decide.

23      Let me tell you my impression, and you can tell me if it's

24 correct.  In a case like this, I think they would be limited to

25 deciding whether the Secretary of State had made the necessary

1    certification, if the signature and kind of *bona fides* of that

2    declaration were correct, and if the declaration met the

3    criteria in the statute, and that's kind of it.  But I don't

4    undersell the scope of their authority.

5         How do you see what they can hear?

6         MR. ISAACSON:  I think, depending on what Your Honor

7    means about whether it complies with the criteria of the

8    statute, I largely agree with Your Honor.  We do have some

9    arguments sort of alluded to towards the end of the petition

10   that perhaps the statute does not extend to lawful speech that

11   occurred in the United States, and that as a statutory matter I

12   think they'd be able to hear, but the broader constitutional

13   claim I completely agree with what Mr. Mehta said and what I

14   think Mr. Drescher has conceded:  The immigration judge and the

15   Board of Immigration Appeals, the BIA, has been quite clear

16   that they do not have jurisdiction to entertain constitutional

17   attacks on the statutes that govern them.  They don't even have

18   jurisdiction to entertain statutory attacks on the regulations

19   that govern them.

20        They have been very clear that they follow the statute and

21   regulations as written, and so if there is a constitutional

22   challenge, it can only be brought at the petition for review

23   stage, which, in addition to Your Honor's concerns about the

24   record, again, there's an issue with the timeline.  The

25   conclusion of the proceedings can't possibly be the time -- the

**JA 313**

1 first time that an Article III court reviews whether the person

2 ought to have been detained during the proceedings.  That's not

3 a coherent legal approach.

4        THE COURT:  Okay.  Thank you.  That's helpful.  We can

5 visit these issues again after briefing is complete, but that's

6 very helpful.

7        Before we go on to release or detention, I did want to

8 hear from the petitioner's side.  If you could kind of preview

9 for me what I call your long game:  You know, you win

10 everything; I rule that Mr. Mahdawi was unlawfully detained.

11 I'm not saying this is how it comes out, but -- but work with

12 me.  You win everything; I release him; he has his immigration

13 hearing and presumably some kind of detainer or detention order

14 out of the immigration court; he's rearrested.  I've completed

15 my task.  I don't understand kind of the end game from your

16 perspective.

17        MR. ISAACSON:  Jurisdictionally, Your Honor, if you've

18 ordered him released on, for example, the *Mapp* bond, I don't

19 think they could rearrest him without interfering with Your

20 Honor's jurisdiction, but Your Honor's saying if you've granted

21 the habeas petition finally --

22        THE COURT:  That's what I'm saying.

23        MR. ISAACSON:  -- you've issued a judgment saying that

24 his detention is unlawful --

25        THE COURT:  Right.

**JA 314**

1        MR. ISAACSON:  -- I don't think they can turn around

2   and violate that judgment simply because he's attended an

3   immigration court hearing.  It won't give rise to a new, more

4   constitutional basis on which to detain him.  I think what

5   would happen is that the proceedings would go forward in the

6   immigration court but without his being detained.  So Your

7   Honor clearly would not be stopping the immigration court

8   proceedings.  We haven't asked Your Honor to enjoin the

9   immigration court proceedings.

10        THE COURT:  Right.

11        MR. ISAACSON:  And in fact, that's one of the big

12  differences from *Reno v. AADC* and also from the *Ruiz Massieu*

13  case that the Government cites.  We're not asking Your Honor to

14  halt the proceedings.  The proceedings would go forward.  But I

15  guess where I part ways with Your Honor's hypothetical is I

16  don't think the Government would then lawfully be able to

17  simply, what, rearrest him --

18        THE COURT:  Right.

19        MR. ISAACSON: -- and have us file a new habeas

20  petition regarding, in effect, the same detention that Your

21  Honor has just declared in this hypothetical unlawful during

22  the course of the removal proceedings.

23      I think the long game, as Your Honor put it, is that the

24  detention is taken care of, the detention is off the table

25  during the pendency of the removal proceedings, and then the

**JA 315**

1    removal proceedings go forward separately.

2            THE COURT:  Okay.  Yeah.  That's fine.

3        Mr. Drescher, no requirement that you respond, but I'll

4    give you the chance.

5            MR. DRESCHER:  Yeah.  Thank you, Your Honor.

6        I take Mr. Isaacson's point, and I can imagine a scenario

7    where -- and I'm not trying to predict this, but I can imagine

8    a scenario whereby new circumstances come to light that would

9    justify a new arrest under these circumstances, but I guess I'd

10   like the opportunity to consider it further and consult with

11   others about how -- what, if any, authority there might be to

12   rearrest somebody for whom the petition has been granted or who

13   has been released under *Mapp*.

14           THE COURT:  Okay.  Fair enough.

15       I think that takes us to the question of hearing

16   concerning release or detention.  I have in mind, Mr. Drescher,

17   your legal objections to the Court's jurisdiction, but I wanted

18   to make sure that you had an opportunity to respond, as we

19   might say, on the merits of the release.

20       I had time last night to read the 94 letters of support

21   for Mr. Mahdawi.  I'll put my cards on the table.  Nobody has

22   ever provided anything like that before.  Usually people's

23   mothers and sisters write, and I understand the sincerity of

24   those letters, but these were quite striking in their

25   geographic breadth and their philosophical breadth.  They

**JA 316**

1  included many members of the Jewish community, people from all

2  aspects of Mr. Mahdawi's life, which is a long windup to make

3  sure that I want to give the Government a chance to respond on

4  those facts, because there may be another side to the story.

5        What would you like to do, Mr. Drescher, on that side?

6        MR. DRESCHER:  I would ask for an opportunity to

7  submit additional briefing, and I appreciate on the -- well, I

8  guess as a threshold matter, as we explained in what we did

9  file, I think Your Honor has to reach the jurisdictional

10 question before it would have authority to issue release under

11 *Mapp*, if such authority exists, that the inherent authority

12 recognized in *Mapp* only exists, I believe, after the threshold

13 jurisdictional question has been reached, so I want to sort of

14 put a pin in that in terms of process.

15     And if the briefing on the jurisdictional question is

16 going to be 14 days for a response to what we filed last night

17 and then seven days after that, I think it's important that the

18 Court cut very square corners here, and we would encourage the

19 Court to reach that issue first, because without reaching that

20 issue, I'm not sure the Court has authority to -- to issue a

21 release order in this case.

22     And so with that in mind, if you want to revisit the

23 schedule for briefing the jurisdictional issue, I'm -- you

24 know, I leave it to the Court and counsel in that regard.

25     With regard to the facts, I would ask for an opportunity

**JA 317**

1  to provide supplemental briefing on the questions of risk of

2  nonappearance and dangerousness and any other factors that

3  might be pertinent.  If the Court sees it the same way as I

4  just suggested, that we need to reach the threshold

5  jurisdictional question first, then there's -- and I appreciate

6  that Mr. Mahdawi is in custody.  I don't want to make light of

7  that at all.

8           THE COURT:  Right.

9           MR. DRESCHER:  But, you know, the relatively

10 deliberate timeline that the Court has articulated for ruling

11 on the jurisdictional question I think has to occur before the

12 Court can reach the question of release or detention.  So if

13 that's the timeline, then we can -- we'd have another two or

14 three weeks to file that supplemental briefing on the question

15 on the merits, so to speak.  If that timeline is accelerated or

16 your court, notwithstanding my contention that you have to

17 reach the jurisdictional question first, wants to go more

18 quickly on the question of detention versus release, we would

19 ask to have at least until some point next week to file

20 additional briefing on the merits.

21           THE COURT:  I was kind of aiming for next Wednesday as

22 a -- you know, as a date to deal with this issue.  In the

23 normal course, bail or detention are kind of up first, and then

24 we reach the merits in the criminal case down the road, and

25 those may include motions to dismiss and -- and legal attacks

**JA 318**

1  on the process, but I hear what you say.

2      Why don't I -- who would like to speak on this issue?

3          MS. DROUBI:  Your Honor, Mohsen Mahdawi sits in a jail

4  cell --

5          THE COURT:  Right.

6          MS. DROUBI:  -- solely on the basis of what the

7  Government has submitted to date.  What they have submitted to

8  date concedes that he is sitting in a jail cell solely because

9  of his lawful speech.  We are prepared today to address any

10  issue you have and believe that the Court is sufficiently

11  supplied with information to be able to make this determination

12  today.  So we'd ask to be heard on this motion immediately.

13          THE COURT:  I don't think I can do that since you

14  filed the motion yesterday.  I recognize the urgency, but I

15  think the Government's entitled to respond to these 94 letters

16  attesting to Mr. Mahdawi's peaceful and productive character.

17  I haven't met anybody here today before now, so I think some

18  time is fair enough.  They wouldn't have taken such drastic

19  measures as to send a cavalcade of SUVs and a posse of agents

20  unless they had something in mind, and I don't know what that

21  was.

22      So I'll give them the week, but -- and I will -- oh, I

23  hate to shove this off through the -- through the briefing on

24  the jurisdiction-stripping questions.  I've heard from the

25  Government on that at length, and I've heard really from --

1 through the motion for release from the -- from the petitioner.

2 I think, unless I hear from you otherwise, that I've heard

3 enough in the next couple of days to make a preliminary

4 determination up or down on the Court's jurisdiction to

5 issue -- pretrial's not quite the right word, but release

6 pending the resolution of the case.

7      From the Government's perspective, I think you've made

8 your legal arguments in that initial memorandum.  Is there

9 anything that you wanted to supplement?

10          MR. DRESCHER:  I don't believe so.

11          THE COURT:  Okay.

12          MR. DRESCHER:  I just want to make sure I understand

13 what your court has articulated, and that is that we would have

14 until next Wednesday to file our supplemental papers on the

15 question of the merits, so to speak, of detention versus

16 release, or is there a deadline nearer in time that Your

17 Honor --

18          THE COURT:  I was thinking Monday noon.

19          MR. DRESCHER:  Monday at noon?

20          THE COURT:  Yes.

21          MR. DRESCHER:  Okay.

22          THE COURT:  Just so I have a chance to read it, which

23 I will do over the next day and a half after that.

24          MR. DRESCHER:  And then the Wednesday date, if I -- if

25 I understand now, you have in mind another hearing a week from

**JA 320**

1 today?

2          THE COURT:  Exactly.

3          MR. DRESCHER:  Okay.

4          THE COURT:  On the issues of detention.

5     How about for you?  Anything additional that you would

6 need to file?  It was a fairly comprehensive memo.

