# No. 25-1113

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

—————————————

**MOHSEN MAHDAWI,**

**Petitioner-Appellee,**

**v.**

**DONALD J. TRUMP, in his official capacity as President of the
United States, PATRICIA HYDE, in her official capacity as
Acting Boston Field Office Director, Immigration and Customs
Enforcement, Enforcement and Removal Operations, J DOE, in
official capacity as Vermont Sub-Office Director of Immigration
and Customs Enforcement, Enforcement and Removal
Operations, TODD LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs Enforcement, KRISTI
NOEM, in her official capacity as Secretary of The United States
Department of Homeland Security, MARCO A. RUBIO, in his
official capacity as Secretary of State, PAMELA BONDI, in her
official capacity as U.S. Attorney General,**

**Respondents-Appellants.**

—————————————

**On Appeal from the United States District Court
for the District of Vermont
District Court Case No. 2:25-cv-389**

—————————————

**JOINT APPENDIX – VOLUME IV of IV (500 – 592)**

—————————————

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

MICHAEL P. DRESCHER
Acting United States Attorney
District of Vermont

ALANNA T. DUONG
Senior Litigation Counsel

DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice

*Attorneys for Respondents-Appellants*

# TABLE OF CONTENTS

Declaration of Peter M. Loescher, M.D.............................................500

Declaration of Daniel D. Fraser.......................................................504

Declaration of Becky Penberthy of Burlington Community Justice Center.......................................................................................507

April 30, 2025 Transcript for Motion for Release Under
*Mapp v. Reno* ............................................................................509

Court Opinion and Order on Motion for Release...........................552

Respondents' Notice of Appeal......................................................581

Docket Sheet..............................................................................582

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT



Case No. 2:25-cv-00389

### DECLARATION OF PETER M. LOESCHER, M.D.

I, Peter M. Loescher, M.D., declare under penalty of perjury that the following is true and correct:

1.    I am a sports medicine specialist at Alice Peck Day Memorial Hospital.

2.    Mohsen Mahdawi is my patient.

3.    I came to know Mohsen through our clinical interactions starting in February 2021 through November of 2022.



6.    Mohsen's entire motivation for being in this country and pursuing higher education has been to work for peace in the Middle East.



**JA 501**



9.      We had many in-depth conversations during my clinical visits with him.

10.     I can say without exception that he presented as a man who cares only about peace and the resolution of conflict in his homeland.



12.     Arresting and detaining him and/or deporting him back to his homeland will, in my opinion, negatively impact his physical health and wellbeing.

13.     This action would be cruel and unnecessary given his goals of working for peace and furthering his education in this country.

14.     I would be happy to speak with anyone involved in his case to provide further information and insight regarding his medical conditions and status as a student and resident/guest in our country.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 21, 2025, in New York, New York.

Sincerely,

/s / Peter M. Loescher
Peter M. Loescher, M.D.


**JA 502**

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

**MOHSEN MAHDAWI,**
Petitioner
v.                                                    No. 2:25-cv-00389
**DONALD J. TRUMP, et al.,**
Respondents

April 26, 2025

I, Daniel D. Fraser, depose and state as follows:

I am an individual of sound mind and legal age writing this of my own free will. I submit this declaration based on my personal knowledge and relationship with Mohsen K. Mahdawi, my dear friend and roommate. I previously submitted a declaration in support of Mohsen's character. To briefly restate the nature of our relationship: Mohsen and I met over nine  years ago, in December of 2015.

He moved into my place in White River Junction, Vermont, on January 4, 2016. We have since become dear friends. Mohsen is not a flight risk, and has deep ties to Vermont. If Mohsen is released, he would be able to live in our house in Vermont during the pendency of the litigation.

Of course he would—it is his house as well as mine.

Additionally, Mohsen would have a means of transportation to and from court hearings, and, if he is allowed to attend his outstanding classes at Columbia, to and from New York for the remainder of the school year. He has a car, as do I. He has frequently driven between Columbia University in New York and his home in Vermont.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my ability.

/s/ Daniel Fraser
Daniel Fraser
White River Junction, VT

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

**MOHSEN MAHDAWI**,
*Petitioner*

No. 2:25-cv-00389

*v.*

**DONALD J. TRUMP**, et al.,
*Respondents*

### DECLARATION OF BECKY PENBERTHY OF
### BURLINGTON COMMUNITY JUSTICE CENTER

Pursuant to 28 U.S.C. § 1746, I, Becky Penberthy, Adult Restorative Services Manager of Burlington Community Justice Center, declare under penalty of perjury the following:

1. I am Becky Penberthy, my pronouns are she/her, and I am restorative justice practitioner living and working in Burlington, Vermont.

2. I have worked as a restorative justice practitioner for 21 years. I currently co-manage adult restorative justice services for Chittenden County, including Pretrial Services. Among other tasks, my work includes: providing direct services to victims of crime and those responsible for crime; facilitating processes around larger community-based incidents of harm not rising to the level of a crime where there is great impact; supervising a team of professionals providing direct service; serving as a Member of the CJC management team; regularly attending and providing input in the Criminal Division of Vermont Superior Court; and regularly facilitating restorative processes with those responsible, with those harmed, with community volunteers and others.

3. I also serve as an Adjunct Professor at Vermont Law and Graduate School, where I teach a graduate-level course on applied restorative justice facilitation.

4. My previous experience includes working as the Court Operations Manager for the Addison County Superior Court, and as the Director of Vermont Pretrial Operations at Lamoille Restorative Center.

5. At the Burlington Community Justice Center, the Pretrial Services Program supports individuals to meet their court-ordered conditions of release, ensure court appearances, reduce detentions, and support public safety. Pretrial Services provides ongoing support throughout the court process.

6. The primary components of Pretrial Services include:

    a. <u>Supervision</u> – We maintain knowledge of and periodic review of court-ordered conditions. We conduct administrative check-ins, held remotely on a platform like Zoom or Teams, with additional check-ins by telephone. If the person is in the State

**JA 507**

of Vermont, we conduct in-person visits. We also connect with community supports who can confirm adherence to court-ordered conditions, such as supervisors, teachers, or counselors/clinicians.

    b.   <u>Court reminders</u> – We make regular phone calls and/or text reminders of upcoming court dates to ensure appearance.

    c.   <u>Connection to Support</u> – We assess the client's need for additional supports and, where appropriate, connect clients to services such as mental health counseling.

    d.   <u>Reporting to the Court</u> – As the Court directs, we provide regular updates to the Court regarding compliance with or violations of court-ordered conditions of release.

7.   On April 28, 2025, I met with Mohsen Mahdawi at Northwest State Correctional Center, where he is currently detained. We discussed his plans upon release and the community support he has in place.

8.   I am ready and willing to provide Pretrial Services to Mr. Mahdawi upon his release, including supervision, pursuant to whatever conditions the Court may set.

WHEREFORE, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Burlington, V.T. on this 28th day of April 2025.

Respectfully Submitted,

Becky Penberthy

Adult Restorative Services Manager
Burlington Community Justice Center

```
                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF VERMONT

MOHSEN MAHDAWI,                    )       CIVIL ACTION NO.
              Petitioner,          )       2:25-cv-389
                                   )
          v.                       )
                                   )
DONALD J. TRUMP, et al.,           )
              Respondents.         )
```

MOTION FOR RELEASE UNDER *MAPP V. RENO*
Wednesday, April 30, 2025
Burlington, Vermont

BEFORE:

    THE HONORABLE GEOFFREY W. CRAWFORD,
    District Judge

APPEARANCES:

DAVID A. ISAACSON, ESQ., Cyrus D. Mehta & Partners PLLC, One
    Battery Park Plaza, 9th Floor, New York, NY 10004, Counsel
    for the Petitioner

LUNA DROUBI, ESQ., and MATTHEW D. MELEWSKI, ESQ., Beldock
    Levine & Hoffman LLP, 99 Park Avenue, PH/26th Floor, New
    York, NY 10016, Counsel for the Petitioner

ANDREW B. DELANEY, ESQ., Martin Delaney & Ricci Law Group, 100
    North Main Street, P. O. Box 607, Barre, VT 05641-0607,
    Counsel for the Petitioner

SHEZZA ABBOUSHI DALLAL, ESQ., CLEAR Project, Main Street Legal
    Services, Inc., CUNY School of Law, 2 Court Square, 5th
    Floor, Long Island City, NY 11101, Counsel for the
    Petitioner

MICHAEL P. DRESCHER, Acting United States Attorney, U.S.
    Attorney's Office, 11 Elmwood Avenue, 3rd Floor, P. O. Box
    570, Burlington, VT 05402-0570, Counsel for the
    Respondents

Johanna Massé, RMR, CRR
Official Court Reporter
802-951-8102 | 802transcripts@gmail.com

**JA 509**

1  Wednesday, April 30, 2025

2     (The following was held in open court at 9:01 AM.)

3      COURTROOM DEPUTY:  Your Honor, the matter before the

4  Court is civil case number 25-CV-389, Mohsen Mahdawi v.

5  Donald J. Trump, *et al.*  Present on behalf -- or present with

6  the petitioner are Attorneys David Isaacson, Luna Droubi,

7  Matthew Melewski, Andrew Delaney, and Shezza Dallal.  Present

8  for the respondents is acting United States Attorney Michael

9  Drescher.

10    We are here for a motion for release under *Mapp v. Reno.*

11     THE COURT:  All right.  Good morning.  Good to see

12  everybody.

13     MR. DRESCHER:  Good morning.

14     MS. DROUBI:  Good morning.

15     THE COURT:  I appreciate all the briefing very much.

16  It's been very helpful.  And I'll dive right into things in a

17  moment, turn things over to Mr. Mahdawi's side as the moving

18  party, give the government a turn after that.

19    One or two housekeeping things.  One is that I've received

20  a number of *ex parte* communications that I don't see -- but

21  they're just citizens that write.  As Mr. Drescher knows, I'm

22  usually quite faithful about making sure to turn these over to

23  both sides, and it's become a bit cumbersome.  I'm inclined not

24  to do that, but I wanted to make sure that was acceptable to

25  both of you.  Happy to -- some of them are telephone calls and

1  some are e-mails.  I think I got a text.  I'm not -- anyway.

2       Mr. Drescher, is it a problem?

3            MR. DRESCHER:  The short answer is no.  I think it's

4  well within the Court's discretion to figure out how to manage

5  outreach to chambers from the public, and we trust the Court's

6  discretion in that regard.

7            THE COURT:  Appreciate it.

8            MS. DROUBI:  Similarly, Your Honor, we trust the

9  judge's discretion.

10           THE COURT:  All right.  Thank you.  That will simplify

11  life a little bit.

12      I'm not quite sure at what point to take up the question

13  of Agent Emmons.  I asked that he come here, but I don't call

14  witnesses.  Parties do.  So why don't we take up his testimony

15  when one side or the other asks to speak with him.  Okay?  But

16  I recognize that there's a question to deal with.

17           MR. DRESCHER:  Your Honor, if I may, it might make

18  sense to take that issue up now just to sort of, you know --

19  for everybody to be on the same set of expectations going

20  forward with regard to retired Agent Emmons' potential

21  testimony.  If I --

22           THE COURT:  I don't feel strongly about it.

23      Ms. Droubi?

24           MS. DROUBI:  It's our position that we think we should

25  be able to present our motion, and at the point if we believe

1 and the Court believes it's necessary to bring Agent Emmons'

2 testimony into this, then -- then we should address it at that

3 time.  That would be our position, Your Honor.

4          THE COURT:  Let's do it with context.  In other words,

5 when it actually kind of arises, then we'll take it up.

6          MR. DRESCHER:  Very well.

7          THE COURT:  Okay.  All right.  I'll turn things over

8 to the petitioner.

9          MS. DROUBI:  And we turn to our colleague, Matthew

10 Melewski, Your Honor.

11          MR. MALEWSKI:  May I approach, Your Honor?

12          THE COURT:  Yes, please.  Thank you.  Where did you

13 come in from?

14          MR. MALEWSKI:  New York City, but I'm on the other

15 side of the lake in Westport.

16     Your Honor, we're here today because Mr. Mahdawi is being

17 unlawfully detained for his advocacy in support of human rights

18 and our motion to cure this unconstitutional violation by

19 releasing him.

20     It's no revelation to say that the U.S. government has

21 sometimes struggled with the First Amendment.  Right off the

22 bat, The Alien and Sedition Acts of 1798; 1918, Immigration and

23 Sedition Acts lead to the Palmer Raids, the expulsion of

24 Russian Jews.  '40s and '50s, you have the Red Scare.  In each

25 of these cases, relatively shortly thereafter the legal and

**JA 512**

1  political systems recognize the damage and overreach by these

2  actions and swing back in the other direction to correct them,

3  to repeal, abrogation, and regret.

4  Unfortunately, it seems that we're doing the same thing

5  today as the administration has begun rounding up and detaining

6  lawful residents of this country for speech that's

7  unequivocally protected by the First Amendment to the

8  Constitution.

9  Mr. Mahdawi has been imprisoned solely for speech that is

10 lawful, lawful protected speech, detained in direct violation

11 of his First Amendment rights.  At the very moment Mr. Mahdawi

12 thought that he was going to realize his years-long effort to

13 become a citizen of this country, literally at the moment that

14 he had taken his final interview and was about -- you know, at

15 the point of being approved, armed men, their faces masked,

16 handcuffed him, forced him into a car, and began to drive him

17 away.  Were it not for the quick intervention of this court,

18 Mr. Mahdawi would be over a thousand miles away from his home,

19 from his lawyers, from his community.

20 The impact of this unlawful action on Mr. Mahdawi and on

21 the millions and millions of lawful residents, students, and

22 visa holders in this country is hard to overstate.  Their

23 speech is chilled.  But chilled isn't -- doesn't quite cover

24 it.  They're afraid.  They're afraid to exercise their core

25 constitutional rights, to write an op-ed, to criticize the

**JA 513**

1  government, to attend an immigration appointment for fear that

2  the masked men might one day come for them too.  And I realize

3  how profound and dangerous that sounds, but the government

4  doesn't deny it.  In fact, the government concedes it.

5       The government announced in advance that they were going

6  to do this, and they've had an opportunity to respond to

7  Mr. Mahdawi's claims before this hearing.  In response to

8  Mr. Mahdawi's claim that he is being imprisoned and retaliated

9  against solely for his protected speech, the government says

10 nothing.  There is no claim here that Mr. Mahdawi is being

11 imprisoned because of unlawful actions or some other

12 constitutionally sound basis.  The only claim at issue here is

13 that Mr. Mahdawi is being imprisoned, detained, because of his

14 lawful speech.  The government just claims they're allowed to

15 do it.  We're asking this court to release Mr. Mahdawi pending

16 his habeas corpus petition, after which the government can

17 determine the constitutional violation at issue with the

18 government's actions.

19      The most cited case in this circuit for release pending a

20 habeas petition is *Mapp v. Reno*, and in *Mapp* the court said

21 before granting release a court needs to evaluate two things:

22 Whether or not there are "substantial claims" in that case and

23 whether or not there are "extraordinary circumstances."  We

24 meet both here.

25      There can be no doubt that Mr. Mahdawi's claims in this

**JA 514**

1  case are substantial claims.  Mr. Mahdawi claims that he is
2  being detained solely for the content of his speech, which is
3  afforded the highest protection under the First Amendment to
4  the Constitution.  That is a clear deprivation of his
5  constitutional rights.  It is not denied by the government.
6  That must be a substantial claim.  Indeed, the scale of this,
7  the scale of this deprivation, is almost unheard of.

8      As Your Honor might divine from our pleadings, courts have
9  talked about extraordinary circumstances in a couple of
10 different ways:  One, courts have said that it's a heightened
11 standard when the petitioner at issue was convicted and
12 sentenced and their liberty interest is relatively low.  This
13 case presents almost the opposite scenario.  In this case the
14 Constitution guarantees Mr. Mahdawi's liberty.

15     The other way courts have looked at extraordinary
16 circumstances is in what *Mapp* calls "unusual cases."  And this
17 case is so unusual that aside from the parallel proceedings in
18 very similar circumstances, over a hundred immigration law
19 professors submitted a brief explaining that they can find no
20 example of the government ever using this particular provision
21 to detain someone for lawful speech.

22     The third way the courts have talked about extraordinary
23 circumstances is circumstances such that release is necessary
24 to give effect to the relief sought in the habeas, to make the
25 remedy effective, and here the relief sought through habeas is

**JA 515**

1 to prevent the government, to stop the government, from

2 detaining Mr. Mahdawi and violating his First Amendment rights

3 by detaining him.

4     The only way to give that relief is through release, and

5 release through this petition, because Mr. Mahdawi cannot bring

6 a constitutional challenge to his detention before the

7 immigration judge and the Board of Immigration Appeals.

8     If he's forced to remain in custody during the course of

9 the removal proceeding, that would deprive Mr. Mahdawi of the

10 relief that is sought in his habeas petition. The damage will

11 have already been done.

12     In a pending habeas case in this district for Ms. Ozturk,

13 the government has already appealed, which heightens the need

14 to release Mr. Mahdawi, so that he is not forced to suffer the

15 consequences, the constitutional injury, during the indefinite

16 length of time that it will take to resolve those appeals -- or

17 appeals in this case.

18     Mr. Mahdawi is a beloved member of his community. He has

19 a home in Vermont. He's an Ivy League student. He still hopes

20 to graduate next month. If he's not released, he won't be able

21 to graduate and he won't be able to matriculate to the graduate

22 program to which he's already been admitted.

