# No. 25-1113

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

**MOHSEN MAHDAWI,**

**Petitioner-Appellee,**

v.

**DONALD J. TRUMP, in his official capacity as President of the
United States, PATRICIA HYDE, in her official capacity as
Acting Boston Field Office Director, Immigration and Customs
Enforcement, Enforcement and Removal Operations, J DOE, in
official capacity as Vermont Sub-Office Director of Immigration
and Customs Enforcement, Enforcement and Removal
Operations, TODD LYONS, in his official capacity as Acting
Director, U.S. Immigration and Customs Enforcement, KRISTI
NOEM, in her official capacity as Secretary of The United States
Department of Homeland Security, MARCO A. RUBIO, in his
official capacity as Secretary of State, PAMELA BONDI, in her
official capacity as U.S. Attorney General,**

**Respondents-Appellants.**

---

**On Appeal from the United States District Court
for the District of Vermont
District Court Case No. 2:25-cv-389**

---

SPECIAL APPENDIX

---

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General
Office of Immigration Litigation

MICHAEL P. DRESCHER
Acting United States Attorney
District of Vermont

ALANNA T. DUONG
Senior Litigation Counsel

DHRUMAN Y. SAMPAT
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. of Justice

*Attorneys for Respondents-Appellants*

## TABLE OF CONTENTS

Court's Order Extending TRO………………………………….…….....1

Court Opinion and Order on Motion for Release……………………......5

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 APR 24  AM 8: 10

CLERK
BY_____
DEPUTY CLERK

MOHSEN MAHDAWI,           )
                          )
        Petitioner,       )
                          )
    v.                    )        Case No. 2:25-cv-389
                          )
DONALD J. TRUMP, et al.,  )
                          )
        Respondent.       )

**ORDER EXTENDING TEMPORARY RESTRAINING ORDER**

On April 14, 2025, agents of the Department of Homeland Security arrested Petitioner

Mohsen Mahdawi in the course of his citizenship interview at the United States Customs and

Immigration Service office in Colchester, Vermont. (Doc. 19-2 ¶¶ 30–34.) He holds permanent

residence status in the United States and is a full-time undergraduate student at Columbia

University. (*Id.* ¶¶ 2, 7; *Id.*, Ex. 2.) The Homeland Security Investigation ("HSI") agents

transported Mr. Mahdawi to the Patrick Leahy Burlington International Airport and advised him

that he would be flown that day to Louisiana. (*Id.* ¶¶ 35–38.) The agents and Mr. Mahdawi

were unable to board a flight, and he was lodged at Northwest State Correctional Facility in

Swanton, Vermont. (*Id.* ¶¶ 39–42.)

Mr. Mahdawi's arrest was not unexpected, and his attorney was able to file the current

habeas petition immediately after his arrest. (*See* Doc. 1.) The filing included an emergency

motion for temporary restraining order ("TRO") seeking to prevent Mr. Mahdawi's removal

from the District of Vermont, pending further order from the court. (Doc. 2.) Judge Sessions

signed the ex parte TRO order on April 14, 2025, and it remains in effect. (Doc. 6.)

The court on its own motion extends the TRO for a period of 90 days or until dismissal of the case or issuance of a preliminary injunction, whichever is soonest. The purpose of extending the TRO is to preserve the court's jurisdiction to hear and decide the issues raised by both parties. These include Mr. Mahdawi's motion for release, scheduled for hearing on April 30, 2025, and the briefing on the Government's motion to dismiss that extends through mid-May with a hearing date to be set.

As a practical matter, Mr. Mahdawi's presence at these hearings is necessary for the court and for his attorneys. The court anticipates that testimony from Mr. Mahdawi may be necessary at the hearing on detention or release and, if release on conditions is justified, the court will engage with Mr. Mahdawi in person on these issues. It is too early to tell the shape and scope of hearings that may follow a ruling on the Government's motion to dismiss, but it is reasonable to anticipate that Mr. Mahdawi's attendance at these hearings will be necessary too.

As a legal matter, Mr. Mahdawi's current detention in Vermont provides the jurisdictional basis for his habeas petition. *See* 28 U.S.C. § 2241(a) ("Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the districts courts and any circuit judge within their respective jurisdictions."). Section 2242 of Title 28 of the U.S. Code imposes the same requirement regarding naming of the immediate custodian: "[The petition] shall allege . . . the name of the person who has custody over him and by virtue of what claim or authority, if known." These provisions have long been understood to limit the jurisdiction of the district courts to "those petitioners who are confined or detained within the territorial jurisdiction of the court." *Ahrens v. Clark*, 335 U.S. 188, 192 (1948); *Rumsfield v. Padilla*, 542 U.S. 426, 443 (2004) ("The plain language of the habeas statute thus confirms the general rule that for core

2

habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement.").

The involuntary removal of a petitioner does not terminate habeas jurisdiction in all cases. *See Ex Parte Endo,* 323 U.S. 283, 307 (1944) ("[The] objective [of habeas corpus] may be in no way impaired or defeated by the removal of the prisoner from the territorial jurisdiction of the District Court."). But removing the petitioner certainly raises issues that are not present when the petitioner remains within the district. In the similar case of *Ozturk v. Trump,* No. 25-cv-374, 2025 WL 1145250 (D. Vt. Apr. 18, 2025), the Government opposed jurisdiction in the District of Vermont after the petitioner, also a foreign student, was transported to Louisiana following filing of a habeas proceeding in the District of Massachusetts (which transferred the case to Vermont). *See* Respondent's Supplemental Opposition to Petitioner's Amended Petition, ECF 83. This case does not feature the same dispute over whether it has been filed in the district of confinement. It was. Enjoining removal of Mr. Mahdawi from Vermont is necessary to prevent disputes about territorial jurisdiction, transfer to another court, immediate custodian, and other issues that may arise in the case of involuntary movement of a petitioner between states.

**Conclusion**

The court ORDERS that the temporary restraining order issued on the date of Mr. Mahdawi's arrest is extended for a period of 90 days or until dismissal of this case or grant of a preliminary injunction, whichever is earliest. The court orders that no respondent, including any

3

**SA 003**

agent or employee, shall remove Mr. Mahdawi from Vermont without further order from this court.

     Dated at Burlington, in the District of Vermont, this 23rd day of April, 2025.

