# No. 25-1113

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

MOHSEN MAHDAWI,

*Petitioner-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, PATRICIA HYDE, in her official capacity as Acting Boston Field Office Director, Immigration and Customs Enforcement, Enforcement and Removal Operations, J DOE, in his official capacity as Vermont Sub-Office Director of Immigration and Customs Enforcement, Enforcement and Removal Operations, TODD LYONS, in his official capacity as Acting Director, Immigration and Customs Enforcement, KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security, MARCO A. RUBIO, in his official capacity as Secretary of State, PAMELA BONDI, in her official capacity as U.S. Attorney General,

*Respondents-Appellants.*

On Appeal from the United States District Court
for the District of Vermont

**BRIEF FOR ISRAELI CITIZENS IN THE UNITED STATES AS
AMICI CURIAE IN SUPPORT OF APPELLEE
URGING AFFIRMANCE**

***(Counsel listed on next page)***

Elizabeth R. Cruikshank
Jonathan L. Backer
INSTITUTE FOR CONSTITUTIONAL
  ADVOCACY & PROTECTION
Georgetown University Law
  Center
600 New Jersey Avenue NW
Washington, DC 20001
(202)-662-4048
erc56@georgetown.edu
jb2845@georgetown.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTERST OF AMICI CURIAE ................................................................ 1

INTRODUCTION ...................................................................................... 2

ARGUMENT ............................................................................................. 4

    I.    Mohsen Is the Antithesis of the Government's Portrayal of Him. ..................................................................... 4

        A.  Mohsen Is an Integral Partner in Efforts to Achieve Sustainable Peace Between Israelis and Palestinians. ....................................................... 4

        B.  Mohsen Is Committed to Combatting Antisemitism. ......................................................... 11

    II.   The Government's Arrest and Detention of Mohsen Based on His Pro-Peace, Pro-Palestine Speech Infringes Not Just His Own First Amendment Rights, But Also Amici's. ...................................................... 14

    III.  Mohsen's Release Is the Only Remedy That Can Protect His and Amici's First Amendment Rights. .............. 20

CONCLUSION ........................................................................................ 23

APPENDIX: LIST OF AMICI CURIAE ............................................ A-1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**Cases**

*Am. Acad. of Religion v. Napolitano,*
  573 F.3d 115 (2d Cir. 2009) ................................................................. 17

*Bd. of Cty. Comm'rs v. Umbehr,*
  518 U.S. 668 (1996) ........................................................................... 15

*Counterman v. Colorado,*
  600 U.S. 66 (2023) ............................................................................ 18

*E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.,*
  950 F.3d 177 (3d Cir. 2020) ................................................................ 22

*Hartman v. Moore,*
  547 U.S. 250 (2006) ........................................................................... 15

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) ........................................................................... 21

*Kleindienst v. Mandel,*
  408 U.S. 753 (1972) ...................................................................... 16–17

*Lamont v. Postmaster Gen.,*
  381 U.S. 301 (1965) ...................................................................... 18–19

*Martin v. Struthers,*
  319 U.S. 141 (1943) ........................................................................... 16

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ........................................................................... 14

*Nielsen v. Preap,*
  586 U.S. 392 (2019) ........................................................................... 22

*Perry v. Sindermann,*
  408 U.S. 593 (1972) ........................................................................... 15

*Ragbir v. Homan*,
   923 F.3d 53 (2d Cir. 2019) ............................................................ 15, 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................................ 15

*Shelton v. Tucker*,
   364 U.S. 479 (1960) ............................................................................ 17

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ............................................................................ 16

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ............................................................................ 17

*United States v. Alvarez*,
   567 U.S. 709 (2012) ............................................................................ 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ............................................................................ 16

## Constitution

U.S. Const. amend. I ................................................................................ 14

