25-1019; 25-1113
*Ozturk v. Hyde*; *Mahdawi v. Trump*

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, concurring in the denial of rehearing *en banc*:

In these cases, a motions panel issued opinions denying motions for stays pending appeal. *See Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025); *Mahdawi v. Trump*, 136 F.4th 443 (2d Cir. 2025). The government has petitioned for rehearing *en banc* of those decisions.[1]

In my view, the motions panel erred by authorizing the use of habeas to collaterally attack ongoing removal proceedings. Congress has provided that "no court shall have jurisdiction, by habeas corpus … or by any other provision of law," to review any questions of law or fact "arising from any action taken or proceeding brought to remove an alien from the United States" except on a petition for review of a final order of removal. 8 U.S.C. § 1252(b)(9). Moreover, "no court shall have jurisdiction to hear any cause or claim" that arises from "the decision or action" to "commence" removal proceedings. *Id*. § 1252(g). While these jurisdictional bars may still allow aliens to challenge the conditions of their confinement during removal proceedings, the statutes do not permit the use of habeas to "challeng[e] the decision to detain them in the first place or to seek removal." *Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (plurality opinion). Yet that is precisely how the motions panel allowed habeas to be used in these cases. In doing so, the motions panel created conflicts with other circuits and decided questions of exceptional importance that would normally justify rehearing *en banc*. *See* Fed. R. App. P. 40(b).

---

[1] *See* Petition for Rehearing, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. May 18, 2025), ECF No. 82; Petition for Rehearing, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 18, 2025), ECF No. 93.

Under the circumstances, however, the *en banc* court will not rehear the decisions of the motions panel to deny the stays pending appeal. Briefs have already been filed in the merits appeals, and the legal questions will be decided on the merits. The opinion of the motions panel will not constrain what the merits panel may decide either as law of the case or through precedent.

## I

The motions panel erred by treating removal and detention in anticipation of removal as separate processes for purposes of the jurisdictional provisions of the Immigration and Nationality Act ("INA"). The motions panel concluded that challenges to immigration detention are "independent of, or wholly collateral to, the removal process." *Ozturk*, 136 F.4th at 397; *Mahdawi*, 136 F.4th at 450. But that is wrong.

Both petitioners here were detained in anticipation of removal. The record before the motions panel indicated that Mahdawi was detained after the Secretary of State determined that his presence in the United States would have "serious adverse foreign policy consequences," *Mahdawi*, 136 F.4th at 447, and that Ozturk was detained after the State Department revoked her student visa on a similar basis, *see Ozturk*, 136 F.4th at 388-89. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). That is the authority the government exercised here. It did not detain the petitioners for any reason independent of its decision to commence removal proceedings. It detained them because of those proceedings. Neither petitioner has alleged a reason for his or her detention that is not also the reason for the government's decision to commence removal proceedings.

2

*See, e.g.*, Habeas Petition at 1, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 1, 2025), ECF No. 7 (seeking habeas relief based on the government's alleged "retaliatory and targeted detention *and attempted removal* of Mr. Mahdawi for his constitutionally protected speech") (emphasis added).[2]

Congress has—in three separate provisions of the INA—directed that courts may not entertain a habeas challenge under these circumstances because challenges to removal must be decided on a petition for review of a final order of removal.

## A

First, § 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." 8 U.S.C. § 1252(g). The Supreme Court has

---

[2] The concurring opinion on behalf of the panel indulges the fiction that Ozturk was "arrested solely due to an op-ed article she had written" and that Mahdawi was "arrested solely in retaliation for his … advocacy work." *Post* at 1-2. In fact, the reason for their *arrests* was the decision to initiate removal proceedings; the Attorney General may detain aliens pending removal proceedings under 8 U.S.C. § 1226(a). The reason for their *removals* is the determination of the Secretary of State that their conduct—including the conduct the concurring opinion identifies—undermined U.S. foreign policy. It is possible to reach the conclusion that the reasons for the *removals* are actually the "sole[]" reasons for the *detentions* only by ignoring the fact that the petitioners have been placed in removal proceedings. While petitioners may make "challenges to detention that are independent of challenges to removal orders" by challenging the conditions of their confinement, the petitioners here instead challenged the grounds for the removal proceedings. H.R. Rep. No. 109-72, at 176 (2005) (Conf. Rep.), *as reprinted in* 2005 U.S.C.C.A.N. 240, 301.

held that § 1252(g) bars the claims of aliens that the government is "selectively enforcing immigration laws against them in violation of their First and Fifth Amendment rights" because such claims represent a "challenge to the Attorney General's decision to 'commence proceedings' against them." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 474, 487 (1999) (quoting 8 U.S.C. § 1252(g)). The decision of the government to commence removal proceedings against an alien includes the detention of the alien pending the removal determination. *See* 8 U.S.C. § 1226(a). In other words, the decision to detain is a "specification of the decision to 'commence proceedings' which … § 1252(g) covers." *Reno*, 525 U.S. at 485 n.9.

Other circuits have recognized this straightforward point. "By its plain terms," § 1252(g) "bars us from questioning [the government's] discretionary decisions to commence removal" of an alien, which include the "decision to take him into custody and to detain him during his removal proceedings." *Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016).[3] As a result, "claims stemming from the decision to arrest and detain an alien at the commencement of removal proceedings are not within any court's jurisdiction." *Limpin v. United States*, 828 F. App'x 429, 429 (9th Cir. 2020).[4] The

---

[3] *See also Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) ("Securing an alien while awaiting a removal determination constitutes an action taken to commence proceedings."); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *11 (4th Cir. July 1, 2025) (Wilkinson, J., dissenting) ("[W]hen the government detains an alien under § 1226(a)—which authorizes detention 'pending a decision on whether the alien is to be removed'—the detention arises from the commencement of proceedings or adjudication of cases.").