7          MS. DROUBI:  I think we'd like the opportunity to

8 reply to address any issues raised by the Government, but we do

9 not need time, and we are obviously trying to move this forward

10 as quickly as possible.

11          THE COURT:  Sure.

12          MS. DROUBI:  So we'd ask for 24 hours to respond.

13          THE COURT:  Yeah.  Tuesday noon.

14          MS. DROUBI:  Yes.

15          THE COURT:  And then we'll all meet Wednesday morning,

16 9 o'clock, same time, same -- same plan.

17     Those were the issues, kind of setting the table and

18 making plans here, that were on my mind.

19     From the petitioner's side, what else would you like to

20 take up?

21          MR. DELANEY:  Your Honor, I would just mention that

22 Mr. Mahdawi's scheduled to graduate from college within the

23 next month.

24          THE COURT:  Right.

25          MR. DELANEY:  And that -- I'm just mentioning that to

**JA 321**

1  illustrate the urgency of his release.

2          THE COURT:  Yes.  No.  I heard that loud and clear.

3  Thank you, Mr. Delaney.

4      From the Government's side?

5          MR. DRESCHER:  I don't think we have anything further,

6  Your Honor.  If -- would Your Honor like me to submit the -- or

7  to share with chambers the letters that were submitted to the

8  Court in New Jersey regarding the authority of the immigration

9  judge.

10          THE COURT:  Yeah, please.

11          MR. DRESCHER:  And I'll share them with counsel as

12  well.

13          THE COURT:  Yeah.  No.  That would be very helpful.

14          MR. DRESCHER:  Okay.

15          THE COURT:  I'll be glad to catch up.  I know cases

16  like this are breaking around the United States, and I'll read

17  anything that you guys submit to me, especially what other

18  judges are doing here and there, because it's hard for me to

19  kind of keep up with that part on my own, but I know you

20  have -- not kind of information.  What's the right word?  -- a

21  web of contacts on both sides that you could keep me apprised.

22          MR. MEHTA:  Your Honor, I just want to mention that

23  this case is of critical importance not just for Mr. Mahdawi

24  and his graduation but for all noncitizens in the United

25  States.  Everybody's fearful right now.  There are over a

**JA 322**

1  million students in the U.S. who don't know what's going to

2  happen if they post, publish research papers, op-eds.  There

3  are some 12 million lawful permanent residents who are fearful.

4  This case is of critical importance and must be decided as

5  quickly as possible.  I understand, Your Honor, you need a

6  week's time to do that, but the -- it's critical that he be

7  released, because there's an egregious constitutional

8  violation, and each day that he spends in prison furthers that

9  constitutional violation, Your Honor.

10        THE COURT:  Yes.  I appreciate that, Mr. Mehta.  I

11  understand your perspective, I think, on that, and I spent

12  quite a bit of time kind of reading your submission on that

13  point, and that's why I've tried to rush -- rush is not the

14  right word, but push this issue forward to get it resolved in

15  the next week.  I wish we could do it today, but I don't think

16  that would be fair to the Government, who received the papers

17  yesterday, and they're entitled to time to put their case

18  forward as well.

19      All right.  With that, I'll -- Ms. Droubi, I'll hold you

20  to your promise that you'll speak with Mr. Drescher a little

21  bit, and I'll thank everybody for their attention.  I wish we

22  had such a good audience routinely.  I'm very grateful for your

23  patience with us and your courtesy, and I'll get out of here.

24  Thank you.

25        MS. DROUBI:  Thank you, Judge.

**JA 323**

1         (Court was in recess at 9:43 AM.)

2                    C E R T I F I C A T I O N

3     I certify that the foregoing is a correct transcript from

4  the record of proceedings in the above-entitled matter.

5

6

7  April 24, 2025                    Johanna Masse  Digitally signed by Johanna Masse
                                                   Date: 2025.04.24 19:51:07 -04'00'

                                     Johanna Massé, RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 APR 24  AM 8:10

CLERK
BY_____
DEPUTY CLERK

MOHSEN MAHDAWI,                        )
                                       )
        Petitioner,                    )
                                       )
                                       )
        v.                             )        Case No. 2:25-cv-389
                                       )
DONALD J. TRUMP, et al.,               )
                                       )
        Respondent.                    )

**ORDER EXTENDING TEMPORARY RESTRAINING ORDER**

On April 14, 2025, agents of the Department of Homeland Security arrested Petitioner

Mohsen Mahdawi in the course of his citizenship interview at the United States Customs and

Immigration Service office in Colchester, Vermont.  (Doc. 19-2 ¶¶ 30–34.)  He holds permanent

residence status in the United States and is a full-time undergraduate student at Columbia

University.  (*Id.* ¶¶ 2, 7; *Id.*, Ex. 2.)  The Homeland Security Investigation ("HSI") agents

transported Mr. Mahdawi to the Patrick Leahy Burlington International Airport and advised him

that he would be flown that day to Louisiana.  (*Id.* ¶¶ 35–38.)  The agents and Mr. Mahdawi

were unable to board a flight, and he was lodged at Northwest State Correctional Facility in

Swanton, Vermont.  (*Id.* ¶¶ 39–42.)

Mr. Mahdawi's arrest was not unexpected, and his attorney was able to file the current

habeas petition immediately after his arrest.  (*See* Doc. 1.)  The filing included an emergency

motion for temporary restraining order ("TRO") seeking to prevent Mr. Mahdawi's removal

from the District of Vermont, pending further order from the court.  (Doc. 2.)  Judge Sessions

signed the ex parte TRO order on April 14, 2025, and it remains in effect.  (Doc. 6.)

**JA 325**

The court on its own motion extends the TRO for a period of 90 days or until dismissal of the case or issuance of a preliminary injunction, whichever is soonest. The purpose of extending the TRO is to preserve the court's jurisdiction to hear and decide the issues raised by both parties. These include Mr. Mahdawi's motion for release, scheduled for hearing on April 30, 2025, and the briefing on the Government's motion to dismiss that extends through mid-May with a hearing date to be set.

As a practical matter, Mr. Mahdawi's presence at these hearings is necessary for the court and for his attorneys. The court anticipates that testimony from Mr. Mahdawi may be necessary at the hearing on detention or release and, if release on conditions is justified, the court will engage with Mr. Mahdawi in person on these issues. It is too early to tell the shape and scope of hearings that may follow a ruling on the Government's motion to dismiss, but it is reasonable to anticipate that Mr. Mahdawi's attendance at these hearings will be necessary too.

As a legal matter, Mr. Mahdawi's current detention in Vermont provides the jurisdictional basis for his habeas petition. *See* 28 U.S.C. § 2241(a) ("Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the districts courts and any circuit judge within their respective jurisdictions."). Section 2242 of Title 28 of the U.S. Code imposes the same requirement regarding naming of the immediate custodian: "[The petition] shall allege . . . the name of the person who has custody over him and by virtue of what claim or authority, if known." These provisions have long been understood to limit the jurisdiction of the district courts to "those petitioners who are confined or detained within the territorial jurisdiction of the court." *Ahrens v. Clark*, 335 U.S. 188, 192 (1948); *Rumsfield v. Padilla*, 542 U.S. 426, 443 (2004) ("The plain language of the habeas statute thus confirms the general rule that for core

habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.").

The involuntary removal of a petitioner does not terminate habeas jurisdiction in all cases. *See Ex Parte Endo,* 323 U.S. 283, 307 (1944) ("[The] objective [of habeas corpus] may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court."). But removing the petitioner certainly raises issues that are not present when the petitioner remains within the district. In the similar case of *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025), the Government opposed jurisdiction in the District of Vermont after the petitioner, also a foreign student, was transported to Louisiana following filing of a habeas proceeding in the District of Massachusetts (which transferred the case to Vermont). *See* Respondent's Supplemental Opposition to Petitioner's Amended Petition, ECF 83. This case does not feature the same dispute over whether it has been filed in the district of confinement. It was. Enjoining removal of Mr. Mahdawi from Vermont is necessary to prevent disputes about territorial jurisdiction, transfer to another court, immediate custodian, and other issues that may arise in the case of involuntary movement of a petitioner between states.

**Conclusion**

The court ORDERS that the temporary restraining order issued on the date of Mr. Mahdawi's arrest is extended for a period of 90 days or until dismissal of this case or grant of a preliminary injunction, whichever is earliest. The court orders that no respondent, including any

agent or employee, shall remove Mr. Mahdawi from Vermont without further order from this

court.

      Dated at Burlington, in the District of Vermont, this 23rd day of April, 2025.

/s/ Geoffrey W. Crawford
District Judge
United States District Court

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

MOHSEN MAHDAWI                   )
Petitioner,                     )
                                )
v.                              )
                                )        No. 25-cv-389
DONALD J. TRUMP; *et al.,*       )
Respondents.                    )

### OPPOSITION TO MOTION FOR RELEASE UNDER *MAPP V. RENO*

The Court should deny Petitioner Mohsen Mahdawi's Motion for Release Under *Mapp v. Reno*, ECF No. 19, for several reasons. First, the Court is barred from exercising habeas jurisdiction pursuant to several provisions of the Immigration and Nationality Act ("INA"); it therefore lacks inherent authority to release Petitioner under *Mapp.* Second, even if the Court were to assert habeas jurisdiction, the Second Circuit's opinion in *Mapp* makes clear that any associated authority to release Petitioner pending resolution of the habeas case is subject to limitations imposed by Congress. Here, there are several such limitations, including Congress's express grant of authority to the Executive Branch to determine whether an alien's continued presence in the United States is contrary to foreign policy, and whether such an alien should be detained until he is removed for that reason. The Executive has made that determination with respect to Petitioner, and courts are ill suited to intervene in matters of foreign policy. Third, a review of Petitioner's history and characteristics, including review of pertinent law enforcement records, indicate that he has failed to make the showing necessary to justify release under *Mapp.*

### FACTUAL BACKGROUND

On March 15, 2025, Secretary of State Marco Rubio issued a memorandum informing the Secretary of Homeland Security that "I have determined that Mohsen MAHDAWI . . . a U.S. Lawful Permanent Resident (LPR), is a deportable alien under [8 U.S.C. § 1227(a)(4)(C)]." *See*

**JA 329**

Exhibit A, filed herewith. The memorandum recognized that under § 1227(a)(4)(C)(i)&(ii), "for cases in which the basis for this determination is the alien's past, current, or expected beliefs, statement or associations that are otherwise lawful, the Secretary of State must personally determine that the alien's presence or activities would compromise a compelling U.S. foreign policy interest." *Id.* Secretary Rubio further stated, "I have determined that the activities and presence of this alien in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." Referencing Mahdawi's role in leading protests at Columbia University, Secretary Rubio explained that he had determined "[t]he activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States." *Id.* The memorandum further noted that "protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict." *Id.*

Following this determination, on April 14, 2025, Mahdawi was taken into custody by the Department of Homeland Security and served with a Notice to Appear ("NTA") in removal proceedings under the Immigration and Nationality Act ("INA"). The NTA alleged that Petitioner is removable because "[t]he Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would compromise compelling U.S. foreign policy interest." The NTA further alleges that Petitioner is subject to removal pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), "in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States."