23     If the government wants to prevent Mr. Mahdawi from being

24 released by claiming that he is a danger to the community that

25 adores him or is a flight risk, they need to do so with clear

**JA 516**

1  and convincing evidence as a matter of due process.  Here the

2  government has not provided enough information to survive the

3  lowest hurdle, the smallest bar.  The only thing the government

4  has introduced is some cartoonishly racist hearsay from ten

5  years ago that amounted to nothing and some other times that

6  somebody wrote down that he was not charged with a crime.  The

7  government has still not provided any recognizable reason why

8  Mr. Mahdawi needs to remain in custody.

9       Last week Your Honor mused, "They wouldn't have taken such

10 drastic measures to send a cavalcade of SUVs and a posse of

11 agents unless they had something in mind, and I don't know what

12 that was."  The government has now had an opportunity to say

13 what that was, and the answer, apparently, is that the

14 government believes it is allowed to incarcerate Mr. Mahdawi

15 and intimidate anyone similarly situated for the content of

16 speech that the government doesn't like.  Mark Twain once said

17 that "history doesn't repeat itself, but it often rhymes."  The

18 question here is just when the pendulum begins to swing back in

19 the other direction, when we reaffirm the primacy of the First

20 Amendment and begin to repair the trust that the Constitution

21 means what it says.

22      I propose we start here today by releasing Mohsen Mahdawi.

23      Thank you, Your Honor.

24       THE COURT:  Quick question.  Frequently in the bail

25 context, we get into details of dangerousness or risk of

**JA 517**

1 flight.  Did you propose to -- to leave the broad principles

2 and deal with these questions, or are you content with what

3 you've said?

4          MR. MALEWSKI:  We're certainly happy to discuss

5 conditions of his release.  We think that reasonable conditions

6 is something that this court is entitled to engage in, and

7 we're prepared to discuss that today.

8          THE COURT:  And when would you like to talk -- in

9 other words, what would you like to do next?  Would you like to

10 turn things over to the government, or did you have witnesses,

11 or where shall we go from your perspective?

12          MR. MALEWSKI:  I think if Your Honor wants to hear

13 from the government on our motion, that's fine.  We're happy to

14 talk about conditions that we believe would be reasonable in

15 the circumstance for release.

16          THE COURT:  All right.  Why don't I give the

17 government a turn and then give you an opportunity.

18          MR. MALEWSKI:  Thank you, Your Honor.

19          THE COURT:  All right.

20          MR. DRESCHER:  Good morning.

21          THE COURT:  Good morning.

22          MR. DRESCHER:  At the outset, as we discussed last

23 week, there are some threshold jurisdictional questions that

24 the Court has to confront before deciding whether it has any

25 authority to consider a motion under *Mapp v. Reno*.  I

**JA 518**

1  appreciate the Court has set this -- noticed this as a hearing

2  under *Mapp v. Reno*.  Your Honor has our briefings with regard

3  to those threshold jurisdictional questions.  I don't want for

4  a moment to be seen as giving up on those.

5      We don't think the Court should be exercising habeas

6  jurisdiction for the reasons we've explained in our prehearing

7  submission, which has been converted to a motion to dismiss,

8  and I'd be happy to answer any questions the Court may have on

9  that before I get into sort of the -- some of the details of

10 the Court's consideration under *Mapp*.  I just want to put a pin

11 in our threshold position that I don't think the Court can

12 consider release until it's asserting habeas jurisdiction,

13 which is a complicated question.

14     The -- Judge Sessions concluded that -- in the Ozturk case

15 that this court has jurisdiction there.  At the moment there's

16 an administrative stay that was handed down by the Second

17 Circuit.  Not -- you know, not weighing in on the relative

18 merits, but it's been stayed for the Circuit to have a chance

19 to consider the government's appeal to the Circuit of Judge

20 Sessions' order there.  They're very serious, weighty

21 questions.

22     I appreciate that petitioner's counsel shared with the

23 Court last night a recent decision in the Khalil matter that

24 grapples with the same issue, again, finding jurisdiction.  I

25 just want to flag for the Court that we're not giving up on any

**JA 519**

1  of those arguments.  They've been submitted in writing.  I'm

2  happy to take up any questions the Court may have on those now,

3  and if the Court has no questions, then I can get into some of

4  our thoughts as to the merits of the *Mapp* motion.

5      THE COURT:  Fair enough.  I saw it somewhat similarly

6  in the sense that I've been at work over -- over the weekend

7  with your materials as well and have sought to address the

8  jurisdictional issues, but in a preliminary way.  In other

9  words, I wouldn't want -- if there were no colorable claim of

10  jurisdiction, that would be foolish to dive into questions of

11  release, but I think, as you say, the ultimate resolution, at

12  least in this court, has got to wait for the briefing schedule

13  to wrap up, which is a couple of weeks away.

14      So you've raised it in your papers.  I've prepared a

15  draft, which -- to be revised after whatever happens at this

16  hearing.  I've dealt with it, but not in a kind of final way,

17  just to assure myself that there's a path forward for

18  jurisdiction.

19      MR. DRESCHER:  Understood.  I just want to be clear

20  that --

21      THE COURT:  Thank you.

22      MR. DRESCHER:  -- our position is, without a finding

23  of jurisdiction --

24      THE COURT:  Right.

25      MR. DRESCHER:  -- relief under *Mapp* should not be

**JA 520**

1  available.

2          THE COURT:  Fair enough.

3          MR. DRESCHER:  I guess at this point I want to sort of

4  talk about how to treat retired FBI Agent Marc Emmons, who is

5  here in court today.

6          THE COURT:  Sure.

7          MR. DRESCHER:  We received the Court's order yesterday

8  afternoon.  We have -- obviously we completely wish to abide by

9  the Court's order.  I understood the Court -- Court's order to

10 reflect the Court's desire to hear from Agent Emmons.  I would

11 like to try to persuade the Court that that's not necessary for

12 a couple of reasons.  At the outset, what -- at the outset,

13 Agent Emmons has reviewed -- and he's in court today.

14         THE COURT:  Yes.  Sure.

15         MR. DRESCHER:  So he's in the courtroom.  I just want

16 to make sure everybody's aware of that.  He's reviewed

17 Mr. Mahdawi's declaration that was filed yesterday and he's

18 reviewed what Mr. Mahdawi said about their interview, and there

19 is not a substantial disagreement with Mr. Mahdawi's recitation

20 of -- of his interactions with him, Agent Emmons' interaction

21 with him.  He takes a little bit of issue with -- I think

22 Mr. Mahdawi uses the word -- describes Agent Emmons as telling

23 him he had been "cleared."  Agent Emmons might take a little

24 bit of issue with the use of that word but does not dispute

25 that in some manner he explained to Mr. Mahdawi that the file

1  was being closed and that it was not an unreasonable inference

2  for Mr. Mahdawi to conclude that he had been cleared in some

3  sense.

4      But I want to emphasize to the Court that what Mr. -- or

5  what Agent Emmons was doing back in 2015-2016 was he was

6  engaging in a national security investigation.  It would be, I

7  think, inappropriate for Mr. -- for Agent Emmons to be called

8  to testify today about the innards of that investigation.  It

9  includes -- you know, investigations like that include

10  sensitive sources of information that the government has a

11  privilege not to disclose.  Information that's generated during

12  the course of those investigations might reveal sources of

13  information.

14      Assuming the Court's interest in hearing from Agent Emmons

15  was triggered by Mr. Mahdawi's declaration and given the

16  absence of a disagreement with regard to -- material

17  disagreement with regard to Mr. Mahdawi's description of that

18  interview, I don't think it's necessary for Agent Emmons to

19  testify.

20      I do want to --

21          THE COURT:  Maybe I could ask you it this way.

22          MR. DRESCHER:  Yeah.

23          THE COURT:  I asked -- the police report that the

24  government submitted was shocking.

25          MR. DRESCHER:  Yeah.

**JA 522**

```
 1        THE COURT:  And -- and, if true, deeply concerning.  I
 2   was shocked, but then when I thought about it, it seemed to me
 3   that something else must have happened other than simply filing
 4   this shocking statement away, and, of course, it did.
 5   Mr. Mahdawi's attorneys brought forward that the FBI had, as
 6   they should, looked into it, and I think what you're telling me
 7   is that I can fairly conclude that they found the statements
 8   from the gunsmith and from his retired friend to be unfounded.
 9   Is that fair?
10        MR. DRESCHER:  No.  No.  And I don't want to leave the
11   Court with that misimpression.  The fact that the investigation
12   was closed should lead to no inference, contrary to arguments
13   in counsel's submission yesterday, that there was not
14   derogatory information found about Mr. Mahdawi.  In fact, the
15   investigation turned up information that was corroborative of
16   the statements recounted in the Windsor police report.  If --
17        THE COURT:  I'm sorry.  I want to make sure I
18   understand what you're saying.  Which I think what you're
19   saying is that Mr. Mahdawi in fact visited the store?
20        MR. DRESCHER:  No.  That -- the shocking parts of the
21   police report, the statements attributed to Mr. Mahdawi is what
22   I perceive the Court is referring to --
23        THE COURT:  Yeah.
24        MR. DRESCHER:  -- the investigation turned up
25   information that was consistent with Mr. Mahdawi making those
```

**JA 523**

1  statements.  Now, the source of that information is not subject

2  to disclosure.  If the Court wants to get into that

3  information, in open court today I think is not the right forum

4  to do that.  I would need to consult with the National Security

5  Division to figure out how to go about doing that.  We could

6  perhaps figure out a way to deliver some information to

7  chambers on an *ex parte* basis.  But a national security

8  investigation touches on a lot of sensitive variables that do

9  not get revealed in open court.

10      The argument that counsel made leading to the inference

11  Your Honor just articulated is -- it's inaccurate.  There was

12  additional derogatory information about Mr. Mahdawi.  It's not

13  derogatory to go into a gun store.  It's not derogatory to

14  speak with other members of the community.  And so I don't want

15  to leave the Court with the wrong impression.  Now, I

16  appreciate this is -- it was a national security investigation,

17  they are inherently nonpublic, and we're in court ten years

18  later today in a very public setting, and so I need to be

19  careful with regard to how I talk about what the state of

20  knowledge was in 2015-2016.

21      The fact that the file was closed does not mean there was

22  no additional derogatory information noted.  It means, for

23  example, there might not be proof of a crime that could be

24  prosecuted beyond a reasonable doubt; or if there was evidence

25  of wrongdoing, that it wasn't in the form of admissible

1  information; or in assessing the relative priorities of the FBI

2  and its resources, the decision was made to move on.

3        We did not intend to get into the fact that there was a

4  national security investigation.

5              THE COURT:  But you started it.

6              MR. DRESCHER:  No, I don't think we did.  We submitted

7  the police report from Windsor, Vermont --

8              THE COURT:  Right.

9              MR. DRESCHER:  -- that contained information.  It was

10 not a federal report.  It contained information that we think

11 is relevant to the Court's assessment of Mr. Mahdawi's -- of

12 whether Mr. Mahdawi presents a risk to the community, just like

13 we do in -- when we're before the Court in criminal cases.  The

14 Court needs to consider in a criminal case a defendant, here

15 the petitioner's history and characteristics in assessing

16 whether he's suitable for release on conditions, and that

17 history and characteristics include the information that was

18 contained in the police report.

19       We presented that to the Court without referencing the

20 fact that there was a national security investigation that was

21 going on.  In their response yesterday, Mr. Mahdawi and counsel

22 recounted that he had in fact been interviewed by the FBI, and

23 then they went on to further argue that the fact that the FBI

24 conveyed to Mr. Mahdawi that they were closing their file

25 should be taken as evidence that there was not more

1  information -- or that we discredited the information that was

2  in the police report.  And I think that's an important

3  distinction to make.

4      Now, to honor the Court's order, you know, Mr. -- or Agent

5  Emmons is here, but I don't think it's appropriate to call him

6  as a witness.  If the Court wants to do a deeper dive into the

7  state of knowledge back in 2015-2016, I would ask an

8  opportunity to brief that and to explore whether that

9  information can be presented to chambers on an *ex parte* basis

10 if the Court wants to do a deep dive into the state of

11 knowledge back then.  So --

12      THE COURT:  All I want to know is very simple, is

13 whether these two gunsmith people made this story up or whether

14 it is true.  That's all I want to know.  And it sounds to me as

15 if the FBI concluded that they were not concerned enough about

16 these statements to proceed in some other way.  As you say,

17 they closed their file.  If that's all it is, that's fine.  I

18 have no intention of diving into their investigation.  These

19 are shocking assertions.  Looks as if on the face of things

20 they weren't substantiated and there's some kind of fantasy or

21 malicious conduct by the informants, but I needed some kind of

22 clarification from you on that.

23      MR. DRESCHER:  Yes.  So I appreciate counsel's

24 characterization of them as -- I believe his term was

25 "cartoonish hearsay."  They are statements made by two members

**JA 526**

1 of the Windsor community. The FBI investigated whether -- they

2 conducted an investigation for national security purposes.

3 They interviewed Mr. Mahdawi. They explained to Mr. Mahdawi

4 that they were closing their file. All of that is right. I do

5 not want to -- the Court to perceive, because it would be

6 inaccurate, that that investigation did not develop information

7 that was -- I don't want to -- I'll take out the negatives.

8 The investigation turned up information that corroborated those

9 statements.

10          THE COURT: But that information's not part of the

11 record here and won't be, correct?

12          MR. DRESCHER: Unless the Court wants to do a deeper

13 dive into the state of information in 2015-2016. I wanted to

14 address the argument made from counsel that the Court should

15 infer there was nothing else, and just as an empirical matter,

16 that's not right. I appreciate the awkwardness of proffering

17 this to the Court in this capacity, but that is our response to

18 them taking issue -- petitioner taking issue with our use of

19 the police report in our filing. We completely put -- I

20 concede -- obviously we supplied the Court with that police

21 report. We did not intend to get into the innards of a

22 national security investigation until the response came in

23 yesterday.

24          THE COURT: All right. Why don't I ask for the

25 petitioner's response.

**JA 527**

1          MS. DROUBI:  Your Honor, respondents opened the door

2    to this issue, as you note, by raising a ten-year-old

3    unsubstantiated, anonymous, redacted, unsigned, hearsay written

4    document in their filing.  In response, we submitted a

5    declaration that Mr. Mahdawi provided under penalty of perjury,

6    which the government has just represented to this court was for

7    the most part accurate.  The matter was closed.  The

8    investigation was closed.  It never rose to the level of

9    anything further, meaning that they took Mr. Mahdawi's

10   declaration to heart.

11        Calling the issue a national security matter has no basis

12   in reality and is a transparent attempt by the government to

13   deflect, to delay, and to avoid the truth that the document the

14   government attempts to have this court rely upon has no merit.

15   We also believe that Mr. Emmons can be put on the stand, and if

16   it treads closely to any national security issue, he can so

17   state.  We believe that we can comfortably stay within the

18   confines of the respondents' submission, which would be the

19   only appropriate path forward if the government continues to

20   ask this court to rely on this document.

21        Further delay on this through briefing would only further

22   delay the unconstitutional detention of our client.

23   Mr. Mahdawi should not suffer for the failures of the

24   government in this submission and should not be subjected to

25   continued incarceration due to his lawful speech.  That's our

1  position, Your Honor.

2         THE COURT:  All right.  So do you intend to call Agent

3  Emmons, or are you content with joining the government in

4  agreeing that the matter was closed after Mr. Mahdawi was

5  interviewed?

6         MS. DROUBI:  Well, I guess since the government has

7  represented to the Court that the matter was closed --

8         THE COURT:  Right.

9         MS. DROUBI:  -- if the government -- if the Court is

10  content with that representation as well, together with our

11  client's declaration that under penalty of perjury he never

12  made such statements, that such statements were not made, that

13  he felt that he was being targeted, stereotyped as a

14  Palestinian man who identified that he was a Palestinian man to

15  this individual, who we have not had the opportunity to cross

16  and to challenge, we think it's sufficient that the government

17  concedes that the matter and the investigation was closed, it

18  was never escalated any further than whatever questioning there

19  was, it was quickly put to bed, and the matter was resolved.

20      So we're content with that representation, and -- as long

21  as the Court is content as well that our client has declared

22  under penalty of perjury that none of these statements were

23  ever made and that the matter was resolved and closed.

24         THE COURT:  All right.  I think the three of us are

25  all in agreement that the record and the facts are that the --

1  a citizen plus his friend came forward with shocking

2  allegations of purchase of firearms and the FBI looked into the

3  matter, spoke with Mr. Mahdawi, and closed its file.  Both

4  sides agree.  I think that is sufficient for me to discount the

5  police report, which is the only thing in front of the Court,

6  as not strong evidence of dangerousness.  So I'm content to

7  leave it there.

8          MR. DRESCHER:  I appreciate Your Honor's assessment of

9  the police report.  To the extent you are observing that we

10  agree with Your Honor's assessment of the police report, we

11  don't, but I appreciate Your Honor has reached its conclusion

12  about what weight to give the report.

13          THE COURT:  Okay.  All right.  So I'll thank retired

14  Agent Emmons for attending.  He's welcome to stay, but there's

15  no requirement.  He won't be called by either side.

16          MR. DRESCHER:  The -- I'll circle back to history and

17  characteristics, but I want to take up the question of whether

18  a substantial issue has been presented such that the Court

19  should lean in and consider granting relief under *Mapp*.