/s/ Geoffrey W. Crawford
District Judge
United States District Court

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

MOHSEN MAHDAWI,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Petitioner,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
DONALD J. TRUMP, et al.,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　Respondents.　　　　　　　　)

2025 APR 30　AM 11: 39

CLERK

BY _____
　　　DEPUTY CLERK

Case No. 2:25-cv-389

## OPINION AND ORDER ON MOTION FOR RELEASE
### (Doc. 19)

On April 14, 2025, Mohsen Mahdawi filed a petition for a writ of habeas corpus

challenging the government's alleged "retaliatory and targeted detention and attempted removal

of Mr. Mahdawi for his constitutionally protected speech." (Doc. 1 ¶ 1.) The claims include a

request for release on bail pending adjudication of the habeas corpus petition. (*Id.* ¶¶ 86–90.)

On April 22, 2025, Mr. Mahdawi filed a Motion for Release under *Mapp v. Reno*, 241 F.3d 221

(2d Cir. 2001). (Doc. 19.) Respondents (also referred to as the "Government" in this decision)

filed a response, and Mr. Mahdawi has filed a reply. The court held a hearing on the motion for

release on April 30, 2025.

### Facts

#### A.　Personal Background

Mr. Mahdawi is 34 years old. He was born and raised in the West Bank. (Doc. 19-2 ¶ 4.)

He entered the United States legally in July 2014 and was married for some years to an

American citizen. (*Id.* ¶ 5; *see also* Doc. 19-4 at 4.) He has been a Legal Permanent Resident of

the United States for ten years; his Permanent Resident Card ("green card") confirms that he has

been a resident since January 2015. (Doc. 19-2 ¶ 1.) His permanent address is in White River

Junction, Vermont. He also owns a small cabin that he built himself in nearby Vershire, Vermont. (Doc. 19-1 at 159.)

Since 2021, Mr. Mahdawi has been an undergraduate student at Columbia University, majoring in philosophy. He hopes to graduate next month. (Doc. 19-2 ¶¶ 2, 7.) He has been admitted to a master's degree program at Columbia's School of International and Public Affairs; that course of study would begin in September 2025. (*Id.* ¶ 9.)

Mr. Mahdawi states that he found comfort and healing in spiritual communities shortly after coming to the United States. (*Id.* ¶ 11.) He joined the First Universalist Society in Hartland, Vermont. (*Id.*) He also began to study Buddhism. (*Id.*) As a student at Columbia, Mr. Mahdawi has dedicated himself "to understanding how to achieve a lasting peace for Palestinians and Israelis, particularly through the study of conflict resolution." (*Id.* ¶ 14.) After Israel took military action in Gaza in fall 2023, Mr. Mahdawi was "outspoken in opposition to the war." (*Id.* ¶ 15.) He took part in student demonstrations where he spoke publicly about "the importance of respecting international law, human rights, and the need for a permanent ceasefire and a peaceful resolution." (*Id.*) The letters submitted on Mr. Mahdawi's behalf describe him as a person who seeks common ground between students who support Israel's military response to the atrocities committed by Hamas and those who express outrage against the level of destruction and civilian casualties. (*See* Doc. 19-1; Doc. 46.)

In its response, the Government directs the court's attention to an incident in summer 2015 when a gun shop owner told Windsor, Vermont police officers that Mr. Mahdawi had visited his store twice, expressing an interest in learning more about firearms and buying a sniper rifle and an automatic weapon and that he "had considerable firearm experience and used to build modified 9mm submachine guns to kill Jews while he was in Palestine." (Doc. 42-2.) The

2

store owner stated that Mr. Mahdawi took photos of the store and its merchandise. (*Id.*) The store owner gave the police the name of a fellow gun enthusiast who stated that he had a similar conversation with Mr. Mahdawi at the "Precision Museum" in Windsor where the enthusiast served as a volunteer tour leader. During that conversation, Mr. Mahdawi allegedly told the gun enthusiast, "I like to kill Jews." (*Id.*) The Government also points to an incident in January 2019 when Mr. Mahdawi was stopped at the border and found to be carrying drugs. (Doc. 42-3.) Mr. Mahdawi describes these as prescription medication. (Doc. 45-1 ¶¶ 42–43.) He was sent to diversion through state court and any record of the offense has been expunged. (*Id.* ¶¶ 44–45; Doc. 19-4.) Finally, the government notes that in the course of separating from his wife in 2018, the couple quarreled and the ex-wife surrendered a firearm to the police for safekeeping. (Doc. 42-2 at 6.)

In his reply, Mr. Mahdawi stated that in November 2015, FBI agent Marc Emmons interviewed him concerning the allegations from July 2015. Mr. Mahdawi confirmed that he had visited the gun shop and the Precision Museum but that he had never discussed buying weapons or killing Jews. (Doc. 45-1 ¶¶ 20–35.) His purpose in visiting the gun shop was to learn whether he was required to register a shotgun his wife had given him as a present. There was no registration requirement for her gift. (*Id.* ¶ 21.) He went to the museum because it is located just a few blocks from where he lived, and he is interested in machines and previously studied engineering. (*Id.* ¶¶ 29–30.) Mr. Mahdawi states that the FBI agent was satisfied with his explanation and closed the investigation. (*Id.* ¶ 36.) He denies possessing illegal drugs in 2019. The domestic incident was an argument that led to no charges. (*Id.* ¶¶ 42–44.) Today his ex-wife is a close friend and supporter.

3

At the court's request, Agent Emmons appeared at the hearing on the motion for release. The Government raised concerns that questioning Mr. Emmons about his investigation could compromise national security concerns. The Government agreed with Mr. Mahdawi that Mr. Emmons' investigation ended in 2015—although not "closed" in any official way—and that there were no charges against Mr. Mahdawi or other unfavorable action. The Government states that it has some other information that it has not shared with the court. The court is satisfied that the information in the police report does not support a finding of dangerousness. If the FBI had substantiated the information, some action would have resulted. That nothing took place supports Mr. Mahdawi's description of meeting with SA Emmons as satisfying him that the two informants were not truthful.