## Statutes

Immigration and Nationality Act
   8 U.S.C. § 1101 ................................................................................... 20
   8 U.S.C. § 1252(a)(5) .......................................................................... 20
   8 U.S.C. § 1252(b) ............................................................................... 20
   8 U.S.C. § 1252(b)(9) ..................................................................... 20–21
   8 U.S.C. § 1252(g) ............................................................................... 20
   8 U.S.C. § 1227(a)(4)(C) ....................................................................... 2

## Other Authorities

60 Minutes, *Columbia Student on the Fight for a Free Palestine and the
   Fight Against Antisemitism* (YouTube, Dec. 5, 2023),
   https://www.youtube.com/watch?v=grj328-hlhA ............................... 12

Bill Whitaker et al., *'It's Tense. It's Hostile.': Turmoil on College Campuses Over Israel-Hamas War*, CBS News (Dec. 3, 2023), https://perma.cc/38S8-JXZ8 .................................................. 7

Chris Mendell & Gelila Negesse, *Over 80 Student Groups Form Coalition Following Suspension of SJP, JVP*, Columbia Spectator (Nov. 29, 2023), https://perma.cc/94VM-NQ2Y...................................... 7

Chris Mendell, *Hundreds of Pro-Palestinian Students Walk Out as Part of National Call to Action, Gather for 'Peaceful Protest Art Installation,'* Columbia Spectator (Nov. 10, 2023), https://perma.cc/QJ22-8YDB............................................. 7, 11

*Dar: The Palestinian Student Society*, Columbia College | Columbia Engineering, https://perma.cc/9FAT-GME7 (last visited Aug. 17, 2025). .................................................................... 6

Gil Eyal, Gurtej Gill & Aum Desai, *Mohsen Mahdawi Worked with Us on Dialogue Across Differences*, Columbia Spectator (May 1, 2025), https://perma.cc/X4KB-4DHM ........................................... 10

*The Take: Behind Columbia University's Months of Tension*, Al Jazeera English (Apr. 24, 2024), https://tinyurl.com/mpfp2n9b........................ 6

## INTERST OF AMICI CURIAE[1]

Amici are a group of 26 Israeli citizens in the United States.[2] As students and faculty at Columbia University and other U.S. colleges and universities and members of the broader New York community, Amici participated in efforts spearheaded by Petitioner-Appellee Mohsen Mahdawi to foster dialogue between Israelis and Palestinians and to promote peace in Israel/Palestine. These efforts gave Amici hope that Israelis and Palestinians could work together not just to understand each other, but to transform our societies and create a peaceful shared future together. Mohsen's arrest and detention disrupted these critical peacemaking and dialogue initiatives, depriving Amici of the benefit of Mohsen's speech and leadership. In addition, Mohsen's arrest and detention have chilled Amici's efforts by sending the message that promotion of peace in Israel/Palestine is contrary to the foreign policy of the United States and grounds for revocation of lawful immigration

---

[1] No party's counsel authored this brief in whole or in part. No person, other than Amici Curiae's counsel, funded the preparation or submission of this brief. All parties consented to the filing of this brief.

[2] A full list of Amici appears as an appendix to this brief. Amici present this brief solely in their personal, private capacities, and the views expressed herein are not those of the colleges or universities with which some Amici are affiliated.

status and deportation. This case therefore implicates not only Mohsen's First Amendment rights, but also Amici's as listeners and collaborators. Accordingly, Amici have a strong interest in the issues presented in this case and in securing the affirmance of the district court's order granting Mohsen's release from immigration detention.