[4] *See also Sissoko v. Rocha*, 509 F.3d 947, 949-50 (9th Cir. 2007) ("Sissoko's detention arose from Rocha's decision to commence expedited removal proceedings. As a result, 8 U.S.C. § 1252(g) applies to the Sissokos'

jurisdictional bar of § 1252(g) does not distinguish between different grounds for such a claim. The decisions of the motions panel authorizing such claims despite § 1252(g) created a conflict with these circuits.

B

Second, § 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order." 8 U.S.C. § 1252(b)(9). Congress specified that "no court shall have jurisdiction, by habeas corpus under [28 U.S.C. § 2241] or any other habeas corpus provision … or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact." *Id.*; *see also id.* § 1252(a)(5) (applying the same jurisdictional bar to "judicial review of an order of removal"). While § 1252(b)(9) may not bar claims challenging the conditions or scope of detention of aliens in removal proceedings, it does bar claims "challenging the decision to detain them in the first place." *Jennings*, 583 U.S. at 294 (plurality opinion).[5] By making such a challenge, the

---

claim. … [W]e hold that 8 U.S.C. § 1252(g)'s jurisdiction-stripping language covers the Sissokos' false arrest claim. The claim directly challenges Rocha's decision to commence expedited removal proceedings."); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002) ("We construe § 1252(g), which removes our jurisdiction over 'decisions to commence proceedings' to include not only a decision in an individual case *whether* to commence, but also *when* to commence, a proceeding.") (alterations omitted).

[5] *See also Jennings*, 583 U.S. at 317 (Thomas, J., concurring in part and concurring in the judgment) ("Section 1252(b)(9) is a 'general jurisdictional limitation' that applies to 'all claims arising from deportation proceedings' and the 'many decisions or actions that may be part of the deportation

habeas claims require a court to answer "*legal questions*" that arise from "an action taken to remove an alien," so the claims "fall within the scope of § 1252(b)(9)." *Jennings*, 583 U.S. at 295 n.3 (plurality opinion). The habeas claims in these cases do exactly that.

Again, other circuits have reached this conclusion. When an alien "seeks release from detention," if "his claim is based on the alleged invalidity of his order of removal" or his anticipated removal, "he is seeking 'judicial review of an order of removal' which is barred." *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1275 (10th Cir. 2018) (quoting 8 U.S.C. § 1252(a)(5)). Thus, "[w]hen a claim by an alien, however it is framed, challenges the procedure and substance of an agency determination that is 'inextricably linked' to the order of removal, it is prohibited by section 1252(a)(5)." *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012).

Our court has previously reached the same conclusion. In *Delgado v. Quarantillo*, an alien subject to a reinstated removal order brought a mandamus action to compel the government to adjudicate her Form I-212 application for a waiver of inadmissibility. *See* 643 F.3d 52, 54 (2d Cir. 2011). We explained that "[o]btaining such a waiver is a necessary prerequisite to her ultimate goal of adjustment of status" and that "an adjustment-of-status challenge is inextricably linked to the reinstatement of an alien's removal order" because it amounts to

---

process.' Detaining an alien falls within this definition—indeed, this Court has described detention during removal proceedings as an 'aspect of the deportation process.' … The phrase 'any action taken to remove an alien from the United States' must at least cover congressionally authorized portions of the deportation process that necessarily serve the purpose of ensuring an alien's removal.") (alterations and citation omitted) (quoting *Reno*, 525 U.S. at 482-83; *Demore v. Kim*, 538 U.S. 510, 523 (2003); and 8 U.S.C. § 1252(b)(9)).

a challenge to the removal order. *Id.* at 55 (internal quotation marks and alteration omitted). We recognized that the alien was "indirectly challenging her reinstated order of removal, and accordingly, we [held] that section 1252(a)(5)'s jurisdictional bar applies equally to preclude such an indirect challenge." *Id.*

In the *Ozturk* and *Mahdawi* cases, the petitioners sought a declaration that the government's "actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment." Habeas Petition at 22, *Ozturk v. Hyde*, No. 25-1019 (2d Cir. Apr. 24, 2025), ECF No. 19; Habeas Petition at 18, *Mahdawi v. Trump*, No. 25-1113 (2d Cir. May 1, 2025), ECF No. 7. But those actions were taken to effectuate the removal of the petitioners and relied on the same rationale. The arguments the petitioners have offered to challenge the detentions necessarily challenge the government's decision to commence removal proceedings. In other words, the petitioners claimed that the detentions are unlawful because the government has no lawful grounds for removing them in the first place.

The proceedings before the district courts illustrate the point. The district court in *Mahdawi* recognized that the Secretary of State has determined that Mahdawi's "presence and activities in the United States would have serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest." *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 222 (D. Vt. 2025). That determination was based on information the government collected showing that:

> Mahdawi, though his leadership and involvement in disruptive protests at Columbia University, has engaged in anti-Semitic conduct through leading pro-Palestinian protests and calling for Israel's destruction. Mahdawi

has been identified at those protests as having engaged in threatening rhetoric and intimidation of pro-Israeli bystanders. The activities and presence of Mahdawi in the United States undermines U.S. policy to combat anti-Semitism around the world and in the United States, in addition to efforts to protect Jewish students from harassment and violence in the United States. Under E.O. 14188, Additional Measures to Combat Anti-Semitism, it is the policy of the United States to combat antisemitism, using all available and appropriate legal tools to hold to account the perpetrators of unlawful anti-Semitic harassment and violence. Consistent with E.O. 14150, America First Policy Directive to the Secretary of State, the foreign policy of the United States champions core American interests and American citizens and condoning anti-Semitic conduct and disruptive protests in the United States would severely undermine that significant foreign policy objective. Moreover, protests of the type led by Mahdawi potentially undermine the peace process underway in the Middle East by reinforcing anti-Semitic sentiment in the region[] and thereby threatening the U.S. foreign policy goal of peacefully resolving the Gaza conflict.