While he was in custody in Vermont, Petitioner filed a Petition for Writ of Habeas Corpus

in this Court. ECF No. 1 ("Petition"), challenging the legality of his "detention and attempted removal." *Id.*, ¶ 1.

Prior to the April 21 status conference, the government submitted a Prehearing Memorandum (ECF No. 25), which explained why the Court lacks jurisdiction to consider the Petition. *Id.* at 3-16. The submission also articulated legal objections to Petitioner's request for release under *Mapp v. Reno. Id.* at 16-21. The Court converted ECF No. 25 to a motion to dismiss (with the government's consent), and invited the government to file this Opposition to Petitioner's Motion for Release Under *Mapp v. Reno*, ECF No 19, by noon Monday, April 28.

## ARGUMENT

### A. The Court Lacks Habeas Jurisdiction and Therefore *Mapp* Is Inapplicable.

As explained in Respondents' Prehearing Memorandum ECF No. 25, at 3-16, the Court lacks habeas jurisdiction because, as the Petition makes clear, it is a challenge to the initiation of removal proceedings against Petitioner, Petitioner's detention is undisputably connected to those proceedings, and under *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ("*AADC*"), and *Ragbir v. Homan,* 923 F.3d 53, 64 (2d Cir. 2019), Petitioner cannot circumvent § 1252(g)'s jurisdiction-stripping effect by alleging that the challenged decisions were "made based on unlawful considerations." Furthermore, under well-settled precedent, the detention of an alien during removal proceedings is "a constitutionally valid aspect of the deportation process." *Demore v. Kim,* 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores,* 507 U.S. 292, 306 (1993)).

The Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), recognizing that federal courts have "inherent authority to admit habeas petitioners to bail in the immigration context" was limited to "case[s] where they may properly assert jurisdiction[.]" *Id.* at 223, 225. As previously demonstrated, this Court does not have jurisdiction. Accordingly, *Mapp* does not permit the Court to consider the question of Petitioner's release.

Moreover, the Second Circuit also recognized in *Mapp* that a court's inherent authority to consider bail for habeas petitioners, "may well be subject to appropriate limits imposed by Congress," and that "Congress has not, to date, curtailed this feature of federal judicial power." 241 F.3d at 223. As previously argued, ECF No. 25, at 16-21, Congress has since legislated to further insulate immigration detention from habeas review. *See* 8 U.S.C. §§ 1226(e) & 1252(a)(2)(B)(ii).

**B.  If the Court (1) Asserts Habeas Jurisdiction and (2) Concludes *Mapp* Relief is Not Foreclosed by Limits Imposed by Congress, Petitioner Still Cannot Meet the Difficult Standard *Mapp* Requires.**

The Second Circuit is clear: "the standard for bail pending habeas litigation is a difficult one to meet: The petitioner must demonstrate that the habeas petition raises substantial claims and that extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp,* 241 F.3d at 226 (quoting *Grune v. Coughlin,* 913 F.2d 41, 43-44 (2d Cir. 1990)); *see also id.* at n.5 (canvassing standards for habeas bail from other courts, including a showing of "a high probability of success"). To ensure any release on bail is also in the public interest, courts must also assess whether Petitioner has established that he does not present a threat or a risk of nonappearance. *Mapp*, 241 F.3d at 231 n.14.

### 1.  Petitioner Has Not Presented a Substantial Claim.

Congress entrusted the Executive Branch with weighing the nation's foreign policy interests against the First Amendment protections afforded to non-citizens. The record in this case demonstrates that the Secretary of State has made that assessment. In Exhibit A, filed herewith, the Secretary specifically concluded not only that Petitioner's presence would have potentially serious adverse foreign policy consequences, *see* 8 U.S.C. § 1227(a)(4)(C)(i), but also that Petitioner's presence would compromise a compelling United States foreign policy interest, 8 U.S.C. §§ 1182(a)(3)(C)(iii) & 1227(a)(4)(C)(ii).

There is thus no doubt that Petitioner's removal is statutorily authorized.  Again, an alien may be removed—including for his "beliefs, statements, and associations"—so long as "the Secretary of State personally determines that the alien's admission would compromise a compelling United States foreign policy interest. 8 U.S.C. §§ 1182(a)(3)(C)(iii) & 1227(a)(4)(C)(ii); *see also* 8 U.S.C. § 1182(a)(3)(B)(i). Importantly, Petitioner does not argue these statutory provisions are themselves unconstitutional.  Nor could he.  The Supreme Court has affirmed that the Executive Branch may base removal actions on an alien's political activity. *Harisiades v. Shaughnessy*, 342 U.S. 580, 591-92 (1952); *see also, e.g.*, *Turner v. Williams*, 194 U.S. 279, 293 (1904). This is one of the specific "areas" where "aliens' First Amendment rights" are "less robust than those of citizens." *Bluman v. Fed. Election Comm'n,* 800 F. Supp. 2d 281, 287 (D.D.C. 2011) (Kavanaugh, J.) (citing *Harisiades,* 342 U.S. at 591–92), aff'd, 565 U.S. 1104 (2012).

Petitioner still challenges his removal on constitutional grounds, however, reasoning it is, essentially, the product of unlawful ideological targeting. ECF No. 19, at 9-11. But that argument should be rejected.

*First*, the Supreme Court has already held that "selective enforcement" claims are broadly unavailable to aliens in the immigration context. In *AADC,* for example, the Court noted the government's admission "that the alleged First Amendment activity was the basis for selecting the individuals for adverse action." 525 U.S. at 488 n.10. The aliens brought a First Amendment challenge and argued to the Supreme Court that a lack of immediate review would have a "chilling effect" on their First Amendment rights. *Id.* at 488.  Nonetheless, the Supreme Court held that under the system for review Congress created, and under our constitutional structure, such a selective enforcement claim was not available.  *Id.* at 490-91. That is this case; *AADC* is dispositive.

*Second*, there is no constitutional bar to the Executive Branch prioritizing certain political activity in the context of exercising otherwise lawful removal authorities. Indeed, in *Harisiades*, the Government sought to remove certain aliens for being members of the Communist Party— *because* they were members of the Communist Party (or at least were at one point). 342 U.S. at 581. There is no constitutional difference between immigration enforcement prioritized toward communists, and that prioritized towards supporters or sympathizers of other causes.

*Third*, Secretary of State Rubio's foreign-policy determination is not reviewable under the First Amendment. The Supreme Court has recognized that administering the nation's foreign policy is the province of the Executive Branch, especially in the context of immigration enforcement. "The Executive should not have to disclose its 'real' reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even if it did disclose them a court would be ill equipped to determine their authenticity *and utterly unable to assess their adequacy*." *AADC*, 525 U.S. at 491 (emphasis added).  Especially so where, as here, such a decision has been expressly assigned to the discretion of the Executive Branch via federal statute.  In those cases, the Secretary's determination is conclusive and unreviewable by the federal courts. *See Zivtofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) ("a controversy 'involves a political question . . . where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it.'") (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993); *see also Haig v. Agee*, 453 U.S. at 282, 289, 309; ECF No. 25, at 14-16. Moreover, even if this rule were subject to some exception, Petitioner has not established why one is warranted here. The Secretary of State's determination enjoys a presumption in favor of regularity that Petitioner has not displaced. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("presumption of regularity" applies to prosecutorial

decisions); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971). Indeed, Petitioner has received the "statutory citation" for his removal, which constitutes the outer bounds of process that he is entitled to here. *Trump v. Hawaii*, 585 U.S. 667, 703-04 (2018) ("respect for the political branches' broad power over the creation and administration of the immigration system meant that the Government need provide only a statutory citation to explain a visa denial") (discussing and quoting *Kerry v. Din,* 576 U.S. 86, 105 (2015) (Kennedy, J., concurring)).  There is no constitutional basis to probe beyond that submission, let alone set it aside.

Thus, Petitioner has not shown a clear case for habeas relief or extraordinary circumstances. The Government has lawful basis for seeking removal and has implemented the process established by Congress for balancing the First Amendment rights of Petitioner against the foreign policy interests of the nation. Having engaged in that congressionally approved balancing, the Court may not second-guess the Executive's determinations that Petitioner's presence in the country is contrary to foreign policy. That determination also compels against reversing the Executive's discretionary decision to detain Petitioner during the duration of his removal proceedings.

## 2.  Petitioner's Release Would Not Be in the Public Interest.

### a.  Releasing Petitioner Would Take Over the Executive's Policy Determination.

*Mapp* relief can only occur if the Petitioner can also establish it is in the public interest. Because the Secretary of State has determined Petitioner's presence in the United States is contrary to foreign policy, a decision to release Petitioner under *Mapp* would necessarily require the Court to second-guess and reject that very determination which Congress has personally entrusted to the Secretary of State. As touched on above, that is not the role of this Court. *See AADC*, 525 U.S. at 491.

### b. Petitioner Cannot Establish He Does Not Present a Danger or a Risk of Non-Appearance.

But even if this Court were to second-guess the decision of the Secretary of State, it should come to the same conclusion. There is ample evidence—all of which, again, should go to the immigration judge and be evaluated during those exclusive proceedings—to indicate that Petitioner is a threat to the community, and thus ineligible for *Mapp* relief. *See Mapp*, 241 F.3d at 231 n.14.

The government acknowledges Petitioner has not been convicted of criminal offenses. However, law enforcement records and Petitioner's submissions indicate he (1) has admitted to being involved in and supporting antisemitic acts of violence; (2) has admitted to an interest in and facility with firearms for that purpose; and (3) has access to unexplained sources of wealth that he has used to purchase real estate, travel internationally, and acquire illegal drugs. These circumstances all militate against release.