20      As we explained in our filings, Mr. Mahdawi is in removal

21  proceedings because the Secretary of State -- exercising the

22  authority that Congress has given the Executive Branch, not

23  just the current administration but any administration in

24  power, the Secretary of State made specific findings that

25  Mr. Mahdawi's presence in the United States was contrary to the

**JA 530**

1  foreign policy of the United States, and he further found, as

2  required by Congress, that Mr. Mahdawi's continued presence

3  would be -- would compromise important foreign policy

4  interests.  I don't think there's any factual dispute that the

5  exhibit to our filing from earlier this week establishes that

6  the Secretary of State has made those determinations.

7        THE COURT:  Right.

8        MR. DRESCHER:  Those determinations are entitled to a

9  presumption of regularity, and that presumption can only be

10  overcome by extraordinary circumstance- -- by an extraordinary

11  showing.  The showing, as I understand it, is simply

12  reiterating the basis for the Secretary's determination, and

13  the basis, as the Secretary's memorandum makes clear, includes

14  Mr. Mahdawi's participation in protests at Columbia University.

15      Congress has given the Executive Branch in the context of

16  administering the immigration laws the role of assessing where

17  the foreign policy interests of the United States -- when those

18  interests bump into otherwise protected First Amendment

19  activity, it is, by Congress' policy choice, the Executive

20  Branch's assessment as to what should give.  To implement the

21  foreign policy of this administration, the Secretary of State

22  made the necessary determinations, made the necessary findings,

23  and as a result, any decision by Your Honor or by any court to

24  release Mr. Mahdawi in these circumstances would require the

25  Court to get involved in and assess the foreign policy

**JA 531**

1 determinations of the Secretary of State.  The Supreme --

2          THE COURT:  Can I interrupt?

3          MR. DRESCHER:  Sure.

4          THE COURT:  That's the connection I don't make.  I

5 recognize that the removal proceeding is kind of the third rail

6 here and that I have nothing to do with it, that Congress has

7 made that clear in the four jurisdiction-stripping provisions.

8 But the issue for me is whether that removes any habeas-based

9 scrutiny of the government's actions, and the Supreme Court

10 decisions authored by Justice Scalia and Justice Alito, hardly

11 shrinking violets when it comes to the enforcement of the

12 immigration laws, applied very thoughtful, careful textual

13 analysis to these provisions, and they don't say what I think

14 at the heart you say, which is once the government announces

15 that this is removal under the foreign policy provision, no

16 other judge can ever look at it.

17     So I'm focused not on the removal proceeding.  That's not

18 for me.  I'm focused on the arrest and detention, and that

19 seems to fall outside of these jurisdiction provisions.

20          MR. DRESCHER:  So the government disagrees.

21          THE COURT:  Right.

22          MR. DRESCHER:  That Title 8, Section 1226(a), gives

23 the government statutory authority to take into custody

24 somebody who is subject to removal proceedings.  It is legal

25 under the statute to detain somebody who is subject to removal.

**JA 532**

1    It's my understanding that people in that circumstance have the

2    opportunity to ask an immigration judge for release, and

3    sometimes the immigration judge will grant a bond and sometimes

4    the immigration judge does not, but Congress has set up that

5    system that authorizes the executive to detain somebody who's

6    subject to removal.

7        And I appreciate what Your Honor just articulated.  It

8    circles back to our jurisdictional arguments.

9            THE COURT:  Right.

10            MR. DRESCHER:  Assuming Your Honor has navigated

11    around those jurisdictional arguments and is going to lean in

12    and assert habeas jurisdiction, as the Court has suggested, the

13    question of *Mapp* relief is different.  I think the Court has to

14    assess the underlying reason why somebody such as Mr. Mahdawi

15    is in a removal proceeding and the associated detention that

16    has arisen from the commencement of those removal proceedings,

17    and in this case that is a specific finding of the Secretary of

18    State that Mr. Mahdawi's presence is contrary to the foreign

19    policy of the United States.

20        Justice Scalia in *AADC* observed that, in his words, you

21    know, courts are "utterly unable to assess" the adequacy of the

22    government's foreign policy in its application to the

23    immigration proceedings.  In *AADC*, the decisions to seek

24    removal of the noncitizens in that case, the government

25    conceded, was based upon First Amendment protected activity of

1 those aliens, and the court recognized, Justice Scalia

2 recognized, that in implementing and executing the foreign

3 policy of the United States, the Executive Branch will favor

4 some countries and disfavor others; it will antagonize some

5 countries by disfavoring their nationals.  There's -- it's a --

6 to put it mildly, a complicated political business that is

7 vested in the political branches.

8          THE COURT:  But let me push back a little.

9          MR. DRESCHER:  Yeah.

10          THE COURT:  That was his merits discussion.  Where did

11 he come down on whether his court, also subject to the

12 stripping provisions, had jurisdiction even to consider the

13 questions?

14          MR. DRESCHER:  Construing a predecessor of the current

15 1252, which has since been amended to specifically carve out

16 habeas jurisdiction.

17          THE COURT:  To reach it, yes.

18          MR. DRESCHER:  To reach it.

19          THE COURT:  Yes.  I can give you a clue.  He found

20 that the Supreme Court had jurisdiction to consider the

21 question.

22          MR. DRESCHER:  Well, it had jurisdiction to

23 consider -- it had jurisdiction to consider a constitutional

24 challenge based upon selective enforcement, which was what the

25 argument was in front of the Court.

**JA 534**

1          THE COURT:  Right.

2          MR. DRESCHER:  The court -- the majority opinion said

3  there was not -- it would not recognize the underlying merits

4  of that argument.  In a predecessor, more jurisdictionally

5  generous version of the statute, the court navigated its way

6  around that.  The statute has since been revised.  I think for

7  our purposes today, the most relevant part of *AADC* in that

8  decision is the court's recognition of the -- of the role of

9  courts relative to the political branches in their

10 implementation of foreign policy.

11         Similarly, in the *Harisiades* case that we cite in our

12 papers, the Supreme Court -- the threshold question in that

13 case was whether it was constitutional for the Executive Branch

14 to deport people who had been here years and years who were

15 characterized by -- as legally resident aliens because they had

16 at one time been a member of the Communist party.

17         THE COURT:  This is the 1952 McCarthy era case?

18         MR. DRESCHER:  The 1952 case.

19         THE COURT:  Perhaps not our proudest period.

20         MR. DRESCHER:  The -- this is -- I take Your Honor's

21 point.

22         THE COURT:  I know you do.

23         MR. DRESCHER:  I completely take Your Honor's point,

24 but Your Honor's point, I think, highlights the fact that we

25 are in policy world, and as the court recognized I believe in

**JA 535**

1    that very case, the Court might disagree with the policies that

2    are being implemented by the Executive Branch.  The

3    overwhelming majority of the people in this room might disagree

4    with the policies being pursued by the Executive Branch.  But

5    that does not justify the Court getting involved in -- in

6    injecting itself in decisions that are so related to the

7    implementation of the foreign policy of the United States.

8         I think that's really the nub of this case:  What role

9    does the Court have, if any, to discount the Secretary of

10   State's determination that the petitioner, Mr. Mahdawi's

11   presence in the country is contrary to foreign policy?  A

12   decision to release Mr. Mahdawi at this time would -- or at any

13   time in this case would necessarily require the Court to assess

14   the relative merits of those policy decisions.

15        THE COURT:  I'm working as hard as I can to follow.

16   All we're talking about is bail, so why does that temporary

17   release so that you and I and the petitioner's counsel can sort

18   out what are difficult issues, why is that a violation of the

19   political doctrine?  All they're asking is that Mr. Mahdawi go

20   home for the weeks or months it takes for us to get to the

21   bottom of what I recognize are difficult questions.

22        MR. DRESCHER:  And I appreciate Your Honor's question.

23   The Secretary's determination that a person's presence in the

24   United States is contrary to foreign policy justifies, under

25   the statutes passed by Congress, the executive's decision to

**JA 536**

1  detain that person once he's in removal proceedings.  That's

2  where we are now.  If Your Honor is assessing the -- because

3  that detention is facially lawful and because the Secretary's

4  determination is entitled to a presumption of regularity, a

5  decision to undo the discretionary decision to detain somebody

6  in Mr. Mahdawi's circumstances necessarily requires a

7  discounting of the Secretary's determination that his presence

8  in the country is contrary to foreign policy.

9          THE COURT:  Okay.  Fair enough.

10         MR. DRESCHER:  I think we've gone over the question of

11 the police report on the subject of dangerousness.

12     With regard to the incident at the border, I think the

13 record before the Court indicates that Mr. Mahdawi was

14 discovered to have controlled substances in his possession when

15 he crossed the border back in 2018 or 2019.

16         THE COURT:  '19, I think.

17         MR. DRESCHER:  As we explained in our filings, there's

18 no suggestion that Mr. Mahdawi has been convicted of any

19 offense.  The fact of that arrest and the fact that there were

20 charges and the fact that the charges were dismissed were

21 presented to the Court, and Mr. Mahdawi's filing number -- in

22 Document 19-4, I think it's significant for the Court to

23 consider whether somebody who is here as a noncitizen, who is

24 potentially subject to removal for violating certain controlled

25 substance offenses, to be leaning that closely in to conduct

**JA 537**

1 that could be a violation of a controlled substance offense is

2 a fair consideration for the Court in assessing Mr. Mahdawi's

3 suitability for release.

4     Finally, as we tried to spell out, Mr. Mahdawi clearly has

5 access to resources that would enable him to abscond if he were

6 of a mind to do that.  He has engaged in international travel

7 on multiple occasions, I understand as recently as last year,

8 and that is another factor the Court should consider in

9 assessing whether Mr. Mahdawi is suitable for release.

10     The crux of our argument on *Mapp* relief, Your Honor, is

11 despite the profound impact it has on Mr. Mahdawi, his

12 detention right now is not illegal, and the argument that is

13 presented by the petition asks this court to get involved in

14 the implementation of the foreign policy of the United States,

15 and I think the Supreme Court has made clear that courts should

16 be extraordinarily reluctant to do that.  And given that legal

17 landscape, *Mapp* relief is not appropriate.

18     Before I sit down, if Your Honor is inclined to issue an

19 order releasing Mr. Mahdawi under *Mapp*, I would like to move

20 for a stay of that order of seven days as indicated in our

21 filing so that the government could pursue review of that order

22 at the Circuit.

23        THE COURT:  And I made a note of the four factors

24 supporting -- that would support a stay.  I think we have

25 probably exhausted the conversation on the likelihood that

**JA 538**

1 you'll prevail on the merits, though I welcome anything else

2 you have to say, but I recognize you've spoken at that at

3 length.

4      The next is the likelihood that the moving party will be

5 irreparably harmed absent a stay.  Where do you come down on

6 that one?

7           MR. DRESCHER:  For all the reasons I just articulated

8 in terms of the merger of the question of release with regard

9 to the Secretary of State's determination --

10           THE COURT:  That would go to whether you win the

11 first, but the harm to Mr. Mahdawi, obviously recognized,

12 right?

13           MR. DRESCHER:  Yeah.  There are competing

14 considerations there, but I want to emphasize the government's

15 legitimate interest in implementing the foreign policy in this

16 context in the manner prescribed by Congress and that his

17 release would -- would be inconsistent with that.

18           THE COURT:  And the third is the prospect that others

19 will be harmed if the Court grants a stay.  Applicable here or

20 not?

21           MR. DRESCHER:  It's my recollection that in these

22 contexts, those two factors merge together.  You know, to the

23 extent others are harmed, I think we can invoke the Secretary

24 of State's determination that what's in the foreign policy

25 interest of the United States affects the welfare of the -- of

**JA 539**

1 the government's relations with foreign powers and its domestic

2 affairs as well.

3         THE COURT:  And the fourth - I just want to make sure

4 that I tick them off and hear from you - the public interest in

5 granting the stay would be the same as the government's

6 interest; is that -- I don't mean to put words in your mouth.

7 I'll just give you the floor.

8         MR. DRESCHER:  Yes.  It would be the same.  And all of

9 this also circles back to our jurisdictional arguments, that,

10 you know, institutionally we don't think the Court should be

11 doing this, that if the Court is involving itself where we

12 believe the INA specifies it should not, you know, that creates

13 an added layer of concern that should -- that should weigh in

14 the Court's consideration of that motion.

15     Just to -- so I think I've said my piece with regard to

16 the contingent motion for a stay if the Court is inclined to

17 issue -- order him released.

18         THE COURT:  Yeah.  Fair enough.  Thank you.

19         MR. DRESCHER:  Thank you.

20         THE COURT:  Mr. Drescher, thank you.

21     Why don't I give you the last word.

22         MR. MALEWSKI:  Thank you, Your Honor.

23     I think Your Honor has it right.  We're not asking this

24 court to delve into the foreign policy decisions of the United

25 States or the reasons and the arguments that the government's

1  going to make in the removal proceeding.  This is just about a

2  habeas claim, making an argument that Mr. Mahdawi is being held

3  in direct violation of his constitutional rights.

4      I think as to a stay --

5          THE COURT:  I tried to be hard on Mr. Drescher, but I

6  try to be sort of equal opportunity about this and be a little

7  bit hard on you.  I feel like we're trying to separate an egg

8  here.  How does the -- why isn't the arrest of Mr. Mahdawi by

9  the agents and the service on him of a notice to appear, why

10 isn't that part of his removal case?

11         MR. MALEWSKI:  Well, I think, Your Honor, you separate

12 an egg carefully, and here we are arguing that no government

13 official has the discretion to detain Mr. Mahdawi solely

14 because of his speech, and that is exactly the sort of

15 constitutional claim that the Supreme Court has recognized we

16 can bring apart from the removal proceeding, and that granting

17 relief on that claim, contrary to the government's statements,

18 doesn't impact the removal proceeding at all.  The removal

19 proceeding continues apace.

20         THE COURT:  You have a hearing soon, right?

21         MR. MALEWSKI:  Yes, Your Honor.  I believe there is a

22 remote hearing scheduled for maybe tomorrow --

23         THE COURT:  Right.

24         MR. MALEWSKI:  -- at the moment.  Historically that's

25 how it happens.  Detention is the exception, not the common

**JA 541**

1  process.  So I think the government is not impinged or impaired

2  or -- their ability to proceed with the removal proceeding is

3  not altered in any way by this court granting relief that we've

4  asked for.

5          THE COURT:  And from your perspective, what would be

6  the appropriate package?  Just release on personal recognizance

7  or a set of conditions or -- if Mr. Mahdawi's released, I have

8  considerable confidence in officials within Vermont that they

9  will recognize my order.

10          MR. MALEWSKI:  Um-hum.

11          THE COURT:  I've always had a very candid and positive

12  relationship.  I worry about New York City because it's a

13  bigger place and they seem a long way away.  How would you see

14  packaging success from your perspective?

15          MR. MALEWSKI:  Mr. Mahdawi lives in Vermont.

16          THE COURT:  Right.

17          MR. MALEWSKI:  As you know, attends university in New

18  York City.  I believe that his university would be able to

19  accommodate remote attendance.  Our preference would be that

20  this court grants release that at a bare minimum allows

21  Mr. Mahdawi to be present in his home in Vermont as well as

22  attend classes and life -- university life in New York City at

23  Columbia University without restriction and without threat that

24  the government will detain him.

25          THE COURT:  All right.  And presumably visit his

**JA 542**

1  attorneys as well.

2         MR. MALEWSKI:  Yes.  Yes, Your Honor.

3         THE COURT:  So he would remain, from your perspective,

4  subject to the original administrative detention, but it would

5  be lifted with respect to incarceration and replaced, in a

6  process analogous to a criminal case, with those conditions of

7  residence in Vermont, attendance in New York for educational

8  and legal purposes?  Just -- I want to make sure I understand

9  kind of the setting.

10         MR. MALEWSKI:  I think that's right, Your Honor.  I

11  think the immigration proceeding continues to have custody of

12  Mr. Mahdawi in order to continue with the proceeding --

13         THE COURT:  Right.

14         MR. MALEWSKI:  -- in that sense, but he would no

15  longer be detained in a facility and be allowed to travel

16  freely to pursue his life.

17         THE COURT:  All right.  Fair enough.  Thank you.

18         MR. MALEWSKI:  Thank you, Your Honor.

19         THE COURT:  Does that complete the presentation from

20  everybody?  I don't want to leave anyone out.

21         MS. DROUBI:  Just one addition, Your Honor.  To the

22  extent it would be helpful to the Court, we have provided a

23  declaration from the Burlington Community Justice Center, who's

24  prepared to provide additional information if that would be

25  amenable or helpful to the Court about their support in any

1  release.

2      THE COURT:  Okay.  Thank you.

3      I'll announce my decision orally.  I've prepared a more

4  detailed explanation, and in light of the points made today, I

5  need an hour or two to revise it, and I'll release it by 3:00

6  or so this afternoon.

7      I'm satisfied that -- first, that as a preliminary matter,

8  that the Court has a basis for exercising habeas jurisdiction

9  over the arrest and detention of Mr. Mahdawi.  I have great

10 respect for the -- I've said this before, and I mean it from my

11 heart, for the immigration court and the immigration process,

12 and I have no intention of interfering with those proceedings

13 that I think start -- they really have their first hearing

14 tomorrow, and I recognize that the immigration judge will face

15 some of these questions as well.

16      But to return to my main theme, I am satisfied that -- at

17 least for purposes of a bail hearing under *Mapp v. Reno* that

18 the Court has a basis for proceeding, for issuing an order

19 regarding release or detention that governs -- that applies

20 during the pendency of the -- of the resolution of the habeas

21 claim.  That's already happening.  We have a briefing schedule

22 to more completely address the jurisdiction-stripping issues.