Mr. Mahdawi states that after the November 2024 election, certain groups "launched a deportation campaign against me and declared that they had reported me to the Trump administration so that I may be deported for my speech in support of Palestinian rights." (*Id.* ¶ 20.) After Mahmoud Khalil's arrest and detention,[1] Mr. Mahdawi "felt like I could no longer speak freely on the issues that mattered to me" and that his "physical safety was in jeopardy." (*Id.* ¶ 21.) After Mr. Khalil's arrest, Mr. Mahdawi "didn't go outside much, or say much publicly." (*Id.*)

## B.    Mr. Mahdawi's Detention by Homeland Security Investigations

On March 27, 2025, Mr. Mahdawi received a notification from the United States Customs and Immigration Services (USCIS) portal that his naturalization interview had been scheduled for April 14, 2025, in Colchester, Vermont. (*Id.* ¶ 22.) The interview was the last

---

[1] For background on Mr. Khalil's case, see *Khalil v. Joyce*, No. 25-cv-1963, 2025 WL 972959 (D.N.J. Apr. 1, 2025).

**SA 008**

stage of Mr. Mahdawi's naturalization process before the formal naturalization ceremony. (*Id.*
¶ 23.) Mr. Mahdawi "suspected that the Trump administration would use the interview as an
opportunity to target and detain" him for his speech. (*Id.* ¶ 24.) He nevertheless made
arrangements to attend the interview in person. (*Id.*)

Mr. Mahdawi traveled to Colchester, Vermont on the morning of April 14, 2025, to
attend his naturalization interview. (*Id.* ¶ 25.) Upon entering the interview room, he recognized
the interviewer as the official who interviewed him for his green card. (*Id.* ¶ 26.) The entire
interview was recorded on video. (*Id.* ¶ 27.) Mr. Mahdawi answered all the interviewer's
questions and passed the citizenship test. (*Id.* ¶ 29.) He also signed a document affirming that
he was willing to take the Oath of Allegiance to the United States. (*Id.*)

After Mr. Mahdawi signed that document, the official said he needed to "check" on some
information and would be right back. (*Id.* ¶ 30.) Once the official left the room, three masked
agents wearing Homeland Security Investigations ("HSI") jackets and their supervisor entered
the room. (*Id.* ¶ 31.) They showed Mr. Mahdawi their badges and told him that he was under
arrest. They did not show him a warrant or any documents. (*Id.* ¶ 32.) The agents separated Mr.
Mahdawi from his attorney, brought him to a hallway where two more masked agents were
waiting, and then shackled him and escorted him to a black van. (*Id.* ¶ 33.) They transported
him to another USCIS office building approximately 10 or 15 minutes away from the Colchester
office. (*Id.* ¶ 34.)

As he was being processed at the USCIS office, agents shoved a Notice to Appear
("NTA") document into his jacket. (*Id.* ¶ 43.) The NTA stated that Mr. Mahdawi was
removable because "[t]he Secretary of State has determined that your presence and activities in
the United States would have serious adverse foreign policy consequences and would

5

compromise a compelling U.S. foreign policy interest." (Doc. 19-2 at 10, 13.) The NTA ordered Mr. Mahdawi to appear before an immigration judge at the South Louisiana Correctional Center on May 1, 2025. (*Id.* at 10.)

Shortly before 2:00 p.m., the agents transported Mr. Mahdawi to the Burlington, Vermont airport. (Doc. 19-2 ¶ 35.) At the airport, two other agents took charge of him; one of the agents had a gun visible in a holster. (*Id.* ¶ 37.) Mr. Mahdawi repeatedly asked where he was being taken, and the agents finally told him that he was being sent to Louisiana. (*Id.* ¶ 38.) The flight left before the agents and Mr. Mahdawi were able to board it; the agents appeared to Mr. Mahdawi to be "visibly upset that we had missed the flight." (*Id.* ¶ 39.) Mr. Mahdawi was then transported to the ICE field office in St. Albans, Vermont. (*Id.* ¶ 40.) After seeing his attorney at the St. Albans office, Mr. Mahdawi was re-shackled and transported to the Northwest State Correctional Facility in Swanton, Vermont. (*Id.* ¶¶ 41–42.)

Counsel for Mr. Mahdawi filed a Petition for Writ of Habeas Corpus in this court on April 14, 2025—the same day that Mr. Mahdawi was detained. (Doc. 1.) Through counsel, Mr. Mahdawi filed a Motion for Release on April 22, 2025. (Doc. 19.) That motion is supported by over 125 letters of support from professors, neighbors, fellow students, and others who know him well. All attest to his mild and peaceful nature, his deep intelligence, and his commitment to principles of non-violence and political activism. A striking number of these letters come from Jewish colleagues and professors involved in the study of the history and culture of Israel and Judaism. (*See* Docs. 19-1, 46.)

The facts recited above appear in Mr. Mahdawi's habeas petition and are described in greater detail in the exhibits attached to his motion for release. The court allowed time for the

**SA 010**

Government to rebut or qualify the facts concerning Mr. Mahdawi's history, character, flight
risk, and dangerousness to the community.

### Analysis

"[A]bsent suspension, the writ of habeas corpus remains available to every individual
detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (plurality
opinion) (citing U.S. Const., Art. I, § 9, cl. 2). "At its historical core, the writ of habeas corpus
has served as a means of reviewing the legality of Executive detention . . . ." *Kapoor v.*
*DeMarco*, 132 F.4th 595, 610 (2d Cir. 2025) (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)).
Indeed, the protections of the "Great Writ" of habeas corpus "have been strongest" in that
context. *St. Cyr*, 533 U.S. at 301.

Subject to certain exceptions, the federal district courts are authorized to grant the writ of
habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a); *see also* 28 U.S.C.
§ 1651(a) ("The Supreme Court and all courts established by Act of Congress may issue all writs
necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and
principles of law."). The court begins with the questions of jurisdiction that the Government has
raised. The parties are currently briefing these questions in greater detail in connection with the
Government's Motion to Dismiss. Because the primary thrust of the Government's argument
against release depends upon its challenge to the court's jurisdiction, the court addresses these
issues here in a preliminary manner based on the evidence and arguments that are available to the
court at this time.

### I.  Jurisdiction

Although the President nominates federal judges and the Senate may vote to confirm
them, it is Congress that grants the courts statutory authority to hear specific types of cases

already identified in Article III as appropriate for federal jurisdiction. One such area of federal jurisdiction is the writ of habeas corpus. See 28 U.S.C. § 2241. But what Congress gives it may also take away. In the area of immigration, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009, and the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, both of which amended the Immigration and Nationality Act (INA), contain "jurisdiction stripping" provisions that constrain the authority of a federal district court to review administrative decisions concerning removal of non-citizens. In the words of the Supreme Court, the IIRIRA is "aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). The principal contribution of the REAL ID Act is to state unambiguously that the jurisdiction stripping provisions of the IIRIRA apply to habeas petitions. Pub. L. No. 109-13, 119 Stat. 302.