## INTRODUCTION

This case concerns the Government's arrest and detention of Mohsen Mahdawi—a Palestinian student at Columbia University and a lawful permanent resident on the precipice of completing the naturalization process—while it also initiated removal proceedings against him on the ground that he purportedly poses a threat to the United States' foreign policy. JA340 (citing 8 U.S.C. § 1227(a)(4)(C)).[3] The Government's portrayal of Mohsen could not be further from the truth. Far from "undermin[ing] the peace process underway in the Middle East" (JA341), Mohsen is an ardent pursuer of peace, as Amici—a group of 26 Israeli citizens in the United States—know firsthand. Indeed, during his time at Columbia, Mohsen was the driving force behind an intensive

---

[3] "JA___" refers to the parties' joint appendix by page number. "Gov't Br. __" refers to the Government's opening brief by page number.

effort to foster dialogue between Israelis and Palestinians on campus and beyond. Mohsen has worked tirelessly to build bridges between Israelis and Palestinians in the United States in the hope of planting the seeds for a more peaceful future for both of our peoples in our shared homeland.

Mohsen's arrest and detention undermines those efforts. By retaliating against Mohsen for speaking out against the war in Gaza, the Government has sought to silence him. In doing so, it has also undermined Amici's own First Amendment rights. First, the Government has deprived Amici of the benefit of Mohsen's speech, which was indispensable to bringing Israelis and Palestinians at Columbia, other campuses, and the broader New York community together. Second, Mohsen's arrest and detention have chilled Amici's peacemaking efforts by sending the signal that attempts by noncitizens to participate in dialogue and reconciliation could threaten their lawful status and ability to remain in the United States.

The district court's order releasing Mohsen from immigration custody—the subject of this appeal—is the only remedy that can meaningfully minimize the First Amendment harms that the Government has inflicted. According to the Government, the only

pathway for Mohsen to raise his First Amendment claim is to remain in custody while his immigration case is adjudicated and eventually to petition this Court for review of any final removal order. But that lengthy process cannot restore speech that is stifled while Mohsen is detained. This Court should therefore affirm the district court's release order and allow Mohsen to continue, with Amici, his pursuit of peace between Israelis and Palestinians.

## ARGUMENT

### I. Mohsen Is the Antithesis of the Government's Portrayal of Him.

#### A. Mohsen Is an Integral Partner in Efforts to Achieve Sustainable Peace Between Israelis and Palestinians.

Mohsen is deeply committed to peace, and he has long been a prominent advocate for dialogue and cooperation between Israelis and Palestinians. He has initiated and facilitated peacemaking conversations among Israelis and Palestinians on Columbia's campus, in the broader New York community, and beyond. His leadership has been integral to the progress of these conversations, and he is widely known to be a bridge-builder. Amici can attest to Mohsen's critical role in our efforts to heal our emotional wounds, create a peaceful resolution to the

Israeli/Palestinian conflict, promote our common security and equality, and build a shared future.

Upon his arrival on Columbia's campus in 2021, Mohsen dedicated himself "to understanding how to achieve a lasting peace for Palestinians and Israelis, particularly through the study of conflict resolution." JA255. A "deeply sophisticated thinker and theorist," he "sought to bring the academic tools he was acquiring in the classroom to bear on" the Israeli/Palestinian conflict. JA117. To that end, he took a range of classes to facilitate his peacemaking work, including international law, peacemaking and negotiation, morality and ethics, and nonviolence in politics. JA97, JA121, JA137. For the final project in his peacemaking and negotiation seminar, Mohsen wrote a paper about creating a peace plan for ending the war in Gaza and developing a long-term peace process for the Israeli/Palestinian conflict. JA121. An Israeli student in the class, an Amicus here, wrote his paper on the same topic from his own perspective, and he and Mohsen, along with their professor, organized a multi-day seminar retreat in the summer of 2024, to which they recruited experts on the Middle East, conflict resolution, children in conflict, and security. JA121. The result of this gathering was a 10-page executive

5

summary titled "the Peace Initiative for Israel-Palestine." JA121–22. The professor who taught the seminar attributed the "core of the ideas" in the final work product to Mohsen and his Israeli classmate. JA122. Their work continued into the fall of 2024. JA122.