Memorandum of the Secretary of State to the Secretary of Homeland Security at 1-2, *Mahdawi v. Trump*, No. 25-CV-389 (D. Vt. Apr. 28, 2025), ECF No. 42-1. Based on this reasoning, the government determined that Mahdawi "is a deportable alien" under 8 U.S.C. § 1227(a)(4)(C)(i). *Id.* at 1. The district court reviewed the legality of this explanation from the government about why Mahdawi was removable as well as other public statements in which the

government articulated its policy of removing aliens who have engaged in activities that conflict with the U.S. foreign policy.[6]

Based on the government's justification for removing Mahdawi, the district court concluded that Mahdawi had raised "a 'substantial claim' of First Amendment retaliation" because the government took an "adverse action" against him based on "protected speech." *Mahdawi*, 781 F. Supp. 3d at 230-31. "Such an act," it said, "would be a violation of the Constitution." *Id.* at 228. The holding of the district court is not limited to Mahdawi's conditions of confinement but challenges the government's decision to commence removal proceedings. The district court decided that the Constitution prohibits the government from taking an "adverse action" based on its reasons for removing Mahdawi; that decision impermissibly resolved legal questions arising from "the decision to seek removal"—and it called the removal into question. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (alteration omitted) (quoting *Jennings*, 583 U.S. at 294 (plurality opinion)).

Similarly, the district court in *Ozturk* observed that the "basis offered by the government to justify Ms. Ozturk's arrest is an assessment by the Department of Homeland Security ('DHS') and ICE that she 'had been involved in associations that "may undermine U.S. foreign policy by creating a hostile environment for Jewish students and indicating support for a designated terrorist organization" including co-authoring an op-ed that found common cause with an

---

[6] *See Mahdawi*, 781 F. Supp. 3d at 231 ("The fact sheet also promises to deport or revoke the student visas of 'all Hamas sympathizers on college campuses, which have been infested with radicalism like never before.' It threatens: 'To all the resident aliens who joined the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you.'") (citation omitted).

organization that was later temporarily banned from campus.'" *Ozturk v. Trump*, No. 25-CV-374, 2025 WL 1420540, at *3 (D. Vt. May 16, 2025) (quoting Memorandum from the National Security Division of the Department of State at 6, *Ozturk v. Trump*, No. 25-CV-374 (D. Vt. Apr. 11, 2025), ECF No. 91-1). But that assessment was not made to justify Ozturk's arrest. It was the justification by which the State Department "approved revocation" of Ozturk's "F-1 visa." Memorandum from the National Security Division of the Department of State, *supra*, at 6. The district court nevertheless relied on this justification—alongside "statements by the Secretary of State describing the purpose of the government's actions"—to conclude that Ozturk had a substantial "First Amendment retaliation claim" based on "a causal connection between protected speech by Ms. Ozturk and adverse action by the government." *Ozturk*, 2025 WL 1420540, at *6-7.

The district courts in these habeas proceedings have scrutinized the government's reasons for commencing removal proceedings and declared those reasons to be unlawful. It makes sense in these cases that the arguments against detention cannot be separated from the arguments against removal; the government had no reason aside from its decision to commence removal proceedings for detaining the petitioners. But that also means that the district courts decided "questions of law and fact, including interpretation and application of constitutional and statutory provisions," that have arisen from the government's actions "to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Congress has barred the use of habeas to mount these challenges to the removal proceedings, even "indirectly." *Delgado*, 643 F.3d at 55. The jurisdictional bar applies to the "questions of law" the district courts have decided; it does not

depend on a formal distinction between the discrete actions the government has taken to remove the aliens. 8 U.S.C. § 1252(b)(9).[7]

## C

Third, § 1252(a)(2)(B) provides that "no court shall have jurisdiction to review" any judgment regarding the granting of discretionary immigration relief or "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B). Even if there were any remaining ambiguity as to whether an alien could challenge the decision to detain him during removal proceedings—on the dubious theory that the detention was somehow neither part of the decision to commence removal proceedings nor an action taken to remove the alien—Congress added this third jurisdictional bar to clarify that courts may not entertain a challenge to a discretionary decision under the INA. The motions panel concluded that § 1252(a)(2)(B) was unlikely to bar jurisdiction here because the statute that authorizes the Attorney General to decide where a detainee is held, 8 U.S.C. § 1231(g)(1), "uses the obligatory 'shall' rather than a permissive 'may.'" *Ozturk*, 136 F.4th at 395.

---

[7] The other concurrence insists that "§ 1252(b)(9) poses no barrier" because the "petitioners do not challenge orders of removal." *Post* at 9. But § 1252(b)(9) is not limited to direct challenges to orders of removal. It bars review of "all questions of law and fact … arising from any action taken or proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(9). Section 1252(b)(9) is an "unmistakable 'zipper' clause" that "channels judicial review of *all*" of the "decisions and actions of the INS." *Reno*, 525 U.S. at 483.

That conclusion was incorrect because the statute confers discretion on the Attorney General to decide which places of detention are "appropriate." 8 U.S.C. § 1231(g)(1). And the Attorney General "may expend" appropriated funds "to acquire, build, remodel, repair, and operate facilities." *Id.*

More important, the statute that authorizes the detention pending removal proceedings in the first place clearly confers discretion. "On a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id*. § 1226(a) (emphasis added). Additionally, except when detention is mandatory based on the alien's criminal history, "pending such decision, the Attorney General … *may* continue to detain the arrested alien." *Id.* (emphasis added). Indeed, the motions panel acknowledged that the detention decision "was not directed by § 1226(a)" and "not mandated by the mere fact that [the petitioner's] case was under adjudication." *Ozturk*, 136 F.4th at 398 (emphasis omitted); *see also Mahdawi*, 136 F.4th at 451. That means it was a discretionary decision under the INA that is insulated from judicial review. But the motions panel authorized review of the decision nonetheless.