Petitioner arrived in the United States in July 2014. *See* ECF No. 19-4, at 4. According to Windsor, Vermont, police reports (filed herewith as Exhibit B), by 2015, he had moved to the Upper Valley, where he initially lived with his wife. In August 2015, Windsor Police spoke with a local gun shop owner, who reported that earlier that summer Petitioner offered to work in the gun shop without monetary compensation. According to the report, Petitioner "supposedly told" the gun shop owner "that he had considerable firearm experience and used to build modified 9mm submachine guns to kill Jews while he was in Palistine [sic]." *Id.* at 2. On another occasion that summer, Petitioner told the gun shop owner that "he wished to purchase a sniper rifle and a machine gun." *Id.* at 3. On this occasion, Petitioner did not specify the exact gun he wanted, and he did not share his purpose in wanting to purchase the weapons. *Id.* The gun shop owner referred

the police to another member of the community, who also recounted that Petitioner stated in 2015 that "I like to kill Jews." *Id.* at 4.

Windsor Police reports also show that by November 2015, Petitioner was in the process of divorcing from his wife, who asked the police department to take custody of a shotgun in their home following a "non-physical argument" with him. *Id.* at 6. The divorce became final in June 2016. *See* ECF No. 19-4, at 4.

Notably, none of the many letters of support submitted on Petitioner's behalf, (ECF No. 19-1), address Petitioner's actions or words from the summer of 2015. Rather, the earliest experience with Petitioner recounted appears to be from a supporter who met him in December 2015, after Petitioner's wife reported to the police that they were divorcing. *See* ECF No. 19-1, at 165[1]; Exhibit B, hereto, at 6. Petitioner moved in with this supporter in January 2016, and they have remained close. *Id.* According to this supporter, when Petitioner moved in with him Petitioner was taking classes at Dartmouth and trying to find employment. This supporter offered Petitioner a job at a general store, where Petitioner appeared to work part-time while attending classes at Dartmouth. ECF No. at 165; *see also id.* at 177.

In addition to attending Dartmouth, Petitioner also attended Lehigh University from 2018 until 2021, when he transferred to Columbia, ECF No. 19-2. At Columbia he remains 13 credits away from obtaining a bachelor's degree. ECF No. 19-1, at 202.

At some point in or after 2018 Petitioner also purchased "a beautiful hilltop piece of land in West Fairlee, VT." ECF 19-1, at 159. He has also repeatedly travelled internationally. *See* CBP Report of January 2019 Encounter with Petitioner at Derby Line Port of Entry, Exhibit C, filed herewith, at 4 (Petitioner reporting he was returning from two days in Montreal to visit a woman

---

[1] Another supporter recalled hearing Petitioner speak in 2015. ECF No. 19-1, at 198.

he had met on a recent Caribbean cruise). According to Exhibit C, when he was returning from Canada in January 2019 at Derby Line, petitioner also illegally possessed LSD, methamphetamine, and illegal mushrooms. *Id.* at 4. He also possessed more than $4,000 in U.S. currency. *Id.* at 4.

When deciding to release or detain someone under the Bail Reform Act, the Court customarily has the benefit of a pre-trial services report, prepared by a neutral member of the probation office. The court does not have the benefit of such a report here. But in light of the disturbing admissions attributed to him by members of the Windsor, Vermont, community in 2015, the absence of any information about that time among Petitioner's voluminous submission should give the Court pause. And, despite having attended college classes since 2016, Petitioner has not yet earned a degree. He also appears to have unexplained access to substantial financial resources, which he used to purchased real estate, travel internationally, and acquire illegal controlled substances. He also expressed interest in purchasing a sniper rifle and a machine gun. Given this information, the Court should be especially reluctant to disturb the Secretary of State's determination that Petitioner's presence is contrary to the foreign policy of the United States.

Petitioner has failed to meet his burden to establish that he does not present a danger or risk of non-appearance.

## CONCLUSION AND REQUEST FOR STAY

For the above reasons, not only does this Court lack jurisdiction to release Petitioner under *Mapp v. Reno,* Petitioner has also failed to make the showing necessary for such release.

If the Court rejects the arguments contained herein and does order Petitioner's release pending the outcome of this matter, the government respectfully requests that the Court stay the order for seven days in order to allow the government to pursue an appeal.

Respectfully submitted,

Dated: April 28, 2025                    By:    */s/ Michael P. Drescher*
                                                Michael P. Drescher
                                                Assistant United States Attorney
                                                District of Vermont

**THE SECRETARY OF STATE**
**WASHINGTON**

SENSITIVE BUT UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

MEMORANDUM FOR THE SECRETARY OF HOMELAND SECURITY

FROM:      Marco Rubio *M_a /l_o*   3/15/2025

SUBJECT:   (SBU) Determination of Deportability under Section 237(a)(4)(C)
           of the Immigration and Nationality Act (INA)

(SBU) I am writing to inform you that upon notification from the Department
of Homeland Security's Homeland Security Investigations (DHS/ICE/HSI) on
March 14, 2025, I have determined that Mohsen MAHDAWI (DOB: ▓▓▓▓
1990; POB: Israel), a U.S. Lawful Permanent Resident (LPR), is a deportable
alien under INA section 237(a)(4)(C). I understand that ICE now intends to
initiate removal charges against him, based on assurances from
DHS/ICE/HSI.

(SBU) Under INA section 237(a)(4)(C)(i), an alien is deportable from the
United States if the Secretary of State has reasonable ground to believe that
the alien's presence or activities in the United States would have potentially
serious adverse foreign policy consequences for the United States. Under
INA section 237(a)(4)(C)(ii), for cases in which the basis for this
determination is the alien's past, current, or expected beliefs, statements, or
associations that are otherwise lawful, the Secretary of State must
personally determine that the alien's presence or activities would
compromise a compelling U.S. foreign policy interest.

(SBU) Pursuant to these authorities, I have determined that the activities
and presence of this alien in the United States would have potentially
serious adverse foreign policy consequences and would compromise a
compelling U.S. foreign policy interest. These determinations are based on
information provided by DHS/ICE/HSI that Mahdawi, through his leadership

-2-

and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the regional and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

(SBU) The Department of State also requests the opportunity to consult with the Department of Homeland Security on any public statements regarding this determination.

(SBU) I hereby expressly authorize use of this notification by the Department of Homeland Security in immigration court.

**Attachments**
   Tab 1 – DHS Letter on Mohsen Mahdawi
   Tab 2 – HSI Subject Profile of Mohsen Mahdawi
   Tab 3 – 8 USC 1227(a)(4)(C)

```
04/23/25                  Windsor Police Department                    649
08:44                     LAW Incident Table:              Page:    1

   Incident
Incident Number  15WN01444    Nature  Suspicious
   Case Number                          Image
      Address√ 737 US RT 5 S
        City  Windsor          State  VT   ZIP  05089
        Area  1423  WINDSOR PD          Contact

   Complainant
Numbr
Last                      Fst               Mid
   DOB            SSN      Adr
Race    Sx   Tel          Cty                ST     ZIP

   Details
Offense/Statute  PSC
                                 Reported         Observed  PSC
   Circumstances  LT05
Rspndg Officers  Connor, C
Rspnsbl Officer  Connor, C       Agency  1423       CAD Call ID
   Received By  Connor, C              Last RadLog
   How Received  T  Telephone          Clearance
   When Reported  22:34:49 08/21/15    Disposition  COM  Disp Date  08/21/15
Occurrd between  18:00:00 08/18/15    Judicial Sts
          and  18:20:00 08/18/15      Misc Entry
          MO

External CAD ID

   Narrative
Narrative  (See below)
Supplement  (See below)
```

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

```
INVOLVEMENTS:
Type  Record #    Date    Description                Relationship
 NM      9437  08/18/15   ███████████████            Witness
 NM     10179  08/18/15   Mahdawi, Mohsen K          POI
 NM     11895  08/18/15   ████████████████████       BOI/AOI
```

**JA 342**

```
LAW Incident Offenses Detail:
                              Offense and Statute Codes
Seq Code                            Statute Code                        Amou
t
  1 PSC  Suspicious Person/Circumstance
  0.00

LAW Incident Circumstances:
                    Contributing Circumstances
Seq Code                                     Comments
  1 LT05  Commercial/Office Building

LAW Incident Responders Detail
    Responding Officers
Seq Name                Unit
  1 Connor, C           M466
```

Narrative:
_____

On 08/18/15 around 1600 hours I was on duty as a Detective for the Windsor Police Department when Chief William Sampson came into the Detective's office and told me that he had just talked to a concerned citizen who wanted to report some suspicious activity.  Chief Sampson said this citizen was concerned because he had heard that a suspicious male subject had recently approached the owner, ████████████ of ████████████████ Gunsmithing, located at 737 US Route 5 S in Windsor about seeking employment at the gun shop.  This concerned citizen told Chief Sampson that he had knowledge that this same suspicious male returned to the gun shop at a later date and had requested to purchase a sniper rifle and a machine gun.  According to this concerned citizen, the suspicious male had taken photographs of the outside and inside of the gun shop. Also this citizen told Chief Sampson that the suspicious male subject told the MR ██████ that he used to make guns for "Hezballah". Chief Sampson asked me to make contact with MR ██████ in an attempt to verify this information.

On 08/18/15 around 1800 hours I was out at Windsor Arms Custom Gunsmithing. I was met at the door by ████████████████████, who I know from previous law enforcement interactions. MR ██████ led me into his place of business, where I told him the reason for my visit.  MR ██████confirmed that the information relayed to Chief Sampson by the concerned citizen was true.  The following is the facts as explained to me by MR ██████

MR ██████told me that sometime around two months ago an adult male subject of middle eastern decent came into MR ██████s place of business.  MR ██████ told me this male explained that he was a resident of the town of Windsor and that he was interested in seeking employment here at the gun shop making guns and modifying guns.  According to ██████ this male even offered to work here for no monetary payment. This male subject supposedly told MR ██████ that he had considerable firearm experience and used to build modified 9mm submachine guns to kill Jews while he was in Palistine.  MR ██████told me that this male subject seemed to in fact have a lot of knowledge about gun design and function.