23 Those briefs haven't come in.  I'll set a hearing at the

24 earliest opportunity and rule promptly on that.  But I think

25 I -- Mr. Mahdawi is -- and his attorneys are correct in

**JA 544**

bringing the issue of his detention forward to the District of

Vermont in the habeas setting, and we will talk much more about

this in the weeks ahead.

That really brings me to the *Mapp* discussion.  I followed

as best I can Judge Calabresi, who has laid out a broad process

for addressing these issues.  I think Mr. Mahdawi has made

substantial claims that his detention is the result of

retaliation for protected speech that he engaged in as a

college student on the Columbia campus.  The various

administration figures have been candid in expressing their

intent to shut down debate of the type that he was engaged in.

I make no ruling about the merits of the claims, only that

these are substantial issues fairly raised and that need

careful consideration by the government and the Court.

Extraordinary circumstances I think are present in a

couple of ways, and I have in mind the need for the Court to

find that it's necessary to maintain Mr. Mahdawi's presence

here in Vermont in order to resolve the petition.

I would find extraordinary circumstances first in the --

in the claims themselves.  This is not the first time that the

nation has seen a chilling action by the government intended to

shut down debate, but it's not common.  We saw -- I've

addressed this a little in the draft.  We certainly saw it in

the Red Scare:  the Palmer Raids of 1919-1920; during -- also

during the McCarthy period.  Both times the immigration laws

1  were used to remove people for their speech.  These are not

2  chapters that we look back with much pride on.  I think the

3  wheel has come round again and the circumstances are fairly

4  described as extraordinary.

5      I would also find extraordinary circumstances in the

6  detention of a person who has received remarkable support from

7  over 90 community members and academics and colleagues and

8  professors across the United States, many of them Jewish, many

9  of them not obvious allies of his views but people who have in

10 a remarkable, consistent pattern described him as a peaceful

11 and positive person who seeks consensus during these really

12 difficult times and in this really difficult discussion about

13 the direction of policy in the -- in the Middle East.

14     I largely discount the suggestion that he presents a risk

15 of harm to others based on the 2015 information that appears in

16 the police report.  I'm satisfied that the information, which

17 was, as I said before, shocking when I first read it -- it

18 concerned an interest in automatic weapons and a sniper rifle.

19 It is exactly the type of information that the FBI exists to --

20 is charged with investigating.  They did so and met with

21 Mr. Mahdawi and took no further action.  The inference that I

22 draw is that they found he had -- was not a risk to any of us,

23 that they were satisfied with his explanation.  It was ten

24 years ago.  Difficult to tell exactly what were the motives of

25 the gunsmith and his friend.  But on the whole, for purposes of

1  bail, I would draw from closing the file and no further -- no

2  further action that these reports were in large part

3  fabricated.  So I don't find a basis for fearing risk of harm.

4      With respect to risk of flight, which I always consider in

5  making a decision about release or detention, Mr. Mahdawi has

6  been a resident of the United States for a decade.  He is a

7  resident specifically of our state or he has a permanent home

8  and what I would judge to be a part-time camp, which he built

9  himself.  He has strong ties in his community that are -- that

10 are described in many of the letters from the Upper Valley

11 area, where he has been a longtime resident.  Neighbors and

12 congregants at the Unitarian Church, his state senator, all of

13 these people have attested to his strong ties to the community.

14 I think risk of flight -- and he appeared voluntarily in

15 response to the USCIS summons even though he knew there was a

16 strong possibility that he would be -- could be arrested when

17 he showed up for his final citizenship interview.  He didn't

18 flee then.  I think the risk of flight is minimal.

19     So I think no risk of harm, no risk of flight, a man

20 raising substantial claims that may or may not succeed in this

21 court but certainly raise very important issues, those were

22 the -- and the great fear for all of us of a chilling or

23 degradation of the First Amendment rights which are very much

24 at the heart of our -- of our democracy, all of those I think

25 support his release subject to the following conditions:

**JA 547**

1      That he continue to reside in Vermont.

2      That he is permitted to attend college and see his lawyers

3 as necessary in New York City.  Of course, he can pass through

4 the states that are needed for that -- for those visits.

5      As I see the setting of his legal status, certainly his

6 administrative hold remains in effect.  He remains subject to

7 this court's jurisdiction but also the administrative process.

8 He's not fully released, but I think these conditions are

9 sufficient to ensure his attendance both in this court and

10 in -- through the remote process that starts tomorrow with the

11 immigration courts.

12      I had given thought to the -- to the question of staying

13 the order, and I have in mind the factors that Mr. Drescher was

14 kind enough to discuss with me.

15      Likelihood that the party seeking the stay will prevail on

16 the merits, I don't think there is a strong likelihood of this.

17 I say this because I am determined to recognize and stay clear

18 of the removal proceeding.  I respect the jurisdictional limits

19 there.  But what remains of the case is I think a strong claim

20 of arrest and detention by the agents in order to stifle the

21 speech of Mr. Mahdawi and those who agree with him, so that I

22 think it is likely that he may well prevail on the merits.

23 It's up to the decision-maker.  It's awkward to sort of

24 forecast this, and it's subject to change, but I think his case

25 is strong so long as his judge takes pains not to interfere

1   with the removal proceedings in Louisiana.

2        Turning to the second, the likelihood that the moving

3   party would be irreparably harmed absent a stay, I think that

4   the two weeks of detention so far demonstrate the great harm

5   that this process inflicts on a person who has been charged

6   with no crime and who has received -- demonstrated his *bona*

7   *fides* in good faith in so many ways.  I think even another day

8   of detention is not to be tolerated.

9        The prospect that others will be harmed if the Court

10  grants the stay doesn't, I think, apply directly.  I think that

11  that really relates to stays in conventional civil cases.  I do

12  have in mind certainly that the government represents that it

13  will be harmed in its conduct of foreign policy, but I don't

14  think the harm of sending Mr. Mahdawi back to his home this

15  morning is -- really presents any great risk to the national

16  interest.

17       The public interest in granting the stay, again, I think

18  doesn't apply directly except in the sense that I've already

19  talked about:  that the First Amendment values raised in

20  Mr. Mahdawi's petition are close to the heart of what we are

21  about as a nation.

22       So I won't grant a stay.  I have thought about kind of

23  postponing the effectiveness of Mr. Mahdawi's release, and I

24  see no reason to do that.  He is a person who has -- presents

25  no risk of flight.  If there is an appeal and if I'm incorrect

1  in this judgment, he will be at his home or at his college and

2  will surrender in the normal course, but I don't think that's

3  very likely.  I think these are issues that can fairly be

4  resolved while Mr. Mahdawi follows the conditions that the

5  Court has set of continued residence at his home and at his

6  camp in the White River Junction area and meaningful engagement

7  and attendance in his -- wrapping up his college career and

8  preparing as best he can for the graduate school.

9       So, Mr. Mahdawi, I will order you released.  I'll follow

10  this up with a written order, but the release is effective at

11  this time.

12       Do the officers have any paperwork that they need to

13  complete?

14           IMMIGRATION OFFICER:  No.

15           THE COURT:  Does he have his phone and his wallet and

16  that kind of thing?

17           IMMIGRATION OFFICER:  We can return them to him right

18  now, Your Honor.

19           THE COURT:  Good.  If you could do that, I'll release

20  him now from the courtroom and we will schedule the next

21  hearing.

22           COUNSEL:  Thank you, Your Honor.

23           THE COURT:  I'll see you out.  Go ahead and I'll make

24  sure all goes well.

25       (Court was in recess at 10:20 AM.)

**JA 550**

1       C E R T I F I C A T I O N

2   I certify that the foregoing is a correct transcript from

3 the record of proceedings in the above-entitled matter.

4

5

6 May 2, 2025          _____

                 Johanna Massé, RMR, CRR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA 551**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

**2025 APR 30    AM 11: 39**

CLERK

BY_____
DEPUTY CLERK

MOHSEN MAHDAWI,                    )
                                   )
    Petitioner,                    )
                                   )
    v.                             )         Case No. 2:25-cv-389
                                   )
DONALD J. TRUMP, et al.,           )
                                   )
    Respondents.                   )

**OPINION AND ORDER ON MOTION FOR RELEASE**
**(Doc. 19)**

On April 14, 2025, Mohsen Mahdawi filed a petition for a writ of habeas corpus

challenging the government's alleged "retaliatory and targeted detention and attempted removal

of Mr. Mahdawi for his constitutionally protected speech." (Doc. 1 ¶ 1.) The claims include a

request for release on bail pending adjudication of the habeas corpus petition. (*Id.* ¶¶ 86–90.)

On April 22, 2025, Mr. Mahdawi filed a Motion for Release under *Mapp v. Reno*, 241 F.3d 221

(2d Cir. 2001). (Doc. 19.) Respondents (also referred to as the "Government" in this decision)

filed a response, and Mr. Mahdawi has filed a reply. The court held a hearing on the motion for

release on April 30, 2025.

**Facts**

**A.    Personal Background**

Mr. Mahdawi is 34 years old. He was born and raised in the West Bank. (Doc. 19-2 ¶ 4.)

He entered the United States legally in July 2014 and was married for some years to an

American citizen. (*Id.* ¶ 5; *see also* Doc. 19-4 at 4.) He has been a Legal Permanent Resident of

the United States for ten years; his Permanent Resident Card ("green card") confirms that he has

been a resident since January 2015. (Doc. 19-2 ¶ 1.) His permanent address is in White River

**JA 552**

Junction, Vermont. He also owns a small cabin that he built himself in nearby Vershire, Vermont. (Doc. 19-1 at 159.)

Since 2021, Mr. Mahdawi has been an undergraduate student at Columbia University, majoring in philosophy. He hopes to graduate next month. (Doc. 19-2 ¶¶ 2, 7.) He has been admitted to a master's degree program at Columbia's School of International and Public Affairs; that course of study would begin in September 2025. (*Id.* ¶ 9.)

Mr. Mahdawi states that he found comfort and healing in spiritual communities shortly after coming to the United States. (*Id.* ¶ 11.) He joined the First Universalist Society in Hartland, Vermont. (*Id.*) He also began to study Buddhism. (*Id.*) As a student at Columbia, Mr. Mahdawi has dedicated himself "to understanding how to achieve a lasting peace for Palestinians and Israelis, particularly through the study of conflict resolution." (*Id.* ¶ 14.) After Israel took military action in Gaza in fall 2023, Mr. Mahdawi was "outspoken in opposition to the war." (*Id.* ¶ 15.) He took part in student demonstrations where he spoke publicly about "the importance of respecting international law, human rights, and the need for a permanent ceasefire and a peaceful resolution." (*Id.*) The letters submitted on Mr. Mahdawi's behalf describe him as a person who seeks common ground between students who support Israel's military response to the atrocities committed by Hamas and those who express outrage against the level of destruction and civilian casualties. (*See* Doc. 19-1; Doc. 46.)

In its response, the Government directs the court's attention to an incident in summer 2015 when a gun shop owner told Windsor, Vermont police officers that Mr. Mahdawi had visited his store twice, expressing an interest in learning more about firearms and buying a sniper rifle and an automatic weapon and that he "had considerable firearm experience and used to build modified 9mm submachine guns to kill Jews while he was in Palestine." (Doc. 42-2.) The

store owner stated that Mr. Mahdawi took photos of the store and its merchandise. (*Id.*) The store owner gave the police the name of a fellow gun enthusiast who stated that he had a similar conversation with Mr. Mahdawi at the "Precision Museum" in Windsor where the enthusiast served as a volunteer tour leader. During that conversation, Mr. Mahdawi allegedly told the gun enthusiast, "I like to kill Jews." (*Id.*) The Government also points to an incident in January 2019 when Mr. Mahdawi was stopped at the border and found to be carrying drugs. (Doc. 42-3.) Mr. Mahdawi describes these as prescription medication. (Doc. 45-1 ¶¶ 42–43.) He was sent to diversion through state court and any record of the offense has been expunged. (*Id.* ¶¶ 44–45; Doc. 19-4.) Finally, the government notes that in the course of separating from his wife in 2018, the couple quarreled and the ex-wife surrendered a firearm to the police for safekeeping. (Doc. 42-2 at 6.)

In his reply, Mr. Mahdawi stated that in November 2015, FBI agent Marc Emmons interviewed him concerning the allegations from July 2015. Mr. Mahdawi confirmed that he had visited the gun shop and the Precision Museum but that he had never discussed buying weapons or killing Jews. (Doc. 45-1 ¶¶ 20–35.) His purpose in visiting the gun shop was to learn whether he was required to register a shotgun his wife had given him as a present. There was no registration requirement for her gift. (*Id.* ¶ 21.) He went to the museum because it is located just a few blocks from where he lived, and he is interested in machines and previously studied engineering. (*Id.* ¶¶ 29–30.) Mr. Mahdawi states that the FBI agent was satisfied with his explanation and closed the investigation. (*Id.* ¶ 36.) He denies possessing illegal drugs in 2019. The domestic incident was an argument that led to no charges. (*Id.* ¶¶ 42–44.) Today his ex-wife is a close friend and supporter.

At the court's request, Agent Emmons appeared at the hearing on the motion for release. The Government raised concerns that questioning Mr. Emmons about his investigation could compromise national security concerns. The Government agreed with Mr. Mahdawi that Mr. Emmons' investigation ended in 2015—although not "closed" in any official way—and that there were no charges against Mr. Mahdawi or other unfavorable action. The Government states that it has some other information that it has not shared with the court. The court is satisfied that the information in the police report does not support a finding of dangerousness. If the FBI had substantiated the information, some action would have resulted. That nothing took place supports Mr. Mahdawi's description of meeting with SA Emmons as satisfying him that the two informants were not truthful.

Mr. Mahdawi states that after the November 2024 election, certain groups "launched a deportation campaign against me and declared that they had reported me to the Trump administration so that I may be deported for my speech in support of Palestinian rights." (*Id.* ¶ 20.) After Mahmoud Khalil's arrest and detention,[1] Mr. Mahdawi "felt like I could no longer speak freely on the issues that mattered to me" and that his "physical safety was in jeopardy." (*Id.* ¶ 21.) After Mr. Khalil's arrest, Mr. Mahdawi "didn't go outside much, or say much publicly." (*Id.*)

## B.     Mr. Mahdawi's Detention by Homeland Security Investigations

On March 27, 2025, Mr. Mahdawi received a notification from the United States Customs and Immigration Services (USCIS) portal that his naturalization interview had been scheduled for April 14, 2025, in Colchester, Vermont. (*Id.* ¶ 22.) The interview was the last

---

[1] For background on Mr. Khalil's case, see *Khalil v. Joyce*, No. 25-cv-1963, 2025 WL 972959 (D.N.J. Apr. 1, 2025).

stage of Mr. Mahdawi's naturalization process before the formal naturalization ceremony. (*Id.* ¶ 23.) Mr. Mahdawi "suspected that the Trump administration would use the interview as an opportunity to target and detain" him for his speech. (*Id.* ¶ 24.) He nevertheless made arrangements to attend the interview in person. (*Id.*)

Mr. Mahdawi traveled to Colchester, Vermont on the morning of April 14, 2025, to attend his naturalization interview. (*Id.* ¶ 25.) Upon entering the interview room, he recognized the interviewer as the official who interviewed him for his green card. (*Id.* ¶ 26.) The entire interview was recorded on video. (*Id.* ¶ 27.) Mr. Mahdawi answered all the interviewer's questions and passed the citizenship test. (*Id.* ¶ 29.) He also signed a document affirming that he was willing to take the Oath of Allegiance to the United States. (*Id.*)

After Mr. Mahdawi signed that document, the official said he needed to "check" on some information and would be right back. (*Id.* ¶ 30.) Once the official left the room, three masked agents wearing Homeland Security Investigations ("HSI") jackets and their supervisor entered the room. (*Id.* ¶ 31.) They showed Mr. Mahdawi their badges and told him that he was under arrest. They did not show him a warrant or any documents. (*Id.* ¶ 32.) The agents separated Mr. Mahdawi from his attorney, brought him to a hallway where two more masked agents were waiting, and then shackled him and escorted him to a black van. (*Id.* ¶ 33.) They transported him to another USCIS office building approximately 10 or 15 minutes away from the Colchester office. (*Id.* ¶ 34.)

As he was being processed at the USCIS office, agents shoved a Notice to Appear ("NTA") document into his jacket. (*Id.* ¶ 43.) The NTA stated that Mr. Mahdawi was removable because "[t]he Secretary of State has determined that your presence and activities in the United States would have serious adverse foreign policy consequences and would

compromise a compelling U.S. foreign policy interest." (Doc. 19-2 at 10, 13.) The NTA ordered

Mr. Mahdawi to appear before an immigration judge at the South Louisiana Correctional Center

on May 1, 2025. (*Id.* at 10.)

Shortly before 2:00 p.m., the agents transported Mr. Mahdawi to the Burlington, Vermont

airport. (Doc. 19-2 ¶ 35.) At the airport, two other agents took charge of him; one of the agents

had a gun visible in a holster. (*Id.* ¶ 37.) Mr. Mahdawi repeatedly asked where he was being

taken, and the agents finally told him that he was being sent to Louisiana. (*Id.* ¶ 38.) The flight

left before the agents and Mr. Mahdawi were able to board it; the agents appeared to Mr.