Four statutory provisions are at issue here. The court considers each in turn. The issues presented by each section are very similar: does the statutory language that prevents the district court from reviewing removal proceedings preclude the court from reviewing the Government's decision to arrest Mr. Mahdawi. The Government argues that these "jurisdiction stripping" provisions shield the decision to detain Mr. Mahdawi from habeas review. He responds that he was detained in retaliation for the exercise of First Amendment rights—a violation of fundamental constitutional rights that lies beyond the authority of the immigration court authorized to hear his removal case.

A.   **Section 1252(g)**

The Government asserts that 8 U.S.C. § 1252(g) deprives the court of jurisdiction to hear Mr. Mahdawi's claims. (Doc. 25 at 3.) Section 1252(g) states:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).[2] In the Government's view, § 1252(g) eliminates this court's jurisdiction because Mr. Mahdawi's petition "seeks to challenge the government's decisions to charge him with removability and detain him" and thus "arise from" the Government's decision and action to "commence proceedings." (Doc. 25 at 3.) In support, the Government relies primarily on the Supreme Court's decision in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AADC*").

In *AADC*, the American-Arab Anti-Discrimination Committee and a number of noncitizens sued the U.S. Attorney General and other officials "for allegedly targeting them for deportation because of their affiliation with a politically unpopular group," the "Popular Front for the Liberation of Palestine," which the Government characterized as an international terrorist and communist organization. *AADC*, 525 U.S. at 472–73. While that suit was pending, Congress passed the IIRIRA, including the provision codified at 8 U.S.C. § 1252(g).[3] The issue litigated in the Supreme Court was whether § 1252(g) deprived the federal courts of jurisdiction over the selective-enforcement lawsuit.

---

[2] Respondents note that the Secretary of Homeland Security now exercises much of the relevant authority that was previously vested in the Attorney General. *See Clark v. Martinez*, 543 U.S 371, 374 n.1 (2005).

[3] The REAL ID Act of 2005 amended § 1252(g) after the *AADC* Court's 1999 decision, adding the phrase "(statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title." Pub. L. No. 109-13, 119 Stat. 302.

SA 013

The Supreme Court explained that § 1252(g) is a narrow provision that applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" *AADC*, 525 U.S. at 482. The Court observed:

> There are of course many other decisions or actions that may be part of the deportation process—such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order.

*Id.* Applying that interpretation, the Court reasoned that AADC and the other respondents were challenging the Attorney General's decision to "commence proceedings" against them and thus fell "squarely within § 1252(g)." *Id.* at 487. The Court also rejected the respondents' contention that § 1252(g) should be interpreted to permit "immediate review of their selective-enforcement claims" to prevent a "chilling effect" on their First Amendment rights. *Id.* at 488. The Court reasoned that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."[4] *Id.*

Much of the *AADC* decision concerns issues that were particularly salient at the moment of IIRIRA's passage, such as the retroactive application of § 1252(g). Today, *AADC* provides binding authority on one critical issue: the meaning of the phrase "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." On this point, Justice Scalia's analysis favors Mr.

---

[4] As recently noted by the District of Massachusetts in *American Association of University Professors v. Rubio*, No. 25-cv-10685, at 33 (D. Mass. Apr. 29, 2025), ECF. No. 73, *AADC*'s holding means that "it does not violate the Constitution for the government to commence removal proceedings against an alien that is in the United States in violation of the law for the **additional** reason that the alien is a member of an organization that supports terrorist activity." *AADC* did not address cases in which political membership is the *only* reason for instituting removal proceedings.

10

Mahdawi's position that the district court retains jurisdiction to hear claims that do not arise from these three identified actions. With the rhetorical *esprit* that distinguishes Justice Scalia's work, he rejected the suggestion that the three specified actions were no more than examples of Government action shielded from judicial review:

> It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings. Not because Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with the need for precision in legislative drafting.

*Id.* at 482.

The Supreme Court returned to these issues in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), in which a legal permanent resident sought to challenge his removal following conviction of a drug offense. Although *Jennings* concerns other "jurisdiction stripping" provisions discussed below, Justice Alito's decision for the majority recognized the continuing authority of the *AADC* decision in restricting § 1252(g) to "the three listed actions of the Attorney General." *Id.* at 294.

The Second Circuit considered similar issues in *Ragbir v. Homan*, 923 F.3d 53 (2d Cir. 2019), *vacated by Pham v. Ragbir*, 141 S. Ct. 227 (2020) (mem.). In *Ragbir*, an individual subject to a removal order sought to challenge its execution on grounds that the Government was retaliating against his exercise of free speech. In contrast to this case, Mr. Ragbir's habeas petition challenged his removal proceedings, not his prior detention. The Second Circuit reversed the dismissal of his petition on jurisdiction stripping grounds, holding that, although § 1252(g) applied to his constitutional claim, the Suspension Clause prevented its application to his removal at least while the habeas petition was pending. "Because Congress has provided no 'adequate substitute' and because there has been no formal suspension of the writ, Ragbir is

11

**SA 015**

entitled to a habeas corpus proceeding as to the basis for the Government's impending action to deport him." *Id*. at 78 (citation omitted).

The Supreme Court vacated the *Ragbir* decision in *Pham v. Ragbir* for further consideration in light of *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020). Though *Thuraissigiam* concerned a different jurisdiction stripping provision, the decision holds that the habeas remedy provides no basis for challenging removal even on constitutional grounds. The writ does not provide a mechanism to seek "the opportunity to remain lawfully in the United States." *Id*. at 119. This case presents the converse of *Thuraissigiam*—a case that does not seek to challenge the removal but addresses instead Mr. Mahdawi's arrest and detention.