But Mohsen's commitment to peace goes far beyond his academic work. In the aftermath of Hamas's attack on October 7, 2023, Mohsen took an active role in the campus pro-Palestinian protest movement. He co-founded the Palestinian Student Society ("Dar") at Columbia, which "serves to engage with and celebrate Palestinian culture, history, and identity."[4] He attended protests opposing military escalation in Gaza and advocating for Palestinians' rights. He gave speeches at several of these protests, advocating for a permanent ceasefire and a peaceful resolution. And he appeared in televised interviews and print news articles regarding the military campaign in Gaza, becoming a public face of the Columbia protests.[5]

---

[4] *Dar: The Palestinian Student Society*, Columbia College | Columbia Engineering, https://perma.cc/9FAT-GME7 (last visited Aug. 17, 2025).

[5] *See, e.g.*, *The Take: Behind Columbia University's Months of Tension*, Al Jazeera English (Apr. 24, 2024), https://tinyurl.com/mpfp2n9b; Bill Whitaker et al., *'It's Tense. It's*

Over time, Mohsen stepped back from his role in the campus protests and instead began to prioritize pursuing dialogue with Israelis regarding a sustainable solution to the conflict. He actively built ties with Israelis on the Columbia campus, and on his initiative, a group of Israelis—including several of the Amici—and Palestinians began meeting. In the early meetings, Mohsen was the only Palestinian in the room, but over time he brought additional Palestinian members into the discussions, people who joined the dialogues because they trusted Mohsen. This group, which grew to include twelve people, met weekly for two hours at a time, sometimes had multiple meetings per week, and often hosted post-meeting Zoom calls to continue the conversation. Mohsen dedicated himself to this work even while balancing classes, other campus activities, and tending to his communities both in New

---

Hostile.': Turmoil on College Campuses Over Israel-Hamas War, CBS News (Dec. 3, 2023), https://perma.cc/38S8-JXZ8; Chris Mendell & Gelila Negesse, *Over 80 Student Groups Form Coalition Following Suspension of SJP, JVP*, Columbia Spectator (Nov. 29, 2023), https://perma.cc/94VM-NQ2Y; Chris Mendell, *Hundreds of Pro-Palestinian Students Walk Out as Part of National Call to Action, Gather for 'Peaceful Protest Art Installation,'* Columbia Spectator (Nov. 10, 2023), https://perma.cc/QJ22-8YDB.

York and Vermont (where his permanent residence is located), and even after he began facing the threat of deportation for his advocacy.

These peacemaking dialogues were challenging but essential, productive, and respectful. Given the very nature of the conversations and the different perspectives the participants brought, it was inevitable that there would be points of disagreement, but there was never any doubt that the participants shared a commitment to human rights, dialogue, and peace.

This group planned to organize larger meetings and invite more Israeli and Palestinian students and faculty to join their peace coalition. Mohsen also met with a group of Israelis from the broader New York community to begin a dialogue process similar to the one he initiated on Columbia's campus. Unfortunately, these efforts to build on the progress that Mohsen began at Columbia foundered after Mohsen's arrest and detention.

Mohsen's leadership was essential to Amici's peacemaking work. There can be no dialogue between Israelis and Palestinians without Palestinians, and Mohsen initiated these conversations, was the first Palestinian to participate, and made it possible for other Palestinians to

join. The fact that Mohsen had initiated these meetings was also meaningful to several Israeli participants, especially those who lacked another channel for engaging deeply with Palestinians. One Amicus found that when he was feeling overwhelmed by the commitment to the peacemaking meetings and his other obligations, thinking of Mohsen's dedication, even in the face of the risk of deportation, motivated him to continue. Several Amici believe that their peacemaking work with Mohsen has been their most valuable experience at Columbia University. And one Amicus from the broader New York community credits his meetings with Mohsen as providing him with the most joy and hope that he has felt since October 7 by allowing him to envision a future for both Palestinians and Israelis living in true safety, equality, and freedom—a sentiment shared by many other Amici.