The other concurrence relies on our decision in *Nethagani v. Mukasey* for the proposition that "when a statute authorizes the Attorney General to make a determination, but lacks additional language specifically rendering that determination to be within his discretion … the decision is not one that is 'specified to be in the discretion of the Attorney General' for purposes of § 1252(a)(2)(B)(ii)." 532 F.3d 150, 154-55 (2d Cir. 2008) (alteration omitted). Our decision in *Nethagani* implicates another circuit split, *see, e.g.*, *Estrada-Martinez v. Lynch*, 809 F.3d 886, 892 n.2 (7th Cir. 2015) (disagreeing with *Nethagani*), over a different line of cases that the

Supreme Court has addressed, *see Wilkinson v. Garland*, 601 U.S. 209, 217 (2024) (explaining that the application of a "statutory standard" to "a given set of facts is reviewable as a question of law under § 1252(a)(2)(D)").[8] In any event, *Nethagani* does not apply here.

In *Nethagani*, we considered "the two provisions [that] authorize the Attorney General (respectively) to 'determine' or 'decide' that the alien was convicted of a particularly serious crime." 532 F.3d at 154 (alterations omitted) (quoting 8 U.S.C. § 1158(b)(2)(A); *id.* § 1231(b)(3)(B)). That determination or decision involves the application of statutory standards "for crimes that are particularly serious *per se*" and of standards set forth in BIA precedent. *Id.* at 155. We agreed with the Third Circuit that "[t]he terms 'decide' or 'determine' are not, standing alone, sufficient to 'specify' discretion" because those terms describe "the application of facts to principles" that an adjudicator would undertake. *Alaka v. Att'y Gen.*, 456 F.3d 88, 96 (3d Cir. 2006) (alterations omitted); *see Nethagani*, 532 F.3d at 155 (agreeing with *Alaka*).

These cases look nothing like that one. Here, § 1226(a) expressly provides that an alien "*may* be arrested and detained" and that "the Attorney General … *may* continue to detain the arrested alien." 8 U.S.C. § 1226(a) (emphasis added); *see Alaka*, 456 F.3d at 98 (recognizing that discretion has been "'specified' sufficiently to bar our review when" the statute states that the official "'may' (rather than 'shall')" undertake the action). The statute not only authorizes a

---

[8] *See also Dor v. Garland*, 46 F.4th 38, 43-44 (1st Cir. 2022) (explaining that "what standard governs 'particularly serious crime' determinations for non-aggravated felons in deportation proceedings" is a question of law under § 1252(a)(2)(D) because it involves "the application of a legal standard to undisputed or established facts").

decision that is "so subjective as to provide no meaningful legal standard," *Alaka*, 456 F.3d at 99, but the statute provides no legal standard to limit the Attorney General's discretion at all. "As a result, the government's decision to detain is one of the 'discretionary determinations' that the INA provides 'some measure of protection' from judicial intervention." *Suri*, 2025 WL 1806692, at *11 (Wilkinson, J., dissenting) (quoting *Reno*, 525 U.S. at 485).

## D

The motions panel's evasion of the three separate limitations on our jurisdiction has resulted in the possibility of contradictory rulings from the federal courts of appeals in the same case. In the Second Circuit, habeas proceedings have proceeded to challenge the petitioners' detentions, and the Second Circuit has essentially decided that it was unlawful to detain the petitioners in order to remove them.[9] But removal proceedings continue in the Fifth Circuit, and the Fifth Circuit may decide that the removals are lawful. So even though the legal arguments are the same, and Congress has authorized detention whenever the removal proceedings are permissible,[10] the result in these cases may be that it is unconstitutional for the

---

[9] *See Ozturk*, 136 F.4th at 399 ("She asserts that the government arrested and detained her to prevent speech with which it disagrees. Such an act would be a violation of the Constitution."); *Mahdawi*, 136 F.4th at 452 ("He asserts that the government arrested him to punish speech with which it disagrees. But doing so would violate the Constitution.").

[10] *See* 8 U.S.C. § 1226(a); *Jennings*, 583 U.S. at 317 (Thomas, J., concurring in part and concurring in the judgment) ("As the Court explains today, Congress either mandates or permits the detention of aliens for the entire duration of their removal proceedings.").

14

government to detain aliens pending removal for a reason that allows the government to remove them.

Congress channeled judicial review of removal proceedings into a single proceeding to avoid such an incoherent result. By enacting § 1252(b)(9), "Congress plainly intended to put an end to the scattershot and piecemeal nature of the review process that previously had held sway in regard to removal proceedings." *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (citing H.R. Rep. No. 109-72, at 174). It designed the statutes "to consolidate and channel review of *all* legal and factual questions that arise from the removal of an alien into the administrative process, with judicial review of those decisions vested exclusively in the courts of appeals." *Id*.

It is reasonable to conclude, as we have said, that the jurisdictional bars do not prevent the adjudication of a claim that is "unrelated to any removal action or proceeding," *Delgado*, 643 F.3d at 55 n.3 (quoting *Ruiz v. Mukasey*, 552 F.3d 269, 274 n.3 (2d Cir. 2009)), or "independent of challenges to removal orders," H.R. Rep. No. 109-72, at 176. But when the petitioners are "challenging the decision to detain them in the first place" because the removal proceedings are allegedly unlawful, that is a challenge to the removal proceedings that Congress has barred. *Jennings*, 583 U.S. at 294 (plurality opinion); *see also id.* at 314 (Thomas, J., concurring in part and concurring in the judgment) ("§ 1252(b)(9) removes jurisdiction over [aliens'] challenge to their detention.").

## E

The other concurrence dismisses as "frivolous" the government's argument that it has suffered an irreparable injury because it has been prevented from exercising its statutory authority. *Post* at 10. The motions panel similarly insisted that "the government

has not demonstrated in what way it is being enjoined by a court from effectuating statutes enacted by representatives of its people." *Mahdawi*, 136 F.4th at 454 (internal quotation marks and alteration omitted).