**JA 343**

MR ████ told me that about three weeks ago this same male subject
returned to Windsor Arms Custom Gunsmithing. MR ████ told me that he has
outside surveillance cameras outside his place of business. MR ████ told me
he was inside his place of business when he saw on his surveillance monitor that
this suspicious male subject was outside taking pictures of MR ████ s gun
shop. MR ████ told me that he went outside to ask the man why he was taking
photos. According to MR ████, the man told him that he was taking pictures
that he planned to give to MR ████ so that he could post them on Facebook. MR
████ said that he invited the male into the gun shop where the male took
photos of the inside of the business and the merchandise on display. According
to MR ████ this male subject never did provide him with copies of these
photographs. MR ████ now suspects this male was taking pictures for the
purpose of reviewing what was in place for security cameras, the type of locks
and security on the doors, and to detail merchandise in the business.

MR ████ told me that on the second visit, the male subject said that he
wished to purchase a sniper rifle and a machine gun. MR ████ told me that the
male had not specified specific firearms for purchase nor had he shared his
purpose or intent with these firearms. MR ████ told me that the male had
provided him with his Vermont Operator's license which contained the male's
photograph. MR ████ told me that he had made a photo copy of the male's
operator's license and he had written the man's phone number down as
documentation. MR ████ provided me with a photo copy of this information.

This photo copy was of Vermont drivers license ████ issued on ████ 15
to Mohsen K Mahdawi DOB ████ 90. The license lists MR Mahdawi's address as 15
Durkee Street in Windsor, Vermont. The license lists MR Mahdawi's physical
features as 6' 0", 165 lbs, and brown eyes. According to MR ████ MR Mahdawi
gave his phone number as 603 ████ According to MR ████, MR Mahdawi told
him that he was getting a job in Rutland, Vermont and that he was going to move
to that area. MR ████ told me that MR Mahdawi has not come back to the gun
shop since this meeting about three weeks ago.

I asked MR ████ if there was anything else that he could think of that
might be helpful. MR ████ told me that his friend ████ a retired
machinist and gun enthusiast, has told MR ████ that he has had similar
conversations with MR Mahdawi about his ties to Palistine and his gun making
experience. MR ████ gave me a phone number to contact MR ████ at
802-████ MR ████ advised that MR Mahdawi had told him that his wife was
in the ARMY. It should be noted, that I am familiar with MR Mahdawi from a
previous law enforcement interaction which took place at his residence at 15
Durkee Street in Windsor. During this interaction I was introduced to a woman
who MR Mahdawi verbally identified as his wife. It was my understanding at this
time, that his wife is a travelling nurse who works at a hospital in the upper
valley area.

On 08/22/15 around 1640 hours I met with MR ████ at the Precision
Museum located on Main Street in Windsor, where MR ████ works as a
volunteer. I had called MR ████ prior to this meeting and let him know the
intended topic of discussion. MR ████ told me that he has spoken several
times about the suspicious male subject of middle eastern decent who came into
MR ████'s gun shop inquiring about potential employment and the possible
purchase of a machine gun and a sniper rifle. MR ████ told me that roughly
2 or 3 weeks ago he was working at the Precision Museum and had a group of 15-20
people in the museum looking at items on display and listening to MR ████
discuss the history of various items. MR ████ said at this time a adult

**JA 344**

male of middle eastern decent came into the museum and joined the group of people taking the museum tour. MR ███████ told me that this male had a cell phone in his hand and appeared to be taking pictures and video of the people in the museum and the items on display, particularly the vintage firearms on display. MR ███████ told me that at some some point this suspicious male approached and told MR ███████ that he was interested in purchasing an automatic rifle and a sniper rifle. MR ███████ told me that he thought this was an odd topic of conversation to be having with a man that he has never met before. According to MR ███████ this male subject told him that "I like to kill Jews". MR ███████ told me that this comment made him nervous because he thought there may be some truth to the man's statement.

MR ███████ then told me about a couple weeks ago he was in the Windsor Price Chopper in the check out line. MR ███████ told me that he noticed that the same suspicious male from the museum was in the check out line ahead of him. MR ███████ said this suspicious male had his cell phone in his hand and appeared to be taking pictures or video of people in the check out line and of the cashier. MR ███████ told me that he has no idea why this male would be taking pictures in the store. MR told me that he is certain this is the same male subject who approached MR ███████ about working at his gun shop and purchasing firearms.

This report is for informational purposes only, and this information will be forwarded to the Department of Homeland Security.

Law Supplemental Narrative:

Supplemental Narratives

| Seq | Name | Date | Narrative |
|-----|------|------|-----------|
| 1 | Connor, C | 11:43:17 09/28/15 | |

As of 09/28/15, no further information or suspicious activity has been received or reported.

```
04/23/25                 Windsor Police Department                    649
08:44                    LAW Incident Table:                Page:    1

   Incident
Incident Number   15WN01996    Nature  Citizen Dispute
   Case Number                          Image
       Address✓ 29 UNION ST; Windsor Fire/Police
        City  Windsor            State  VT   ZIP   05089
        Area  1423  WINDSOR PD           Contact  male in lobby

   Complainant
Numbr        13457
   Last                         Fst  Meagan        Mid
    DOB                  SSN        -   -   Adr✓ 15 DURKEE ST
    Race  W Sx  F Tel   (714)           Cty  Windsor        ST  VT ZIP  05089

   Details
Offense/Statute  CDIS
                                    Reported  0450  Observed  CDIS
   Circumstances  LT20
Rspndg Officers  Frank, J         Rataj, C            Silver, D
Rspnsbl Officer  Silver, D         Agency  1423          CAD Call ID    25924
    Received By  Boutilier, M             Last RadLog  19:15:22 11/18/15    CMPLT
   How Received  T  Telephone            Clearance  RTF  Report to Follow
  When Reported  16:45:51 11/18/15      Disposition  COM  Disp Date  11/24/15
Occurrd between  16:45:37 11/18/15      Judicial Sts
          and    16:45:37 11/18/15      Misc Entry
          MO

External CAD ID

   Narrative
 Narrative  (See below)
Supplement  (See below)

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

INVOLVEMENTS:
Type  Record #     Date      Description                  Relationship
NM     10179   11/24/15   Mahdawi, Mohsen K            POI
NM     13457   11/24/15                                *Complainant
CA     25924   11/18/15   16:45 11/18/15 Family Fight  *Initiating Call
PR      2255   11/18/15   BRO Gun Mossberg 12GA  $0    Property
```

**JA 346**

```
LAW Incident Offenses Detail:
                            Offense and Statute Codes
Seq Code                        Statute Code                        Amou
t
  1 CDIS Citizen Dispute
  0.00

LAW Incident Circumstances:
                    Contributing Circumstances
Seq Code                                    Comments
  1 LT20  Residence/Home

LAW Incident Responders Detail
    Responding Officers
Seq Name                Unit
  1 Frank, J            M469
  2 Rataj, C            M464
  3 Silver, D           M471

Main Radio Log Table:
Time/Date            Typ Unit          Code  Zone  Agnc Description
19:15:22 11/18/15    1   M464          CMPLT 1423  1423 incid#=15WN01996 Compl
19:15:22 11/18/15    1   M469          CMPLT 1423  1423 incid#=15WN01996 Compl
19:15:22 11/18/15    1   M471          CMPLT 1423  1423 incid#=15WN01996 Compl
17:00:22 11/18/15    1   M471          ARRVD 1423  1423 incid#=15WN01996 Arriv
16:52:33 11/18/15    1   M464          ARRVD 1423  1423 incid#=15WN01996 Arriv
16:46:44 11/18/15    1   M469          ARRVD 1423  1423 incid#=15WN01996 Arriv
16:46:24 11/18/15    1   M469          ENRT  1423  1423 incid#=15WN01996 Enrou
```

Narrative:

On 11-18-2015 at approximately 1700 hours I responded to the lobby of the
Windsor Police Department for a citizen dispute.  Upon arrival, I made contact
with ███████████ DOB: ███████████ ███████████ of 15 Durkee Street in Windsor
who asked that the WPD take possesion of her personally owned 12GA Mossberg
Shotgun until the situation with her partner is resolved. █████ advised that
she and her partner Mohsen K. M. Mahdaii DOB: ████-1990 (603) ████████ also of 15
Durkee Street are going through a divorce and that they had just had a non-
physical argument. Also present in the WPD lobby was █████'s friend, identified
as Matthew J. Wesley DOB: ███████████████ of ███████████████ located in
Lebanon, NH 03766 who advised that he too had a non-physical argument with
Mahdaii surrounding the circumstances as to why Wesley was in Mahdaii's house at
15 Durkee Street with █████ █████ advised that she will retrieve the firearm
from the WPD at a later date.  This weapon has been logged into the WPD Evidence
Room to negate escalation surrounding this incident as requested by ███████.

Nothing follows.  DAS/M471

Law Supplemental Narrative:
                        Supplemental Narratives
Seq Name                Date            Narrative
  1 Adams, J            10:04:30 06/16/16
Shotgun listed in involvement's released to ███████████████ on 06/16/2016 at 0830
hrs. Receipt kept on file.

**JA 347**



## U.S. Customs and Border Protection
### U.S. Department of Homeland Security
#### TECS - Secondary Inspection Report

04/22/2025 15:19 EDT                Generated By ▮▮▮▮▮▮▮▮▮▮                Page 1 of 5

| Referral Source | | | |
|---|---|---|---|
| Referred By | Referred Date | Referred Time | Referred From |
| ▮▮▮▮▮ | 01/12/2019 | 15:28 EST | ▮▮▮▮▮ |
| Referral Reason | | | |
| 7-POINT | | | |

| Package | | |
|---|---|---|
| Conveyance Type | No Plate or No VIN | VIN Number |
| A - AUTO | N/A | |
| License Plate State | License Plate Number | Inbound / Outbound |
| VT - VERMONT | GTA561 | I - Inbound |
| Secondary Plates | | |
| | | |
| Vehicle Search | No. Of Passengers In Vehicle | |
| S-SEVEN POINT INSPECTION | 1 | |
| Referring Officer Code | Referral Type | |
| ▮▮▮▮▮ | C-Baggage | |
| Reason for Referral Code | | |
| ▮▮▮▮▮ | | |

| Encounter | | |
|---|---|---|
| Last Name | First Name | DOB |
| MAHDAWI | MOHSEN | 09/12/1990 |
| Hispanic | Sex | Race | Travel Document Presented | Lost / Stolen Document |
| No | M - Male | U - UNKNOWN | Yes | No |
| Doc Number | Doc Type | Issuing Country | State/Province | |
| 207408761 | C1 - PERMANENT RESIDENT CARD (1998 - 2003) | USA - UNITED STATES | | |
| Nationality | City of Birth | Country of Birth | |
| XXX - UNDETERMINED NATIONALITY | | | |
| Father's Last Name | Father's First Name | Father's Middle Name | |
| | | | |
| Mother's Last Name | Mother's First Name | Mother's Middle Name | |
| | | | |
| Email Addresses | | | |
| | | | |
| Phone Numbers | | | |
| | | | |

| Baggage | |
|---|---|
| Secondary Officer Name | Site Id |
| ▮▮▮▮▮ | ▮▮▮▮▮ |
| Inspection Start Date and Time | Inspection End Date and Time |
| 01/12/2019 22:48 EST | 01/12/2019 22:57 EST |
| FinCEN FORM 105 | Currency Amount (USD) |
| | |
| Bag Exam | Number of Bags X-Rayed |
| Yes | |
| Positive / Negative Inspection | Personal Search | ▮▮▮ sed | X-Ray/Nil Utilized for this Inspection |
| P - Positive | No | ▮▮▮ | |
| Category | | | |
| 1 | | | |
| Violation Codes | | | |
| DRG - DRUG SEIZURES - CONTROLLED (21 CFR 1308.12-15)/PROHIBITED MEDS > 1000 UNITS | | | |
| Related Document Number | Create Incident Log | Incident Log Report Number | |
| | | ▮▮▮▮▮ | |