Mahdawi to be "visibly upset that we had missed the flight." (*Id.* ¶ 39.) Mr. Mahdawi was then

transported to the ICE field office in St. Albans, Vermont. (*Id.* ¶ 40.) After seeing his attorney

at the St. Albans office, Mr. Mahdawi was re-shackled and transported to the Northwest State

Correctional Facility in Swanton, Vermont. (*Id.* ¶¶ 41–42.)

Counsel for Mr. Mahdawi filed a Petition for Writ of Habeas Corpus in this court on

April 14, 2025—the same day that Mr. Mahdawi was detained. (Doc. 1.) Through counsel, Mr.

Mahdawi filed a Motion for Release on April 22, 2025. (Doc. 19.) That motion is supported by

over 125 letters of support from professors, neighbors, fellow students, and others who know

him well. All attest to his mild and peaceful nature, his deep intelligence, and his commitment to

principles of non-violence and political activism. A striking number of these letters come from

Jewish colleagues and professors involved in the study of the history and culture of Israel and

Judaism. (*See* Docs. 19-1, 46.)

The facts recited above appear in Mr. Mahdawi's habeas petition and are described in

greater detail in the exhibits attached to his motion for release. The court allowed time for the

Government to rebut or qualify the facts concerning Mr. Mahdawi's history, character, flight risk, and dangerousness to the community.

## Analysis

"[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality opinion) (citing U.S. Const., Art. I, § 9, cl. 2). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention . . . ." *Kapoor v. DeMarco*, 132 F.4th 595, 610 (2d Cir. 2025) (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)). Indeed, the protections of the "Great Writ" of habeas corpus "have been strongest" in that context. *St. Cyr*, 533 U.S. at 301.

Subject to certain exceptions, the federal district courts are authorized to grant the writ of habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a); *see also* 28 U.S.C. § 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."). The court begins with the questions of jurisdiction that the Government has raised. The parties are currently briefing these questions in greater detail in connection with the Government's Motion to Dismiss. Because the primary thrust of the Government's argument against release depends upon its challenge to the court's jurisdiction, the court addresses these issues here in a preliminary manner based on the evidence and arguments that are available to the court at this time.

## I.    Jurisdiction

Although the President nominates federal judges and the Senate may vote to confirm them, it is Congress that grants the courts statutory authority to hear specific types of cases

already identified in Article III as appropriate for federal jurisdiction. One such area of federal
jurisdiction is the writ of habeas corpus. See 28 U.S.C. § 2241. But what Congress gives it may
also take away. In the area of immigration, the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009, and the REAL ID Act
of 2005, Pub. L. No. 109-13, 119 Stat. 302, both of which amended the Immigration and
Nationality Act (INA), contain "jurisdiction stripping" provisions that constrain the authority of
a federal district court to review administrative decisions concerning removal of non-citizens. In
the words of the Supreme Court, the IIRIRA is "aimed at protecting the Executive's discretion
from the courts—indeed, that can fairly be said to be the theme of the legislation." *Reno v. Am.-
Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). The principal contribution of the
REAL ID Act is to state unambiguously that the jurisdiction stripping provisions of the IIRIRA
apply to habeas petitions. Pub. L. No. 109-13, 119 Stat. 302.

  Four statutory provisions are at issue here. The court considers each in turn. The issues
presented by each section are very similar: does the statutory language that prevents the district
court from reviewing removal proceedings preclude the court from reviewing the Government's
decision to arrest Mr. Mahdawi. The Government argues that these "jurisdiction stripping"
provisions shield the decision to detain Mr. Mahdawi from habeas review. He responds that he
was detained in retaliation for the exercise of First Amendment rights—a violation of
fundamental constitutional rights that lies beyond the authority of the immigration court
authorized to hear his removal case.

  **A.**   **Section 1252(g)**

  The Government asserts that 8 U.S.C. § 1252(g) deprives the court of jurisdiction to hear
Mr. Mahdawi's claims. (Doc. 25 at 3.) Section 1252(g) states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).[2]  In the Government's view, § 1252(g) eliminates this court's jurisdiction

because Mr. Mahdawi's petition "seeks to challenge the government's decisions to charge him

with removability and detain him" and thus "arise from" the Government's decision and action

to "commence proceedings." (Doc. 25 at 3.)  In support, the Government relies primarily on the

Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S.

471 (1999) ("*AADC*").

In *AADC*, the American-Arab Anti-Discrimination Committee and a number of

noncitizens sued the U.S. Attorney General and other officials "for allegedly targeting them for

deportation because of their affiliation with a politically unpopular group," the "Popular Front

for the Liberation of Palestine," which the Government characterized as an international terrorist

and communist organization. *AADC*, 525 U.S. at 472–73.  While that suit was pending,

Congress passed the IIRIRA, including the provision codified at 8 U.S.C. § 1252(g).[3]  The issue

litigated in the Supreme Court was whether § 1252(g) deprived the federal courts of jurisdiction

over the selective-enforcement lawsuit.

---

[2] Respondents note that the Secretary of Homeland Security now exercises much of the relevant authority that was previously vested in the Attorney General. *See Clark v. Martinez*, 543 U.S 371, 374 n.1 (2005).

[3] The REAL ID Act of 2005 amended § 1252(g) after the *AADC* Court's 1999 decision, adding the phrase "(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title." Pub. L. No. 109-13, 119 Stat. 302.

The Supreme Court explained that § 1252(g) is a narrow provision that applies "only to

three discrete actions that the Attorney General may take: her 'decision or action' to

'*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482.

The Court observed:

> There are of course many other decisions or actions that may be part of the
> deportation process—such as the decisions to open an investigation, to surveil the
> suspected violator, to reschedule the deportation hearing, to include various
> provisions in the final order that is the product of the adjudication, and to refuse
> reconsideration of that order.

*Id.* Applying that interpretation, the Court reasoned that AADC and the other respondents were

challenging the Attorney General's decision to "commence proceedings" against them and thus

fell "squarely within § 1252(g)." *Id.* at 487. The Court also rejected the respondents' contention

that § 1252(g) should be interpreted to permit "immediate review of their selective-enforcement

claims" to prevent a "chilling effect" on their First Amendment rights. *Id.* at 488. The Court

reasoned that "an alien unlawfully in this country has no constitutional right to assert selective

enforcement as a defense against his deportation."[4] *Id.*

Much of the *AADC* decision concerns issues that were particularly salient at the moment

of IIRIRA's passage, such as the retroactive application of § 1252(g). Today, *AADC* provides

binding authority on one critical issue: the meaning of the phrase "arising from the decision or

action by the Attorney General to commence proceedings, adjudicate cases, or execute removal

orders against any alien under this chapter." On this point, Justice Scalia's analysis favors Mr.

---

[4] As recently noted by the District of Massachusetts in *American Association of
University Professors v. Rubio*, No. 25-cv-10685, at 33 (D. Mass. Apr. 29, 2025), ECF. No. 73,
*AADC*'s holding means that "it does not violate the Constitution for the government to
commence removal proceedings against an alien that is in the United States in violation of the
law for the **additional** reason that the alien is a member of an organization that supports terrorist
activity." *AADC* did not address cases in which political membership is the *only* reason for
instituting removal proceedings.

Mahdawi's position that the district court retains jurisdiction to hear claims that do not arise from
these three identified actions. With the rhetorical *esprit* that distinguishes Justice Scalia's work,
he rejected the suggestion that the three specified actions were no more than examples of
Government action shielded from judicial review:

> It is implausible that the mention of three discrete events along the road to
> deportation was a shorthand way of referring to all claims arising from deportation
> proceedings. Not because Congress is too unpoetic to use synecdoche, but because
> that literary device is incompatible with the need for precision in legislative
> drafting.

*Id.* at 482.

The Supreme Court returned to these issues in *Jennings v. Rodriguez*, 583 U.S. 281
(2018), in which a legal permanent resident sought to challenge his removal following conviction
of a drug offense. Although *Jennings* concerns other "jurisdiction stripping" provisions
discussed below, Justice Alito's decision for the majority recognized the continuing authority of
the *AADC* decision in restricting § 1252(g) to "the three listed actions of the Attorney General."
*Id.* at 294.

The Second Circuit considered similar issues in *Ragbir v. Homan*, 923 F.3d 53 (2d Cir.
2019), *vacated by Pham v. Ragbir*, 141 S. Ct. 227 (2020) (mem.). In *Ragbir*, an individual
subject to a removal order sought to challenge its execution on grounds that the Government was
retaliating against his exercise of free speech. In contrast to this case, Mr. Ragbir's habeas
petition challenged his removal proceedings, not his prior detention. The Second Circuit
reversed the dismissal of his petition on jurisdiction stripping grounds, holding that, although
§ 1252(g) applied to his constitutional claim, the Suspension Clause prevented its application to
his removal at least while the habeas petition was pending. "Because Congress has provided no
'adequate substitute' and because there has been no formal suspension of the writ, Ragbir is

entitled to a habeas corpus proceeding as to the basis for the Government's impending action to deport him." *Id*. at 78 (citation omitted).

The Supreme Court vacated the *Ragbir* decision in *Pham v. Ragbir* for further consideration in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). Though *Thuraissigiam* concerned a different jurisdiction stripping provision, the decision holds that the habeas remedy provides no basis for challenging removal even on constitutional grounds. The writ does not provide a mechanism to seek "the opportunity to remain lawfully in the United States." *Id*. at 119. This case presents the converse of *Thuraissigiam*—a case that does not seek to challenge the removal but addresses instead Mr. Mahdawi's arrest and detention.

There is more to say about the limits the Supreme Court has imposed on § 1252(g) and whether singling out and detaining a legal resident in retaliation for his speech is excluded from habeas review because it is part of the commencement of that individual's removal proceedings. The court will reserve further discussion on these issues for the ruling on the dismissal motion. For purposes of the motion to release, it is sufficient to recognize that in *AADC* and *Jennings*, Justices Scalia and Alito, no shrinking violets when it comes to enforcement of the immigration laws, both recognized the need to apply § 1252(g) in a manner consistent with the actual text of the provision. Such an analysis allows for the exercise of habeas jurisdiction in cases that do not seek to challenge the removal proceedings but are directed instead at administrative detention alleged to be employed to stifle protected speech. As discussed below, Mr. Mahdawi has raised substantial constitutional claims that support a finding of jurisdiction at this stage in the proceedings.

**B.      Section 1226(e)**

Section 1226(e) of Title 8 of the U.S. Code provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the denial of bond or parole.

Section 1226 provides the general framework governing the arrest of non-citizens by the executive branch pending removal. In *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court considered the extent of § 1226(e)'s reach: "Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail." *Id.* at 517. The Supreme Court reached the same conclusion in *Jennings*, 583 U.S. 281. In *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020), the Second Circuit recognized the right of a detained person to challenge "the procedures that resulted in his prolonged incarceration without a determination that he poses a heightened bail risk." These cases make clear that § 1226(e) does not preclude review through habeas procedures of claims that administrative action violates the Constitution.

**C.      Section 1252(a)(5)**

Section 1252(a)(5) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and section 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e).

This provision—and 8 U.S.C. § 1252(b)(9), discussed next—"consolidate review of challenges to orders of removal in the courts of appeals." *Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011). It is well-settled that direct appeals and indirect attacks on removal orders issued by the

immigration courts are heard in the first instance in the applicable circuit courts. But a challenge

to an individual's arrest and detention is different, as discussed by the court in *Delgado*: "We

note, however, that a suit brought against immigration authorities is not per se a challenge to a

removal order; whether the district court has jurisdiction will turn on the substance of the relief

that a plaintiff is seeking." *Id.* at 55. The *Delgado* decision cited *Kellici v. Gonzales*, 472 F.3d

416 (6th Cir. 2006) for the proposition that the "district court, not [the] court of appeals, had

jurisdiction where plaintiffs' habeas petitions challenged only the constitutionality of the arrest

and detention, *not* the underlying administrative order of removal." *Id.* Because Mr. Mahdawi's

habeas petition challenges only his arrest and detention—not the removal proceeding—

§ 1252(a)(5) is very unlikely to bar his petition.

### D.      Section 1252(b)(9)

Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, arising from any action taken
> or proceeding brought to remove an alien from the United States under this
> subchapter shall be available only in judicial review of a final order under this
> section.    Except as otherwise provided in this section, no court shall have
> jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas
> corpus provision, by section 1361 or 1651 or such title, or by any other provision
> of law (statutory or nonstatutory), to review such an order or such questions of law
> or fact.

The application of § 1252(b)(9) turns on a single textual issue: is the claim of an unconstitutional

arrest in this case one "arising from any action taken or proceeding brought to remove an alien

from the United States"? The Government seeks an expansive reading of "arising from any

action taken . . . to remove an alien" that would place judicial review of the constitutional claim

not in this court but before the circuit court reviewing a potential removal order issued in Mr.

Mahdawi's immigration case.

The Supreme Court rejected the Government's position in *Jennings v. Rodriguez*, in

which a person detained in the course of removal proceedings sought a bond hearing to

determine whether his continued detention was justified. The Court considered whether

§ 1252(b)(9) stripped the Court itself of jurisdiction to review a habeas petition. Drawing on the

analysis of *AADC*, the Court held that

> it is enough to note that respondents are not asking for review of an order of
> removal; they are not challenging the decision to detain them in the first place or to
> seek removal; and they are not even challenging any part of the process by which
> their removability will be determined. Under these circumstances, § 1252(b)(9)
> does not present a jurisdictional bar.

583 U.S. at 294–95. The plurality decision by Justice Alito rejected the argument that detention

is part and parcel of removal and is covered by the "arising from" language, embracing a

narrower reading of that phrase. "The question is not whether *detention* is an action taken to

remove an alien but whether *the legal questions* in this case arise from such an action. And for

the reasons explained above, those legal questions are too remote from the actions taken to fall

within the scope of § 1252(b)(9)." *Id.* at 295 n.3.

The same conclusion follows in this case. Mr. Mahdawi has raised a substantial claim

that the Government arrested him to stifle speech with which it disagrees. Such an act would be

a violation of the Constitution—quite separate from the removal procedures followed by the

immigration courts. The legal questions presented by Mr. Mahdawi's petition for habeas corpus

thus do not "arise from" the Government's decision to place him in removal proceedings. The

court will return to this issue after briefing is complete on the motion to dismiss, but there is a

sufficient basis for jurisdiction to proceed to the issue of release or detention.

## II.    *Mapp* **Analysis**

The case *Mapp v. Reno* continues to establish the legal standard for the exercise of a

court's inherent authority to admit to bail individuals properly within their jurisdiction. 241 F.3d

at 226. "[A] court considering a habeas petitioner's fitness for bail must inquire into whether the

habeas petition raises substantial claims and whether extraordinary circumstances exist that make

the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (cleaned up); *see*

*also Daum v. Eckert*, No. 20-3354, 2021 WL 4057190, at \*2 (2d Cir. Sept. 8, 2021) (amended

summary order) (same); *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1145250, at \*15 (D. Vt.

Apr. 18, 2025) (same). This is a "difficult" standard to meet. *Mapp*, 241 F.3d at 226; *see also*

*Wall v. United States*, 619 F.3d 152, 155 n.4 (2d Cir. 2010) (standard is "rigorous"). The

standard is "higher even than that created by 18 U.S.C. § 3143(b)." *United States v. Manson*,

788 F. App'x 30, 32 (2d Cir. 2019) (summary order) (quoting *Grune v. Coughlin*, 913 F.2d 41,

44 (2d Cir. 1990)). "The petitioner bears the burden of demonstrating both the 'substantial

questions' and the 'exceptional circumstances' required" under *Mapp*. *Swerbiolov v. United*

*States*, No. 04-cv-3320, 2005 WL 1177938, at \*2 (E.D.N.Y. May 18, 2005).

### A.    **Substantial Questions**

#### 1.    **First Amendment**

A reader who has reached this point in our discussion may well share the court's initial

perception that Mr. Mahdawi has raised substantial questions about the use of administrative

arrest to stifle his exercise of free speech. "The Supreme Court has been unambiguous that

executive detention orders, which occur without the procedural protections required in courts of

law, call for the most searching review." *Velasco Lopez*, 978 F.3d at 850 (citing *Boumediene v.*

*Bush*, 553 U.S. 723, 781–83 (2008)). Both sides agree in a general way that the arrest was

prompted by Mr. Mahdawi's statements during protests on the Columbia campus. The

Government describes these statements as harmful to the conduct of its foreign policy; Mr.

Mahdawi alleges that the administration seeks to shut down criticism of the conduct of the war in

Gaza.

Noncitizen residents like Mr. Mahdawi enjoy First Amendment rights in this country to

the same extent as United States citizens. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945)

(holding that a noncitizen who published communist literature was protected by First

Amendment); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting that the First

Amendment does not distinguish "between citizens and resident [noncitizens]"); *United States v.*

*Verdugo-Urquidez*, 494 U.S. 259, 270 (1990) (confirming that resident noncitizens "enjoy

certain constitutional rights," including "First Amendment rights"); *Rafeedie v. I.N.S.*, 795 F.

Supp. 13 (D.D.C. 1992) ("Plaintiff is entitled to the same First Amendment protections as United

States citizens, including the limitations imposed by the overbreadth and vagueness doctrines.");

*OPAWL — Building AAPI Feminist Leadership v. Yost*, 747 F. Supp. 3d 1065, 1080 (S.D. Ohio

2024) ("[T]he Supreme Court has never held that the First Amendment fails to protect

[noncitizens'] political speech to the same extent it protects citizens' political speech."). That

includes the right to be free from retaliation for the exercise of his First Amendment rights.