There is more to say about the limits the Supreme Court has imposed on § 1252(g) and whether singling out and detaining a legal resident in retaliation for his speech is excluded from habeas review because it is part of the commencement of that individual's removal proceedings. The court will reserve further discussion on these issues for the ruling on the dismissal motion. For purposes of the motion to release, it is sufficient to recognize that in *AADC* and *Jennings*, Justices Scalia and Alito, no shrinking violets when it comes to enforcement of the immigration laws, both recognized the need to apply § 1252(g) in a manner consistent with the actual text of the provision. Such an analysis allows for the exercise of habeas jurisdiction in cases that do not seek to challenge the removal proceedings but are directed instead at administrative detention alleged to be employed to stifle protected speech. As discussed below, Mr. Mahdawi has raised substantial constitutional claims that support a finding of jurisdiction at this stage in the proceedings.

12

### B.    Section 1226(e)

Section 1226(e) of Title 8 of the U.S. Code provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.  No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the denial of bond or parole.

Section 1226 provides the general framework governing the arrest of non-citizens by the executive branch pending removal.  In *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court considered the extent of § 1226(e)'s reach: "Section 1226(e) contains no explicit provision barring habeas review, and we think that its clear text does not bar respondent's constitutional challenge to the legislation authorizing his detention without bail." *Id.* at 517.  The Supreme Court reached the same conclusion in *Jennings*, 583 U.S. 281.  In *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020), the Second Circuit recognized the right of a detained person to challenge "the procedures that resulted in his prolonged incarceration without a determination that he poses a heightened bail risk."  These cases make clear that § 1226(e) does not preclude review through habeas procedures of claims that administrative action violates the Constitution.

### C.    Section 1252(a)(5)

Section 1252(a)(5) provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and section 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e).

This provision—and 8 U.S.C. § 1252(b)(9), discussed next—"consolidate review of challenges to orders of removal in the courts of appeals." *Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011).  It is well-settled that direct appeals and indirect attacks on removal orders issued by the

13

immigration courts are heard in the first instance in the applicable circuit courts. But a challenge

to an individual's arrest and detention is different, as discussed by the court in *Delgado*: "We

note, however, that a suit brought against immigration authorities is not per se a challenge to a

removal order; whether the district court has jurisdiction will turn on the substance of the relief

that a plaintiff is seeking." *Id.* at 55. The *Delgado* decision cited *Kellici v. Gonzales*, 472 F.3d

416 (6th Cir. 2006) for the proposition that the "district court, not [the] court of appeals, had

jurisdiction where plaintiffs' habeas petitions challenged only the constitutionality of the arrest

and detention, *not* the underlying administrative order of removal." *Id.* Because Mr. Mahdawi's

habeas petition challenges only his arrest and detention—not the removal proceeding—

§ 1252(a)(5) is very unlikely to bar his petition.

**D.    Section 1252(b)(9)**

Section 1252(b)(9) provides:

> Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, arising from any action taken
> or proceeding brought to remove an alien from the United States under this
> subchapter shall be available only in judicial review of a final order under this
> section.    Except as otherwise provided in this section, no court shall have
> jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas
> corpus provision, by section 1361 or 1651 or such title, or by any other provision
> of law (statutory or nonstatutory), to review such an order or such questions of law
> or fact.

The application of § 1252(b)(9) turns on a single textual issue: is the claim of an unconstitutional

arrest in this case one "arising from any action taken or proceeding brought to remove an alien

from the United States"? The Government seeks an expansive reading of "arising from any

action taken . . . to remove an alien" that would place judicial review of the constitutional claim

not in this court but before the circuit court reviewing a potential removal order issued in Mr.

Mahdawi's immigration case.

14

The Supreme Court rejected the Government's position in *Jennings v. Rodriguez*, in which a person detained in the course of removal proceedings sought a bond hearing to determine whether his continued detention was justified. The Court considered whether § 1252(b)(9) stripped the Court itself of jurisdiction to review a habeas petition. Drawing on the analysis of *AADC*, the Court held that

> it is enough to note that respondents are not asking for review of an order of removal; they are not challenging the decision to detain them in the first place or to seek removal; and they are not even challenging any part of the process by which their removability will be determined. Under these circumstances, § 1252(b)(9) does not present a jurisdictional bar.

583 U.S. at 294–95. The plurality decision by Justice Alito rejected the argument that detention is part and parcel of removal and is covered by the "arising from" language, embracing a narrower reading of that phrase. "The question is not whether *detention* is an action taken to remove an alien but whether *the legal questions* in this case arise from such an action. And for the reasons explained above, those legal questions are too remote from the actions taken to fall within the scope of § 1252(b)(9)." *Id.* at 295 n.3.

The same conclusion follows in this case. Mr. Mahdawi has raised a substantial claim that the Government arrested him to stifle speech with which it disagrees. Such an act would be a violation of the Constitution—quite separate from the removal procedures followed by the immigration courts. The legal questions presented by Mr. Mahdawi's petition for habeas corpus thus do not "arise from" the Government's decision to place him in removal proceedings. The court will return to this issue after briefing is complete on the motion to dismiss, but there is a sufficient basis for jurisdiction to proceed to the issue of release or detention.

**SA 019**

II.  *Mapp* **Analysis**

The case *Mapp v. Reno* continues to establish the legal standard for the exercise of a

court's inherent authority to admit to bail individuals properly within their jurisdiction.  241 F.3d

at 226.  "[A] court considering a habeas petitioner's fitness for bail must inquire into whether the

habeas petition raises substantial claims and whether extraordinary circumstances exist that make

the grant of bail necessary to make the habeas remedy effective."  *Id.* at 230 (cleaned up); *see*

*also Daum v. Eckert*, No. 20-3354, 2021 WL 4057190, at *2 (2d Cir. Sept. 8, 2021) (amended

summary order) (same); *Ozturk v. Trump*, No. 25-cv-374, 2025 WL 1145250, at *15 (D. Vt.

Apr. 18, 2025) (same).  This is a "difficult" standard to meet.  *Mapp*, 241 F.3d at 226; *see also*

*Wall v. United States*, 619 F.3d 152, 155 n.4 (2d Cir. 2010) (standard is "rigorous").  The

standard is "higher even than that created by 18 U.S.C. § 3143(b)."  *United States v. Manson*,

788 F. App'x 30, 32 (2d Cir. 2019) (summary order) (quoting *Grune v. Coughlin*, 913 F.2d 41,

44 (2d Cir. 1990)).  "The petitioner bears the burden of demonstrating both the 'substantial

questions' and the 'exceptional circumstances' required" under *Mapp*.  *Swerbiolov v. United*

*States*, No. 04-cv-3320, 2005 WL 1177938, at *2 (E.D.N.Y. May 18, 2005).