In addition to initiating these peacemaking dialogues, Mohsen participated in other similar efforts to bridge divides among individuals with different perspectives on Israel/Palestine. One Amicus, an Israeli Columbia professor who runs a program called Listening Tables to bring together university community members for civil dialogues across political and other differences, was delighted when Mohsen volunteered

to help organize tables that would include more Palestinian, Arab, and Muslim community members—groups that had been inadequately represented at prior table discussions. Mohsen also worked with a campus group called Bridge Columbia, which champions viewpoint diversity, responsible discourse, and a solution-oriented political culture, to organize a panel discussion in fall 2024 on the Israeli/Palestinian conflict, ensuring that a wide range of viewpoints was represented.[6] Mohsen's arrest interfered with the group's attempts to organize another panel with Jewish and Palestinian students in spring 2025.

Mohsen is exemplary both in the depth of his commitment to peacemaking and in the personal qualities he exhibits in that work and in the rest of his life. He has an unwavering commitment to peace and justice. His advocacy is rooted in Buddhism, which emphasizes compassion, nonviolence, and the dignity of all life. He channels his personal experiences of trauma, loss, and grief and shares them openly and vulnerably, which is essential to building bridges and making peace. He exhibits no bitterness or anger regarding the adversity he has

---

[6] Gil Eyal, Gurtej Gill & Aum Desai, *Mohsen Mahdawi Worked with Us on Dialogue Across Differences*, Columbia Spectator (May 1, 2025), https://perma.cc/X4KB-4DHM.

10

experienced; instead, he has taken a personal history of great suffering and transformed it into his life's calling. He approaches conversations, including with people with very different backgrounds and perspectives, from a place of kindness, respect, compassion, and empathy. In all aspects of his life, he is dedicated to building community, and he is resilient, thoughtful, curious, and generous. He is a person of the highest integrity.

### B. Mohsen Is Committed to Combatting Antisemitism.

Through his advocacy, Mohsen has committed to combating antisemitism, and he is completely lacking in prejudice against Jews. Some of this commitment has been highly publicized: At a campus protest in November 2023, when an unidentified individual began shouting antisemitic and anti-Black statements, Mohsen attempted to calm the person.[7] After the individual was confronted by campus police, Mohsen grabbed the megaphone and denounced the statements, leading the crowd in a chant of "shame on you." He said of the individual, "you don't represent us," and expressed his solidarity with "Jewish brothers and sisters who stand with us here today." In a subsequent interview on 60

---

[7] Mendell, *supra* n.5.

Minutes, Mohsen was asked about the incident and reiterated his belief that "to be antisemitic is unjust—is unjust—and the fight for the freedom of Palestine and the fight against antisemitism go hand in hand, because injustice anywhere is a threat to justice everywhere."[8]

As numerous letters in the record attest, Mohsen is also deeply respectful of and curious about the Jewish faith, and all faiths, in his private life. During his undergraduate studies at Lehigh University, he studied Hebrew to "improve his capacity to build bridges with Israelis in his pursuit of peace." JA167. He frequently attended both Chabad and Hillel—centers of campus Jewish life—participating in Shabbat dinners and befriending Jewish classmates. JA167, JA183. He has referred to the Lehigh Director of Jewish Student Life, with whom he formed a longstanding friendship, as his "brother in peace." JA173. When his then-romantic partner, a Jewish woman, was missing her family traditions during the COVID-19 pandemic, he hosted Hanukkah dinners with her, as well as insisting on reciting every prayer during Passover seders with her family. JA167, JA183.

---

[8] 60 Minutes, *Columbia Student on the Fight for a Free Palestine and the Fight Against Antisemitism*, at 1:41 (YouTube, Dec. 5, 2023), https://www.youtube.com/watch?v=grj328-hlhA.