That argument is bizarre. Congress has authorized the executive branch to decide whether and where to detain an alien pending removal proceedings. *See* 8 U.S.C. §§ 1226(a), 1231(g)(1). Judicial orders entered in defiance of jurisdictional limitations—based on the dubious conclusion that detentions pending ongoing removal proceedings are unlawful—have now prevented the government from exercising that statutory authority. The Supreme Court has "long held that, 'any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay) (alteration omitted) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *accord New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

The motions panel decided that judicial interference with the detention does not matter because "nothing prevents the government from continuing … the removal proceedings it has commenced." *Ozturk*, 136 F.4th at 402; *Mahdawi*, 136 F.4th at 455. But "detention is necessarily a part of this deportation procedure." *Demore*, 538 U.S. at 524 (alteration omitted) (quoting *Carlson v. Landon*, 342 U.S. 524, 538 (1952)). Congress has authorized the executive branch to detain an alien pending immigration proceedings to provide "time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final

16

decision can be made." *Jennings*, 583 U.S. at 286 (majority opinion). The detention "serves the purpose" of preventing deportable aliens "from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 528. The Supreme Court "has recognized detention during deportation proceedings as a constitutionally valid *aspect of the deportation process*." *Id.* at 523 (emphasis added).

In these cases, the government exercised its statutory authority to implement removal proceedings that involved detention of the aliens while the proceedings were ongoing. "[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018).

## II

The foregoing considerations justify *en banc* rehearing in these cases because the motions panel decided questions of exceptional importance in a way that conflicts with the decisions of other circuits. *See* Fed. R. App. P. 40(b). At this stage of the litigation, however, the only appellate proceedings have involved the decisions of a motions panel to deny motions for stays pending appeal based on the government's jurisdictional arguments. Those decisions will not constrain a subsequent merits panel—in this case or in others.

## A

"Nearly every Circuit, including this one, has held that a merits panel may revisit a motions panel's decision on jurisdiction." *Hassoun v. Searls* (*Hassoun II*), 976 F.3d 121, 134 (2d Cir. 2020) (internal quotation marks and alterations omitted); *see also Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 95 (2d Cir. 2013) ("A merits panel may revisit a decision made by a motions panel."). "Because law of the case

17

doesn't bind an appellate court even as to final orders, it follows that the doctrine is even less binding in the context of interlocutory orders." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999). We have offered "[s]everal reasons" for that conclusion:

> First, … the law of the case doctrine is discretionary, not mandatory. The doctrine expresses, in shorthand fashion, a practice of courts generally not to reconsider that which has already been decided. But it does not purport to be a legally binding limitation on the court's authority to reconsider such matters. Second, a motions panel's decision is based on an abbreviated record and made without the benefit of full briefing by the parties, which may result in a less than thorough exploration of the issues. Third, reexamination of a question regarding our jurisdiction is especially important whenever there is reason to believe that it may be lacking.

*Id.* (citation omitted). That is how the circuit courts have generally understood the effect of a decision of a motions panel on the law of the case:

> Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court. The same approach applies to similar preliminary relief rulings, as attachment or an appellate injunction pending appeal. A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal, however, does become the law of the case for further proceedings in the trial court on remand and in any subsequent appeal.

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478.5 (3d ed. 2025) (footnotes omitted). An

"initial ruling on appealability … often is made by a motions panel, frequently without the benefit of the arguments that may be made after full briefing and with the understanding that reconsideration by the merits panel is appropriate." *Id.*

We and other circuits have relied on these considerations to conclude that the decision of a motions panel is "without precedential authority" on a subsequent panel. *Kaplan v. Rand*, 192 F.3d 60, 68 (2d Cir. 1999).[11] The opinion of a motions panel resolving a motion for a stay pending appeal predicts the likelihood of success before a merits panel that will itself resolve the merits.[12] Even when an opinion of the merits panel has failed to materialize—because the case became moot before the merits were addressed—we have declined to vacate an earlier opinion of a motions panel addressing a stay motion because there were "no legal consequences of the court's opinion for the parties, in terms of preclusion or even precedent." *Hassoun II*, 976 F.3d at 134. Other circuits have similarly concluded that "the necessarily tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case."

---

[11] *See also Kell v. Benzon*, 925 F.3d 448, 462 n.12 (10th Cir. 2019) ("Because *Kozeny* was issued by a two-judge motions panel, we would ordinarily discount the opinion's precedential value.") (discussing *In re Kozeny*, 236 F.3d 615, 619-20 (10th Cir. 2000)); *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014) ("[T]he decisions of motions panels are generally interlocutory in nature (and, thus, not strictly binding upon subsequent panels).").

[12] *See SEC v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 161 (2d Cir. 2012) ("The merits panel is, of course, free to resolve all issues without preclusive effect from this ruling. … [O]ur ruling, to the extent it addresses the merits, finds only that the movant has shown a likelihood of success and does not address the ultimate question to be resolved by the merits panel—whether the district court's order should in fact be overturned.").

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020). Those circuits have explained that "[a]n order granting a stay pursuant to F.R.A.P. 8 is not a final adjudication of the merits of the appeal" and, "[t]o the extent that it deals with the merits of the appeal, it is only a prediction as to the likelihood of how they will be resolved." *FTC v. Food Town Stores, Inc.*, 547 F.2d 247, 249 (4th Cir. 1977).

## B

The other concurrence suggests that the decision of a motions panel might create "dispositive precedent" such that opinions from our shadow docket of emergency motions will preclude any future merits panels from reconsidering the same issues with full briefing on a full record. *Post* at 16. That is incorrect.

The Supreme Court has explained that "interim orders are not conclusive as to the merits" but only "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). A "stay order is not a ruling on the merits, but instead simply stays [a lower-court] injunction *pending a ruling on the merits*." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring in grant of applications for stays). The point is to allow the court "to decide the merits in an orderly fashion—after full briefing, oral argument, and our usual extensive internal deliberations—and ensure that we do *not* have to decide the merits on the emergency docket." *Id*. A "decision on the interim legal status" of some action might "often constitute a form of precedent (*de jure* or *de facto*) that provides guidance … during the years-long interim period until a final decision on the merits." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2570 (2025) (Kavanaugh, J., concurring). But the decision to grant or to

deny interim relief during that period does not resolve the legal questions.