JA 348

For Official Use Only / Law Enforcement Sensitive



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
TECS - Secondary Inspection Report

| 04/22/2025 15:19 EDT | Generated By ███████████ | Page 2 of 5 |
|---|---|---|

| SAS Number | | Create ██ | | ██ Number |
|---|---|---|---|---|
| ██████████████ | | | ████ | |
| Baggage Inspection Complete | | | | |
| Yes | | | | |

For Official Use Only / Law Enforcement Sensitive



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
TECS - Secondary Inspection Report

04/22/2025 15:19 EDT                    Generated By ██████████                    Page 3 of 5

**Comments History**

**JA 350**

For Official Use Only / Law Enforcement Sensitive



## U.S. Customs and Border Protection
## U.S. Department of Homeland Security
### TECS - Secondary Inspection Report

04/22/2025 15:19 EDT                    Generated By: ████████ LIAM                    Page 4 of 5

**Entered By:** ████████        **Created Date/Time:** 01/12/2019 22:57 EST

On Saturday January 12, 2019 at approximately 1530 a white Audi bearing Vermont License plate GTA 561 being driven by Mohsen MAHDAWI (COC: Palestine, DOB: ████████ US LPR, A#207408761) arrived at the I-91 Derby Line, VT port of entry. MAHDAWI told primary CBPO ████████ that he was coming back from 2 days in Montreal, visiting a woman he met on a cruise to the Caribbean two weeks before. MAHDAWI presented his US LPR Card and a passport issued by The Palestinian Authority (PP#3154593) to CBPO ████████. CBPO ████████ referred MAHDAWI to secondary for a 7 point vehicle inspection and to have MAHDAWI's story checked.

In secondary, CBPO ████████ reviewed subject's presented documents and due to the subject's IR6 LPR status, CBPO ████████ asked the MAHDAWI how he obtained his status. MAHDAWI stated that he got his status through marriage. CBPO ████████ noticed that there was no K Visa in MAHDAWI's passport, but he had a B1/B2 visa issued in June 2014 through June 2017. CBPO ████████ questioned MAHDAWI about where he met his wife and where they were married; MAHDAWI stated that he met his wife in Jerusalem and married his wife in Palestine and then he entered the US as a visitor and adjusted his status within the US.

CBPO ████████ began running systems checks on MAHDAWI and was reviewing prior secondary inspections done on MAHDAWI when MAHDAWI stepped up to the counter and wanted to know how long he was going to be at the port. MAHDAWI stated that he had an appointment in White River Junction, VT at 1745 that afternoon and asked if he should reschedule. CBPO ████████ stated that the inspection would take as long as necessary to establish the facts surrounding MAHDAWI's LPR status, identity, and the purpose of his trip to Canada. MAHDAWI stated that he has been questioned several times before and asked CBPO ████████ if there was any way to expedite the inspection. CBPO ████████ stated that there was no way to expedite the inspection; MAHDAWI stated that he was ████████ to call his lawyer. At this point MAHDAWI was told by CBPO ████████ who overheard the interview, to hand over his cell phone that he was using at the time. MAHDAWI said that he would not hand over his phone and was going to record the encounter and send the video to his lawyer. At this point CBPO ████████ with approval from SCBPO ████████ called for backup to handcuff MAHDAWI; CBPO ████████ handcuffed MAHDAWI and performed an immediate patdown for weapons which was negative. MAHDAWI was then escorted to the secure holding cell at approximately 1620. MAHDAWI's shoes, belt and scarf were removed before detention. CBPO ████████ and CBPO ████████ conducted checks on MAHDAWI in the cell every 15 minutes. CBPO ████████ took possession of MAHDAWI's cell phone; MAHDAWI refused to provide the passcode to unlock his phone. Approximately 20 minutes later CBPO's ████████, ████████ and ████████ and SCBPO ████████ approached MAHDAWI in the holding cell and asked again for the passcode, MAHDAWI again refused to provide the passcode. MAHDAWI was informed that his phone would be detained because he refused to provide the passcode.

At approximately 1630 CBPO's ████████ nd ████████ conducted a seven point inspection of the vehicle; inside MAHDAWI's suitcase located in the vehicle's trunk CBPO ████████ found a bag of mushrooms. CBPO ████████ found $3600 USD in two separate envelopes in MAHDAWI's baggage. While the seven point inspection was taking place, (A)APD ████████ searched MAHDAWI's wallet and found 1 tab that had the appearance of LSD, (A)APD ████████ also found the wallet to contain $525 USD. The total amount of money that MAHDAWI was carrying was $4125 USD. (A) APD ████████ instructed CBPO's to sea▒▒ he car again to see if there was any contraband that was missed. CBPO's ████████ and ████████ searched the car again and CBPO ████████ found 3 prescription bottles for methylph▒▒▒▒te with MAHDAWI's name on them.

CBPO ████████ examined all three prescription bottles; two of the bottles were legitimate methy▒▒▒▒nidate tablets prescribed for AD/HD. The third bottle contained 16 clear, unmarked capsules filled with a white powder. CBPO ████████ opened one of the capsules and tested the powder using Marquis Reagent 902; the powder field tested positive for methamphetamine. All the powder in the capsule was destroyed in testing. (A)APD ████████ tested the tab with Ehrlich's (Modified) Reagent 907; the tab field tested positive for LSD. (A)APD ████████ mushrooms were tested using Marquis Reagent 902; the mushrooms field tested positive for opiates. The remaining 15 capsules were weighed by SCBPO ████████ and found to be 12 grams, the mushrooms were weighed by (A)APD ████████ and found to weigh 5 grams.

At approximately 1705 MAHDAWI complained of stomach pain and stated that he was very cold and requested medical attention; SCBPO ████████ called EMS at 1710. EMS arrived at 1730 and examined MAHDAWI; they found his blood pr▒▒▒▒ low and his temperature normal, despite

JA 351

For Official Use Only / Law Enforcement Sensitive



**U.S. Customs and Border Protection**
**U.S. Department of Homeland Security**
TECS - Secondary Inspection Report

| 04/22/2025 15:19 EDT | Generated By███████████ | Page 5 of 5 |

MAHDAWI's complaints of being cold. EMS transported MAHDAWI to North Country Hospital at 1800; CBPO █████ rode in the ambulance with MAHDAWI, CBPO█████ followed behind the ambulance. MAHDAWI was released from the hospital and returned to the POE in good condition at approximately 2037. The doctors reported that he is not suffering from any serious condition. Subject was placed back into a detention cell; CBPO █████ continued making checks every 15 minutes.

CBPO █████ created █████████████████ for MAHDAWI and ███████████████████. CBPO █████ continued running systems queries and found that MAHDAWI was a positive match to several system lookouts.

██████ CBPO █████ discovered in the queries that MAHDAWI was already divorced from █████ (DOB: █████ COC: USC) while he was in conditional status before he received his U.S. LPR card with the IR6 code.

█████████████████████████████████████████████████████████████████████

At approximately 1604, █████████████████████████████████████████████

JTTF TFO █████ was contacted and was advised of the situation. █████ declined interest in the case. HSI was contacted and declined to appear on this date, but do have interest in the case and will obtain the information at a later date.

At approximately 1930 SCBPO █████ notified Vermont State Police of the situation; VSP Sergeant █████ responded to the POE at approximately 2000. Sgt. █████ issued MAHDAWI a citation █████ lt, stating that she would return later to pick up █████ rugs once CBPO's finished the paperwork. CBPO █████ placed the mushrooms in seizure bag #A5408968, the LSD tab was placed in seizure bag █████ 08965, and the remaining 15 capsules of methamphetamine in seizure bag #A5408966. FPF number 2019020900002801, incident number 2019SA0006929. All three bags were placed in a safe pending transfer to Vermont State Police slated for January 13, 2019.

At approximately 2030, CBPO █████ detained with approval of Port Director █████ the Apple iPhone that belonged to MAHDAWI inside a seizure bag #A5408969 with the 6051D Form 2248161.

MADHAWI was released as LPR at 2120 in good spirits. MAHDAWI was informed about the detention of his phone, and the entirety of his money and belongings were returned to him. After MAHDAWI was released he apologized to all the CBPO's involved in the incident and when he was escorted to his car MAHDAWI stated to CBPO's █████ and █████ that he would like to have to shake their hands. MAHDAWI left the POE voluntarily and on █ wn accord.

Referral Reason History

| Referred By █████ | Referred Date/Time:01/12/2019 15:28 EST | Referred From █████ |
| 7-POINT | | |

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF VERMONT

MOHSEN MAHDAWI,

*Petitioner*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States; PATRICIA HYDE,
in her official capacity as Acting Boston Field
Office Director; Vermont Sub-Office Director of
Immigration and Customs Enforcement; TODD
M. LYONS, in his official capacity as Acting
Director for U.S. Immigration and Customs
Enforcement; KRISTI NOEM, in her official
capacity as Secretary of the United States
Department of Homeland Security; MARCO
RUBIO, in his official capacity as Secretary of
State; and PAMELA BONDI, in her official
capacity as Attorney General of the United States,

*Respondents*.