*See Ragbir*, 923 F.3d at 71 (holding that legal permanent resident could not be deported in

retaliation for his protected speech even where he was deportable on other grounds).

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to

inhibit exercise of the protected right,' and the law is settled that as a general matter the First

Amendment prohibits government officials from subjecting an individual to retaliatory

actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (first alteration in

original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). The Second Circuit

has specifically recognized that retaliation for protected political speech is a cognizable ground

for habeas relief in the immigration context. *Ragbir*, 923 F.3d at 71.

    The black letter elements of a claim of retaliation in violate of the First Amendment are

(1) that the speech or conduct at issue was protected, (2) that the defendant took an adverse

action against the plaintiff, and (3) that there was a causal connection between the protected

speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir.

2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015). Mr.

Mahdawi has raised serious arguments on each of these issues such that he has made a

"substantial claim" regarding the alleged violation of his First Amendment right.

### a.    Protected Speech

    Mr. Mahdawi has presented sufficient evidence that his speech was protected under the

First Amendment. "[S]peech on a matter of 'public concern' is at 'the heart . . . of First

Amendment[] protection' and 'occupies the highest rung of the hierarchy of First Amendment

values.'" *Ragbir*, 923 F.3d at 69–70 (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011))

(alterations in original). Here, Mr. Mahdawi's speech concerned an issue of great public interest.

His speech, which advocated for a peaceful resolution of the conflict in Gaza and opposed

Israel's military campaign, is at the heart of an ongoing political debate among the American

people. "Because [Mr. Mahdawi's] speech concerns 'political change,' it is also 'core political

speech' and thus 'trenches upon an area in which the importance of First Amendment protections

*is at its zenith.*'" *Ragbir*, 923 F.3d at 70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425

(1988)) (emphasis in *Ragbir*).

Mr. Mahdawi's speech does not appear to fall within any areas in which the First Amendment permits restrictions based on the content of speech. The Supreme Court recently summarized these areas: "incitement—statements direct at producing imminent lawless action and likely to do so," "defamation—false statements of fact harming another's reputation," "obscenity—valueless material appealing to the prurient interest," and "true threats of violence." *Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023) (cleaned up).

In a memorandum written by Secretary of State Marco Rubio, the government accused Mr. Madawi of "engag[ing] in threatening rhetoric and intimidation of pro-Israeli bystanders" at a protest. (Doc. 42-1 at 2.) A bail hearing is not the time to make detailed findings on the merits of the First Amendment claim. On the limited record available, Mr. Mahdawi has provided enough information to show that his speech was protected.

### b.    Adverse Action

There is also record evidence that Mr. Mahdawi's arrest and detention constitutes adverse action for the purposes of his First Amendment retaliation claim. On April 14, 2025, Mr. Mahdawi went to the USCIS Burlington Field Office to continue the process of becoming a U.S. citizen. (Doc. 19-2 ¶ 25.) Upon completing that interview, he was detained. (*Id.* ¶¶ 31–33.) He was removed from his community and his family and cannot currently make progress toward completing his undergraduate degree. (*Id.* ¶¶ 45–48.) The threat of such conduct "would chill a person of ordinary firmness from continuing to engage in the protected activity." *Bello-Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021).

### c.    The Government's Motivation in Detaining Mr. Mahdawi

Mr. Mahdawi bears the burden of proving that the Government detained him in retaliation for his protected speech or to chill the speech of others. A bail hearing is not the time

to rule on the merits of the evidence or the methods of inferring retaliatory motive. It is
sufficient at this juncture to consider the Government's public statements, including Executive
Orders 14161 and 14188, as evidence of retaliatory intent. Executive Order 14161 states that its
purpose is, in relevant part, to "protect [United States] citizens from aliens who . . . espouse
hateful ideology." Executive Order 14188 is entitled "Additional Measures to Combat Anti-
Semitism." The fact sheet accompanying Executive Order 14188 promises to "*punish* anti-
Jewish racism in leftist, anti-American colleges and universities." Fact Sheet: President Donald
J. Trump Takes Forceful and Unprecedent Steps to Combat Anti-Semitism,
https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-
forceful-and-unprecedented-steps-to-combat-anti-semitism/ [https://perma.cc/6QTD-M3FD]
(emphasis added). The fact sheet also promises to deport or revoke the student visas of "all
Hamas sympathizers on college campuses, which have been infested with radicalism like never
before." *Id.* It threatens: "To all the resident aliens who joined the pro-jihadist protests, we put
you on notice: come 2025, we will find you, and we will deport you." *Id.* Before his election,
President Trump reportedly promised donors, in reference to pro-Palestinian activism, that he
would "set that movement back 25 or 30 years" if elected. Robert Tait, *Trump Tells Donors He
Will Crush Pro-Palestinian Protests if Re-Elected*, The Guardian (May 27, 2024),
https://www.theguardian.com/world/article/2024/may/27/trump-donors-israel-gaza-palestinian-
protests [https://perma.cc/S3DS-FN9W]. Together, this evidence is sufficient for Mr.
Mahdawi's present purpose of raising a "substantial claim" of First Amendment retaliation.

### 2. Due Process

The Due Process Clause of the Fifth Amendment protects the right of "any person" from
"be[ing] deprived of life, liberty, or property, without due process of law." The guarantees of the

Due Process Clause "include a substantive component, which forbids the government to infringe
certain 'fundamental' liberty interests at all, no matter what process is provided, unless the
infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S.
292, 301–02 (1993). Noncitizens in removal proceedings are accorded full due process and
equal protection rights. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process
Clause applies to all 'persons' within the United States, including [noncitizens], whether their
presence here is lawful, unlawful, temporary, or permanent."). And the Supreme Court has
specifically recognized the availability of substantive due process claims in the context of
immigration detention. *Id.* at 694.

    Mr. Mahdawi has raised a substantive due process claim, alleging that his detention
violates the Fifth Amendment because "it bears no reasonable relation to any legitimate
government purpose." (Doc. 1 ¶ 72.) He asserts that, to comport with the requirements of the
Fifth Amendment, "[i]mmigration detention must further the twin goals of ensuring a
noncitizen's appearance during removal proceedings and preventing danger to the community."
(*Id.* ¶ 71.)

    The Supreme Court "has recognized detention during deportation proceedings as a
constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523
(2003). In certain cases, the INA mandates a noncitizen's detention pending removal, namely
when a noncitizen has committed certain criminal offenses. 8 U.S.C. § 1226(c). In general,
however, the government's decision to detain an immigrant pending removal is discretionary.
*Id.* § 1226(a). And courts cannot generally question those discretionary decisions. Mr. Mahdawi
is correct, however, that the government's discretion is not unbounded, and "both removable and

inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious."
*Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting).

Detention incident to removal proceedings "has two regulatory goals: ensuring the
appearance of [noncitizens] at future immigration proceedings and preventing danger to the
community." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Matter of Guerra*, 24 I&N Dec.
37, 40 (BIA 2006) (when determining whether to release a noncitizen from detention, an
Immigration Judge considers whether the individual "is a threat to national security, a danger to
the community at large, likely to abscond, or otherwise a poor bail risk"). Thus, such detention
can never be punitive, either by design or effect. *Zadvydas*, 533 U.S. at 690 ; *see also Fong Yue
Ting v. United States*, 149 U.S. 698, 730 (1893); *Ozturk*, 2025 WL 1145250, at *60 ("So long as
detention is motivated by those goals, and not a desire for punishment, the Court is generally
required to defer to the political branches on the administration of the immigration system."). If
the government wishes to detain a noncitizen as punishment for violating this nation's
immigration laws, it must do so on the basis of a criminal statute and only after conducting a
criminal prosecution. *See Wong Wing v. United States*, 163 U.S. 228 (1896). Mr. Mahdawi may
therefore succeed on his Fifth Amendment claim if he demonstrates *either* that the government
acted with a punitive purpose *or* that it lacks any legitimate reason to detain him.

The same evidence that supports Mr. Mahdawi's First Amendment claim supports his
Fifth Amendment claim. If the Government detained Mr. Mahdawi as punishment for his
speech, that purpose is not legitimate, regardless of any alleged First Amendment violation.
Immigration detention cannot be motivated by a punitive purpose. Nor can it be motivated by
the desire to deter others from speaking. The court is satisfied that Mr. Mahdawi has raised

important issues concerning potential constitutional violations and that these questions satisfy the *Mapp* requirement of substantial questions.

### B.    Extraordinary Circumstances

The *Mapp* decision also requires a finding of extraordinary circumstances. "[A] habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226.

The court finds that extraordinary circumstances support Mr. Mahdawi's release for several reasons.

First, it is under this heading that the court will consider the conventional bail issues of risk of flight and danger to society. *D'Alessandro v. Mukasey*, No. 08-cv-914, 2009 WL 799957, at *5 (W.D.N.Y. Mar. 25, 2009) ("[T]hat there is no evidence to support a finding that [the petitioner] is a flight risk or is a danger to the community" can also constitute an extraordinary circumstance.). There is no risk of flight. Mr. Mahdawi has strong ties to the Vermont community where he owns a home (and a half, counting the camp in Vershire). (*See* Doc. 19-1 at 100, 159, 179, 185, 190.) He is a full-time student who has been accepted into a graduate program. (Doc. 19-2 ¶¶ 9–9; Doc. 19-1 at 202.) He presented himself at the USCIS office in Colchester even though he had suspicions that he would be detained. (Doc. 19-2 ¶¶ 41, 49); He has deep connections to colleagues, professors, his faith community, and—it would appear—a great many friends. (*See generally* Doc. 19-1.)

He also presents no danger to his community or to others. The court has considered the allegations made by the gunsmith in 2015. If true, they are highly damaging to Mr. Mahdawi's chances of release and of having any future in the United States at all. In 2015, the FBI

conducted a thorough investigation of the allegations and found no basis to act. Had the statements attributed to Mr. Mahdawi been true, they would have resulted in some official response. In a case of the dog that did not bark, the FBI concluded its investigation without taking action. That decision gives rise to a reasonable inference that the agency charged with the protection of the public from crime found no basis for proceeding against Mr. Mahdawi in any venue. Ten years have passed since that time without any criminal charge except for a referral to a state-run diversion program in 2019 concerning a potential drug offense. The record of that referral and any citation has been expunged in the normal course.

People who have come to know Mr. Mahdawi more recently than 2015 describe him as a peaceful figure who seeks consensus in a highly-charged political environment. (*See generally* Doc. 19-1; Doc. 46.) But, even if he were a firebrand, his conduct is protected by the First Amendment. Unlike many habeas petitioners, he comes before the court charged with no offense and free from any claim of criminal conduct. The court is aware that he has offended his political opponents and apparently given rise to concerns at the State Department that he is an obstacle to American foreign policy. Such conduct is insufficient to support a finding that he is in any way a danger as we use that term in the context of detention and release.

The court also considers the extraordinary setting of this case and others like it. Legal residents—not charged with crimes or misconduct—are being arrested and threatened with deportation for stating their views on the political issues of the day. Our nation has seen times like this before, especially during the Red Scare and Palmer Raids of 1919–1920 that led to the deportation of hundreds of people suspected of anarchist or communist views. In *Colyer v. Skeffington*, 265 F. 17 (1920), Judge Anderson of the District of Massachusetts granted habeas relief to multiple immigrants detained for their political beliefs. His decision was instrumental in

bringing an end to the moral panic that gripped the nation and its officials. Similar themes were

sounded during the McCarthy period in the 1950s when thousands of non-citizens were targeted

for deportation due to their political views. Ellen Schrecker, *Immigration and Internal Security:*

*Political Deportations During the McCarthy Era*, Vol. 60 Sci. & Soc'y 393 (1996). Again, the

fever passed, but not before Justice Jackson was moved to dissent in *U.S. ex rel. Knauff v.*

*Shaughnessy*, 338 U.S. 537, 317 (1950), writing in a habeas case concerning the exclusion of a

German war bride:

> Security is like liberty in that many are the crimes committed in its name. The
> menace to the security of this country, be it great as it may, from this girl's
> admission is as nothing compared to the menace to free institutions inherent in
> procedures of this pattern.

Justice Minton's majority decision is not much remembered. The wheel of history has come

around again, but as before these times of excess will pass. In the meantime, this case—like

*Colyer* and *Knauff*—is extraordinary in the sense that it calls upon the ancient remedy of habeas

to address a persistent modern wrong.

## C.    Necessary to Make the Habeas Remedy Effective

Mr. Mahdawi argues that release is necessary to make habeas effective because keeping

him in detention pending adjudication on the merits "would ratify the chilling effect that the

government intends to create." (Doc. 19 at 21.) As this court observed in *Ozturk*:

> The Second Circuit has specifically recognized potential retaliation for protected
> political speech as a cognizable ground for habeas relief in the immigration context,
> noting that "to allow this retaliatory conduct to proceed would broadly chill
> protected speech, among not only activists subject to final orders of deportation but
> also those citizens and other residents who would fear retaliation against others."

2025 WL 1145250, at *19 (quoting *Ragbir v. Homan*, 923 F.3d 53, 71 (2d Cir. 2019)). Mr.

Mahdawi, like Ms. Ozturk, "has presented evidence to support [his] argument that [he] may

qualify for a retaliation claim." *Id.* "[A]n inmate's constitutional protections are not left at the

prison gate." *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995). However, "[t]he fact of

confinement and the needs of the penal institution impose limitations on constitutional rights,

including those derived from the First Amendment, which are implicit in incarceration." *Id.*

(quoting *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977)). Mr.

Mahdawi's ability to exercise his First Amendment rights is "severe[ly] curtail[ed]" as long as he

is detained. *Id.* If he has been detained in retaliation for exercising those rights, release is

essential to make habeas relief effective, not only for him but for others who wish to speak freely

without fear of government retaliation. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury.").

### III.   Disposition

The Government seeks a stay of the order releasing Mr. Mahdawi.

"A court making an initial custody determination in a habeas corpus case should be

guided by the language of Fed. R. App. P. 23(c), and by the factors traditionally considered in

decid[ing] whether to stay a judgment in a civil case." *Dhine v. Dist. Dir.*, 822 F. Supp. 1030,

1031 (S.D.N.Y. 1993) (citing *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). Rule 23(c) reflects

a general preference for release pending appeal:

> While a decision ordering the release of a prisoner is under review, the prisoner
> must—unless the court or judge rendering the decision, or the court of appeals, or
> the Supreme Court, or a judge or justice of either court orders otherwise—be
> released on personal recognizance, with or without surety.

Courts evaluating whether to stay a civil ruling pending appeal consider the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed
> on the merits; (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested
> in the proceeding; and (4) where the public interest lies.

*DiMartile v. Hochul*, 80 F.4th 443, 456 (2d Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418,

425–26 (2009)). Furthermore, in cases concerning release from detention, "if the respondent

establishes that the [petitioner] would constitute a danger to the community if released, the Court

may consider that factor in resolving the stay question." *Dhine*, 822 F. Supp. at 1031 (citing

*Hilton*, 481 U.S. at 777).

### A.   Likelihood of Success on the Merits

The court has already functionally addressed this issue, resolving it in favor of Mr.

Mahdawi: "A substantial claim for relief [under *Mapp*] is found where a petitioner relies on clear

case law establishing the likelihood of success on his claim." *Evangelista v. Ashcroft*, 204 F.

Supp. 2d 405, 407 (E.D.N.Y. 2002). The Government cannot also make a showing of likelihood

of success on the merits. This factor therefore weighs in favor of Mr. Mahdawi's immediate

release.

### B.   Irreparable Injury

The Government will not be irreparably harmed absent a stay. As already discussed in

this opinion, the evidence currently before the court suggests that Mr. Mahdawi is neither a flight

risk nor a danger to the community, and his release will not interfere with his removal

proceedings. The Government has thus failed to demonstrate any legitimate interest in Mr.

Mahdawi's continued confinement.

On the other hand, "[t]he interest of the habeas petitioner in release pending appeal[ is]

always substantial." *Hilton*, 481 U.S. at 777. Every day that a person is detained is a significant

injury. And Mr. Mahdawi's interest in release is particularly substantial in this case given the

First Amendment concerns he has raised. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The

loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable

injury."). Without release, Mr. Mahdawi will also be unable to complete his undergraduate degree. These possible injuries weigh strongly against the issuance of a stay.

**C.    Injury to Other Interested Parties**

The court is not aware of possible injury to other interested parties in this case.

**D.    The Public Interest**

Mr. Mahdawi's release is also in the public interest. His continued detention would likely have a chilling effect on protected speech, which is squarely against the public interest. And continuing to detain him would not benefit the public in any way, as Mr. Mahdawi appears not to be either a flight risk or a danger to the community. Finally, Mr. Mahdawi's release will benefit his community, which appears to deeply cherish and value him. The court therefore declines to stay its order pending appeal and instead requires Mr. Mahdawi's immediate release.

## CONCLUSION

Petitioner's Motion for Release (Doc. 19) is GRANTED. The court orders the release of Mohsen Madawi on his personal recognizance during the pendency of this habeas proceeding. His release is subject to the following conditions:

1. **That he reside in Vermont;**

2. **That he is permitted to travel to New York State for educational purposes or to meet with his lawyers or as otherwise ordered by the court;**

3. **That he attend all court hearings in this case in person unless excused by order of the court.**

Mahdawi v. Trump, *et al*.                                        Case No. 2:25-CV-389

Dated at Burlington, in the District of Vermont, this 30th day of April, 2025.