A.  **Substantial Questions**

1.  **First Amendment**

A reader who has reached this point in our discussion may well share the court's initial

perception that Mr. Mahdawi has raised substantial questions about the use of administrative

arrest to stifle his exercise of free speech.  "The Supreme Court has been unambiguous that

executive detention orders, which occur without the procedural protections required in courts of

law, call for the most searching review."  *Velasco Lopez*, 978 F.3d at 850 (citing *Boumediene v.*

*Bush*, 553 U.S. 723, 781–83 (2008)).  Both sides agree in a general way that the arrest was

16

prompted by Mr. Mahdawi's statements during protests on the Columbia campus. The Government describes these statements as harmful to the conduct of its foreign policy; Mr. Mahdawi alleges that the administration seeks to shut down criticism of the conduct of the war in Gaza.

Noncitizen residents like Mr. Mahdawi enjoy First Amendment rights in this country to the same extent as United States citizens. *See, e.g.*, *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (holding that a noncitizen who published communist literature was protected by First Amendment); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) (noting that the First Amendment does not distinguish "between citizens and resident [noncitizens]"); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270 (1990) (confirming that resident noncitizens "enjoy certain constitutional rights," including "First Amendment rights"); *Rafeedie v. I.N.S.*, 795 F. Supp. 13 (D.D.C. 1992) ("Plaintiff is entitled to the same First Amendment protections as United States citizens, including the limitations imposed by the overbreadth and vagueness doctrines."); *OPAWL — Building AAPI Feminist Leadership v. Yost*, 747 F. Supp. 3d 1065, 1080 (S.D. Ohio 2024) ("[T]he Supreme Court has never held that the First Amendment fails to protect [noncitizens'] political speech to the same extent it protects citizens' political speech."). That includes the right to be free from retaliation for the exercise of his First Amendment rights. *See Ragbir*, 923 F.3d at 71 (holding that legal permanent resident could not be deported in retaliation for his protected speech even where he was deportable on other grounds).

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (first alteration in

17

SA 021

original) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)). The Second Circuit has specifically recognized that retaliation for protected political speech is a cognizable ground for habeas relief in the immigration context. *Ragbir*, 923 F.3d at 71.

The black letter elements of a claim of retaliation in violate of the First Amendment are (1) that the speech or conduct at issue was protected, (2) that the defendant took an adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Demarest v. Town of Underhill*, 2025 WL 88417, at *2 (2d Cir. 2025) (summary order) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015). Mr. Mahdawi has raised serious arguments on each of these issues such that he has made a "substantial claim" regarding the alleged violation of his First Amendment right.

### a.       Protected Speech

Mr. Mahdawi has presented sufficient evidence that his speech was protected under the First Amendment. "[S]peech on a matter of 'public concern' is at 'the heart . . . of First Amendment[] protection' and 'occupies the highest rung of the hierarchy of First Amendment values.'" *Ragbir*, 923 F.3d at 69–70 (quoting *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)) (alterations in original). Here, Mr. Mahdawi's speech concerned an issue of great public interest. His speech, which advocated for a peaceful resolution of the conflict in Gaza and opposed Israel's military campaign, is at the heart of an ongoing political debate among the American people. "Because [Mr. Mahdawi's] speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections *is at its zenith*.'" *Ragbir*, 923 F.3d at 70 (quoting *Meyer v. Grant*, 486 U.S. 414, 421–22, 425 (1988)) (emphasis in *Ragbir*).

Mr. Mahdawi's speech does not appear to fall within any areas in which the First

Amendment permits restrictions based on the content of speech. The Supreme Court recently

summarized these areas: "incitement—statements direct at producing imminent lawless action

and likely to do so," "defamation—false statements of fact harming another's reputation,"

"obscenity—valueless material appealing to the prurient interest," and "true threats of violence."

*Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023) (cleaned up).

In a memorandum written by Secretary of State Marco Rubio, the government accused

Mr. Madawi of "engag[ing] in threatening rhetoric and intimidation of pro-Israeli bystanders" at

a protest. (Doc. 42-1 at 2.) A bail hearing is not the time to make detailed findings on the merits

of the First Amendment claim. On the limited record available, Mr. Mahdawi has provided

enough information to show that his speech was protected.

### b.    Adverse Action

There is also record evidence that Mr. Mahdawi's arrest and detention constitutes

adverse action for the purposes of his First Amendment retaliation claim. On April 14, 2025,

Mr. Mahdawi went to the USCIS Burlington Field Office to continue the process of becoming a

U.S. citizen. (Doc. 19-2 ¶ 25.) Upon completing that interview, he was detained. (*Id.* ¶¶ 31–

33.) He was removed from his community and his family and cannot currently make progress

toward completing his undergraduate degree. (*Id.* ¶¶ 45–48.) The threat of such conduct "would

chill a person of ordinary firmness from continuing to engage in the protected activity." *Bello-

Reyes v. Gaynor*, 985 F.3d 696, 700 (9th Cir. 2021).

### c.    The Government's Motivation in Detaining Mr. Mahdawi

Mr. Mahdawi bears the burden of proving that the Government detained him in

retaliation for his protected speech or to chill the speech of others. A bail hearing is not the time

19

**SA 023**

to rule on the merits of the evidence or the methods of inferring retaliatory motive. It is sufficient at this juncture to consider the Government's public statements, including Executive Orders 14161 and 14188, as evidence of retaliatory intent. Executive Order 14161 states that its purpose is, in relevant part, to "protect [United States] citizens from aliens who . . . espouse hateful ideology." Executive Order 14188 is entitled "Additional Measures to Combat Anti-Semitism." The fact sheet accompanying Executive Order 14188 promises to "*punish* anti-Jewish racism in leftist, anti-American colleges and universities." Fact Sheet: President Donald J. Trump Takes Forceful and Unprecedent Steps to Combat Anti-Semitism, https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/ [https://perma.cc/6QTD-M3FD] (emphasis added). The fact sheet also promises to deport or revoke the student visas of "all Hamas sympathizers on college campuses, which have been infested with radicalism like never before." *Id.* It threatens: "To all the resident aliens who joined the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you." *Id.* Before his election, President Trump reportedly promised donors, in reference to pro-Palestinian activism, that he would "set that movement back 25 or 30 years" if elected. Robert Tait, *Trump Tells Donors He Will Crush Pro-Palestinian Protests if Re-Elected*, The Guardian (May 27, 2024), https://www.theguardian.com/world/article/2024/may/27/trump-donors-israel-gaza-palestinian-protests [https://perma.cc/S3DS-FN9W]. Together, this evidence is sufficient for Mr. Mahdawi's present purpose of raising a "substantial claim" of First Amendment retaliation.