This respect for the Jewish faith persisted through his on-campus advocacy and peacemaking dialogues on Israel/Palestine. As a participant in the campus protests, he secured implementation of a rule that signs and chants needed to be approved in advance to avert the possibility of antisemitic content being included. JA95. After the November 2023 protest incident, Mohsen successfully encouraged Columbia administrators to limit access to campus demonstrations to Columbia affiliates only, which reduced the incidence of antisemitic messaging. JA95. When one of Mohsen's partners in his peacemaking efforts explained that she was an observant Jew and could not work on the Sabbath or on Jewish holidays, Mohsen was careful to choose meeting times that worked with her schedule; he also ensured, without being asked, that kosher food options would be available any time they dined together. JA104. One Columbia student wrote that he felt "much safer as a Jew on Columbia's campus because of Mohsen" and that Mohsen had "done more to reduce anti-semitism than any other individual on our campus in the four years I have studied at Columbia." JA95.

## II. The Government's Arrest and Detention of Mohsen Based on His Pro-Peace, Pro-Palestine Speech Infringes Not Just His Own First Amendment Rights, But Also Amici's.

In arresting and detaining Mohsen, the Government sought to stifle Mohsen's pro-peace, pro-Palestine advocacy. But the intended effect of the Government's actions toward Mohsen was to strike a blow against the broader movement for peace in Israel/Palestine of which Amici are a part. The Government's attempt to silence Mohsen denied Amici the benefit of Mohsen's speech as a partner for peace and chilled our collective efforts to foster dialogue among Israelis and Palestinians and to build a better future together. A reversal of the district court's order releasing Mohsen from immigration detention would inflict those First Amendment harms anew.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). The First Amendment thus prohibits the government from "us[ing] the power of the State to punish or suppress disfavored expression." *Id.* at 188. This

prohibition extends to nearly all aspects of government action, including the use of prosecutorial authority, *see, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 256 (2006), the terms of public employment, *see, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597–98 (1972), and the termination of public contracts, *see, e.g.*, *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996). And this Court has recognized that the First Amendment likewise prohibits viewpoint-based immigration enforcement. *Ragbir v. Homan*, 923 F.3d 53, 71 (2d Cir. 2019), *cert. granted, judgment vacated on other grounds*, 141 S. Ct. 227 (2020) (mem.). Whatever action the government takes, it "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

In ordering Mohsen's release from immigration detention, the district court held that Mohsen had "raised substantial questions about the use of administrative arrest to stifle his exercise of free speech." JA567. The court recognized that Mohsen's advocacy "for a peaceful resolution of the conflict in Gaza" and his opposition to "Israel's military campaign" constitute "core political speech" that "is at the heart of

ongoing political debate among the American people." JA569 (internal quotation marks omitted). And the court found sufficient evidence at this stage in the proceedings that Mohsen's arrest and detention were in retaliation for this speech based on the Government's public statements announcing its intent to target pro-Palestinian activism. JA570–71. The Government does not challenge those conclusions on appeal.

By attempting to silence Mohsen, the Government also undermined Amici's own First Amendment rights. "Freedom of speech presupposes a willing speaker. But where a speaker exists, . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976). The Free Speech Clause thus safeguards not only the right to speak, but also the "right to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)); *see also Martin v. Struthers*, 319 U.S. 141, 143 (1943) (holding that an anti-solicitation statute implicated not only the speaker's rights but also "the right of the individual householder to determine whether he is willing to receive her message"). In *Mandel*, the Supreme Court recognized that the Attorney General's denial of a visa to

a Marxist journalist "implicated" the First Amendment rights of university professors who had invited him "to hear [the journalist] explain and seek to defend his views." 408 U.S. at 764–65 (internal quotation marks omitted); *accord Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 117–18 (2d Cir. 2009). This right to receive information and ideas, the Supreme Court held, "is 'nowhere more vital' than in our schools and universities." *Mandel*, 408 U.S. at 763 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers *and students* must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." (emphasis added)).