The Justices have sometimes, "in denying emergency relief, stressed that 'equitable considerations' counseled against preliminary relief," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 n.10 (2007) (alteration omitted) (quoting *Bustop, Inc. v. Bd. of Ed.*, 439 U.S. 1380, 1383 (1978) (Rehnquist, J., in chambers)), and the Court has emphasized that "[t]he propriety of preliminary relief and resolution of the merits are of course 'significantly different' issues," *id.* (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 393 (1981)). We understand the scope of a stay decision in light of the traditional equitable principles that apply "whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) ("[T]he equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act."). [13] Those principles are "heavily influenced by the division of jurisdiction" in which the Court of Chancery would provide "preliminary relief in cases where the

---

[13] The Supreme Court has explained that "[a]n appellate court's power to hold an order in abeyance while it assesses the legality of the order has been … preserved in the grant of authority to federal courts" under the All Writs Act, *Nken*, 556 U.S. at 426 (citing 28 U.S.C. § 1651(a)), which "invests a court with a power essentially equitable," *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999). The Act authorizes a federal court to "issue all writs necessary or appropriate in aid of their respective jurisdictions" but only insofar as the issuance is "agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

21

final decision on the merits was reserved to the courts of law."[14] Under those circumstances, when the Court of Chancery decided whether a party had a likelihood of success on the merits, it was not deciding a legal question but instead predicting what the law courts would do. The analysis reflected "the awkwardness of protecting common law rights in a court unqualified to declare whether the rights existed. The theme was comity, not premature adjudication."[15] "The rationale for *predicting* the strength of the plaintiff's case rather than *adjudicating* it on the spot" extended "from a reluctance to pass on common law rights to an unwillingness to reach the merits without a full hearing"; as a result, "even in cases where Chancery itself ultimately would decide the merits, the court began to *predict* rather than *assess* the merits" when deciding whether to grant preliminary relief.[16] The judges explained "that avoiding premature decision was an end in itself, perhaps even the court's 'great object.'"[17]

In the context of a stay pending appeal, we continue to describe the determination of a likelihood of success as a prediction about

---

[14] John Leubsdorf, *The Standard for Preliminary Injunctions*, 91 Harv. L. Rev. 525, 527 (1978).

[15] *Id.* at 532; *see Great W. Ry. Co. v. Birmingham & Oxford Junction Ry. Co.*, 41 Eng. Rep. 1074, 1076 (Ch. 1848) ("[T]he Court will in many cases interfere and preserve property in *statu quo* during the pendency of a suit, in which the rights to it are to be decided, and *that* without expressing, and often without having the means of forming, any opinion as to such rights."); *see also Hunter v. Thomas*, 173 F.2d 810, 812 (10th Cir. 1949) ("Habeas corpus is a civil proceeding. It is a legal, not an equitable, remedy.") (footnote omitted).

[16] Leubsdorf, *supra* note 14, at 533 (emphasis added).

[17] *Id.*

what the merits panel will do rather than an independent legal determination:

> In deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel is predicting the likelihood of success of the appeal. That is, the motions panel is predicting rather than deciding what our merits panel will decide. In resolving the merits of a preliminary injunction appeal, our merits panel is deciding the likelihood of success of the actual litigation.

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021).[18] The distinctive treatment of a stay makes sense because "a stay operates upon the judicial proceeding itself. It does so either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Nken*, 556 U.S. at 428. In other words, a stay "suspend[s] judicial alteration of the status quo." *Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regul. Comm'n*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers).[19]

---

[18] Similarly, "[t]o obtain a stay pending the filing and disposition of a petition for a writ of certiorari, an applicant must show" both "a *reasonable probability* that four Justices will consider the issue sufficiently meritorious to grant certiorari" and "a fair *prospect* that a majority of the Court will vote to reverse the judgment below." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (emphasis added). Those are also predictive judgments.

[19] We might treat injunctions differently because "[a]n injunction and a stay have typically been understood to serve different purposes." *Nken*, 556 U.S. at 428. An injunction "is a means by which a court tells someone what to do or not to do" and thereby "directs the conduct of a party, and does so with the backing of its full coercive powers." *Id.* The applicable case law accordingly provides that injunctive relief "may only be awarded upon a clear showing that the plaintiff is *entitled* to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (emphasis added). The approach accords with the

23

As a result, "a stay order actually says nothing about the parties' legal rights."[20] The purpose of the stay decision is "to preserve the appellate court's role to decide the appeal (regardless of which way the court rules)" and to "provid[e] meaningful judicial review to parties (again, regardless of which way the court rules)."[21] That purpose often requires the motions panel "to risk the improper deprivation of rights in the meantime"—that is, to *discount* what might be the better view of the merits in light of the paramount remedial considerations.[22]

---

concern that, "if courts dispense injunctions without regard to the merits, plaintiffs who are in the wrong will be just as likely to secure relief as those who have rights." Leubsdorf, *supra* note 14, at 547. But "Professor Leubsdorf did not apply his theory" requiring direct consideration of the merits "to stays pending appeal." Jill Wieber Lens, *Stays of Injunctive Relief Pending Appeal: Why the Merits Should Not Matter*, 43 Fla. St. U. L. Rev. 1319, 1358 n.165 (2016).

[20] Lens, *supra* note 19, at 1340.

[21] *Id.*; *see Hadden v. Dooley*, 74 F. 429, 431 (2d Cir. 1896) ("[W]hen the questions which naturally arise upon the transactions make them a proper subject for deliberate examination, if a stay of proceedings will not result in too great injury to the defendants, it is proper to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined by evidence and proofs which have the merit of accuracy.") (internal quotation marks omitted).

[22] Lens, *supra* note 19, at 1340; *see NetChoice, LLC v. Fitch*, No. 25-A-97, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay) (concurring in the denial of an "application for interim relief" because even though the applicant had "demonstrated that it is likely to succeed on the merits," it had not "sufficiently demonstrated that the balance of harms and equities favors it at this time").

So when a motions panel decides to grant or to deny a stay pending appeal, it decides whether to preserve the status quo ante based on a prediction of what the merits panel will decide. It is making a predictive judgment rather than a law-declaring one.