Case No. 2:25-cv-00389

**REPLY TO RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR
RELEASE UNDER *MAPP v. RENO***

**JA 353**

## **INTRODUCTION**

Petitioner Mohsen Mahdawi is being detained solely on the basis of his lawful speech in support of Palestinian human rights. Respondents have now had two weeks to advance an alternative explanation, and still Respondents do not claim otherwise or provide any contrary evidence. The extraordinary nature of Mr. Mahdawi's arrest and subsequent detention cannot be overstated: the government knowingly lured a lawful permanent resident of over ten years to his naturalization appointment only to shackle and detain him because of his advocacy. This is a blatant violation of Mr. Mahdawi's First Amendment rights, and no government official has discretion to violate the U.S. Constitution.

Mr. Mahdawi left a refugee camp in the West Bank after being shot in the leg and after witnessing the murder of loved ones. He came to the United States to complete his education and find a new life. He is neither a flight risk nor a danger to the community, quite the contrary. He hopes only to continue with his educational pursuits and become a United States citizen. Over 130 total declarations in support of Mr. Mahdawi have attested to his peace-loving nature, his deep community ties, and his rootedness in Vermont. Nearly 50 newly-received declarations, including from individuals who have known him since he first arrived in the United States and a letter of support signed by over 200 Israelis, further illustrate that Mr. Mahdawi is an asset to society, not a danger.

Respondents attempt to obfuscate the unprecedented nature of this arrest and incarceration and diminish this Court's inherent authority to order Mr. Mahdawi's release pending the adjudication of this habeas petition. There is no jurisdictional bar to a constitutional challenge to the legality of *detention*, as the Supreme Court has repeatedly held. And this is clearly an unusual case, raising substantial claims and extraordinary circumstances, warranting release under *Mapp v. Reno*.

In arresting a lawful permanent resident for nothing more than his speech, the government has mounted a full-frontal attack on First Amendment freedoms. The Court should reject Respondents'

arguments and exercise its inherent authority to restore Mr. Mahdawi to his freedom—the status he had prior to the present controversy, and the only status that is constitutionally justified—pending further adjudication.

## ARGUMENT

### I.    MR. MAHDAWI EASILY ESTABLISHES A SUBSTANTIAL CLAIM

Mr. Mahdawi's habeas corpus petition raises substantial claims under the First Amendment. He has shown through the government's own evidence—and which the government does not dispute—that his lawful speech is the sole basis of his detention. (Dkt. No. 42 at 2; Dkt. No. 42-1 at 1-2; Dkt. No. 19-3, Form I-213 at 2). The Respondents' own official, signed report provides that the only basis for Mr. Mahdawi's arrest was related to his purported "leadership and involvement . . . in protests at Columbia University"—speech that Respondents necessarily deemed lawful because the Secretary of State made a determination pursuant to 8 U.S.C. § 1182(a)(3)(C)(iii), *cited in* 8 U.S.C. § 1227(a)(4)(C)(ii) (addressing certain speech "that would be lawful within the United States"). (Dkt. No. 19-3; Dkt. No. 19-4, at 2.).

Respondents contend, relying chiefly on *Harisiades v. Shaughnessy,* 342 U.S. 580, 591-92 (1952), that "[t]he Supreme Court has affirmed that the Executive Branch may base removal actions on an alien's political activity." Dkt. No. 42 at 5. This misreads *Harisiades*, which involved "joining an organization advocating overthrow of government by force and violence," and applied a statute expressly proscribing "membership" in the "communist party."  *Harisiades*, 342 U.S. at 591-592.[1] Although *Harisiades* upheld the deportation of noncitizens based on their Communist Party membership, it did so on the ground that such membership was not protected under then-current First

---

[1] Respondents also selectively quote from *Bluman v. Fed. Election Comm'n*, 800 F.Supp. 2d 281, 287 (D.D.C. 2011) ("the Court has indicated that alien's first amendment rights **might** be less robust than those of citizens **in certain discrete areas**.") (emphasis added), which only concerned activities related to democratic self-governance, like voting and holding office.

Amendment doctrine, regardless of citizenship status. *See* 342 U.S. at 592 & n.18 (citing *Dennis v. United States*, 341 U.S. 494 (1941)). No one suggests that Mr. Mahdawi has joined an organization advocating for violent overthrow of the U.S. government, and the government concedes that his "associations" are lawful. (Dkt. No. 42 at 2, citing 8 U.S.C. § 1227(a)(4)(C)). The controlling rule here is thus that "[f]reedom of speech and of press is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Applying 8 U.S.C. § 1227(a)(4)(C) to justify Mr. Mahdawi's detention for his protected speech is therefore unconstitutional, whether or not the statute may be unconstitutional as a general matter for other reasons, *see* Dkt. No. 1 at ¶¶ 83-85.

Respondents also contend that "Secretary of State Rubio's foreign-policy determination is not reviewable under the First Amendment" because "[t]he Supreme Court has recognized that administering the nation's foreign policy is the province of the Executive Branch, especially in the context of immigration enforcement." Dkt. #42 at 6. This argument badly overreaches. Respondent's contention implies that Secretary Rubio could unreviewably decree the detention and removal of all aliens of a particular religion, or all aliens who have ever said an unkind word about the current President.  Given *Bridges*, 326 U.S. at 148, that cannot be the law. *See also Ragbir v. Homan,* 923 F.3d 53 (2d Cir. 2019) ("[Ragbir's] advocacy for reform of immigration policies and practices is at the heart of current political debate among American citizens and other residents"). And because this constitutional jurisprudence creates "judicially manageable standards" to adjudicate Mr. Mahdawi's claims, *Baker v. Carr*, 369 U.S. 186, 217 (1962), there is no unreviewable political question here.

## II.    MR. MAHDAWI'S CASE PRESENTS EXTRAORDINARY CIRCUMSTANCES[2]

---

[2] "[E]xtraordinary circumstances" comes from *Aronson v. May*, 85 S. Ct. 3 (1964) where the petitioner had been convicted and sentenced before bringing a habeas petition and seeking release on bail. The Court held that in addition to "substantial questions presented by the appeal," there must be "some circumstance making this application exceptional and deserving of special treatment in the interests of justice." *Id.* at 6-7. A "greater showing of special reasons" was necessary where a habeas petition followed a conviction and sentence, as opposed to "a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt." *Id.*  Mr. Mahdawi's petition fits into the latter category. Other courts have also opined that the relative liberty interest of the Petitioner is relevant in granting release. *See, e.g.*, *Grune v. Coughlin*, 913 F.2d 41 (2d Cir. 1990).

Virtually every aspect of this case is extraordinary, and Respondents do not even attempt an argument to the contrary. *See* Dkt. No. 42 at 7. The circumstances surrounding Mr. Mahdawi's apprehension, the scope of the constitutional violation, and the harm it has caused and will continue to cause to his education and to his health must lead to a finding of extraordinary circumstances.

The nature of Mr. Mahdawi's apprehension in and of itself was extraordinary. Respondent Marco Rubio made his "determination" with respect to Mr. Mahdawi on March 14, 2025, one month before his arrest on April 14, 2025. The Respondents sent Mr. Mahdawi a notice to appear for his naturalization interview on March 27, 2025, two weeks after the determination was made. Respondents therefore scheduled the interview with the knowledge and intent to punish Mr. Mahdawi in the most extraordinary of ways: having him conclude his naturalization interview before masked and armed agents handcuffed him, forced him into a car, and rushed him to the airport with the goal of sending him to Louisiana, away from his home and support systems.

With respect to the scope of the constitutional deprivation, this too is extraordinary. In fact, it is unprecedented. The government concedes that it has detained Mr. Mahdawi on no other basis than his lawful speech and associations. (Dkt. No. 19-3, Form I-213 at 2.) The provision of the INA cited by Respondents as justification for detaining Mr. Mahdawi has not, to counsel's knowledge, ever been applied as the sole charge to detain and deport a lawful permanent resident for engaging in First Amendment protected speech until March of 2025, when Respondents targeted lawful permanent resident Mahmoud Khalil for his protected speech. In the decades since Section 237(a)(4)(C)(i) has been enacted, it has been reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. *Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999).

The government's violation of Mr. Mahdawi's First Amendment rights through his arrest and detention is clear and extraordinary. It is well established that "[t]he loss of First Amendment

freedoms, for even minimal periods of time, constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also, e.g.*, *Vacchio v. Ashcroft*, 404 F.3d 663, 673 (2d Cir. 2005) (calling a showing of irreparable harm "analogous" to a showing of "extraordinary circumstances"). Each day of Mr. Mahdawi's continued detainment renews the violation of his First Amendment rights by restricting his contact with the outside world and hindering his ability to speak freely. *See, e.g.*, *Ramatu Kiadii v. Decker*, 423 F. Supp. 3d 18, 20 (SDNY 2018) (wondering "if the *Mapp* court could have imagined circumstances more extraordinary than the detention of a woman credibly claiming United States citizenship"); *Coronel*, 449 F. Supp. 3d at 239 ("[T]he Court . . . finds extraordinary circumstances with regards to Petitioners' procedural due process claims.").

Finally, Mr. Mahdawi will suffer as a result of his continued detention. Mr. Mahdawi came to this country, in part, to build a better life and to obtain an education. As a result of the government's conduct, Mr. Mahdawi will not be able to graduate from Columbia University. (Droubi Decl. Ex. 1-CB). And if does not receive his degree prior to the start of fall of 2025, Mr. Mahdawi will be ineligible to register in the master's program that he has been admitted to. *Id.* Additionally, Mr. Mahdawi suffers from health issues that have been exacerbated by his confinement, and if he is not released pending adjudication of his habeas petition, his health will continue to deteriorate. (Ex. 3 ¶ 8; Ex. 2 ¶¶ 2-19). ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

5



The element of the *Mapp* standard, "necessary to make the habeas remedy effective," comes from a fifth circuit case, *Boyer v. Orlando*, 402 F.2d 966 (5th Cir. 1968). *See Mapp*, 241 F.3d at 226. There, where a Petitioner challenged his misdemeanor conviction alleging denial of his right to counsel, which he had not been provided, the Fifth Circuit reasoned that "Boyer's sentence would long have been served before" his habeas case could be heard, and thus "no practical relief could be afforded notwithstanding the Court's recognition of his constitutional claim." *Id.* at 968. Therefore, the Court ordered the Petitioner released on bail to make his remedy truly effective.