_____
Geoffrey W. Crawford, Judge
United States District Court

**UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT**

| | |
|---|---|
| MOHSEN MAHDAWI, <br><br>       Petitioner, <br><br>   v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; PATRICIA HYDE, in her official capacity as Acting Field Office Director; Vermont Sub-Office Director of Immigration and Customs Enforcement; TODD M. LYONS, in his official capacity as Acting Director for U.S. Immigration and Customs Enforcement; KRISTI NOEM, in her official capacity as Secretary of  the United States Department of Homeland Security; MARCO RUBIO, in his official capacity as Secretary of State; and PAMELA BONDI, in her official capacity as Attorney General of the United States, <br><br>       Respondents. | No. 2:25-cv-389 |

**RESPONDENTS' NOTICE OF APPEAL**

PLEASE TAKE NOTICE that all named Respondents hereby appeal to the United States Court of Appeals for the Second Circuit from the Court's Orders of April 24, 2025 (ECF No. 34, extending the temporary restraining order) and of April 30, 2025 (ECF No. 54, accepting jurisdiction, ordering Petitioner's release under *Mapp v. Reno*, and denying motion for stay pending appeal).

Respectfully submitted,

Dated: April 30, 2025     By:   */s/ Michael P. Drescher*
              Michael P. Drescher
              Acting United States Attorney
              District of Vermont

**JA 581**

# 2:25cv389, Mahdawi V. Trump Et Al

US District Court Docket

United States District Court, Vermont

(Burlington)

### This case was retrieved on 06/27/2025

## Header

**Case Number:** 2:25cv389
**Date Filed:** 04/14/2025
**Assigned To:** District Judge Geoffrey W. Crawford
**Nature of Suit:** Habeas Corpus - Alien Detainee (463)
**Cause:** Aliens: Habeas Corpus to Release INS Detainee
**Lead Docket:** None
**Other Docket:** None
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 8:1105(a)
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Habeas Corpus - Alien Detainee

## Participants

### Litigants

Mohsen Mahdawi
**Petitioner**

### Attorneys

Brett M. Kaufman , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-549-2603 Fax: 212-995-4031 Email:Bkaufman@aclu.Org

Brian Matthew Hauss , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
USA
212-549-2500 Email:Bhauss@aclu.Org

Cyrus D. Mehta , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Cyrus D. Mehta & Partners PLLC
One Battery Park Plaza, 9th Floor
New York, NY  10004
USA
212-425-0555 Email:Cm@cyrusmehta.Com

David A. Isaacson , Esq.
ATTORNEY TO BE NOTICED
Cyrus D. Mehta & Partners PLLC
One Battery Park Plaza, 9th Floor
New York, NY  10004

**JA 582**

2:25cv389, Mahdawi V. Trump Et Al

## Litigants                                    ## Attorneys

USA
212-425-0555 Fax: 212-425-3282
Email:Disaacson@cyrusmehta.Com

Esha Bhandari , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Email:Ebhandari@aclu.Org

Hillary A. Rich , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
315-521-9231 Email:Hrich@acluvt.Org

Lia N. Ernst , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA
(802) 223-6304 Fax: (802) 223-6304 Email:Lernst@acluvt.Org

Luna Droubi , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Beldock Levine & Hoffman LLP
99 Park Avenue, Ph/26th Floor
New York, NY 10016
USA
212-277-5875 Email:Ldroubi@blhny.Com

Matthew D. Melewski , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
Beldock Levine & Hoffman LLP
99 Park Avenue, Ph/26th Floor
New York, NY 10016
USA
212-277-5815 Email:Mmelewski@blhny.Com

Michael K.T. Tan , Esq.
PRO HAC VICE;ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
USA
212-549-2500 Fax: 332-221-1702

Monica H. Allard , Esq.
ATTORNEY TO BE NOTICED
ACLU Foundation of Vermont
P.O. Box 277
Montpelier, VT 05601-0277
USA

**JA 583**

2:25cv389, Mahdawi V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | 802-251-7091 Email:Mallard@acluvt.Org |
| | Nathan F. Wessler , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY  10004<br>USA<br>212-519-7847 Email:Nwessler@aclu.Org |
| | Noor Zafar , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY  10004<br>USA<br>212-549-2500 Email:Nzafar@aclu.Org |
| | Shezza Abboushi Dallal , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Main Street Legal Services Inc.<br>Clear Project Cuny School Of Law 2 Court Square, Ste 5th Floor<br>Long Island City, NY  11101<br>USA<br>718-970-1875 Email:Shezza.Dallal@law.Cuny.Edu |
| | Sidra Mahfooz , Esq.<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad Street, 18th Floor<br>New York, NY  10004<br>USA<br>631-741-3383 Email:Smahfooz@aclu.Org |
| | Andrew B. Delaney , Esq.<br>ATTORNEY TO BE NOTICED<br>Martin Delaney & Ricci Law Group<br>100 North Main Street P.O. Box 607<br>Barre, VT  05641-0607<br>USA<br>802-479-0568 Fax: 802-479-5414 Email:Andrew@mdrvt.Com |
| Donald  J. Trump<br>in his official capacity as President of the United States \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT  05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Patricia Hyde<br>in her official capacity as Acting Boston Field Office Director,<br>Immigration And Customs Enforcement, Enforcement And<br>Removal Operations \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT  05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| J Doe<br>in official capacity as Vermont Sub-Office Director Of Immigration<br>And Customs Enforcement, Enforcement And Removal Operations | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office |

2:25cv389, Mahdawi V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| \|<br>**Respondent** | 11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Todd Lyons<br>in his official capacity as Acting Director, U.S. Immigration And Customs Enforcement \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Kristi Noem<br>in her official capacity as Secretary Of The United States Department Of Homeland Security \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Marco A. Rubio<br>in his official capacity as Secretary Of State \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |
| Pamela Bondi<br>in her official capacity as U.S. Attorney General \|<br>**Respondent** | Michael P. Drescher , AUSA<br>ATTORNEY TO BE NOTICED<br>United States Attorney's Office<br>11 Elmwood Avenue, 3rd Floor P.O. Box 570<br>Burlington, VT 05402-0570<br>USA<br>(802) 951-6725 Email:Michael.Drescher@usdoj.Gov |

# Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 04/14/2025 | PETITION for Writ of Habeas Corpus filed by Mohsen Mahdawi. (Filing fee $ 5.) (Attachments: # 1 Civil Cover Sheet)(Delaney, Andrew) (Attachment 1 replaced on 4/14/2025) (law). (Entered: 04/14/2025) | |
| 2 | 04/14/2025 | EMERGENCY MOTION for Temporary Restraining Order filed by Mohsen Mahdawi. (Delaney, Andrew) (Main Document 2 replaced and Attachment(s) added on 4/14/2025: # 1 Proposed Order) (law). (Main Document 2 replaced on 4/18/2025) (sjl). (Entered: 04/14/2025) | |
| 3 | 04/14/2025 | CASE assigned to Judge William K. Sessions III. (law) (Entered: 04/14/2025) | |
| 4 | 04/14/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 1 PETITION for Writ of Habeas Corpus filed by Mohsen Mahdawi. This JS 44 Civil Cover Sheet omitted the related case information and has been replaced. The corrected JS 44 is now attached to 1 and this entry. (law) (Entered: 04/14/2025) | |
| 5 | 04/14/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 2 EMERGENCY MOTION for Temporary Restraining Order filed by Mohsen Mahdawi. The main document combined the motion and proposed order as a singular PDF. Also, the proposed order has been revised to include a full case caption. The documents have been broken apart and are now separately attached to 2 and this entry. (Attachments: # 1 Proposed Order) (law) (Entered: 04/14/2025) | |

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | 04/14/2025 | FILING FEE RECEIVED of $5.00. Receipt number 5683. (kac) (Entered: 04/14/2025) | |
| 6 | 04/14/2025 | ORDER granting 2 Emergency Motion for Temporary Restraining Order. Signed by Judge William K. Sessions III on 4/14/2025. (law) (Entered: 04/14/2025) | |
| 7 | 04/14/2025 | MOTION for Appearance Pro Hac Vice of David A. Isaacson (Filing fee $ 150 receipt number AVTDC-2059973) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of David A. Isaacson, # 2 Certificate of Good Standing) (Delaney, Andrew) Modified on 4/14/2025 to clarify attachments (sjl). (Entered: 04/14/2025) | |
| 8 | 04/14/2025 | ORDER granting 7 Motion for Admission Pro Hac Vice of David A. Isaacson. Signed by Judge William K. Sessions III on 4/14/2025. (This is a text-only Order.) (eae) (Entered: 04/14/2025) | |
| 9 | 04/15/2025 | MOTION for Appearance Pro Hac Vice of Luna Droubi (Filing fee $ 150 receipt number AVTDC-2060446) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Luna Droubi, # 2 Certificate of Good Standing) (Delaney, Andrew) Modified on 4/15/2025 to clarify attachments (sjl). (Entered: 04/15/2025) | |
| 10 | 04/15/2025 | MOTION for Appearance Pro Hac Vice of Cyrus D. Mehta (Filing fee $ 150 receipt number AVTDC-2060453) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Cyrus D. Mehta, # 2 Certificate of Good Standing) (Delaney, Andrew) (Entered: 04/15/2025) | |
| 11 | 04/15/2025 | NOTICE OF APPEARANCE by Michael P. Drescher, AUSA on behalf of Donald J. Trump, Patricia Hyde, J Doe, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi.(Drescher, Michael) Filers clarified on 4/15/2025 (law). (Entered: 04/15/2025) | |
| 12 | 04/15/2025 | ORDER REASSIGNING CASE. It is found that this is likely not a related case to 2:25-cv-00374 and the clerk is directed to return this case to the civil wheel for random reassignment. Signed by Judge William K. Sessions III on 4/15/2025. (law) Modified on 4/15/2025 to clarify text (sjl). (Entered: 04/15/2025) | |
| 13 | 04/15/2025 | CASE reassigned to District Judge Geoffrey W. Crawford. (law) (Entered: 04/15/2025) | |
| 14 | 04/16/2025 | ORDER granting 9 and 10 MOTIONS for Admission Pro Hac Vice of Luna Droubi and Cyrus D. Mehta respectively. Signed by District Judge Geoffrey W. Crawford on 4/16/2025. (This is a text-only Order.) (jal) (Entered: 04/16/2025) | |
| 15 | 04/16/2025 | NOTICE of Hearing: Status Conference set for 4/23/2025 at 9:00 AM in Burlington Courtroom 110 before District Judge Geoffrey W. Crawford. (eh) (Entered: 04/16/2025) | |
| 16 | 04/18/2025 | ORDER: re 15 Notice of Hearing. Counsel shall be prepared to address preliminary issues of jurisdiction and detention or release. If necessary, court may allow additional briefing after the hearing. Signed by District Judge Geoffrey W. Crawford on 4/18/2025. (This is a text-only Order.)(jal) (Entered: 04/18/2025) | |
| 17 | 04/18/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 2 EMERGENCY MOTION for Temporary Restraining Order. The Main Document has been replaced to include the corrected document as an earlier correction omitted the main document. The corrected Main Document is now attached to 2 and this entry. (sjl) (Entered: 04/18/2025) | |
| 18 | 04/21/2025 | MOTION for Appearance Pro Hac Vice of Matthew Melewski (Filing fee $ 150 receipt number AVTDC-2063276) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Matthew Melewski # 2 Certificate of Good Standing) (Delaney, Andrew) Modified on 4/22/2025 to clarify attachment (sjl). (Entered: 04/21/2025) | |
| 19 | 04/22/2025 | MOTION for Release Under Mapp v. Reno with Request for Oral Argument/Hearing filed by Mohsen Mahdawi (Attachments: # 1 Exhibit 1 (sealed), # 2 Declaration of Mohsen Mahdawi (sealed), # 3 Exhibit 3 | |

JA 586

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (sealed), # 4 Exhibit 4 (sealed)) (Delaney, Andrew) Modified on 4/22/2025 to clarify text/attachments and Attachment 1 replaced) (sjl). (Additional attachment(s) added on 4/22/2025: # 5 Exhibit 1 (redacted)), # 6 Exhibit 3 (redacted)) (sjl). (Entered: 04/22/2025) | |
| 20 | 04/22/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 19 MOTION for for Release Under Mapp v. Reno. Exhibit 1 has been replaced to remove illegible PDF headers. The corrected document is now attached to 19 and this entry. (sjl) (Entered: 04/22/2025) | |
| 21 | 04/22/2025 | REVISED NOTICE of Hearing: Status Conference and Hearing on 19 MOTION for Release Under Mapp v. Reno set for 4/23/2025 at 09:00 AM in Burlington Courtroom 110 before District Judge Geoffrey W. Crawford. (Revised only to include hearing on Doc. 19 .) (sjl) (Entered: 04/22/2025) | |
| 22 | 04/22/2025 | ORDER granting 18 MOTION for Admission Pro Hac Vice of Matthew Melewski. Signed by District Judge Geoffrey W. Crawford on 4/22/2025. (This is a text-only Order.) (jal) (Entered: 04/22/2025) | |
| 23 | 04/22/2025 | MOTION for Leave to File an Amicus Curiae Brief filed by Immigration Lawyers, Law Professors, and Scholars (Attachments: # 1 Proposed Amicus Brief, # 2 Appendix I, # 3 Appendix II, # 4 Proposed Order) (Stokes, Brett) Modified on 4/22/2025 to clarify attachments (sjl). (Attachment 2 replaced on 4/28/2025 to clarify attachments (sjl). (Entered: 04/22/2025) | |
| 24 | 04/22/2025 | UNOPPOSED MOTION to File Under Seal Certain Exhibits re: 19 MOTION for Release Under Mapp v. Reno filed by Mohsen Mahdawi (Delaney, Andrew) Modified on 4/22/2025 to clarify text (sjl). (Entered: 04/22/2025) | |
| 25 | 04/22/2025 | MEMORANDUM by Donald J. Trump, Patricia Hyde, J Doe, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi (Prehearing Submission) re: 1 PETITION for Writ of Habeas Corpus. (Drescher, Michael) Modified on 4/22/2025 to clarify text (sjl). Modified on 4/23/2025 to update docket event type (sjl). (Entered: 04/22/2025) | |
| 26 | 04/22/2025 | ORDER granting 23 MOTION for Leave to File an Amicus Curiae Brief. Signed by District Judge Geoffrey W. Crawford on 4/22/2025. (This is a text-only Order.) (jal) (Entered: 04/22/2025) | |
| 27 | 04/22/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 19 MOTION for Release Under Mapp v. Reno filed by Mohsen Mahdawi. Exhibits 1 and 3 have been sealed. Redacted versions of Exhibits 1 and 3 are now attached to 19 and this entry. (Attachments: # 1 Exhibit 3 (redacted)) (sjl) (Entered: 04/22/2025) | |
| 28 | 04/23/2025 | MINUTE ENTRY for proceedings held before District Judge Geoffrey W. Crawford: Status Conference held on 4/23/2025. Attorneys C. Mehta, D. Isaacson, L. Droubi, M. Melewski, and A. Delaney present with petitioner. M. Drescher, AUSA present on behalf of respondents. Court makes inquiries and counsel makes statements. Court makes findings. ORDERED: 25 Memorandum converted to a Motion to Dismiss Under R. 12. Petitioner to file responses within 14 days, respondent to file replies 7 days thereafter. Motion hearing re: 19 MOTION for Release Under Mapp v. Reno set for 4/30/2025 at 9:00 AM in Burlington Courtroom 110 before District Judge Geoffrey W. Crawford. Court to issue entry order. (Court Reporter: Johanna Masse) (eh) (Entered: 04/23/2025) | |
| 29 | 04/23/2025 | NOTICE of Hearing re: 19 MOTION for Release Under Mapp v. Reno. Motion Hearing set for 4/30/2025 at 9:00 AM in Burlington Courtroom 110 before District Judge Geoffrey W. Crawford. (eh) (Entered: 04/23/2025) | |
| 30 | 04/23/2025 | NOTICE OF APPEARANCE by Lia N. Ernst, Esq on behalf of Mohsen Mahdawi.(Ernst, Lia) (Entered: 04/23/2025) | |
| 31 | 04/23/2025 | NOTICE OF APPEARANCE by Monica H. Allard, Esq on behalf of Mohsen Mahdawi.(Allard, Monica) (Entered: 04/23/2025) | |