### 2.    Due Process

The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." The guarantees of the

Due Process Clause "include a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). Noncitizens in removal proceedings are accorded full due process and equal protection rights. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent."). And the Supreme Court has specifically recognized the availability of substantive due process claims in the context of immigration detention. *Id.* at 694.

Mr. Mahdawi has raised a substantive due process claim, alleging that his detention violates the Fifth Amendment because "it bears no reasonable relation to any legitimate government purpose." (Doc. 1 ¶ 72.) He asserts that, to comport with the requirements of the Fifth Amendment, "[i]mmigration detention must further the twin goals of ensuring a noncitizen's appearance during removal proceedings and preventing danger to the community." (*Id.* ¶ 71.)

The Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). In certain cases, the INA mandates a noncitizen's detention pending removal, namely when a noncitizen has committed certain criminal offenses. 8 U.S.C. § 1226(c). In general, however, the government's decision to detain an immigrant pending removal is discretionary. *Id.* § 1226(a). And courts cannot generally question those discretionary decisions. Mr. Mahdawi is correct, however, that the government's discretion is not unbounded, and "both removable and

inadmissible [noncitizens] are entitled to be free from detention that is arbitrary or capricious."
*Zadvydas*, 533 U.S. at 721 (Kennedy, J., dissenting).

Detention incident to removal proceedings "has two regulatory goals: ensuring the
appearance of [noncitizens] at future immigration proceedings and preventing danger to the
community." *Zadvydas*, 533 U.S. at 690 (cleaned up); *see also Matter of Guerra*, 24 I&N Dec.
37, 40 (BIA 2006) (when determining whether to release a noncitizen from detention, an
Immigration Judge considers whether the individual "is a threat to national security, a danger to
the community at large, likely to abscond, or otherwise a poor bail risk"). Thus, such detention
can never be punitive, either by design or effect. *Zadvydas*, 533 U.S. at 690 ; *see also Fong Yue
Ting v. United States*, 149 U.S. 698, 730 (1893); *Ozturk*, 2025 WL 1145250, at *60 ("So long as
detention is motivated by those goals, and not a desire for punishment, the Court is generally
required to defer to the political branches on the administration of the immigration system."). If
the government wishes to detain a noncitizen as punishment for violating this nation's
immigration laws, it must do so on the basis of a criminal statute and only after conducting a
criminal prosecution. *See Wong Wing v. United States*, 163 U.S. 228 (1896). Mr. Mahdawi may
therefore succeed on his Fifth Amendment claim if he demonstrates *either* that the government
acted with a punitive purpose *or* that it lacks any legitimate reason to detain him.

The same evidence that supports Mr. Mahdawi's First Amendment claim supports his
Fifth Amendment claim. If the Government detained Mr. Mahdawi as punishment for his
speech, that purpose is not legitimate, regardless of any alleged First Amendment violation.
Immigration detention cannot be motivated by a punitive purpose. Nor can it be motivated by
the desire to deter others from speaking. The court is satisfied that Mr. Mahdawi has raised

important issues concerning potential constitutional violations and that these questions satisfy the *Mapp* requirement of substantial questions.

### B.    Extraordinary Circumstances

The *Mapp* decision also requires a finding of extraordinary circumstances. "[A] habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226.

The court finds that extraordinary circumstances support Mr. Mahdawi's release for several reasons.

First, it is under this heading that the court will consider the conventional bail issues of risk of flight and danger to society. *D'Alessandro v. Mukasey*, No. 08-cv-914, 2009 WL 799957, at *5 (W.D.N.Y. Mar. 25, 2009) ("[T]hat there is no evidence to support a finding that [the petitioner] is a flight risk or is a danger to the community" can also constitute an extraordinary circumstance.). There is no risk of flight. Mr. Mahdawi has strong ties to the Vermont community where he owns a home (and a half, counting the camp in Vershire). (*See* Doc. 19-1 at 100, 159, 179, 185, 190.) He is a full-time student who has been accepted into a graduate program. (Doc. 19-2 ¶¶ 9–9; Doc. 19-1 at 202.) He presented himself at the USCIS office in Colchester even though he had suspicions that he would be detained. (Doc. 19-2 ¶¶ 41, 49); He has deep connections to colleagues, professors, his faith community, and—it would appear—a great many friends. (*See generally* Doc. 19-1.)

He also presents no danger to his community or to others. The court has considered the allegations made by the gunsmith in 2015. If true, they are highly damaging to Mr. Mahdawi's chances of release and of having any future in the United States at all. In 2015, the FBI

23

conducted a thorough investigation of the allegations and found no basis to act. Had the statements attributed to Mr. Mahdawi been true, they would have resulted in some official response. In a case of the dog that did not bark, the FBI concluded its investigation without taking action. That decision gives rise to a reasonable inference that the agency charged with the protection of the public from crime found no basis for proceeding against Mr. Mahdawi in any venue. Ten years have passed since that time without any criminal charge except for a referral to a state-run diversion program in 2019 concerning a potential drug offense. The record of that referral and any citation has been expunged in the normal course.

People who have come to know Mr. Mahdawi more recently than 2015 describe him as a peaceful figure who seeks consensus in a highly-charged political environment. (*See generally* Doc. 19-1; Doc. 46.) But, even if he were a firebrand, his conduct is protected by the First Amendment. Unlike many habeas petitioners, he comes before the court charged with no offense and free from any claim of criminal conduct. The court is aware that he has offended his political opponents and apparently given rise to concerns at the State Department that he is an obstacle to American foreign policy. Such conduct is insufficient to support a finding that he is in any way a danger as we use that term in the context of detention and release.