The Government's arrest and detention of Mohsen undermined Amici's right to receive information and ideas. As mentioned, *see* pp. 8–10, *supra*, Mohsen was an indispensable component of Amici's efforts to foster dialogue between Israelis and Palestinians on Columbia's campus and beyond. Without Mohsen's leadership—through words, conduct, and his spirit of openness and kindness—the peacemaking efforts in which

Amici engaged with him would not have taken place. Indeed, Mohsen's arrest and detention brought these dialogue efforts to a close by removing the linchpin to the conversation. Amici are hopeful that Mohsen's release and his anticipated return to Columbia in the coming weeks to begin a master's degree (JA254, JA261) will rekindle the conversations that Mohsen helped initiate and allow us to continue learning from our Palestinian friends and colleagues and deepen our understanding of their experiences and perspectives.

Mohsen's arrest and detention also have chilled Amici's peacemaking efforts. Government action that has "a deterrent effect" on First Amendment activity constitutes "an unconstitutional abridgment" to the same degree as a direct prohibition. *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965); *see also Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (construing a criminal law prohibiting threatening statements to require proof of the defendant's subjective intent to threaten another to avoid a chilling effect); *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (striking down a law prohibiting false statements about military decorations or medals in part based on its chilling effect). In *Lamont*, for example, the Supreme Court struck down a statute that required the

Postmaster General to detain foreign mail containing "communist political propaganda" without outright prohibiting such content. *Id.* at 302 (internal quotation marks omitted). Even though addressees could obtain their detained mail by submitting a request to the Postmaster General, the Court recognized that those in "sensitive positions" would be unlikely to make such a request and that anyone would "likely . . . feel some inhibition in sending for literature which federal officials have condemned." *Id.* at 307.

As this Court has recognized, First Amendment retaliation through immigration enforcement similarly "chill[s] protected speech" among not only noncitizen activists, "but also those citizens and other residents who would fear retaliation against others." *Ragbir*, 923 F.3d at 71. The Government's conduct in this case has had just such an effect. Retaliation against Mohsen for his speech sends a devastating message: that there is no space for bridge-building or peace work between Palestinians and Israelis in the United States. It suggests that the U.S. Government would prefer to sustain division rather than support those striving for reconciliation and peace. It has a chilling effect on individuals, even Israeli citizens, who speak critically of the Israeli government. And it

signals that even the most peaceful forms of advocacy on behalf of Palestinians will not be tolerated, reinforcing the notion that nonviolent resistance, dialogue, and cross-community building are not viable alternatives to violence. This messaging makes all of us—including Israelis, non-Israeli Jews, and Palestinians—less safe and less free. Retaliation against Mohsen is an attack on our collective peacemaking work and on our shared future.

## III. Mohsen's Release Is the Only Remedy That Can Protect His and Amici's First Amendment Rights.

The Government's primary argument on appeal is that various provisions of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, precluded the district court from exercising judicial review of Mohsen's claims. Gov't Br. 12–39 (arguing that the district court lacked jurisdiction to review Mohsen's claims under 8 U.S.C. § 1252(a)(5), (b)(9), and (g)). In the Government's view, the "exclusive path" for Mohsen to challenge his arrest and detention under the First Amendment is through the INA's petition-for-review process, which allows courts of appeals to review final orders of removal. *Id.* at 10; *see also* 8 U.S.C. § 1252(b). That expansive reading of the INA's limitations on judicial review cannot be correct because it would deny any meaningful remedy

for First Amendment retaliation of the kind that Mohsen has experienced.