Denying those predictive judgments binding effect not only respects the nature of the decisions but also prevents the shadow docket from overtaking our normal appellate procedures. Some jurists have worried that "forecasting the merits risks prejudging them," *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024), or that a preliminary merits ruling "can create a lock-in effect" that may "predetermine the case's outcome … on the underlying merits question," *Labrador*, 144 S. Ct. at 934 (Kavanaugh, J., concurring in the grant of stay). Treating the stay decisions as having conclusively resolved the legal questions would not merely create the *risk* of prejudgment; it would institutionalize prejudgment by binding future panels to the prediction made in the course of evaluating a motion for a stay. That is the wrong approach:

> Lock-in would be less concerning if there was little chance of error in the initial decision by the motions panel. But the chance of error is significant simply due to the circumstances. Those circumstances include a lack of familiarity with the case, less than full appellate briefing, and possibly no hearing, all within a "compressed timeframe not conducive to deliberate decision-making."[23]

In fact, "[i]t is not uncommon to think and decide differently when one knows more." *CASA*, 145 S. Ct. at 2572 (Kavanaugh, J., concurring); *see also Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (Alito, J.,

---

[23] Lens, *supra* note 19, at 1345 (footnote omitted) (quoting Kevin J. Lynch, *The Lock-In Effect of Preliminary Injunctions*, 66 Fla. L. Rev. 779, 800 (2014)).

dissenting from the denial of the application for stay) ("[A]s is almost always the case when we decide whether to grant emergency relief, I do not rule out the possibility that further briefing and argument might convince me that my current view is unfounded."). The other concurrence agrees that legal questions are best decided with "the benefit of adversarial briefing and argument," and it objects to the "discussion of such complicated issues with little briefing and no argument." *Post* at 20-21. We resolve legal questions in the light of our normal appellate procedures rather than in the shadows of the emergency motions docket.

## C

The other concurrence simultaneously suggests that (1) it is "not worthy of *en banc* review" to reconsider the decision of a motions panel on a stay pending appeal, and (2) the decision of the motions panel might bind every future merits panel to which the same legal issues are presented. *Post* at 3. Those propositions cannot both be true. If the other concurrence were correct that the stay opinions in these cases "created dispositive precedent," *id.* at 16, that would plainly make the cases worthy of *en banc* review. If, however, "this [c]ourt has never reviewed *en banc* a motions panel decision on a stay pending appeal," *id.* at 3, that is a strong clue that we have not previously regarded such decisions as binding.[24]

---

[24] *Cf. N.C. Utilities Comm'n v. FCC*, 552 F.2d 1036, 1045 (4th Cir. 1977) (explaining that "the rule of interpanel accord serves … to allocate decisionmaking power between coequal panels subject to reversal by the Court of Appeals en banc" but when "en banc review … is prevented … strict application of the rule of interpanel accord seems unwarranted"); *Thomas v. Bryant*, 938 F.3d 134, 189 (5th Cir. 2019) (Willet, J., dissenting) ("[I]f the full court cannot take it en banc, then perhaps the other members of this court—who never had the opportunity to reject or bless

We have not. Despite all the recent high-profile discussion of the precedential effect of decisions issuing interim emergency relief, the other concurrence rests its case to the contrary only on tendentious readings of scattered language in a couple of older cases.

First, the other concurrence suggests that we decided that all shadow docket decisions were binding in a two-sentence holding in 2003. In *Khan v. Ashcroft*, 352 F.3d 521 (2d Cir. 2003), our court considered whether a prior decision called *Domond* remained valid following the decision of the Supreme Court in *St. Cyr*. We explained that it did. We said that "[w]e see nothing in *St. Cyr II* that detracts from the result or reasoning of *Domond*," and "the same considerations and principle that led us to reach a different decision in *Domond* than we had reached in *St. Cyr I* lead us to conclude that *Domond* remains good law in the wake of the Supreme Court's decision in *St. Cyr II*." *Id.* at 523-24.[25] The *Khan* panel then noted that a motions panel had previously granted a motion to vacate a stay of removal of an alien and, in doing so, decided "at least for purposes of considering the pending motion to lift the stay, that *Domond* remains

what the panel did here—should not be bound by it in a future case."), *on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020).

[25] Given that extensive discussion, "[t]he opinion's discussion elsewhere" about a motions panel's treatment of *Domond* was "thus 'unnecessary to the disposition of the case before it.'" *United States v. Johnson*, 143 F.4th 184, 186 (2d Cir. 2025) (Lohier, J., concurring in the denial of rehearing en banc) (quoting *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 508 (2d Cir. 1996)). I agree that "[w]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Id.* at 190 (Menashi, J., concurring in the denial of rehearing en banc) (quoting *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949)). But several members of our court have rejected that conclusion. *See id.* at 195 n.1 (Merriam, J., dissenting from the denial of rehearing en banc).

binding authority in this Circuit." 352 F.3d at 524 (quoting *Mohammed v. Reno*, 309 F.3d 95, 103 (2d Cir. 2002)). The stay of removal in *Mohammed* was odd in that the district court had also decided that the alien was not entitled to habeas relief. And the motions panel was uncertain that the appropriate way to resolve the propriety of the stay was by motion rather than through a normal appeal.[26]

When the question of the validity of *Domond* arose again in *Khan*, the alien argued "that the words 'at least for purposes of considering the pending motion to lift the stay' indicate that the *Mohammed* panel 'did not intend for other courts to be bound by its decision.'" 352 F.3d at 524. Our court responded that "[w]e reject the contention that the *Mohammed* panel's view of *Domond* was somehow intended to be less than precedential." *Id*. Neither the court nor the parties addressed whether the decision of a stay panel binds a subsequent panel. The litigation focused on what the *Mohammed* panel intended by its qualifying phrase "at least for purposes of considering the pending motion to lift the stay." On the assumption that the import of that phrase is what mattered, the *Khan* court decided that the phrase did not change the fact that "[t]he question of *Domond*'s continued validity was essential to an evaluation of Mohammed's entitlement to a stay." *Id*. That sounds reasonable to me, but the unquestioned assumption is what matters here.