The same analysis applies in this circumstance. Mr. Mahdawi argues that his detention is a violation of the First Amendment, and that every day he is incarcerated is a further violation of his constitutional rights. In the parallel removal proceeding, however, the immigration judge and the Board of Immigration Appeals lack jurisdiction over Mr. Mahdawi's constitutional claims, as Respondents concede, *see* Apr. 23, 2025 Tr. at 12. Like in *Boyer*, this provides Mr. Mahdawi with no effective remedy. In *Boyer*, by the time adjudication of Boyer's constitutional claims and release under habeas could be sought, his sentence would have long been served; in this case, by the time adjudication of Mr. Mahdawi's constitutional claims and release under habeas could be sought, he will have endured the very speech-restricting unconstitutional detention his habeas petitioner aims to address, likely for years. The speech of others will have been chilled for all that time as well. In other

words, "no practical relief could be afforded notwithstanding the Court's recognition of his constitutional claim." *Boyer* at 968. The only way to make the habeas remedy effective is to release Mr. Madhawi pending resolution of his habeas petition.

## III.   MR. MAHDAWI IS NOT A DANGER TO SOCIETY OR A FLIGHT RISK

Courts have also found that lack of dangerousness and flight risk support a finding of extraordinary circumstances. *D'Alessandro*, 2009 U.S. Dist. LEXIS 24954 *16. As the over 130 declarations establish, including nearly 50 newly submitted declarations attached as **Exhibit 1**, Mr. Mahdawi is a beloved member of his communities and poses no danger to society and is not a flight risk. One such submission was signed by over 200 Israeli citizens in the U.S. and 250 others who are "appalled" by the "immoral detainment of Mohsen Mahdawi, a Palestinian activist and an advocate of peace, by ICE." (Droubi Decl. Exhibit 1-A). They write, "[t]he targeting of Mohsen is especially absurd given his prominent voice in advocating for dialogue and cooperation between Israelis and Palestinians on Columbia's campus, in the NYC community, and beyond," adding "Mohsen actively built ties with Israelis, understanding that the only sustainable way forward in Israel/Palestine is through shared work between Israelis and Palestinians. Many of us have worked with and gotten to know Mohsen on a deeply personal level. We have been moved by his empathy, kindness, and fortitude." *Id.*

The Respondents' only claims otherwise come in the form of old and unsubstantiated allegations that have long been dismissed. Respondents present a 10-year-old report, memorializing hearsay of two individuals, which was promptly closed by the Windsor Police Department (Ex. 2 ¶¶ 35-39), and incidents related to his divorce from November 18, 2015 (Dkt 42-2 at 5). Mr. Mahdawi is unequivocal that he never made the statements misattributed to him in the decade-old reports. In fact, Mr. Mahdawi later discussed with investigators his concern that the shop owner's conduct was fueled by animus related to his national origin, and their query with him went no further. (Ex. 2. ¶¶

20-38). Respondents provide no information regarding further investigation or determinations on the allegations, a glaring omission which is likely because such information would demonstrate that these claims were ultimately found to be baseless. Indeed, Respondents' selective disclosures to the Court obscure the truth more than clarify it. The only other basis upon which Respondents claim Mr. Mahdawi is a "danger to society" was a temporary detention by Customs and Border Patrol from six years ago related to his lawful prescription medication for a medical condition and vitamins. This incident led to no charges and was fully expunged. (Ex. 2 ¶¶ 42-45, **Exhibit A**). Indeed, Respondents themselves concede that Petitioner "has not been convicted of criminal offenses." (Br. at 8.)

Respondents also falsely claim that none of the declarations stem from individuals who knew of Mr. Mahdawi in or around these relevant time periods. (Br. at 9.) *But see,* Dkt. No. 19-1, Ex. 1-BU ("I've known Mohsen for over 10 years" and calls him "one of the most spiritually gifted young men that I have met"). New declarations from those who have known him for the past 10 years confirm that "his message has been one of peace and tolerance" and that he "bring[s] people together from 'both sides of the aisle' to share a meal and talk." (Ex. 1-H; 1-B, 1-D, 1-H, 1-X, 1-AK.) Even his ex-wife, who Respondents attempt to implicate in preventing his release, shares only praise about her former spouse, describing him as "kind[]" and "hardworking," noting that he "earned people's trust and treated everyone like family" and that he "brought joy, insight, introspection, and that same curiosity to every interaction," and concluding that Mr. Mahdawi is "everything that America stands for, opportunity, ingenuity, and hard work." (Ex. 1-AU.)[3]

## IV.    MR. MAHDAWI WOULD COMPLY WITH ANY COURT CONDITIONS

Mr. Mahdawi "poses no danger to the community," is not a "flight risk," and is not

---

[3] Petitioner's ex-wife executed her declaration prior to the government's filing, and she is currently unreachable for the remainder of this week while at a retreat. Should the Court seek additional corroboration that the unsubstantiated allegations in the 2015 police report are not accurate, counsel anticipates that she should be reachable and able to file a supplemental declaration by the morning of May 2 with additional clarifying testimony.

"dangerous"; all conditions that warrant his immediate release. *Barbecho v. Decker*, 2020 U.S. Dist. LEXIS 66163, at *22 (S.D.N.Y. Apr. 14, 2020). Mr. Mahdawi has a home in Vermont, and an apartment in New York City. (Ex. 4) He owns a car and has a large support system. *Id.* And the Burlington Community Justice Center has declared that they will provide supervision, court reminders, connections to support, and periodic updates to the Court. (Ex. 5 ¶ 8.)

In light of Petitioner's lack of flight risk and deep community ties, conditions of release are not necessary. Nonetheless, Mr. Mahdawi has sworn that he would comply with any conditions the Court deems reasonable, including staying within the bounds of Vermont except for travelling to and from Columbia University when necessary for his studies or for his graduation, or for shopping at nearby shopping centers in New Hampshire. (Ex. 2  ¶¶ 47-50.) *See D'Alessandro v. Mukasey*, 2009 U.S. Dist. LEXIS 24954, at *18-19 (W.D.N.Y. Mar. 25, 2009) (granting an order to release a habeas petitioner based on a finding of a substantial claim and extraordinary circumstances, and ordering that the Petitioner be subjected to certain conditions). As such, Mr. Mahdawi should immediately be released.

## V.    NOTHING ELIMINATES THIS COURT'S INHERENT AUTHORITY TO RELEASE MR. MAHDAWI PENDING ADJUDICATION OF HIS HABEAS PETITION.

None of the provisions cited by Respondents prevent this Court from releasing Mr. Mahdawi. In fact, Respondents' argument was recently rejected by another judge of this Court with regard to a similar habeas petition filed by nonimmigrant student Rumeysa Ozturk. *See Ozturk v. Trump*, 2:25-cv-00374-wks, 2025 WL 1145250, at *11 (D.Vt. April 18, 2025).

The jurisdiction-stripping provision in 8 U.S.C. § 1252(g) does not apply to a constitutional challenge to the legality of detention. The government misapprehends *Reno v. AADC*, 525 U.S. 471, 482 (1999). There, the Supreme Court held that this provision is tethered solely to "three discrete actions" referenced in 8 U.S.C. § 1252(g), and therefore does not alter a court's jurisdiction to review "many other decisions or actions that may be part of the deportation process." *Id.* at 483. *AADC* was

9

**JA 362**

"exclusively about removal," whereas here, the "plain text of subsection (g) does not support a reading that [Petitioner's] detention and resulting constitutional claims arise from" these three discrete actions. *Ozturk*, Doc No. 104, slip op. at 37,v41. As in *Ozturk*, "whether removal proceedings have proceeded according to law and in comport with the Constitution is not a question before this Court," and the government's argument "stretches the bounds of the text and the facts of this case." *Id*. at 37-38; *see Bello-Reyes v. Gaynor,* 985 F.3d 696, 698 (9th Cir. 2021) (addressing merits of First Amendment challenge to ICE detention); *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 921 (W.D. Tex. 2018) (same).

Next, 8 U.S.C. § 1226(e) has no application to a petitioner's challenge to the legality of his detention. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). It also is not, contrary to the government's suggestion, an example of Congress, after *Mapp*, having "since legislated to further insulate immigration detention from habeas review." Dkt. #42 at 4. *See, e.g., Elkimya v. Dep't of Homeland Sec,* 484 F.3d 151, 154 (2d Cir. 2007) (rejecting the government's argument that the REAL ID Act undermined the availability of release on bail pursuant to *Mapp*).

Finally, 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply here. It applies to "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," 8 U.S.C. § 1252(a)(2)(B)(ii), and "the Government has no discretion to violate the Constitution," *Xi v. Haugen*, 68 F.4th 824, 829 (3d Cir. 2023); *see Ozturk*, slip op. at 46.

## CONCLUSION

The opposition relies on mischaracterized precedents, outdated and misleading allegations, and conflation of detention authority with foreign policy adjudication. *Mapp*'s standard for bail—substantial claims and necessity for effective habeas—is met here.

Dated: April 29, 2025
          Burlington, Vermont

Respectfully submitted,

Andrew B. Delaney
**MARTIN DELANEY & RICCI LAW
GROUP**
100 North Main Street
Barre, Vermont 05641
andrew@mdrvt.com
P: 802-479-0568

/s/ Lia Ernst
Monica H. Allard
Hillary A. Rich
**ACLU FOUNDATION OF
VERMONT**
P.O. Box 277
Montpelier, VT 05601
P: (802) 223-6304
lernst@acluvt.org

Nathan Freed Wessler*
Brett Max Kaufman*
Brian Hauss*
Esha Bhandari*
Noor Zafar*
Sidra Mahfooz*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
P: (212) 549-2500
nwessler@aclu.org

Luna Droubi*
Matthew Melewski*
**BELDOCK LEVINE & HOFFMAN
LLP**
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: (212) 277-5875
F: (212) 277-5880
ldroubi@blhny.com
mmelewski@blhny.com

**CLEAR Project**
**Main Street Legal Services, Inc.**
Ramzi Kassem***
Naz Ahmad***
Mudassar Hayat Toppa***
Shezza Abboushi Dallal*
CUNY School of Law
2 Court Square, 5th Floor
Long Island City, NY 11101
Tel.: (718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
mudassar.toppa@law.cuny.edu
shezza.dallal@law.cuny.edu

Cyrus D. Mehta*
David A. Isaacson
**CYRUS D. MEHTA & PARTNERS
PLLC**
One Battery Park Plaza, 9th Floor
New York, New York 10004
P: 212-425-0555
F: 212-425-3282

*Attorneys for Petitioner*

*Pro Hac Vice

***Pro Hac Vice application forthcoming