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 32 | 04/23/2025 | NOTICE OF APPEARANCE by Hillary A. Rich, Esq on behalf of Mohsen Mahdawi.(Rich, Hillary) (Entered: 04/23/2025) | |
| 33 | 04/23/2025 | SCHEDULING ORDER AND ORDER on Motion to File Under Seal (Doc. 24). The court will resume the hearing on the motion for release on Wednesday, April 30, 2025, at 9:00 a.m. The court requires the presence of the petitioner Mr. Mahdawi in court. The Government's response to the motion for release shall be filed not later than noon, Monday, April 28, 2025. Any reply from the petitioner shall be filed not later than noon, Tuesday, April 29, 2025. The court converts the Government's Memorandum (Doc. 25) to a motion to dismiss the petition under Fed. R. Civ. P. 12. The petitioner's response to the motion to dismiss shall be filed not later than May 7, 2025. The Government's reply shall be filed not later than May 14, 2025. The court GRANTS the motion to file under seal certain exhibits containing personal identifying information (Doc. 24). In addition, the court has removed identifying information such as residence addresses and "A number" identifiers from the petitioner's filings. Signed by District Judge Geoffrey W. Crawford on 4/23/2025. (sjl) (Entered: 04/23/2025) | |
| 34 | 04/24/2025 | ORDER EXTENDING TEMPORARY RESTRAINING ORDER. The court ORDERS that the temporary restraining order issued on the date of Mr. Mahdawi's arrest is extended for a period of 90 days or until dismissal of this case or grant of a preliminary injunction, whichever is earliest. The court orders that no respondent, including any agent or employee, shall remove Mr. Mahdawi from Vermont without further order from this court. Signed by District Judge Geoffrey W. Crawford on 4/23/2025. (sjl) (Entered: 04/24/2025) | |
| 35 | 04/25/2025 | MOTION for Leave to File Amicus Brief and MOTION to Expedite filed by E.S. (Attachments: # 1 Proposed Amicus Brief)(law) (Entered: 04/25/2025) | |
| 36 | 04/25/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Nathan Freed Wessler, Brett Max Kaufman, Brian Hauss, Esha Bhandari, Noor Zafar, Sidra Mahfooz (Filing fee $ 900 receipt number AVTDC-2065878) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Nathan Freed Wessler, # 2 Certificate of Good Standing Nathan Freed Wessler, # 3 Affidavit of Brett Max Kaufman, # 4 Certificate of Good Standing Brett Max Kaufman, # 5 Affidavit of Brian Hauss, # 6 Certificate of Good Standing Brian Hauss, # 7 Affidavit of Esha Bhandari, # 8 Certificate of Good Standing Esha Bhandari, # 9 Affidavit of Noor Zafar, # 10 Certificate of Good Standing Noor Zafar, # 11 Affidavit of Sidra Mahfooz, # 12 Certificate of Good Standing Sidra Mahfooz)(Ernst, Lia) Modified to clarify text and Attachment 11 replaced on 4/28/2025) (sjl). (Entered: 04/25/2025) | |
| 37 | 04/25/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Shezza Abboushi Dallal (Filing fee $ 150 receipt number AVTDC-2065899) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Shezza Abboushi Dallal, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 4/28/2025 to clarify text/attachment (sjl). (Entered: 04/25/2025) | |
| 38 | 04/28/2025 | TRANSCRIPT of Status Conference and Motion for Release Hearing held on 4/23/2025 before Judge Geoffrey W. Crawford. Court Reporter/Transcriber Johanna Masse, telephone number 802-951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/22/2025. Redacted Transcript Deadline set for 6/2/2025. Release of Transcript Restriction set for 7/31/2025. (sjl) (Entered: 04/28/2025) | |
| 39 | 04/28/2025 | ORDER: re 35 MOTION for Leave to File MOTION to Expedite Ruling; The court acknowledges with thanks receipt of this filing and declines to include it in the docket of 2:25-CV-389. Signed by District | |

**JA 588**

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Judge Geoffrey W. Crawford on 4/28/2025. (This is a text-only Order.) (jal) (Entered: 04/28/2025) | |
| 40 | 04/28/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 36 UNOPPOSED MOTION for Appearance Pro Hac Vice of Nathan Freed Wessler, Brett Max Kaufman, Brian Hauss, Esha Bhandari, Noor Zafar, Sidra Mahfooz filed by Mohsen Mahdawi. The Affidavit of Sidra Mahfooz has been replaced to correct the PDF size and to remove illegible PDF headers. The corrected document is now attached to 36 and this entry. (sjl) (Entered: 04/28/2025) | |
| 41 | 04/28/2025 | ORDER granting 37 MOTION for Admission Pro Hac Vice of Shezza Abboushi Dallal. Signed by District Judge Geoffrey W. Crawford on 4/28/2025. (This is a text-only Order.) (jal) (Entered: 04/28/2025) | |
| 42 | 04/28/2025 | RESPONSE in Opposition re 19 MOTION for Release Under Mapp v. Reno filed by Donald J. Trump, Patricia Hyde, J Doe, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Drescher, Michael) (Entered: 04/28/2025) | |
| 43 | 04/28/2025 | ORDER granting 36 MOTION for Admission Pro Hac Vice of Nathan Freed Wessler, Brett Max Kaufman, Brian Hauss, Esha Bhandari, Noor Zafar and Sidra Mahfooz. Signed by District Judge Geoffrey W. Crawford on 4/28/2025. (This is a text-only Order.) (jal) (Entered: 04/28/2025) | |
| 44 | 04/28/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 23 MOTION for Leave to File an Amicus Curiae Brief. Appendix I has been replaced with an amended version to revise a footnote. The revised document is now attached to 23 and this entry. (sjl) (Entered: 04/28/2025) | |
| 45 | 04/29/2025 | REPLY to Response to 19 MOTION for Release Under Mapp v. Reno filed by Mohsen Mahdawi. (Attachments: # 1 Exhibit 2 (redacted), # 2 Exhibit 3 (redacted), # 3 Exhibit 4, # 4 Exhibit 5) (Allard, Monica) Modified on 4/29/2025 to clarify attachments (sjl). (Additional attachment(s) added on 4/29/2025: # 5 Exhibit 2 (filed under seal), # 6 Exhibit 3 (filed under seal)) (sjl). (Additional attachment(s) added: # 7 Main Document (redacted) and Attachments 1 and 2 replaced and clarified on 5/22/2025) (sjl). (Entered: 04/29/2025) | |
| 46 | 04/29/2025 | SUPPLEMENTAL DOCUMENT(S) Exhibit 1 re: 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno by Mohsen Mahdawi. (Allard, Monica) Modified on 4/29/2025 to clarify event/text (sjl). (Entered: 04/29/2025) | |
| 47 | 04/29/2025 | UNOPPOSED MOTION to File Under Seal Exhibits 2 & 3 re: 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno filed by Mohsen Mahdawi(Ernst, Lia) Modified on 4/29/2025 to clarify text (sjl). (Entered: 04/29/2025) | |
| 48 | 04/29/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno. Unredacted copies of Exhibits 2 and 3 having been received are now attached to 45 under seal. (sjl) (Entered: 04/29/2025) | |
| 49 | 04/29/2025 | ORDER: re 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno; The court requests that the Government produce FBI SA Marc Emmons at the court hearing on 4/30/25 to provide testimony concerning his investigation of Mr. Mahdawi in 2015. Signed by District Judge Geoffrey W. Crawford on 4/29/2025. (This is a text-only Order.)(jal) (Entered: 04/29/2025) | |
| 50 | 04/29/2025 | ORDER granting 47 MOTION to File Under Seal Exhibits 2 & 3 re: 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno. Signed by District Judge Geoffrey W. Crawford on 4/29/2025. (This is a text-only Order.) (jal) (Entered: 04/29/2025) | |
| 51 | 04/29/2025 | NOTICE of Supplemental Authority by Mohsen Mahdawi re 19 MOTION for Release Under Mapp v. Reno (Attachments: # 1 Khalil v. Joyce, # 2 American Association of University Professors v. Rubio) | |

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (Ernst, Lia) (Attachments 1 and 2 replaced and text clarified on 4/30/2025) (sjl). (Entered: 04/29/2025) | |
| 52 | 04/30/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 51 Notice of Supplemental Authority. Attachments 1 and 2 have been replaced to remove illegible PDF headers. The corrected documents are now attached to 51 and this entry. (Attachments: # 1 American Association of University Professors v. Rubio) (sjl) (Entered: 04/30/2025) | |
| 53 | 04/30/2025 | MINUTE ENTRY for proceedings held before District Judge Geoffrey W. Crawford: Motion Hearing held on 4/30/2025 re 19 MOTION for Release Under Mapp v. Reno. Attorneys D. Isaacson, L. Droubi, M. Melewski, A. Delaney, and S. Dallal present with petitioner. M. Drescher, AUSA present on behalf of respondents. Court makes inquiries and counsel make statements re: court's receipt of ex-parte communications re: case, potential testimony of FBI S/A Marc Emmons (retired), Windsor Police Department report, and closing of FBI file re: Petitioner. Court makes findings. ORDERED: Parties defer to the court's discretion to not disclose ex-parte communications. The court's review and parties statements about the Windsor Police Department report and closing of FBI file obviates the need for S/A Emmons to testify. Respondent makes Oral Motion to Stay Release for 7 Days if the court sets conditions of release. Court makes inquiries and counsel make statements re: 19 MOTION for Release Under Mapp v. Reno. Court makes findings. ORDERED: 19 MOTION for Release Under Mapp v. Reno is granted. Respondents Oral Motion to Stay Release for 7 Days is denied. Petitioner to be released immediately. Court to issue written findings. (Court Reporter: Johanna Masse) (eh) (Entered: 04/30/2025) | |
| 54 | 04/30/2025 | OPINION AND ORDER granting 19 MOTION for Release Under Mapp v. Reno. Signed by District Judge Geoffrey W. Crawford on 4/30/2025. (sjl) (Entered: 04/30/2025) | |
| 55 | 04/30/2025 | NOTICE OF APPEAL as to 34 Order Extending Temporary Restraining Order, 54 Opinion and Order on Motion for Release by Donald J. Trump, Patricia Hyde, J Doe, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi. (Drescher, Michael) Text clarified on 4/30/2025 (law). (Entered: 04/30/2025) | |
| 56 | 05/02/2025 | ORDER: The court suspends the briefing schedule on the Governments motion to dismiss until the Court of Appeals rules on the interlocutory appeal. The court will set a new briefing schedule as necessary after consulting with counsel. Signed by District Judge Geoffrey W. Crawford on 5/2/2025. (This is a text-only Order.) (jal) (Entered: 05/02/2025) | |
| 57 | 05/02/2025 | TRANSCRIPT of Motion for Release Under Mapp V. Reno held on 4/30/2025 before Judge Geoffrey W. Crawford as to 55 Notice of Appeal. Court Reporter/Transcriber Johanna Masse, telephone number (802) 951-8102. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/27/2025. Redacted Transcript Deadline set for 6/5/2025. Release of Transcript Restriction set for 8/4/2025. (eh) (Entered: 05/02/2025) | |
| 58 | 05/02/2025 | TRANSMITTED Index on Appeal, Circuit No. 25-1113, re: 55 Notice of Appeal, (Attachments: # 1 Docket Sheet (public), # 2 Docket Sheet (sealed), # 3 Clerk's Certification)(kac) (Entered: 05/02/2025) | |
| 59 | 05/02/2025 | ORDER of USCA, Circuit No. 25-1113, as to 55 Notice of Appeal; motion for a stay pending appeal is referred to the three-judge motions panel hearing the Ozturk motion sitting May 6, 2025. (kac) (Entered: 05/02/2025) | |
| 60 | 05/08/2025 | ORDER on Lifting of Rule 5.2(c) Restrictions. The court has received media requests to modify the Federal Rule of Civil Procedure 5.2(c) restrictions on the docket in the above-captioned matter to allow nonparties to access case filings remotely through PACER. The court | |

**JA 590**

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | hereby ORDERS any party who wishes to object to this request to file an objection on or before May 14, 2025. Signed by District Judge Geoffrey W. Crawford on 5/8/2025. (sjl) (Entered: 05/08/2025) | |
| 61 | 05/09/2025 | ORDER of USCA, Circuit No. 25-1113, as to 55 Notice of Appeal: govt's motion for a stay of the district court's release order and extended TRO is DENIED; govt's request for a writ of mandamus is also DENIED. (kac) (Entered: 05/09/2025) | |
| 62 | 05/12/2025 | ORDER: The court requests the parties to confer and submit a proposed briefing schedule within fifteen (15) days for the motion to dismiss as well as an outline of how they intend to prepare for a merits hearing. Signed by District Judge Geoffrey W. Crawford on 5/12/2025. (jal) (Entered: 05/12/2025) | |
| 63 | 05/12/2025 | MOTION for Further Order re 54 OPINION AND ORDER granting 19 MOTION for Release Under Mapp v. Reno filed by Mohsen Mahdawi (Ernst, Lia) Modified on 5/13/2025 to clarify text (sjl). (Entered: 05/12/2025) | |
| 64 | 05/13/2025 | RESPONSE to 63 MOTION for Further Order re 54 OPINION AND ORDER granting 19 MOTION for Release Under Mapp v. Reno filed by Donald J. Trump, Patricia Hyde, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi. (Drescher, Michael) (Entered: 05/13/2025) | |
| 65 | 05/14/2025 | SUPPLEMENTAL ORDER ON CONDITIONS OF RELEASE granting 63 MOTION for Further Order re 54 OPINION AND ORDER granting 19 MOTION for Release Under Mapp v. Reno. Signed by District Judge Geoffrey W. Crawford on 5/14/2025. (sjl) (Entered: 05/14/2025) | |
| 66 | 05/14/2025 | RESPONSE re 60 Order, by Mohsen Mahdawi. (Ernst, Lia) (Entered: 05/14/2025) | |
| 67 | 05/19/2025 | UNOPPOSED MOTION for Leave to Refile 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno and Certain Exhibits filed by Mohsen Mahdawi (Attachments: # 1 Exhibit 1 (Redacted), # 2 Exhibit 2 (Redacted), # 3 Exhibit 3 (Redacted)) (Delaney, Andrew) Modified on 5/19/2025 to clarify text/attachments and Attachment 2 replaced) (sjl). (Attachment 2 replaced on 5/22/2025) (sjl). (Entered: 05/19/2025) | |
| 68 | 05/19/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 67 UNOPPOSED MOTION for Leave to Refile 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno and Certain Exhibits. Exhibit 2 has been replaced to correct a page size and PDF headers. The corrected document is now attached to 67 and this entry. (sjl) (Main Document 68 replaced on 5/22/2025) (sjl). (Entered: 05/19/2025) | |
| 69 | 05/20/2025 | ORDER granting 67 MOTION for Leave to Re-File 45 REPLY to Response to 19 MOTION for Release Under Mapp v. Reno and Certain Exhibits. Signed by District Judge Geoffrey W. Crawford on 5/20/2024. (This is a text-only Order.) (jal) (Entered: 05/20/2025) | |
| 70 | 05/21/2025 | ORDER: re 62 ORDER: The parties have conferred and are in agreement that the Petitioners Opposition to Defendants Motion to Dismiss 25 is due June 4, 2025, with the reply due June 11, 2025. An outline of preparations for the merits hearing will be submitted no later than May 27, 2025. Signed by District Judge Geoffrey W. Crawford on 5/20/2025. (This is a text-only Order.) (jal) (Entered: 05/21/2025) | |
| 71 | 05/22/2025 | NOTICE OF DOCKET ENTRY CORRECTION re: 45 REPLY to Response, 67 UNOPPOSED MOTION for Leave to Refile, and 68 NOTICE OF DOCKET ENTRY CORRECTION. A redacted Main Document has been uploaded to Doc. 45 and the original Main Document is now sealed, and Exhibits 2 and 3 for Doc. 45 have been replaced with redacted versions pursuant to Doc. 69 (TOO) and are all attached to 45 and this entry. A revised redacted Exhibit 2 for 67 is now attached to 67 , 68 , and this entry. (Attachments: # 1 Exhibit 2 (Doc. 45-1) (redacted), # 2 Exhibit 3 (Doc. 45-2) (redacted), # 3 Exhibit 2 (Docs. 67-2 and 68) (redacted)) (sjl) (Entered: 05/22/2025) | |

2:25cv389, Mahdawi V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 72 | 05/22/2025 | UNOPPOSED MOTION for Appearance Pro Hac Vice of Michael Tan (Filing fee $ 150 receipt number AVTDC-2079522) filed by Mohsen Mahdawi (Attachments: # 1 Affidavit of Michael Tan, # 2 Certificate of Good Standing) (Ernst, Lia) Modified on 5/22/2025 to clarify text/attachment (sjl). (Entered: 05/22/2025) | |
| 73 | 05/23/2025 | ORDER: re 71 Notice of Docket Entry Correction (PDF): The court grants the request to modify the restrictions on the docket following redaction of portions of petitioner's filing relating to personal health. The docket and filings in the case are open to the public. Signed by District Judge Geoffrey W. Crawford on 5/21/2025. (This is a text-only Order.)(jal) (Entered: 05/23/2025) | |
| 74 | 05/23/2025 | ORDER granting 72 MOTION for Admission Pro Hac Vice of Michael Tan. Signed by District Judge Geoffrey W. Crawford on 5/23/2025. (This is a text-only Order.) (jal) (Entered: 05/23/2025) | |
| 75 | 06/04/2025 | RESPONSE in Opposition re 25 MEMORANDUM filed by Mohsen Mahdawi. (Delaney, Andrew) (Entered: 06/04/2025) | |
| 76 | 06/05/2025 | ORDER: re 25 MEMORANDUM -- The court suspends briefing on the motion to dismiss until the Court of Appeals concludes its en banc proceedings. At that time, the court will set a date for the Governments reply and set a hearing date. Signed by District Judge Geoffrey W. Crawford on 6/5/2025. (This is a text-only Order.)(jal) (Entered: 06/05/2025) | |
| 77 | 06/11/2025 | MOTION for Limited Discovery filed by Mohsen Mahdawi (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 # 3 Exhibit 3, # 4 Exhibit 4 # 5 Exhibit 5) (Delaney, Andrew) Modified on 6/12/2025 to clarify text/attachments (sjl). (Entered: 06/11/2025) | |
| 78 | 06/25/2025 | RESPONSE in Opposition re 77 MOTION for Limited Discovery filed by Donald J. Trump, Patricia Hyde, J Doe, Todd Lyons, Kristi Noem, Marco A. Rubio, Pamela Bondi. (Drescher, Michael) (Entered: 06/25/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**