The court also considers the extraordinary setting of this case and others like it. Legal residents—not charged with crimes or misconduct—are being arrested and threatened with deportation for stating their views on the political issues of the day. Our nation has seen times like this before, especially during the Red Scare and Palmer Raids of 1919–1920 that led to the deportation of hundreds of people suspected of anarchist or communist views. In *Colyer v. Skeffington*, 265 F. 17 (1920), Judge Anderson of the District of Massachusetts granted habeas relief to multiple immigrants detained for their political beliefs. His decision was instrumental in

24

**SA 028**

bringing an end to the moral panic that gripped the nation and its officials. Similar themes were

sounded during the McCarthy period in the 1950s when thousands of non-citizens were targeted

for deportation due to their political views. Ellen Schrecker, *Immigration and Internal Security:*

*Political Deportations During the McCarthy Era*, Vol. 60 Sci. & Soc'y 393 (1996). Again, the

fever passed, but not before Justice Jackson was moved to dissent in *U.S. ex rel. Knauff v.*

*Shaughnessy*, 338 U.S. 537, 317 (1950), writing in a habeas case concerning the exclusion of a

German war bride:

> Security is like liberty in that many are the crimes committed in its name. The
> menace to the security of this country, be it great as it may, from this girl's
> admission is as nothing compared to the menace to free institutions inherent in
> procedures of this pattern.

Justice Minton's majority decision is not much remembered. The wheel of history has come

around again, but as before these times of excess will pass. In the meantime, this case—like

*Colyer* and *Knauff*—is extraordinary in the sense that it calls upon the ancient remedy of habeas

to address a persistent modern wrong.

### C.   Necessary to Make the Habeas Remedy Effective

Mr. Mahdawi argues that release is necessary to make habeas effective because keeping

him in detention pending adjudication on the merits "would ratify the chilling effect that the

government intends to create." (Doc. 19 at 21.) As this court observed in *Ozturk*:

> The Second Circuit has specifically recognized potential retaliation for protected
> political speech as a cognizable ground for habeas relief in the immigration context,
> noting that "to allow this retaliatory conduct to proceed would broadly chill
> protected speech, among not only activists subject to final orders of deportation but
> also those citizens and other residents who would fear retaliation against others."

2025 WL 1145250, at *19 (quoting *Ragbir v. Homan*, 923 F.3d 53, 71 (2d Cir. 2019)). Mr.

Mahdawi, like Ms. Ozturk, "has presented evidence to support [his] argument that [he] may

qualify for a retaliation claim." *Id.* "[A]n inmate's constitutional protections are not left at the

**SA 029**

prison gate." *Rodriguez v. Phillips*, 66 F.3d 470, 478 (2d Cir. 1995). However, "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Id.* (quoting *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977)). Mr. Mahdawi's ability to exercise his First Amendment rights is "severe[ly] curtail[ed]" as long as he is detained. *Id.* If he has been detained in retaliation for exercising those rights, release is essential to make habeas relief effective, not only for him but for others who wish to speak freely without fear of government retaliation. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

### III.   Disposition

The Government seeks a stay of the order releasing Mr. Mahdawi.

"A court making an initial custody determination in a habeas corpus case should be guided by the language of Fed. R. App. P. 23(c), and by the factors traditionally considered in decid[ing] whether to stay a judgment in a civil case." *Dhine v. Dist. Dir.*, 822 F. Supp. 1030, 1031 (S.D.N.Y. 1993) (citing *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). Rule 23(c) reflects a general preference for release pending appeal:

> While a decision ordering the release of a prisoner is under review, the prisoner must—unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise—be released on personal recognizance, with or without surety.

Courts evaluating whether to stay a civil ruling pending appeal consider the following factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

26

*DiMartile v. Hochul*, 80 F.4th 443, 456 (2d Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)). Furthermore, in cases concerning release from detention, "if the respondent establishes that the [petitioner] would constitute a danger to the community if released, the Court may consider that factor in resolving the stay question." *Dhine*, 822 F. Supp. at 1031 (citing *Hilton*, 481 U.S. at 777).

## A.    Likelihood of Success on the Merits

The court has already functionally addressed this issue, resolving it in favor of Mr. Mahdawi: "A substantial claim for relief [under *Mapp*] is found where a petitioner relies on clear case law establishing the likelihood of success on his claim." *Evangelista v. Ashcroft*, 204 F. Supp. 2d 405, 407 (E.D.N.Y. 2002). The Government cannot also make a showing of likelihood of success on the merits. This factor therefore weighs in favor of Mr. Mahdawi's immediate release.

## B.    Irreparable Injury

The Government will not be irreparably harmed absent a stay. As already discussed in this opinion, the evidence currently before the court suggests that Mr. Mahdawi is neither a flight risk nor a danger to the community, and his release will not interfere with his removal proceedings. The Government has thus failed to demonstrate any legitimate interest in Mr. Mahdawi's continued confinement.

On the other hand, "[t]he interest of the habeas petitioner in release pending appeal[ is] always substantial." *Hilton*, 481 U.S. at 777. Every day that a person is detained is a significant injury. And Mr. Mahdawi's interest in release is particularly substantial in this case given the First Amendment concerns he has raised. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable

27

**SA 031**

injury."). Without release, Mr. Mahdawi will also be unable to complete his undergraduate degree. These possible injuries weigh strongly against the issuance of a stay.

### C.    Injury to Other Interested Parties

The court is not aware of possible injury to other interested parties in this case.

### D.    The Public Interest

Mr. Mahdawi's release is also in the public interest. His continued detention would likely have a chilling effect on protected speech, which is squarely against the public interest. And continuing to detain him would not benefit the public in any way, as Mr. Mahdawi appears not to be either a flight risk or a danger to the community. Finally, Mr. Mahdawi's release will benefit his community, which appears to deeply cherish and value him. The court therefore declines to stay its order pending appeal and instead requires Mr. Mahdawi's immediate release.

CONCLUSION

Petitioner's Motion for Release (Doc. 19) is GRANTED. The court orders the release of Mohsen Madawi on his personal recognizance during the pendency of this habeas proceeding. His release is subject to the following conditions:

1.    **That he reside in Vermont;**

2.    **That he is permitted to travel to New York State for educational purposes or to meet with his lawyers or as otherwise ordered by the court;**

3.    **That he attend all court hearings in this case in person unless excused by order of the court.**

**SA 032**

Mahdawi v. Trump, *et al*.                                      Case No. 2:25-CV-389

Dated at Burlington, in the District of Vermont, this 30th day of April, 2025.

Geoffrey W. Crawford, Judge
United States District Court

**SA 033**