Courts have declined to adopt "extreme" readings of the INA's jurisdictional limitations that deny "any meaningful chance for judicial review." *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018). In *Jennings*, the Supreme Court construed Section 1252(b)(9), but the Court's reasoning applies equally to all three INA provisions that the Government contends bar judicial review here. Section 1259(b)(9) channels to the courts of appeals through the petition-for-review process "[j]udicial review of all questions of law or fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). "[E]schew[ing] uncritical literalism," the Court declined to read that provision's "arising from" language so broadly so as to deny judicial review of "claims of prolonged detention." *Jennings*, 583 U.S. at 293–94 (cleaned up). Doing so would be "absurd" because "[b]y the time a final order of removal was eventually entered, the allegedly excessive detention would have already taken place." *Id.* at 293; *see also E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*,

21

950 F.3d 177, 185–86 (3d Cir. 2020) (distilling from *Jennings* and *Nielsen v. Preap*, 586 U.S. 392 (2019), the principle that Section 1252(b)(9) does not apply to "now-or-never claims" that "seek relief that courts cannot meaningfully provide alongside review of a final order of removal").

Those principles apply with full force to Mohsen's claims. A petition for review from any final order of removal—if there ever is one—cannot restore the speech in which Mohsen would have engaged and from which Amici would have benefited had he remained outside of immigration custody. Nor can the petition-for-review process unwind the chilling effect that Mohsen's arrest and detention have had on the broader peacemaking efforts in which Amici and Mohsen have collaborated. As the district court found, "release is essential . . . not only for [Mohsen] but for others who wish to speak freely without fear of government retaliation." JA577. Only release pending the outcome of Mohsen's immigration case can minimize the First Amendment harms that the Government's retaliatory actions have inflicted.

## CONCLUSION

For all of the foregoing reasons, Amici respectfully request that this Court affirm the district court's release order.

August 25, 2025

Respectfully submitted,

<u>/s/ *Elizabeth R. Cruikshank*</u>
Elizabeth R. Cruikshank
Jonathan L. Backer
INSTITUTE FOR CONSTITUTIONAL
   ADVOCACY & PROTECTION
Georgetown University Law
   Center
600 New Jersey Avenue NW
Washington, DC 20001
(202)-662-4048
erc56@georgetown.edu
jb2845@georgetown.edu

*Counsel for Amici Curiae*

## APPENDIX: LIST OF AMICI CURIAE

**Michael Joseph Baratz**, Masters of International Affairs, Columbia University

**Naor Ben-Yehoyada**, Associate Professor of Anthropology, Columbia University

**Sahar Bostock**, History Ph.D., Columbia University, Class of 2025

**Yinon Cohen**, Yosef Haim Yerushalmi Professor of Israel and Jewish Studies, Columbia University

**Aharon Dardik**, Columbia University, School of General Studies, Class of 2026

**Gil Eyal**, Professor of Sociology, Columbia University

**Michal Fux**, Ph.D., Research Scientist, Massachusetts Institute of Technology

**Josh Drill**, Masters of Science in Strategic Communications, Columbia University

**Tamara Gayer**

**Gili Getz**, Israeli Peace Activist

**Tamar Glezerman**, Israelis for Peace Co-Founder

**Tal Hirschhorn**, Department of Biological Sciences, Columbia University

**Eden Kaduri**, Columbia University, School of International and Public Affairs, Class of 2026

**Michal Koch**

**Amos Laor**, Columbia Law School

**Karin Loevy**, NYU School of Law, Professor at the New School

**Nadav Nazarathy**, Member of Israelis for Peace, Friend of Standing Together

**Yael Niv**, Ph.D, Princeton University faculty of Psychology and Neuroscience

**Noa Wolf**, Masters of Social Work, CUNY, Class of 2026

**Roni Ziv**, Columbia University, School of General Studies

**D.L.**, Ph.D., Columbia University, Class of 2024

**Ella D.**, Columbia University

**E.T.**, Columbia University

**G.T.**, The New School

**N.**, Columbia University, Teachers College

**N.F.**, Columbia University, Graduate School of Arts and Sciences, Class of 2030

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 4301 words, excluding the parts of the brief exempted by Rule 32(a)(7)(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word (14-point Century Schoolbook), and is double-spaced.

/s/ *Elizabeth R. Cruikshank*
Elizabeth R. Cruikshank

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Elizabeth R. Cruikshank*
Elizabeth R. Cruikshank