Second, the other concurrence notes that we said in *Hassoun II* that "[v]acatur pursuant to *Munsingwear* is an exception to the regular

---

[26] *See Mohammed*, 309 F.3d at 98 n.2 ("Neither party has considered whether the appropriate procedure for challenging an order granting a stay pending appeal is a motion to lift the stay or an appeal from the order. In the absence of attention to the issue, we will assume that the Government's motion is a suitable device.").

procedure for establishing and revising precedents." 976 F.3d at 135. It suggests that the use of the word "precedents" means that we decided stay panel decisions are binding. But when we vacate a decision pursuant to *Munsingwear*, we are normally vacating the decision of a district court that has become moot pending appeal. The decision of a district court is a "precedent" in that it is a judicial decision, but no decision of a district court is ever binding as a precedential matter.[27] In fact, for that proposition *Hassoun II* cited the decision of the Supreme Court in *U.S. Bancorp Mortgage Company v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994), which in turn quoted Justice Stevens:

> Judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.

*Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 40 (1993) (Stevens, J., dissenting). Sure enough, Justice Stevens was describing what should happen when the "parties to a case pending on appeal ask the appellate court to vacate the judgment *entered by the trial court*." *Id.* at 34 (emphasis added). No one thinks judgments entered by trial courts are binding on other courts. In this context, "precedents" simply means judicial decisions.

Third, the other concurrence thinks it is some kind of gotcha that I myself have cited the opinion of a stay panel in a subsequent opinion. *See Chen v. Garland*, 43 F.4th 244, 250 (2d Cir. 2022) ("As

---

[27] *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") (quoting 18 Moore's Federal Practice § 134.02[1] [d] (3d ed. 2011)).

always, 'because we have an obligation to assure ourselves of jurisdiction under Article III, we begin there.'") (alteration omitted) (quoting *Hassoun v. Searls* (*Hassoun I*), 968 F.3d 190, 195 (2d Cir. 2020)). But I have also cited summary orders, out-of-circuit decisions, district court decisions, and law review articles. That does not mean that I regard all those authorities as binding precedents. The quotation of a stay decision for this truism about jurisdiction does not mean that the court was bound by it.[28]  It means that the panel concluded that what the stay opinion said was correct.

Fourth, the other concurrence argues that when *Hassoun II* said that the opinion of a stay panel had "no legal consequences … for the parties, in terms of preclusion or even precedent," 976 F.3d at 134, it must have intended "precedent" to be limited only to party-specific consequences such as preclusion. That is not what it meant. But that is an especially weird argument for the other concurrence to make because it simultaneously argues that the very same word in the next three sentences of the same paragraph must refer to "precedent" as binding for future cases. *See post* at 17-19. That is a lot of weight to put on a single word that apparently means radically different things from sentence to sentence.

The focus of a *Munsingwear* analysis is on the effect for the parties, but that can also include a precedential effect. *See Hassoun II*, 976 F.3d at 133 (noting that, "as a repeat player before the courts," the government "has an institutional interest in vacating adverse rulings of potential precedential value") (quoting *Arevalo v. Ashcroft*, 386 F.3d 19, 20-21 (1st Cir. 2004)). In *Hassoun II*, we explained that "a motions panel's jurisdictional ruling is 'persuasive, but not binding,'" *id.* at 134

---

[28]  In this instance, however, *Hassoun I* was merely quoting the decision of the Supreme Court in *Trump v. Hawaii*, 585 U.S. 667, 697 (2018).

(quoting *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020)), and that the "stay-panel opinion cannot spawn binding legal consequences regarding the merits of the case," *id.* (quoting *Democratic Exec. Comm.*, 950 F.3d at 795).

### D

Even if *Hassoun II* were incorrect about the binding effect of the decision of a motions panel, that would not end the matter. We further explained that if the decision of a motions panel "*will* be binding within th[e] circuit with respect to future requests for similar preliminary relief" or have other "legal consequences" for the government or another party, vacatur would be appropriate. *Id.* at 135 n.9 (emphasis added); *accord Democratic Exec. Comm.*, 950 F.3d at 795 n.2 ("[I]n a rare case where a party could identify any ruling within a stay-panel opinion that *would* have precedential effect beyond the preliminary decision on the stay, then vacatur may be warranted if the case were to become moot."). Under the case law, therefore, either the opinion of a motions panel will not bind future panels as law of the circuit or a party affected by the precedential effect of such an opinion would be entitled to vacatur should the case become moot before the merits are decided. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950); *Azar v. Garza*, 584 U.S. 726, 730-31 (2018) (vacating an order of the court of appeals denying a motion for a stay pending appeal).

These considerations affect whether the *en banc* court will rehear the stay decisions. In these cases, the government sought the stays on a brief timeline and only on the basis of its jurisdictional arguments.[29] The case may look different to a merits panel "with[]

---

[29] *See* Oral Argument Audio Recording, *Mahdawi v. Trump*, No. 25-1113, at 7:07 (the government explaining that its arguments are "based on the

the benefit of the arguments that may be made after full briefing." 18B Wright, Miller & Cooper, *supra*, § 4478.5. Because merits briefs have been filed, the merits appeals will be heard in tandem on an expedited timeline, and the stay decisions will not bind the panel that will conclusively decide the issues, it is not unreasonable for the *en banc* court to await a decision on the merits.

*　　*　　*

Our protocols for conducting a rehearing *en banc* appear to formally but not practically allow for the reconsideration of a stay decision before the merits appeal is heard. But that obstacle is a problem only if the stay decision will control how the issues are decided on the merits.[30] The opinions of the motions panel denying the stays wrongly decided questions of exceptional importance about the scope of our jurisdiction. But those opinions will not prevent the court from arriving at a correct understanding of the applicable jurisdictional limits.

---

jurisdictional bars rather than on the underlying merits" because the merits were not at issue "in these proceedings right now before you"); *id.* at 6:44 (the government explaining that "[w]e have not taken a position" on the constitutional issues).

[30]  *See supra* note 24.